**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | | |
|---|---|---|
| Paragould Light & Water Commission | ) | |
| (d/b/a – Paragould Light, Water & | ) | |
| Cable – PLWC); City of Poplar Bluff | ) | |
| Municipal Utilities; Kennett Board of | ) | |
| Public Works; City of Piggott-AR | ) | |
| Municipal Light Water and Sewer; City | ) | |
| of Malden - Board of Public Works; | ) | |
| Evergy Kansas Central, Inc.; | ) | |
| Evergy Metro, Inc.; Evergy Missouri West, | ) | |
| Inc.; American Electric Power Service | ) | |
| Corporation on behalf of its affiliates Public | ) | |
| Service Company of Oklahoma and | ) | No. 23-1133 |
| Southwestern Electric Power Company; | ) | |
| Xcel Energy Services Inc. on behalf of its | ) | |
| operating company affiliate Southwestern | ) | |
| Public Service Company; Western Farmers | ) | |
| Electric Cooperative, | ) | |
| | ) | |
| *Petitioners*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Federal Energy Regulatory Commission, | ) | |
| | ) | |
| *Respondent*. | ) | |

**AMENDED PETITION FOR REVIEW**

Petitioners file this Amended Petition for Review to add FERC's newly-

amended order to their original petition.

1

On May 22, 2023, Petitioners filed their original Petition for Review in this case (No. 23-1133). That Petition listed these Commission orders as those to be reviewed:

1. *Southwest Power Pool, Inc.*, Order on Initial Decision, Docket No. ER18-99-005, 182 FERC ¶ 61,141 (Feb. 28, 2023) ("Order")

2. *Southwest Power Pool, Inc.,* Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, Docket No. ER18-99-007, 183 FERC ¶ 62,048 (May 1, 2023).

All initial filings were timely made. The Commission moved for, and received, a 30-day extension of time to file its certified index to the record, which is now due August 9. Order Granting Motion to Extend Time, Dkt. 2005200 (June 27, 2023).

On July 5, 2023, the Commission issued an order amending and modifying its February 28, 2023 Order. The amended order reaches the same conclusion and modifies some of the reasoning in the February 28 Order.

Petitioners understand that under *Sierra Club v. FERC*, 68 F.4th 630, 646 (D.C. Cir. 2023), they are "under no obligation to file a new petition for review challenging [this] additional order." Properly viewed, the latest order is "an amendment" to the February 28 Order specified in the earlier petition. *Id.* Even so, to make clear that Petitioners "intend to seek review not only of the [February 28 Order and May 1 Notice] but also of any amendment to it," Petitioners hereby amend their Petition for Review to add the following order (also attached):

3. *Southwest Power Pool, Inc.*, Order Addressing Arguments Raised on Rehearing, Docket No. ER18-99-007, 184 FERC ¶ 61,004 (July 5, 2023).

All other statements in the initial Petition for Review remain correct and adequate.

Dated: July 17, 2023

Respectfully submitted,

*/s/ Matthew A. Fitzgerald*

Robert A. Weishaar, Jr.
MCNEES WALLACE & NURICK LLC
1200 G Street NW, Suite 800
Washington, DC 20005
T: (202) 898-0688
bweishaar@mcneeslaw.com

Kenneth R. Stark
MCNEES WALLACE & NURICK LLC
100 Pine Street
Harrisburg, PA 17101
T: (717) 237-8000
kstark@mcneeslaw.com

*Counsel for Paragould Light Water & Cable, Paragould Light Commission, Poplar Bluff Municipal Utilities, Kennett Board of Public Works, City of Piggott Municipal Light Water & Sewer, and City of Malden Board of Public Works*

Matthew A. Fitzgerald
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
T: (804) 775-4716
mfitzgerald@mcguirewoods.com

Noel H. Symons
Carrie Mobley
MCGUIREWOODS LLP
888 16th Street NW, Suite 500
Washington, D.C. 20006
T: (202) 857-2929
nsymons@mcguirewoods.com
cmobley@mcguirewoods.com

Patrick Smith
Corporate Counsel
THE EVERGY COMPANIES
818 S. Kansas Avenue, P.O. Box 889
Topeka, KS 66601
T: (785) 575-8362
Patrick.Smith@westarenergy.com

*Counsel for the Evergy Companies and on behalf of all Petitioners*

3

Daniel E. Frank
Allison E. S. Salvia
EVERSHEDS SUTHERLAND (US) LLP
700 Sixth Street, NW, Suite 700
Washington, DC 20001-3980
T: (202) 383-0100
danielfrank@eversheds-sutherland.com
allisonsalvia@eversheds-sutherland.com

*Counsel for Western Farmers Electric
Cooperative*

Timothy T. Mastrogiacomo
Lead Assistant General Counsel
XCEL ENERGY SERVICES INC.
701 Pennsylvania Avenue NW, Suite 250
Washington, D.C. 20004
T: (202) 661-4481
tim.t.mastrogiacomo@xcelenergy.com

*Counsel for Xcel Energy Services Inc. on
behalf of its operating company affiliate
Southwestern Public Service Company*

Shaun M. Boedicker
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue N.W.
Washington, D.C. 20036
T: (202) 429-3000
sboedicker@steptoe.com

*Counsel for American Electric Power
Service Corporation, on behalf of its
affiliates, Public Service Company of
Oklahoma and Southwestern Electric
Power Company*

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| Paragould Light & Water Commission (d/b/a – Paragould Light, Water & Cable – PLWC); City of Poplar Bluff Municipal Utilities; Kennett Board of Public Works; City of Piggott-AR Municipal Light Water and Sewer; City of Malden - Board of Public Works; Evergy Kansas Central, Inc.; Evergy Metro, Inc.; Evergy Missouri West, Inc.; American Electric Power Service Corporation on behalf of its affiliates Public Service Company of Oklahoma and Southwestern Electric Power Company; Xcel Energy Services Inc. on behalf of its operating company affiliate Southwestern Public Service Company; Western Farmers Electric Cooperative, <br><br> *Petitioners*, <br><br> v. <br><br> Federal Energy Regulatory Commission, <br><br> *Respondent*. | No. 23-1133 |

**CORPORATE DISCLOSURE STATEMENTS**

Under Rule 26.1 of the Federal Rules of Appellate Procedure ("FRAP") and D.C. Circuit Rule 26.1, Petitioners hereby submit their respective corporate disclosure statements. Petitioners represent a broad array of municipal entities and transmission owners located within the service territory of Southwest Power Pool,

5

Inc. ("SPP") that seek to ensure just and reasonable rates in SPP pricing Zone 10. Petitioners were active participants in the Commission proceedings in which the orders subject to review were issued and sought rehearing of the Commission's Order.  Petitioners and/or the stakeholders they represent are subject to, and will be affected by, the orders under review.

### CORPORATE DISCLOSURE STATEMENT OF THE EVERGY COMPANIES

Evergy Kansas Central, Inc.; Evergy Metro, Inc.; and Evergy Missouri West, Inc. (collectively the "Evergy Companies"), are wholly owned subsidiaries of Evergy, Inc. ("Evergy").  Evergy is a publicly held company (stock ticker EVRG on the NASDAQ) incorporated in the state of Missouri.  Evergy has no parent company and no publicly held corporation owns 10% or more of its stock.

Evergy, through the Evergy Companies, provides electric service at retail throughout Kansas and Missouri to approximately 1.6 million customers and provides wholesale service to municipalities and cooperatives that in turn serve additional Kansas and Missouri retail customers.

*/s/ Matthew A. Fitzgerald*
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
T: (804) 775-4716
mfitzgerald@mcguirewoods.com

## CORPORATE DISCLOSURE STATEMENT OF PARAGOULD LIGHT & WATER COMMISSION (D/B/A PARAGOULD LIGHT, WATER & CABLE – PLWC)

Paragould Light & Water Commission (d/b/a Paragould Light, Water & Cable – PLWC) is a municipal entity organized under the laws of the State of Arkansas.  Paragould Light & Water Commission receives electric transmission service from SPP in SPP pricing Zone 10 and provides wholesale energy supply and related electricity services to its citizens and businesses in its municipal territory.  Paragould Light & Water Commission is adversely impacted by the rates established in the orders under review.  Paragould Light & Water Commission issues no stock, has no parent corporation, and is not owned in whole or in part by any publicly held corporation.

*/s/ Kenneth R. Stark*
MCNEES WALLACE & NURICK LLC
100 Pine Street
Harrisburg, PA 17101
T: (717) 237-8000
kstark@mcneeslaw.com

## CORPORATE DISCLOSURE STATEMENT OF CITY OF POPLAR BLUFF MUNICIPAL UTILITIES

City of Poplar Bluff Municipal Utilities is a municipal entity organized under the laws of the State of Missouri and is under the jurisdiction of the City Council of the City of Poplar Bluff.  City of Poplar Bluff Municipal Utilities receives electric transmission service from SPP in SPP pricing Zone 10 and provides wholesale energy supply and related electricity services to its citizens and businesses in its municipal territory.  City of Poplar Bluff Municipal Utilities – whose objective is to provide the people of Poplar Bluff with the best light, water, and sewer service at the lowest possible rate – is adversely impacted by the rates established in the orders under review.  City of Poplar Bluff Municipal Utilities issues no stock, has no parent corporation, and is not owned in whole or in part by any publicly held corporation.

*/s/ Kenneth R. Stark*
MCNEES WALLACE & NURICK LLC
100 Pine Street
Harrisburg, PA 17101
T: (717) 237-8000
kstark@mcneeslaw.com

8

## CORPORATE DISCLOSURE STATEMENT OF KENNETT BOARD OF PUBLIC WORKS

Kennett Board of Public Works is a municipal entity organized under the laws of the State of Missouri.  Kennett Board of Public Works receives electric transmission service from SPP in SPP pricing Zone 10 and provides wholesale energy supply and related electricity services to its citizens and businesses in its municipal territory.  Kennett Board of Public Works is adversely impacted by the rates established in the orders under review.  Kennett Board of Public Works issues no stock, has no parent corporation, and is not owned in whole or in part by any publicly held corporation.

*/s/ Kenneth R. Stark*
MCNEES WALLACE & NURICK LLC
100 Pine Street
Harrisburg, PA 17101
T: (717) 237-8000
kstark@mcneeslaw.com

## CORPORATE DISCLOSURE STATEMENT OF CITY OF PIGGOTT-AR MUNICIPAL LIGHT WATER AND SEWER

City of Piggott-AR Municipal Light Water and Sewer is a municipal entity organized under the laws of the State of Arkansas.  City of Piggott-AR Municipal Light Water and Sewer receives electric transmission service from SPP in SPP pricing Zone 10 and provides wholesale energy supply and related electricity services to its citizens and businesses in its municipal territory.  City of Piggott-AR Municipal Light Water and Sewer is adversely impacted by the rates established in the orders under review.  City of Piggott-AR Municipal Light Water and Sewer issues no stock, has no parent corporation, and is not owned in whole or in part by any publicly held corporation.

*/s/ Kenneth R. Stark*
MCNEES WALLACE & NURICK LLC
100 Pine Street
Harrisburg, PA 17101
T: (717) 237-8000
kstark@mcneeslaw.com

## CORPORATE DISCLOSURE STATEMENT OF CITY OF MALDEN-BOARD OF PUBLIC WORKS

City of Malden-Board of Public Works is a municipal entity organized under the laws of the State of Missouri. City of Malden-Board of Public Works receives electric transmission service from SPP in SPP pricing Zone 10 and provides wholesale energy supply and related electricity services to its citizens and businesses in its municipal territory. City of Malden-Board of Public Works is adversely impacted by the rates established in the orders under review. City of Malden-Board of Public Works issues no stock, has no parent corporation, and is not owned in whole or in part by any publicly held corporation.

*/s/ Kenneth R. Stark*
MCNEES WALLACE & NURICK LLC
100 Pine Street
Harrisburg, PA 17101
T: (717) 237-8000
kstark@mcneeslaw.com

## CORPORATE DISCLOSURE STATEMENT OF
## WESTERN FARMERS ELECTRIC COOPERATIVE

Petitioner Western Farmers Electric Cooperative ("WFEC") is a generation and transmission cooperative headquartered in Anadarko, Oklahoma. WFEC owns, operates, and maintains more than 3,800 miles of transmission lines located principally in Oklahoma. WFEC serves its 21 distribution cooperative member-owners and Altus Air Force Base, which, in turn, serve the electric needs of their retail customers in Oklahoma, New Mexico, Kansas, and Texas. None of WFEC's members owns 10% or more of WFEC.

Relevant to this proceeding, WFEC is a Member of Southwest Power Pool, Inc. ("SPP"), WFEC's transmission facilities in the SPP region are administered through the SPP Open Access Transmission Tariff, and WFEC is a transmission customer of SPP with load in SPP's Zone 10.

*/s/ Daniel E. Frank*
Daniel E. Frank
Allison E. S. Salvia
EVERSHEDS SUTHERLAND (US) LLP
700 Sixth Street, NW, Suite 700
Washington, DC 20001-3980
T: (202) 383-0100
danielfrank@eversheds-sutherland.com
allisonsalvia@eversheds-sutherland.com

## CORPORATE DISCLOSURE STATEMENT OF
## XCEL ENERGY SERVICES INC., ON BEHALF OF SOUTHWESTERN
## PUBLIC SERICE COMPANY

Xcel Energy Services Inc. ("Xcel Energy Services"), on behalf of its

public utility affiliate Southwestern Public Service Company ("SPS"), provides

the following disclosure statement:

SPS is a New Mexico corporation and an operating utility engaged in the

generation, purchase, transmission, distribution, and sale of electric power. SPS

is a wholly-owned utility subsidiary of Xcel Energy Inc. ("Xcel Energy"). There

are no other parent corporations or publicly held companies that own a 10% or

greater ownership interest in SPS. SPS's principal place of business is 790

South Buchanan Street, Amarillo, TX 79101.

Xcel Energy Services is a Delaware corporation and the service company

subsidiary of Xcel Energy and provides SPS with an array of services, including

making appearances before the Commission and reviewing courts. There are no

other parent corporations or publicly held companies that own a 10% or greater

ownership interest in Xcel Energy Services. Xcel Energy Services' principal

place of business is 414 Nicollet Mall, Minneapolis, Minnesota, 55401.

Xcel Energy is a Minnesota corporation and a holding company under the

Public Utility Holding Company Act of 2005. Xcel Energy's principal place of

business is 414 Nicollet Mall, Minneapolis, Minnesota, 55401. Xcel Energy is a

publicly-traded company on the NASDAQ under the symbol "XEL." The

Vanguard Group in its most recent financial discloser indicated that it owns

10.18% of Xcel Energy. There are no other parent corporations or publicly held

companies that own a 10% or greater ownership interest in Xcel Energy.

Neither Xcel Energy Services nor SPS nor any affiliate, other than Xcel

Energy, has issued shares to the public.[1]

*/s/ Timothy T. Mastrogiacomo*
Lead Assistant General Counsel
XCEL ENERGY SERVICES INC.
701 Pennsylvania Avenue NW, Suite 250
Washington, D.C. 20004
T: (202) 661-4481
tim.t.mastrogiacomo@xcelenergy.com

---

[1] Xcel Energy Services and certain operating company subsidiaries of Xcel
Energy Inc., including SPS, Northern States Power Company, a Minnesota
corporation, Northern States Power Company, a Wisconsin corporation, and
Public Service Company of Colorado, have issued first mortgage bonds and other
debt securities that are publicly traded. A complete list of all debt securities of
Xcel Energy Inc. and its subsidiaries is available at the Xcel Energy Inc. website
(www.xcelenergy.corn) under Investor Information.

## CORPORATE DISCLOSURE STATEMENT OF AMERICAN ELECTRIC POWER SERVICE CORPORATION ON BEHALF OF ITS AFFILIATES PUBLIC SERVICE COMPANY OF OKLAHOMA AND SOUTHWESTERN ELECTRIC POWER COMPANY

American Electric Power Service Corporation ("AEPSC") is a corporation organized and existing under the laws of the State of New York. AEPSC is a wholly-owned subsidiary of American Electric Power Company, Inc. ("AEP"), a New York corporation whose common stock is held by the public and traded on the NASDAQ Stock Market under the symbol "AEP." AEP has no parent company. Certain institutional investors including Vanguard may from time to time hold 10 percent or more of the outstanding shares of AEP but to AEP's knowledge no publicly-held company has a 10 percent or greater ownership interest in AEP.

Among its many subsidiaries, AEP owns nine electric operating companies and seven transmission companies and is a joint owner in several additional transmission companies. AEPSC provides a variety of administrative and technical services to AEP's affiliates, including Public Service Company of Oklahoma ("PSO") and Southwestern Electric Power Company ("SWEPCO"), on behalf of which AEPSC participated in the proceedings before the Federal Energy Regulatory Commission that resulted in the Orders as to which review is sought in this Court. PSO is a corporation organized and existing under the laws of

Oklahoma.  SWEPCO is a corporation organized and existing under the laws of

Delaware.  Both PSO and SWEPCO are wholly-owned subsidiaries of AEP.

> */s/ Shaun M. Boedicker*
> Shaun M. Boedicker
> STEPTOE & JOHNSON LLP
> 1330 Connecticut Avenue N.W.
> Washington, D.C. 20036
> T: (202) 429-3000
> sboedicker@steptoe.com
>
> *Counsel for American Electric Power Service Corporation, on behalf of its affiliates, Public Service Company of Oklahoma and Southwestern Electric Power Company*

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | | |
|---|---|---|
| Paragould Light & Water Commission | ) | |
| (d/b/a – Paragould Light, Water & | ) | |
| Cable – PLWC); City of Poplar Bluff | ) | |
| Municipal Utilities; Kennett Board of | ) | |
| Public Works; City of Piggott-AR | ) | |
| Municipal Light Water and Sewer; City | ) | |
| of Malden - Board of Public Works; | ) | |
| Evergy Kansas Central, Inc.; | ) | |
| Evergy Metro, Inc.; Evergy Missouri West, | ) | |
| Inc.; American Electric Power Service | ) | |
| Corporation on behalf of its affiliates Public | ) | |
| Service Company of Oklahoma and | ) | No. 23-1133 |
| Southwestern Electric Power Company; | ) | |
| Xcel Energy Services Inc. on behalf of its | ) | |
| operating company affiliate Southwestern | ) | |
| Public Service Company; Western Farmers | ) | |
| Electric Cooperative, | ) | |
| | ) | |
| *Petitioners*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Federal Energy Regulatory Commission, | ) | |
| | ) | |
| *Respondent*. | ) | |

**CERTIFICATE OF SERVICE**

Under Rules 15(c) and 25 of the Federal Rules of Appellate Procedure and

Rules 15(a) and 25 of the Circuit rules, I certify that I have this 17th day of July

2023, served by email or first-class mail, this Petition for Review on the Office of

17

the Solicitor General of the Federal Energy Regulatory Commission and the

Secretary of the Commission:

Ms. Kimberly D. Bose
Secretary
Federal Energy Regulatory
Commission
888 First Street, NE
Washington, DC 20426

Mr. Robert H. Solomon
Solicitor
Federal Energy Regulatory
Commission
888 First Street, NE
Washington, DC 20426

I further certify that I have served a copy of the foregoing Petition for

Review on all persons on the Commission's service list in the underlying

proceedings, Docket Nos. ER18-99-000, *et al.*, via electronic mail as shown in the

service list attached as Exhibit 4.

# Exhibit 1

182 FERC ¶ 61,141
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Willie L. Phillips, Acting Chairman;
James P. Danly, Allison Clements,
and Mark C. Christie.

Southwest Power Pool, Inc.                    Docket No. ER18-99-005

ORDER ON INITIAL DECISION

(Issued February 28, 2023)

1.      This case is before the Commission on exceptions to an Initial Decision issued on
December 6, 2021.[1]  The Initial Decision addresses disputes arising from Southwest
Power Pool, Inc.'s (SPP) proposal to revise its Open Access Transmission Tariff (Tariff)
to include the annual transmission revenue requirement (ATRR) of transmission facilities
associated with the City of Nixa, Missouri (City of Nixa), owned by GridLiance High
Plains LLC (GridLiance),[2] in one of SPP's existing transmission pricing zones, SPP
Pricing Zone 10 (Zone 10), for purposes of rate recovery.  Participants litigated
three general issues:  (1) whether, and to what extent, the placement of the transmission
facilities associated with the City of Nixa (Nixa Assets) in Zone 10 involves a cost shift;
(2) whether benefits accrue to Zone 10 customers as a result of placing the Nixa Assets in
Zone 10; and (3) whether the benefits justify the cost shift.

2.      In the Initial Decision, the Presiding Judge concluded that SPP's proposal to
incorporate the Nixa Assets in Zone 10 is consistent with cost causation principles and is
otherwise just and reasonable.  As discussed below, we affirm the Initial Decision.

I.      **Background**

A.      **SPP's Zonal Construct**

3.      SPP uses a zonal rate design, pursuant to which its footprint is separated into a
number of transmission pricing zones for purposes of establishing transmission service
rates.  The Tariff specifies a zonal ATRR for each pricing zone that is based on the sum
of the ATRRs for each transmission owner in the zone.  Some pricing zones consist of
the facilities of a single transmission owner, while other zones consist of the facilities of

---

[1] *Sw. Power Pool, Inc.*, 177 FERC ¶ 63,021 (2021) (Initial Decision).

[2] GridLiance was formerly known as South Central MCN LLC.

multiple transmission owners. Customers taking transmission service for delivery to load within a particular pricing zone pay a transmission rate based, in part, on the sum of the ATRRs for each transmission owner in that zone. Generally, the charges for Network Integration Transmission Service (network service) in a pricing zone are calculated by multiplying a customer's percentage share of total load in the zone (i.e., its load-ratio share) by the zonal ATRR.[3] When a new transmission owner is added to an existing pricing zone, the ATRR for its transmission facilities in the zone and any associated load not already included in the zonal load are added to the existing zone's zonal ATRR and total load. Therefore, the addition of a new transmission owner to an existing transmission pricing zone will change the existing customers' charges for network service, unless the average cost of the new transmission owner's transmission system (i.e., its ATRR divided by its load) is exactly the same as the existing zone's average cost. Rates for point-to-point transmission service are also based on the zonal ATRR and are set forth in Attachment T of the Tariff.[4]

### B. **SPP Zonal Placement Process**

4.      In 2017, SPP instituted a new Transmission Owner Zonal Placement Process (Zonal Placement Process) to review and determine zonal placement for existing transmission facilities that new SPP transmission-owning members propose to include under the SPP Tariff. A group of SPP transmission owners challenged the SPP Zonal

---

[3] *See* SPP, Tariff, pt. III (Network Integration Transmission Service), § 34.1 (Monthly Demand Charge) (3.0.0); *see also id.*, Schedule 9 (Network Integration Transmission Service) (9.0.0). Schedule 9 (Network Integration Transmission Service) under SPP's Tariff describes that the transmission customer taking network service shall pay a monthly demand charge for the SPP Pricing Zone where the load is located.

[4] Schedule 7 (Long-Term Firm and Short-Term Firm Point-to-Point Transmission Service) under SPP's Tariff describes that the transmission customer shall pay the zonal rate based upon the SPP Pricing Zone where the load is located for firm point-to-point transmission service. *See id.*, Schedule 7 (Long-Term Firm and Short-Term Firm Point-to-Point Transmission Service) (8.0.0).

Schedule 8 (Non-Firm Point-to-Point Transmission Service) under SPP's Tariff describes that the transmission customer shall pay the zonal rate based upon the SPP Pricing Zone where the load is located for non-firm point-to-point transmission service. *See id.*, Schedule 8 (Non-Firm Point-to-Point Transmission Service) (7.0.0).

Schedule 11 (Base Plan Zonal Charge and Region-wide Charge) under SPP's Tariff describes that SPP will assess a zonal component to recover the ATRR of facilities classified as Base Plan Upgrades and a regional component to recover the region-wide ATRR. *See id.*, Schedule 11 (Base Plan Zonal Charge and Region-wide Charge) (9.0.0).

Document Accession #: 20230228-3063     Filed Date: 02/28/2023

Placement Process in a complaint at the Commission, arguing that allocating the costs of a new SPP member's transmission facilities to existing customers of a zone results in an unjust and unreasonable cost shift between new and existing transmission customers.[5] The Commission denied the complaint, finding that the complainants did not show that the shifting of cost responsibility for existing transmission costs in the context of integrating a new transmission owner into SPP was *per se* unjust, unreasonable, or unduly discriminatory.[6]  The Commission noted that it has previously found, on a case-by-case basis, that some degree of cost shifting is just and reasonable.[7]  However, the Commission also stated that parties may challenge the placement of a new transmission owner's facilities in a transmission pricing zone:

> Specifically, parties have the right to protest the proposed placement of a new transmission owner in an existing zone when SPP makes the filing pursuant to section 205 of the [Federal Power Act (FPA)] to add the ATRR of the new owner to the existing zone's ATRR.  In such protests, parties have the opportunity to argue that cost shifts render the proposed placement and new ATRR unjust, unreasonable, and unduly discriminatory or preferential.  The language of the SPP Tariff does not preclude the Commission from then accepting or rejecting SPP's filing based on case-specific facts and circumstances.[8]

## C.    Nixa Assets and SPP Proposal

5.      The Nixa Assets consist of approximately 10 miles of transmission lines and related facilities interconnected to Southwestern Power Administration (Southwestern) in Zone 10 and to City Utilities of Springfield, Missouri (City Utilities) in SPP Pricing

---

[5] *Indicated SPP Transmission Owners v. Sw. Power Pool, Inc.*, 162 FERC ¶ 61,213 (ITOs Complaint Order), *reh'g denied*, 165 FERC ¶ 61,005 (2018) (ITOs Complaint Rehearing Order).

[6] *See* ITOs Complaint Order, 162 FERC ¶ 61,213 at PP 62, 68.

[7] *Id.* P 63.

[8] *Id.* P 74.

Zone 3 (Zone 3).[9]  GridLiance acquired the Nixa Assets from the City of Nixa on April 1, 2018.[10]

6.      On October 18, 2017, SPP submitted proposed Tariff revisions to add an ATRR and a formula rate template and implementation protocols for the Nixa Assets.  SPP explained that it had used its Zonal Placement Process to place the facilities in Zone 10. SPP stated that it considered two potential zones for placement of the Nixa Assets — Zone 3 and Zone 10 — but that its criteria did not indicate clearly in which of the two zones the Nixa Assets should be placed.  SPP stated that the SPP Tariff indicated that Zone 10 is the most appropriate zone for the Nixa Assets because the load served by the Nixa Assets is already included in Zone 10.  Several parties protested SPP's filing, raising concerns about the rate impact on customers in Zone 10.  On March 15, 2018, the Commission set the Tariff revisions for hearing and settlement judge procedures.[11]

7.      On August 30, 2019, SPP submitted an offer of settlement in the hearing docket on behalf of GridLiance and the ARKMO Cities (ARKMO).[12]  The offer of settlement was contested by a group of SPP transmission owners (ITO)[13] and Associated Electric

---

[9] Southwestern, a federal power marketing association, is not a transmission-owning member of SPP but has an arrangement with SPP to provide transmission service pursuant to Attachment AD of the SPP Tariff.  Southwestern operates its own Balancing Authority Area (BAA).

[10] On May 19, 2022, the Commission approved the transfer of ownership of the Nixa Assets from GridLiance to the Missouri Joint Municipal Electric Utility Commission (MJMEUC).  *See GridLiance High Plains LLC*, 179 FERC ¶ 61,113 (2022); *see also Sw. Power Pool, Inc.*, 179 FERC ¶ 61,134 (2022) (accepting proposed tariff revisions subject to refund and establishing hearing and settlement judge procedures).

[11] *Sw. Power Pool, Inc.*, 162 FERC ¶ 61,215 (Hearing Order), *order denying reh'g and clarification*, 164 FERC ¶ 61,120 (2018) (Rehearing Order).

[12] ARKMO includes the following customers within Zone 10:  Paragould Light Water & Cable; Paragould Light Commission; Poplar Bluff Municipal Utilities; Kennett Board of Public Works; City of Piggott Municipal Light, Water & Sewer; and the City of Malden.

[13] ITOs include:  Evergy Kansas Central, Inc., Evergy Metro, Inc., and Evergy Missouri West, Inc.; American Electric Power Service Corporation, on behalf of its affiliates Public Service Company of Oklahoma and Southwestern Electric Power Company; Xcel Energy Services Inc., on behalf of its affiliate Southwestern Public Service Company; and Western Farmers Electric Cooperative.  ITOs in this proceeding

Document Accession #: 20230228-3063          Filed Date: 02/28/2023

Cooperative, Inc. The Commission issued an order on February 18, 2021 rejecting the contested settlement and remanding to resume hearing procedures.[14] The Commission found that there was insufficient evidence in the record for the Commission to make a determination on whether and the extent to which there are cost shifts involved in the placement of the Nixa Assets in Zone 10 or benefits that may accrue that would justify any such cost shifts.[15] Of note, the Commission found that:

> The existence of a rate impact does not necessarily mean that the cost allocation for the Nixa Assets is unjust and unreasonable. Nonetheless, we are not convinced that the record in this case shows that sufficient benefits will accrue to Zone 10 customers to justify the Settlement. As the ITOs pointed out, the evidence presented by SPP and GridLiance as to the benefits of the inclusion of the Nixa Assets is general in nature and not specific to Zone 10 customers. We note that this issue was not thoroughly briefed because many of the parties argued that the cost shift issue was outside the scope of the proceeding; we expect that on remand to the Chief Judge the parties will engage in this issue more closely. For example, we expect the parties to evaluate the cost shifts reflecting, among other things, known and measurable changes to the GridLiance system for the next five to seven years, consistent with *Tri-State*.[16]

## II.   Initial Decision and Subsequent Pleadings

8.     On December 6, 2021, the Presiding Judge issued the Initial Decision, which addressed three general issues: (1) whether, and to what extent, the placement of the Nixa Assets in Zone 10 involves a cost shift; (2) whether benefits accrue to Zone 10 customers as a result of placing the Nixa Assets in Zone 10; and (3) whether the benefits justify the cost shift. The Presiding Judge determined that SPP's proposal to incorporate

---

are different from the group of SPP transmission owners that challenged the SPP Zonal Placement Process. *See* ITOs Complaint Order, 162 FERC ¶ 61,213 at P 1 n.3.

[14] *Sw. Power Pool, Inc.*, 174 FERC ¶ 61,116 (Remand Order), *order on reh'g*, 175 FERC ¶ 61,235 (2021) (Remand Rehearing Order).

[15] Remand Order, 174 FERC ¶ 61,116 at P 40.

[16] *Id.* P 41 (citing *Sw. Power Pool, Inc.*, Opinion No. 562, 163 FERC ¶ 61,109, at P 157 (2018) (*Tri-State*), *order on reh'g*, Opinion No. 562-A, 166 FERC ¶ 61,019 (2019) (*Tri-State Rehearing*)).

the Nixa Assets in Zone 10 is consistent with cost causation principles and is otherwise just and reasonable.[17]  Specifically, the Presiding Judge found that:  (1) the placement of the Nixa Assets in Zone 10 will result in a $1.8 million cost shift to Zone 10 customers; (2) the Nixa Assets accrue substantial, specific, but unquantifiable benefits (i.e., integration benefits, reliability enhancements, and support for power transfers) to Zone 10 customers; and (3) those benefits justify the cost shift involved in the placement of the Nixa Assets in Zone 10.[18]

9.      On January 5, 2022, ARKMO, ITOs, Nebraska Public Power District (NPPD), and Commission Trial Staff (Trial Staff) each filed a brief on exceptions to the Initial Decision.  On January 25, 2022, SPP, GridLiance, and City Utilities each filed a brief opposing exceptions to the Initial Decision.

10.     We address the Presiding Judge's findings in the Initial Decision and the issues raised by the briefs in detail below.

## III.  **Discussion**

11.     For the reasons discussed below, we affirm the Initial Decision's findings that SPP's proposal to include the ATRR for the Nixa Assets in Zone 10 is just and reasonable and consistent with the cost causation principle.  Accordingly, we accept SPP's proposed Tariff revisions.

12.     Participants in this proceeding do not dispute on exceptions that the Nixa Assets qualify as transmission under the SPP Tariff.  The question raised in this proceeding is whether GridLiance recovering the costs of the Nixa Assets in Zone 10 transmission rates is just and reasonable and consistent with the cost causation principle.  Compliance with the cost causation principle is evaluated "by comparing the costs assessed against a party to the burdens imposed or benefits drawn by that party."[19]  Cost allocation may be adequate when "the benefits customers receive from the transmission facilities 'are at least roughly commensurate' with the costs allocated to them."[20]  Here, we consider

---

[17] Initial Decision, 177 FERC ¶ 63,021 at PP 2, 188, 206.

[18] *Id.* PP 77, 122, 153.

[19] *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1368-69 (D.C. Cir. 2004) (citing *K N Energy, Inc. v. FERC*, 968 F.2d 1295, 1300 (D.C. Cir. 1992)).

[20] ITOs Complaint Rehearing Order, 165 FERC ¶ 61,005 at P 23.  The "roughly commensurate" standard is based upon decisions in the Seventh Circuit discussed further below.  *See Ill. Commerce Comm'n v. FERC*, 576 F.3d 470 (7th Cir. 2009) (*ICC I*); *Ill.*

whether the benefits customers in Zone 10 receive from the Nixa Assets are at least roughly commensurate with the costs allocated to them. We address below the elements the Initial Decision relied upon when making the determination that the benefits of the Nixa Assets justify the cost shift to Zone 10 customers.

### A.   Amount of Cost Shift

#### 1.   Initial Decision

13.    The Presiding Judge concluded that the cost shift experienced by all Zone 10 customers, including the City of Nixa, as a result of placing the Nixa Assets in Zone 10 rates is the entire GridLiance ATRR, or $1.8 million.[21] The Presiding Judge relied on the assessment of ARKMO witness Mr. Busbee and found that all other calculations of the cost shift were flawed.[22]

14.    The Presiding Judge determined that Mr. Busbee's testimony better reflected the facts of the case because it treated all Zone 10 customers equally, focusing on the total increase in the Zone 10 ATRR rather than the portion of the GridLiance ATRR that would be paid for by the non-City of Nixa customers in Zone 10.[23] The Presiding Judge found that this approach was consistent with, and was supported by, testimony by SPP witness Mr. Locke that asserted that rate impacts should be assessed by reference to all customers in Zone 10 because SPP determines rates on a zonal basis.[24] The Presiding Judge stated that determining intra-zonal cost shifts from the City of Nixa to non-City of Nixa customers in Zone 10 depends on a ratemaking distinction that is not recognized within SPP's zonal rate construct.[25]

15.    The Presiding Judge stated that, unlike the situation in *Tri-State*, where new facilities and new load were entering SPP at the same time, the City of Nixa converted to SPP network service before GridLiance transferred functional control of the Nixa Assets

---

*Commerce Comm'n v. FERC*, 756 F.3d 556 (7th Cir. 2014) (*ICC II*); *Ill. Commerce Comm'n v. FERC*, 721 F.3d 764 (7th Cir. 2013) (*ICC III*).

[21] Initial Decision, 177 FERC ¶ 63,021 at P 77 (citing Tr. at 1356:12-1357:23; Ex. GHP-0225).

[22] *Id.*

[23] *Id.* P 80.

[24] *Id.*

[25] *Id.*

Docket No. ER18-99-005                                                    - 8 -

to SPP or submitted its ATRR for inclusion of the Nixa Asset costs in SPP's rates.[26]  The Presiding Judge stated that, given this factual distinction, there was no requirement to consider cost shifts between subsets of Zone 10 customers.[27]  The Presiding Judge further stated that Mr. Busbee's testimony correctly determined that the City of Nixa's rates, like the rates of non-City of Nixa customers in Zone 10, would increase based on the inclusion of GridLiance's ATRR in Zone 10 rates, and that it would not be appropriate to reduce the amount of cost shift to focus only on the portion to be paid by non-City of Nixa customers in Zone 10.[28]

16.    The Presiding Judge disagreed with testimony by ARKMO and ITOs witness Mr. Puga and by GridLiance witness Mr. Tsoukalis that argued the cost shift amount should be reduced by the portion of the Southwestern ATRR that is paid for by the City of Nixa.[29]  The Presiding Judge stated that GridLiance has no basis to claim credit for bringing the City of Nixa load into Zone 10 because the City of Nixa converted to SPP network service before, and independently of, any decision by GridLiance to roll its ATRR into SPP's rates.[30]  The Presiding Judge stated that any portion of the overall Zone 10 ATRR paid for by the City of Nixa has nothing to do with the cost shifted to Zone 10 customers by the addition of the GridLiance ATRR.[31]

17.    The Presiding Judge found that the arguments from ITOs and ARKMO to articulate the cost shift as a percentage of GridLiance's total ATRR do not make sense because the cost shift should be determined by reference to the cost shifted to all Zone 10 customers, not by reference to an "artificial distinction" between the City of Nixa and non-City of Nixa customers in Zone 10.[32]  The Presiding Judge stated that the cost shift is 100% in this case as opposed to the 89% claimed by ITOs.[33]  However, the Presiding Judge asserted that this percentage did not show the magnitude of the cost shift that the Commission sought any better than the rate impact figures advanced by SPP and

---

[26] *Id.* P 81.

[27] *Id.*

[28] *Id.*

[29] *Id.* P 82.

[30] *Id.*

[31] *Id.*

[32] *Id.* P 83.

[33] *Id.*

Document Accession #: 20230228-3063    Filed Date: 02/28/2023
Docket No. ER18-99-005                                                                      - 9 -

GridLiance.[34]  The Presiding Judge found that stating the cost shift as a percentage inappropriately exacerbated the perception of the cost shift, just as SPP's and GridLiance's rate impact analysis muted the perception of the cost shift.[35]  The Presiding Judge also found that, in nominal terms, the $1.8 million cost shift is less than half of the $4.3 million cost shift found in *Tri-State*, which provided a proper context and balanced view of the magnitude of the cost shift in this case.[36]

18.    The Presiding Judge rejected ITOs' claim that the cost shift should be measured as a percentage because the roughly commensurate test requires the same proportions of costs assigned to different Zone 10 customers as benefits derived by different Zone 10 customers.[37]  The Presiding Judge stated that such a proportionate distribution requirement did not appear in the relevant Commission or court precedent.[38]

19.    The Presiding Judge rejected Trial Staff's proposal to increase the cost shift amount by considering the cost that GridLiance included in Schedule 11.[39]  The Presiding Judge stated that GridLiance was directed to incur Schedule 11 costs pursuant to the SPP regional process and that the Schedule 11 costs therefore were not related to GridLiance's acquisition of the Nixa Assets or SPP's zonal placement decision.[40]  The Presiding Judge determined that Trial Staff's proposal to include GridLiance's Schedule 11 costs inappropriately inflated the cost shift calculation based on costs unrelated to zonal placement, akin to the same reasons that Trial Staff argued against considering Schedule 1 (Scheduling, System Control and Dispatch Service) costs as part of the cost of zonal placement (i.e., whether such costs relate to the zonal placement of the new transmission assets).[41]

---

[34] *Id.*

[35] *Id.*

[36] *Id.*

[37] *Id.* P 84.

[38] *Id.*

[39] *Id.* P 85.

[40] *Id.*

[41] *Id.*

## 2. **Briefs on Exceptions**

20.     Participants argue that the Initial Decision erred in finding that the relevant cost shift in this proceeding was only $1.8 million, compared to the $4.3 million cost shift in *Tri-State*. Participants argue that the appropriate cost shift in this proceeding is actually 89% of the ATRR for the Nixa Assets for 2021, because 89% is the total amount of the Nixa Assets being borne by non-City of Nixa load in Zone 10; prior to the addition of the Nixa Assets to Zone 10, the City of Nixa paid for 100% of their costs.[42]

21.     ITOs argue that contrary to the Initial Decision, the City of Nixa was a beneficiary rather than a victim of the cost shift.[43] ITOs state that the economics are plain that the City of Nixa's transmission costs went down, not up, and that the costs of other Zone 10 customers went up as a direct result.[44] ARKMO argues that the Initial Decision's use of the $1.8 million figure was simplified and fails to provide a full and accurate picture of the cost shift at issue, which occurs over several rate years.[45] ARKMO also argues that the Initial Decision erred in not evaluating intra-zonal cost shifts between the City of Nixa and non-City of Nixa customers in Zone 10, as the Commission had set this issue for hearing in the initial hearing order and in the rejection of the settlement.[46] NPPD argues that the Presiding Judge failed to undertake a proper assessment of the actual cost shifts to existing Zone 10 customers that would accrue as a result of SPP's proposal.[47]

22.     ARKMO and Trial Staff argue that the Initial Decision disregarded the rate impact on Zone 10 customers and erred in finding that the evidence of rate impacts was too tangential to the cost shift in this case and too speculative.[48] Trial Staff argues that the Commission found that rate impact should be evaluated including percentage increases to

---

[42] ARKMO Brief on Exceptions at 25; ITOs Brief on Exceptions at 30; Trial Staff Brief on Exceptions at 39-40; NPPD Brief on Exceptions at 5.

[43] ITOs Brief on Exceptions at 32.

[44] *Id.* at 34.

[45] ARKMO Brief on Exceptions at 28.

[46] *Id.* at 33.

[47] NPPD Brief on Exceptions at 4-5.

[48] ARKMO Brief on Exceptions at 86 (citing Initial Decision, 177 FERC ¶ 63,021 at P 180); Trial Staff Brief on Exceptions at 36.

transmission cost responsibility.[49]  Trial Staff notes that, in *Tri-State*, the Commission highlighted the importance of rate impact ("an eight percent increase in Zone 17 rates") in evaluating cost shift.[50]  ARKMO argues that the rate impacts from 2018 to 2021 are known and measurable, and some future rate impacts can be reasonably forecasted using available data.  ARKMO notes the presentation by Trial Staff of the current 21-22% rate increase to Zone 10 customers compared to the less severe eight percent increase in *Tri-State*.[51]

23.    ITOs argue that the cost shift should not be measured in nominal dollars alone, as this is difficult to weigh against non-monetized benefits when determining whether the benefits are proportional to costs.[52]  ITOs argue that nominal dollars, proportionality and rate impacts are all useful to understand a cost shift and should not be viewed alone.[53]  The ITOs note that the Initial Decision's comparison of the nominal dollars between this case and *Tri-State* was simplistic and ignores the differences between the two matters.[54]  Trial Staff argues that the Schedule 11 costs for the Notice to Construct upgrade[55] should be included in the cost shift based on the precedent from *Tri-State*.[56]  Trial Staff and NPPD further argue that SPP's own calculations confirm that the zonal placement in this case results in the highest ever impact on Schedule 9 rates in a zone, i.e., an increase of 23.5% to Schedule 9 rates.[57]

---

[49] Trial Staff Brief on Exceptions at 36 (citing ITOs Complaint Order, 162 FERC ¶ 61,213 at P 62).

[50] *Id.* at 38.

[51] ARKMO Brief on Exceptions at 87.

[52] ITOs Brief on Exceptions at 36-37.

[53] *Id.* at 38.

[54] *Id.* at 39-40.

[55] SPP had directed GridLiance to construct an upgrade to the Nixa Assets to address a regional reliability issue, and the parties refer to this upgrade as the Notice to Construct.  *See* Ex. GHP-0229 at 5:5-8:6.

[56] Trial Staff Brief on Exceptions at 32.

[57] *Id.* at 41 (citing Ex. ARK-0074 at 2); NPPD Brief on Exceptions at 6 (citing Ex. SPP-0026 at 6:17).

Docket No. ER18-99-005                                                    - 12 -

### 3.  <u>Briefs Opposing Exceptions</u>

24.     According to SPP, GridLiance, and City Utilities, the Presiding Judge's decision is
appropriate and supported by abundant record evidence.[58]  GridLiance argues that an
Administrative Law Judge's decision is entitled to "great deference" with respect to
matters of witness credibility and weight of evidence,[59] and that the Commission
generally must find some clear indicator of error to overturn an Administrative Law
Judge's decision.[60]

25.     City Utilities asserts that the Initial Decision appropriately considered rate impacts
when evaluating the cost shifts of placing Nixa Assets in Zone 10 even though the
Remand Order did not obligate the Presiding Judge to do so.[61]  Additionally, City
Utilities argues that rate impact is "a fairly meaningless measuring stick" in this
proceeding because "muddying" the cost shift analysis with discussions of rate impact
ignores the fact that, as the Initial Decision states, "cost shift will not change as more load
converts and the rate impact decreases."[62]

26.     Similarly, SPP explains that focusing on rate impacts could paint an incomplete
picture of the effect in this particular case.[63]  GridLiance supports this position by stating
that the GridLiance ATRR is a more appropriate measure of cost shift than the rate
impacts.[64]  GridLiance also asserts that ITOs' and ARKMO's theory of cost shifts, which
is based solely on load ratio share percentages, results in illogical outcomes because it

---

[58] SPP Brief Opposing Exceptions at 7; GridLiance Brief Opposing Exceptions
at 12; City Utilities Brief Opposing Exceptions at 11.

[59] GridLiance Brief Opposing Exceptions at 10 (citing *BP Am. Inc.*, 173 FERC
¶ 61,239, at P 154 (2020); *Entergy Servs., Inc.*, 130 FERC ¶ 61,023, at P 53 n.66 (2010);
*El Paso Nat. Gas Co.*, 67 FERC ¶ 61,327, at 62,156 (1994)).

[60] *Id.* at 11 (citing *Entergy Servs., Inc.*, 130 FERC ¶ 61,023 at P 53 n.66 ("Thus,
the Commission will not overturn the Presiding Judge's judgment as to what evidence he
found meaningful or worthy of weight absent some clear indicator of error, which is not
present here.")).

[61] City Utilities Brief Opposing Exceptions at 10.

[62] *Id.* at 11.

[63] SPP Brief Opposing Exceptions at 43 (citing Ex. SPP-001 at 18:7-22; Tr.
at 116:17-117:18).

[64] GridLiance Brief Opposing Exceptions at 65-66.

offers nothing in terms of magnitude of rate impacts.[65]  SPP concurs, stating that the
Presiding Judge properly determined that an evaluation of the cost shift in this proceeding
requires consideration of the costs paid by all Zone 10 customers, not merely those paid
by non-City of Nixa customers in Zone 10.[66]  SPP explains that this is precisely how
zonal rates are designed to work, i.e., each customer pays the same zonal rate times its
load ratio share for the costs of all facilities, even though each customer benefits
differently from each individual transmission facility in the zone.[67]  SPP states that the
City of Nixa pays a share of the costs of serving other Zone 10 customers without
receiving proportionate benefits, resulting in a "cost shift" to the City of Nixa from assets
used primarily to serve "non-City of Nixa" customers.[68]

27.     SPP argues that artificially dividing Zone 10 into "City of Nixa" and "non-City of
Nixa" customers obfuscates the magnitude of the cost shift to the specific, individual
customers protesting in this proceeding.[69]  SPP further argues that there is no basis in the
record to view the cost shift from the City of Nixa to other Zone 10 customers, and that
determining the cost shift on a "City of Nixa versus non-City of Nixa" basis would
require a distinction that is not recognized in SPP's zonal rate construct or justified by the
evidentiary record.[70]

28.     SPP argues that the appropriate and balanced approach is to consider the costs and
benefits to the City of Nixa from the "non-City of Nixa" facilities and the benefits that
every other Zone 10 customer receives, not only from the Nixa Assets, but also from the
City of Nixa's contribution to the costs of the facilities serving those customers.[71]  City
Utilities adds that a reasoned analysis of the rate impacts of SPP's zonal placement must
address the fact the City of Nixa load in Zone 10 is absorbing a share of existing Zone 10
costs, including the costs of facilities that enable power flows that do not benefit the City

---

[65] *Id.* at 19.

[66] SPP Brief Opposing Exceptions at 7-8 (citing Tr. at 1662:20-1663:20).

[67] *Id.* at 8 (citing Ex. SPP-0031 at 28:17-29:4, 36:18-37:6; Ex. SPP-0026
at 13:11-12).

[68] *Id.* at 46.

[69] *Id.*

[70] *Id.* at 44-45 (citing Initial Decision, 177 FERC ¶ 63,021 at PP 80, 81, 83).

[71] *Id.* at 46 (citing Ex. SPP-0031 at 22:7-11; Tr. at 614:3-16).

Docket No. ER18-99-005                                                    - 14 -

of Nixa's load.[72]  GridLiance concurs, asserting that cost shifts in both directions must be analyzed when considering rate impacts to non-City of Nixa customers.[73]

### 4.    Commission Determination

29.    We affirm the Presiding Judge's finding that the cost shift at issue in this proceeding should be calculated as GridLiance's proposed ATRR for the Nixa Assets, which is $1.8 million.  We find that the Presiding Judge properly balanced competing testimony to reach this finding, which is supported by the evidence presented at hearing.

30.    Participants raise several objections to the $1.8 million figure.  First, participants argue that the proper measure of the cost shift is the amount of the Nixa Assets that will be paid by non-City of Nixa customers rather than the full amount of the GridLiance ATRR.  We disagree.  As we discuss more fully below, the City of Nixa is already a Zone 10 customer and the Commission's evaluation of the cost shift to Zone 10 customers can and should incorporate costs paid by the City of Nixa as well as other customers in that zone.  As the Initial Decision notes, the City of Nixa had divested the Nixa Assets and converted to SPP's network service prior to the inclusion of the Nixa Assets into Zone 10, and their transmission rates under Zone 10 will increase upon inclusion of the Nixa Assets just as will the transmission rates of other Zone 10 customers.[74]  Removing the City of Nixa from the cost shift figure would thus give an incomplete view of the total cost shift amount.

31.    Trial Staff argues that the Presiding Judge erred in not including as part of the cost shift the value of the Schedule 11 costs associated with upgrades on the system incurred for the Notice to Construct related to the Nixa Assets.  We agree with the Presiding Judge that the Schedule 11 costs related to the Notice to Construct are not relevant to the cost shift at issue here, as they are the results of SPP's regional transmission planning process rather than GridLiance's acquisition of the Nixa Assets or the inclusion of the Nixa Assets in Zone 10.  Although Trial Staff argues that the Commission allowed consideration of Schedule 11 costs in the *Tri-State* decision, the costs in that proceeding involved upgrades planned prior to the integration of the transmission facilities into their new zone rather than the post-integration upgrades at issue here.[75]

---

[72] City Utilities Brief Opposing Exceptions at 13.

[73] GridLiance Brief Opposing Exceptions at 73.

[74] *See* Initial Decision, 177 FERC ¶ 63,021 at PP 81-82.

[75] *See Tri-State*, 163 FERC ¶ 61,109 at P 157.

Document Accession #: 20230228-3063     Filed Date: 02/28/2023

32.     Participants also argue that the Presiding Judge erred in determining the cost shift as a dollar figure rather than a rate impact upon non-City of Nixa customers.  The Presiding Judge bases his decision in part upon a finding that the Commission in the Remand Order asked for evidence of cost shifts, not rate impacts.[76]  While we agree that these are different terms with distinct meanings, we disagree that the Commission intended to limit the hearing to one type of evidence with respect to cost shifts.  Both cost shifts in absolute dollar value and rate impacts by percentage can be useful methods of evaluating cost causation.  The Commission was clear in the ITOs Complaint Order that both cost shifts and rate impacts associated with the placement of a new transmission owner into an existing zone could be relevant issues for determining whether a placement was just and reasonable.[77]  For purposes of this proceeding, however, we are able to reach a determination below on whether the benefits from the Nixa Assets justify the costs of their inclusion into Zone 10 based solely on the cost shift evidence in the record.  Therefore, we find it is not necessary to rely on the rate impact evidence in the record.

### B.     Benefits to Customers

#### 1.     Initial Decision

33.     The Presiding Judge found that SPP and GridLiance demonstrated several substantial and specific benefits that accrue to Zone 10 customers from the Nixa Assets, with the integration benefits as the most compelling.[78]  The Presiding Judge found that SPP, in its role as a regional transmission organization (RTO), has to ensure that the Nixa Assets are sufficiently integrated with, and embedded in, SPP as part of the Zonal Placement Process.[79]  The Presiding Judge agreed with ITOs and ARKMO that qualification as transmission facilities under Attachment AI of the SPP Tariff in and of itself does not necessarily establish a benefit that would justify a cost shift.[80]  However, the Presiding Judge noted that ITOs and ARKMO did not contest that the Nixa Assets qualified as transmission facilities or that they were generally integrated.[81]

---

[76] Initial Decision, 177 FERC ¶ 63,021 at P 176.

[77] ITOs Complaint Order, 162 FERC ¶ 61,213 at P 62 (referring to both cost shifts and rate impacts as relevant to whether a zonal placement is just and reasonable).

[78] *Id.* PP 122-123.

[79] *Id.* P 123.

[80] *Id.*

[81] *Id.*

34.     The Presiding Judge found that the Nixa Assets also provide a reliability benefit as identified in the record.[82]  The Presiding Judge noted that testimony provided by GridLiance witness Mr. Tsoukalis regarding the N-1-1 contingency analysis and the Notice to Construct project established this benefit and reinforced that this benefit accrues specifically to Zone 10 customers.[83]  The Presiding Judge found that the Nixa Assets' contribution to the resolution of N-1-1 contingencies has value to lower SPP's need to rely on corrective action plans despite not resolving every N-1-1 contingency or to enable SPP to operate its system to withstand N-1 contingencies.[84]  The Presiding Judge stated that Mr. Puga and ITOs' witness Mr. Schnitzer admitted that the reliability benefit exists.[85]

35.     The Presiding Judge identified the facilitation of power transfers between numerous sources and sinks in Zone 10 and neighboring areas as a third benefit identified in the record.[86]  The Presiding Judge stated that Mr. Tsoukalis's testimony regarding shift factor and historical metered flow data analyses demonstrated that this benefit extends beyond the City of Nixa to non-City of Nixa customers.[87]  The Presiding Judge stated that ITOs and ARKMO did not offer any evidence to support their position that the transfers identified in excess of the City of Nixa's consumption were loop flows.[88]  Additionally, the Presiding Judge stated that ITOs and ARKMO were unable to deny that the Nixa Assets are available for SPP to use as additional capacity between Zone 10 and Zone 3 for all customers on a nondiscriminatory basis.[89]  The Presiding Judge found that questions about the accuracy of the shift factor and historical metered flow data analyses were credibly addressed.[90]

---

[82] *Id.* P 125.

[83] *Id.*

[84] *Id.*

[85] *Id.*

[86] *Id.*

[87] *Id.*

[88] *Id.* P 126.

[89] *Id.*

[90] *Id.*

Document Accession #: 20230228-3063      Filed Date: 02/28/2023

36.     In making the finding that several substantial and specific benefits exist, the Presiding Judge discounted GridLiance's attempts to increase the number of benefits by applying multiple labels to essentially the same benefit.[91]   The Presiding Judge determined that Mr. Tsoukalis's testimony regarding joint planning and coordination of maintenance benefits were examples of the same integration benefit.[92]   The Presiding Judge further determined that GridLiance's counterflow and environmental benefits were not independent benefits.[93]   Despite this, the Presiding Judge found the remaining examples to be evidence that the Nixa Assets' integration benefits specifically accrue to Zone 10 customers, not only to the SPP region.[94]

37.     The Presiding Judge stated that the objections from ITOs, ARKMO, NPPD, and Trial Staff challenging all of the benefits by arguing that they accrue disproportionately to the City of Nixa misread the Commission's framing of the issues examined in the supplemental hearing, which was to seek additional evidence and briefing on benefits that are specific to Zone 10 customers.[95]   The Presiding Judge stated that the Remand Order did not suggest that the consideration of benefits specific to Zone 10 customers should be limited to only those benefits that accrue to non-City of Nixa customers in Zone 10.[96]   The Presiding Judge stated that the Commission did not make a distinction among different Zone 10 customers in the Remand Order and that it was therefore appropriate to consider benefits to all Zone 10 customers.[97]   The Presiding Judge further stated that the City of Nixa received the same rate increase as other Zone 10 customers, and the benefit it accrues should be counted along with benefits accruing to all other Zone 10 customers.[98]

---

[91] *Id.* P 122.

[92] *Id.* P 124.

[93] *Id.*

[94] *Id.*

[95] *Id.* P 127.

[96] *Id.*

[97] *Id.*

[98] *Id.* P 128.

38. The Presiding Judge disagreed with assertions from ITOs, ARKMO, NPPD, and Trial Staff that the benefits are not specific enough and are trivial or incidental.[99] The Presiding Judge stated that the benefits identified in the record, coupled with the admissions from Mr. Puga and Mr. Schnitzer that some benefits exist, offer substantial evidence of benefits that accrue specifically to Zone 10 customers.[100] The Presiding Judge noted that while some of the benefits may extend to customers outside of Zone 10, these benefits should not be disqualified from consideration because they demonstrate benefits to customers in Zone 10.[101]

39. The Presiding Judge stated that SPP and GridLiance both produced evidence that questioned the argument that no economic benefits accrue for ARKMO from the Nixa Assets despite assertions from Trial Staff, ITOs, and ARKMO.[102] The Presiding Judge also noted that it appeared that GridLiance decided that a showing of economic benefits, in terms of production cost savings, was not a necessary part of its benefits analysis, which led the Presiding Judge to not consider any such benefits.[103] However, the Presiding Judge explained that the Commission did not require a showing of economic benefits in the *Tri-State* case, nor did the Eighth Circuit find one necessary in affirming the Commission.[104]

## 2.    Briefs on Exceptions

40. Participants argue that the Initial Decision points only to generic benefits to multiple zones and to specific concrete benefits to the City of Nixa only and fails to show any specific and tangible quantifiable benefits from the Nixa Assets to non-City of Nixa customers in Zone 10.[105] NPPD also argues that there is no basis for the Presiding Judge to disregard any distinction between existing Zone 10 customers and the City of Nixa in

---

[99] *Id.* P 130.

[100] *Id.* PP 129-130.

[101] *Id.* P 130.

[102] *Id.* P 133.

[103] *Id.*

[104] *Id.*

[105] ARKMO Brief on Exceptions at 35; ITOs Brief on Exceptions at 40-46 (providing a chart of the benefits found in the Initial Decision and whether those benefits accrued to non-City of Nixa Zone 10 customers); Trial Staff Brief on Exceptions at 30; NPPD Brief on Exceptions at 9-11.

reviewing benefits, given that it is the placement of the City of Nixa into Zone 10 that gives rise to the need for any evaluation.[106] NPPD adds that the Presiding Judge erred in failing to quantify any benefits as required by Commission precedent.[107] NPPD argues that the benefits from the Nixa Assets to Zone 10, to the extent such benefits exist at all, fail to meet the "roughly commensurate" standard set forth in *ICC I*.[108]

41.    ITOs argue that in finding GridLiance's shift factor analysis and an accompanying power transfer analysis demonstrate integration benefits that justify the cost shift, the Initial Decision proves too much; if nothing more than that level of integration is necessary to justify a local cost allocation then any cost allocation would be justified for any looped facility.[109] ARKMO and ITOs argue that the integration benefits found in the Initial Decision were already found by the Commission to be insufficient to justify the costs of the facilities and remanded the proceeding to "engage in [the cost shift] issue more closely."[110]

42.    ARKMO argues that it does not benefit from a single 10-mile 69 kV delivery line that is over 200 miles away. ARKMO argues that the reliability benefits accrue primarily and almost exclusively to the City of Nixa. ARKMO argues that only the City of Nixa requires the Nixa Assets to reach its load, and the City of Nixa would "go dark" at "tremendous" cost without the Nixa Assets.[111] ARKMO and Trial Staff state that the reliability analysis was unable to find non-trivial reliability benefits to Zone 10 because the analysis examined more than 38,000 contingencies and only identified 12 N-1-1 meaningful contingencies, of which only one would cause a slight increase in overloading in one facility in Zone 10.[112] Trial Staff notes that for the one overloaded

---

[106] NPPD Brief on Exceptions at 7.

[107] *Id.* at 10.

[108] *Id.* at 11 (citing *ICC I*, 576 F.3d at 470, 477).

[109] ITOs Brief on Exceptions at 47.

[110] ARKMO Brief on Exceptions at 37; ITOs Brief on Exceptions at 48 (quoting Remand Order, 174 FERC ¶ 61,116 at P 41).

[111] ARKMO Brief on Exceptions at 42 (quoting Tr. at 1272:7-15).

[112] *Id.* at 43; Trial Staff Brief on Exceptions at 42.

Document Accession #: 20230228-3063          Filed Date: 02/28/2023

element found in Zone 10, the element is still overloaded even with the Nixa Assets in service.[113]

43.     ARKMO and ITOs argue that power transfer benefits accrue mainly to the City of Nixa.  ARKMO argues that the Initial Decision ignores the weaknesses in the power flow evidence that it argued at hearing.  ARKMO states that the metered flow data analysis showed that almost all the power that enters the Nixa Assets is consumed by the City of Nixa.[114]  The ITOs argue that the facts question whether flows through and out of the Nixa Assets are actually beneficial or are more like inadvertent loop flows that occur as an "unavoidable consequence" of interconnected utility operations, and are generally not compensable.[115]  The ITOs note that SPP's load flow tests showed that no more than one percent of the flows serving ARKMO flow on the Nixa Assets.[116]

44.     Additionally, ARKMO, ITOs, and Trial Staff argue that the shift factor analysis presented by Mr. Tsoukalis is hypothetical, does not reflect actual system operations, does not provide evidence of benefits substantially held by Zone 10, and does not provide a basis for determining how much of the total use of the assets is by the City of Nixa.[117]  Trial Staff argues that the shift factor analysis showed only that power flows over an interconnected grid.  ARKMO argues that testimony from its own witness, Mr. Puga, showed that the shift factor analysis provided by Mr. Tsoukalis for the Nixa Assets is smaller than the minimum thresholds commonly accepted in the industry as meaningful shift factor values.[118]  ITOs argue that any redundancy benefit provided by connection to two Balancing Authority Areas also accrues mostly to the City of Nixa.[119]

45.     Trial Staff notes that Mr. Tsoukalis admitted that his shift factor analysis would mean that the Nixa Assets provide benefits to customers in PJM Interconnection, L.L.C.

---

[113] Trial Staff Brief on Exceptions at 43 (citing Tr. at 1054:2-4).

[114] ARKMO Brief on Exceptions at 46; ITOs Brief on Exceptions at 60.

[115] ITOs Brief on Exceptions at 62-63 (citing *E. Ky. Power Coop., Inc.*, 114 FERC ¶ 61,035, at P 33 (2006)).

[116] ITOs Brief on Exceptions at 62-63.

[117] ARKMO Brief on Exceptions at 49; ITOs Brief on Exceptions at 65; Trial Staff Brief on Exceptions at 50.

[118] ARKMO Brief on Exceptions at 49.

[119] ITOs Brief on Exceptions at 68.

Document Accession #: 20230228-3063          Filed Date: 02/28/2023

(PJM) and throughout the Eastern Interconnection.[120]  Trial Staff also argues that the shift factor analysis used source-sink pairings that may never occur in real life.  Trial Staff also argues that the comparability argument was misstated, as even if some Southwestern assets in Zone 10 have a smaller shift factor than the Nixa Assets there is no proof that those Southwestern assets have no reliability, maintenance, economic or other benefits to Zone 10 customers.[121]

46.     Further, ARKMO argues that the Notice to Construct was issued after the filing in this docket, and involves Schedule 11 charges rather than the Schedule 9 ATRR, which is at issue here.[122]  Trial Staff also argues that neither SPP nor GridLiance established that the Notice to Construct project conferred integration or reliability benefits on non-City of Nixa Zone 10 customers.[123]  Trial Staff points to testimony from Mr. Locke that the benefitting load of the Notice to Construct upgrade includes the City of Nixa's load.[124]  Trial Staff also argues that the Nixa Assets' integration and embeddedness with the entire SPP system was too generalized a benefit to rely upon, as the Commission already rejected relying upon benefits that are "general in nature and not specific to Zone 10 customers" in the Order Rejecting Settlement.[125]

47.     ARKMO notes that the Initial Decision does not respond to its argument that the failure of SPP and GridLiance to produce economic benefits or Locational Marginal Price benefits from the Nixa Assets to non-City of Nixa customers helps demonstrate that they have not met their burden.[126]

48.     ITOs also argue that there is no proof of planning benefits to non-City of Nixa Zone 10 customers, as the single incident noted by GridLiance only related to upgrades caused by overloads on the Nixa Assets.  ITOs argue that the sort of broad scale planning collaboration found in *Tri-State* is not present here.[127]  Moreover, ITOs argue that any

---

[120] Trial Staff Brief on Exceptions at 51.

[121] *Id.* at 54.

[122] ARKMO Brief on Exceptions at 39.

[123] Trial Staff Brief on Exceptions at 56.

[124] *Id.* at 57 (citing Ex. SPP-0026 at 17:14-23).

[125] *Id.* at 60 (citing Remand Order, 174 FERC ¶ 61,116 at P 41).

[126] ARKMO Brief on Exceptions at 53.

[127] ITOs Brief on Exceptions at 49-50.

Document Accession #: 20230228-3063          Filed Date: 02/28/2023

benefits related to future planning efforts are a red herring, as the costs of any resulting facilities will be recovered under Schedule 11 rather than the Schedule 9 costs at issue here.[128] ITOs and Trial Staff also argue that there are no environmental benefits from the Nixa Assets, as all claimed environmental benefits are general and stem from the construction of the Notice to Construct project rather than the Nixa Assets themselves, nor was there any evidence in the record that the Nixa Assets were a key factor in the retirement of the James River Power Station.[129]  Additionally, Trial Staff notes that the history of the Nixa Assets shows that they were used to transport electricity created from fossil fuels, unlike the multi-value projects at issue in other proceedings.[130]

49.    Trial Staff also argues that the Initial Decision's finding that there was an economic benefit to lessening the likelihood that SPP would need to use corrective action plans conflicted with its finding that GridLiance had not demonstrated economic benefits in terms of production cost savings to Zone 10 customers.[131]  Trial Staff notes that the argument over corrective action plans was speculative, as no study was performed and the testimony was uncertain at best.[132]

50.    Trial Staff argues that the evidence regarding maintenance benefits pales in comparison with what was offered in the Tri-State proceeding.[133]  Trial Staff notes that neither SPP nor GridLiance has identified any maintenance project Southwestern could conceivably have in the future that would require the Nixa Assets to remain in service.

51.    ARKMO, ITOs, and Trial Staff argue that the Initial Decision erred in finding that the benefits in this case were comparable to those found in the *Tri-State* case.[134]  ARKMO, ITOs, and Trial Staff argue that there were several specific, concrete benefits found in *Tri-State* that do not exist here, including NPPD benefiting from Tri-State's facilities by avoiding duplication of facilities; the historic joint transmission planning pursuant to a contractual arrangement between NPPD and Tri-State; and the fact that

---

[128] *Id.* at 51-52.

[129] *Id.* at 54; Trial Staff Brief on Exceptions at 47-48.

[130] Trial Staff Brief on Exceptions at 49.

[131] *Id.* at 43.

[132] *Id.* at 44.

[133] *Id.* at 45.

[134] ARKMO Brief on Exceptions at 56; ITOs Brief on Exceptions at 70; Trial Staff Brief on Exceptions at 24.

NPPD did not have a physical path to all of its loads without using Tri-State's facilities.[135] ARKMO argues that the *Tri-State* decision actually compels the conclusion that the cost shift here be ruled unjust and unreasonable.

52.     ITOs argue that the Initial Decision's comparison to *Tri-State* was in error because such comparison reduced the case to a single-question test: is the facility at issue a networked facility?  This test, the ITOs argue, would obviate the need for a case-by-case review of zonal networked facilities.[136]  ITOs and Trial Staff argue that the Initial Decision ignores key distinctions between this proceeding and the one in *Tri-State*, including a contractual arrangement in *Tri-State* that demonstrated that the facilities at issue were built to serve customers of both Tri-State and NPPD.[137]  Trial Staff notes that both NPPD and Tri-State could not reach their customers without using the other's facilities, which is not the case for the Nixa Assets.[138]  Trial Staff further argues that the contractual arrangement meant that NPPD and Tri-State operated as a single entity.[139]

53.     Trial Staff argues that the Initial Decision erred in finding that the City of Nixa is among those Zone 10 customers that can be considered when determining if there are more than incidental or trial benefits.[140]  Trial Staff argues that cost causation principles require that the cost shift be evaluated for parties who will now bear a part of the costs of the Nixa Assets.  Trial Staff notes that a cost shift occurs when a zonal placement "causes rates for one set of network customers to increase, and rates for other customers to decrease."[141]  Trial Staff also notes the decision in *Allegheny* as another reason not to believe that the Commission intended to include benefits to the City of Nixa in this case.[142]  Trial Staff argued that the Commission in that proceeding evaluated the benefits

---

[135] ARKMO Brief on Exceptions at 56-58.

[136] ITOs Brief on Exceptions at 70-71.

[137] *Id.* at 72-74; Trial Staff Brief on Exceptions at 24-26.

[138] Trial Staff Brief on Exceptions at 25.

[139] *Id.* at 26.

[140] *Id.* at 27.

[141] *Id.* at 29 (citing Initial Decision, 177 FERC ¶ 63,021 at P 43).

[142] *Id.* at 30 (citing *PJM Interconnection, L.L.C.*, 94 FERC ¶ 61,295, at 62,074 (2001) (*Allegheny*)).

to the non-Allegheny customers in the PPL Group Zone in PJM rather than justifying it based on benefits to Allegheny.[143]

### 3.    Briefs Opposing Exceptions

54.    GridLiance, SPP, and City Utilities assert that the Initial Decision correctly concluded that the Nixa Assets provide significant benefits to Zone 10 as a whole and specifically to non-City of Nixa customers.[144] GridLiance asserts that ITOs' and ARKMO's arguments that the Commission determined that integration benefits alone cannot justify a cost shift mischaracterize Commission orders in this proceeding.[145] GridLiance argues that the Nixa Assets provide the traditional integration benefits outlined in the Commission's *Mansfield* test and that no party disputes the corresponding benefits that the Nixa Assets provide to all Zone 10 customers.[146] SPP states that, consistent with prior zonal placement cases,[147] the Presiding Judge found that the "most compelling" evidence of benefits are the integration benefits.[148]

55.    GridLiance asserts that the Presiding Judge correctly held that the Nixa Assets provide reliability benefits that accrue specifically to Zone 10 customers.[149] GridLiance argues that reliability benefits occur any time a transmission asset helps avoid load shedding or other costly corrective actions, and that under several N-1-1 contingency conditions, the Nixa Assets reduce or eliminate the need for corrective actions.[150] GridLiance argues that ITOs fail to rebut the argument that an N-1-1 contingency does

---

[143] *Id.*

[144] GridLiance Brief Opposing Exceptions at 27; SPP Brief Opposing Exceptions at 16; City Utilities Brief Opposing Exceptions at 7.

[145] GridLiance Brief Opposing Exceptions at 31.

[146] *Id.* at 29 (citing *Mansfield Mun. Elec. Dept.*, Opinion No. 454, 97 FERC ¶ 61,134, at 61,613 (2001), *reh'g denied*, Opinion No. 454-A, 98 FERC ¶ 61,115 (2002) (*Mansfield*)).

[147] SPP Brief Opposing Exceptions at 16 (citing Initial Decision, 177 FERC ¶ 63,021 at P 155).

[148] *Id.* (quoting Initial Decision, 177 FERC ¶ 63,021 at P 123; Tr. at 109:13-17).

[149] GridLiance Brief Opposing Exceptions at 40.

[150] *Id.* at 40-41.

not have to be in Zone 10 for Zone 10 customers to benefit.[151]  Additionally, GridLiance asserts that without the Nixa Assets, the system will not be N-1 secure if one of the facilities in the N-1-1 contingency is out for maintenance.[152]

56.    GridLiance argues that ITOs and ARKMO misconstrue the metered power flow analysis on which the Presiding Judge found that power transfer benefits extend beyond the City of Nixa to non-City of Nixa customers.[153]  GridLiance argues that ITOs ignore flows out of Zone 10, give no reason for why only flows into Zone 10 matter, and conflate net flows as shown in the metered data with the flows shown in the shift factor analysis.[154]  GridLiance asserts that including the counterflows in the averaging of the metered data, as ARKMO suggests, exemplifies the problem of over-relying on the metered flow data to determine what power flows on the Nixa Assets.[155]  Additionally, SPP contends that, using ARKMO's power flow analysis of the Nixa Assets, the Nixa Assets are no different from transmission facilities that are directly connected to and serving ARKMO and that the City of Nixa receives similar reliability benefit from facilities connected to ARKMO as ARKMO claims it receives (or does not receive) from the Nixa Assets.[156]

57.    GridLiance opposes the argument from ITOs and ARKMO that flows modeled by Mr. Tsoukalis do not show what portion of the total flows serve the City of Nixa compared to other Zone 10 load.[157]  GridLiance cites *Allegheny* to argue that the Commission rejected similar arguments when it held that the transmission line at issue did not have to be the "exclusive" path to deliver energy and that alternative paths to deliver energy do not undermine the analysis.[158]  Additionally, GridLiance rebuts arguments from ITOs that the shift factor results identified by Mr. Tsoukalis are too small

---

[151] *Id.* at 34-35.

[152] *Id.* at 35.

[153] *Id.* at 44.

[154] *Id.* at 46-47.

[155] *Id.* at 47.

[156] SPP Brief Opposing Exceptions at 48-49 (citing Ex. SPP-006 at 25:1-27:2).

[157] GridLiance Brief Opposing Exceptions at 48.

[158] *Id.* at 48-49 (citing *Allegheny*, 95 FERC at 61,721).

by arguing that there is no industry standard minimum threshold for shift factors.[159] GridLiance asserts that the Initial Decision correctly rejected arguments from ITOs and ARKMO that the shift factor is unreliable and that any flows through and out of the Nixa Assets are inadvertent loop flows.[160]

58.     SPP contends that the Presiding Judge correctly found that evidence of a Notice to Construct demonstrated a reliability benefit to Zone 10.[161]  GridLiance and SPP agree that the City of Nixa did not cause the need for the Notice to Construct Project, but rather that SPP issued the Notice to Construct to GridLiance to address transmission line overloads resulting from the retirement of a City Utilities-owned power station.[162]  SPP and GridLiance argue that if SPP did not have functional control of the Nixa Assets, or if the Nixa Assets were not included in Zone 10, SPP faced less efficient and more costly alternatives to address the overload issue in Zone 10.[163]  SPP explains that the fact that the Nixa Assets are located in Zone 10 means that the costs associated with the upgrade are also recovered in Zone 10 rates, which results in an appropriate alignment of the cost of the transmission solution with the zone in which the issue of the excess flows originated.[164]  SPP asserts that the Notice to Construct ultimately validates the Zonal Placement Process and that SPP's criteria resulted in a zonal placement in this proceeding that aligned with cost causation by ensuring that the cause of a reliability issue and the solution are located in the same Zone.[165]

59.     SPP states that Trial Staff misconstrues SPP's argument by observing that the City of Nixa caused the need for the Nixa Assets,[166] but SPP notes that the Presiding Judge found evidence of reliability, integration, and power flow benefits to Zone 10 from the

---

[159] *Id.* at 50.

[160] *Id.* at 52.

[161] SPP Brief Opposing Exceptions at 28 (quoting Initial Decision, 177 FERC ¶ 63,021 at P 125).

[162] GridLiance Brief Opposing Exceptions at 32; SPP Brief Opposing Exceptions at 29-30 (citing Ex. SPP-0026 at 16:1-13; Ex. SPP-018 at 1; Tr. at 110:9-111:1).

[163] GridLiance Brief Opposing Exceptions at 33; SPP Brief Opposing Exceptions at 30 (quoting Ex. SPP-0026 at 17:3-14).

[164] SPP Brief Opposing Exceptions at 30 (quoting Ex. SPP-0026 at 17:3-14).

[165] *Id.* at 28-29, 31.

[166] *Id.* at 33 (citing Trial Staff Brief on Exceptions at 59).

Docket No. ER18-99-005                                                          - 27 -

Nixa Assets and thus appropriately found that Zone 10 should contribute to the costs of these facilities.[167]  SPP argues that, contrary to Trial Staff's arguments, the cause of the Notice to Construct project was Zone 10, which is further evidence that SPP's placement of the Nixa Assets in Zone 10 adhered to the cost causation principle.[168]

60.     SPP asserts that the Presiding Judge rightly concluded that the fact that many of the benefits in this proceeding are unquantifiable does not render them trivial or otherwise less meaningful in evaluating whether SPP's proposed zonal placement is just and reasonable.[169]  SPP maintains that benefits cannot always be, and do not need to be, quantified, which has been recognized by the Commission and the courts.[170]  SPP states that benefits cannot always be quantified in such a way as to make a cost-benefit analysis accurate or useful and emphasizes that SPP does not conduct a cost-benefit analysis as part of the Zonal Placement Process, nor has the Commission mandated it to do so.[171]  SPP argues that its approach properly reflects both the limited role of SPP as an independent RTO and the Commission's exclusive rate-setting authority, and that precedent states that the Commission need not quantify benefits.[172]

61.     GridLiance asserts that the Presiding Judge correctly refrained from distinguishing the City of Nixa from non-City of Nixa customers within Zone 10 and that the Commission did not require such a distinction to be made.[173]  City Utilities states that ARKMO's argument that the Initial Decision failed to carefully scrutinize the costs and benefits among the City of Nixa and non-City of Nixa facilities in Zone 10 amounts to "misdirection" designed to hide ARKMO's chief complaint that it does not get as much benefit as other Zone 10 facilities.[174]  SPP argues that the Presiding Judge's rejection of the "City of Nixa versus non-City of Nixa" premise is well grounded both in the SPP Tariff and the record, as under the Tariff, all customers in a pricing zone pay a rate based

---

[167] *Id.*

[168] *Id.* at 33-34.

[169] *Id.* at 25-26.

[170] *Id.* at 26-27 (quoting *Neb. Pub. Power Dist. v. FERC*, 957 F.3d 932, 941 (8th Cir. 2020) (*NPPD v. FERC*)).

[171] *Id.* at 27.

[172] *Id.* at 28 (citing Ex. SPP-0026 at 12:19-21).

[173] GridLiance Brief Opposing Exceptions at 56.

[174] City Utilities Brief Opposing Exceptions at 7-8.

on the ATRRs associated with all facilities in that zone, regardless of which facilities may have previously been used to provide service to a specific customer prior to the customer or the Transmission Owner joining the RTO.[175]  SPP argues that the Tariff and zonal rate constructs generally do not take such a customer-by-customer, facility-by-facility approach.[176]  SPP further notes that there is no single, monolithic "non-City of Nixa" group of customers, which supports the fact that all Zone 10 customers, including the City of Nixa, pay their load ratio share of the costs of all Zone 10 facilities, regardless of whether they derive the same benefits from individual facilities that other Zone 10 customers derive from those facilities.[177]

62.    SPP argues that it provided extensive evidence in support of its proposal to place the Nixa Assets in Zone 10, and while this evidence was not relied upon by the Presiding Judge, it provides context and lends additional support for the conclusion that SPP's proposal to place the Nixa Assets in Zone 10 is just and reasonable.[178]  SPP also argues that it provided key evidence that its decision to place the Nixa Assets in the same Zone as the City of Nixa load is consistent with Commission policy.[179]  SPP states that its "matching" of the load and assets in this case is consistent with the Commission's "Section 30.9" policy that allows Transmission Customers to receive billing credits if transmission facilities they own are integrated with the Transmission System, provided that they are paying rates within that same Zone,[180] which supports SPP's decision to include both the Nixa Assets and the City of Nixa load in the same Zone.[181]  SPP states that all that is required to obtain section 30.9 credits is a showing of integration, and the SPP Tariff contains a presumption of integration that may have applied had the City of Nixa sought section 30.9 credits.[182]

---

[175] SPP Brief Opposing Exceptions at 23.

[176] *Id.* at 24.

[177] *Id.* at 25.

[178] *Id.* at 35.

[179] *Id.* at 37.

[180] *Id.* at 38 (citing Tr. at 618:3-22).

[181] *Id.* (citing Tr. at 1625:1-5).

[182] *Id.*

Document Accession #: 20230228-3063     Filed Date: 02/28/2023

63.     SPP states that the Initial Decision rightly concluded that the differences between the instant proceeding and *Tri-State* are "immaterial factual differences."[183]  SPP asserts that, though the two proceedings have factual differences, that does not mean that the proposal to place the Nixa Assets in Zone 10 in this case is unjust and unreasonable.[184]  SPP contends that the types of benefits that the Commission found in *Tri-State* are analogous to the types of benefits that the Presiding Judge found in the Initial Decision.[185]  SPP explains that, specifically, in *Tri-State*, the Commission found integration benefits and reliability benefits that supported the decision to place the Tri-State transmission facilities in Zone 17.[186]  SPP further explains that, here, the Presiding Judge found that SPP and GridLiance demonstrated integration and reliability benefits from the Nixa Assets in Zone 10.[187]  SPP concludes that *Tri-State* demonstrates the types of benefits that may justify a zonal placement,[188] and that the record fully supports a finding that the types of benefits present in *Tri-State* are also present here.[189]

### 4.     Commission Determination

64.     We affirm the Presiding Judge's finding that the Nixa Assets provide benefits that accrue to Zone 10 customers.  As we discuss more fully below, the record supports the finding that the Nixa Assets provide integration, reliability, and power transfer benefits to Zone 10 customers.

65.     The main argument raised on exceptions is that the benefits that the Nixa Assets provide allegedly accrue mostly, if not entirely, to the City of Nixa rather than other Zone 10 customers.  We find that the Presiding Judge properly evaluated the benefits of the Nixa Assets to all Zone 10 customers – including the City of Nixa – rather than restricting his findings to non-City of Nixa customers.  The City of Nixa no longer owns the Nixa Assets, and did not own them at the time it joined SPP.  As a member of Zone 10, the City of Nixa will pay for a portion of the cost of the Nixa Assets, the same as other members.  Additionally, as SPP points out, under SPP's zonal rate design, all

---

[183] *Id.* at 40 (quoting Initial Decision, 177 FERC ¶ 63,021 at P 157).

[184] *Id.* at 40-41 (citing Ex. ARK-0076 at 72:24-73:8).

[185] *Id.* at 41-42.

[186] *Id.* at 42 (citing *Tri-State*, 163 FERC ¶ 61,109 at PP 106-14, 192).

[187] *Id.*; *see* Initial Decision, 177 FERC ¶ 63,021 at PP 123-125.

[188] SPP Brief Opposing Exceptions at 42.

[189] *Id.* at 42-43.

Document Accession #: 20230228-3063          Filed Date: 02/28/2023

customers in a pricing zone pay a rate based on the ATRRs associated with all transmission facilities in that zone, regardless of which facilities may have previously been used to provide service to a specific customer prior to the customer or the Transmission Owner joining the RTO.[190]  Thus, it was appropriate for the Presiding Judge to consider the benefits of the Nixa Assets to all Zone 10 customers, including the City of Nixa.

66.     We also note that in rejecting the contested settlement in this proceeding the Commission required a showing of benefits to Zone 10 customers as a whole rather than to one customer or group of customers.[191]  In the order on rehearing, the Commission noted:  "In particular, there is a dispute over whether all Zone 10 customers, including any non-ARKMO Cities customers in that zone, are negatively impacted in a way that does not outweigh the benefits of placing the Nixa Assets in that zone."[192]  We do not require that benefits be separately calculated for each customer, but benefits must be roughly commensurate to the costs incurred.  Accordingly, we evaluate both the benefits to Zone 10 customers as a whole and whether those benefits are shared among customers within the zone.

67.     We agree with the Presiding Judge that the Nixa Assets provide integration benefits to customers in Zone 10.  The Nixa Assets are integrated with the SPP transmission system, are available for use by SPP network transmission service customers, and provide an additional path for power flows that could be used by other customers in Zone 10 to serve load or access the market.[193]  The Nixa Assets serve as a tie between two BAAs and between two transmission pricing zones in the SPP footprint.[194]  The southern end of the Nixa Assets is located in the Southwestern BAA and Zone 10.  The northern end of the Nixa Assets is in the service territory of City Utilities, which is in the SPP BAA and part of Zone 3.  The Nixa Assets create a link

---

[190] *See id.* at 23.

[191] *See* Remand Order, 174 FERC ¶ 61,116 at P 41 ("we are not convinced that the record in this case shows that sufficient benefits will accrue to Zone 10 customers to justify the Settlement."); *id.* P 43 ("we are unable to determine that customers as a whole within Zone 10 will benefit from the Settlement.").

[192] Remand Rehearing Order, 175 FERC ¶ 61,235 at P 43.

[193] Initial Decision, 177 FERC ¶ 63,021 at P 100 (citing GridLiance Supplemental Initial Brief at 47-48 (citing Ex. GHP-0250 at 21:4-6)).

[194] *See* Ex. GHP-0229 at 4:13-5:2; Ex. GHP-0234 at 4:15-5:2.

between the Southwestern BAA and the SPP BAA, and between Zones 3 and 10.[195]  As
the Initial Decision notes, by having these two BAAs and SPP pricing zones connected
by transmission facilities that are now under SPP's control, there is an integration benefit
to Zone 10 customers and "those facilities can be planned more effectively and operated
more reliably than being outside the function and control of the RTO."[196]

68.     Participants on exceptions argue that these integration benefits go to the City of
Nixa rather than to other Zone 10 customers.  We disagree.  The benefits discussed above
improve the ability of SPP to serve all of the customers of Zone 10.  Evidence presented
at hearing shows that the Nixa Assets being integrated into SPP means they are part of
the system-wide planning models and can be used in central dispatch for the benefit of
Zone 10 customers.[197]  Parties also presented testimony to show that the integration of the
Nixa Assets assisted in the coordination of maintenance by allowing SPP to take outages
on certain facilities during peak conditions without having to wait for lower load
conditions.[198]  These benefits do not go entirely to the City of Nixa, as participants argue
on exceptions.

69.     The Presiding Judge also determined that the Nixa Assets provide reliability
benefits to Zone 10.  While we agree, we find that the record in this proceeding
demonstrates that those benefits are limited.  The Presiding Judge noted that
Mr. Tsoukalis's N-1-1 contingency analysis established the reliability benefit of the Nixa
Assets, supported the finding that the benefit accrues specifically to Zone 10 customers,
and showed that "the Nixa Assets' contribution to N-1-1 contingencies has value in terms
of lowering SPP's need to rely on [corrective action plans]."[199]  All parties agree that the
Nixa Assets provide significant reliability benefits to the City of Nixa.  As ARKMO
notes, in the absence of the Nixa Assets the City of Nixa could "go dark" at significant
cost.[200]  However, we agree that the evidence presented of reliability benefits to non-City
of Nixa customers is limited.  As ARKMO and ITOs note, the contingency analysis

---

[195] Ex. GHP-0234 at 4:15-5:2.

[196] Initial Decision, 177 FERC ¶ 63,021 at P 124 n.229 (quoting Tr. 109:13-17).

[197] *See* GridLiance Brief Opposing Exceptions at 39 (citing Ex. GHP-0229
at 12:5-13:2; Ex. SPP-0026 at 18:1-9).

[198] *See* Ex. GHP-0234REV at 21:11-21.

[199] Initial Decision, 177 FERC ¶ 63,021 at P 125.  An N-1-1 contingency analysis
considers the consecutive loss of two elements in a power system, distinct from an N-1
analysis, which evaluates the reliability effects of the loss of one element.

[200] *See* ARKMO Brief on Exceptions at 42.

Document Accession #: 20230228-3063    Filed Date: 02/28/2023

found that the Nixa Assets helped to address only one contingency within Zone 10, and even in that case they provided only a limited reliability benefit. As such, we find that there is a reliability benefit from the Nixa Assets to Zone 10, but it is a limited benefit to the zone as a whole. Notwithstanding this limited reliability benefit to the Zone as a whole, we find adequate evidence, as shown above, to uphold the Presiding Judge's finding.

70.     The Presiding Judge found that the Notice to Construct project did not constitute a separate benefit but served as anecdotal evidence in support of the integration and reliability benefits for Zone 10 customers from the Nixa Assets. We agree. Evidence presented at the hearing showed that Zone 10 load had benefitted from certain generating units that created counterflow from Zone 10 transmission facilities. Following the retirement of the generating units, SPP determined that flow in Zone 10 was causing an overload and, as a result, that upgrades to the Nixa Assets were necessary to resolve the problem. The integration of the Nixa Assets facilitated the development and implementation of the Notice to Construct project.[201] As discussed above, we find that the Schedule 11 costs associated with the Notice to Construct are not relevant to this proceeding, which addresses Schedule 9 costs associated with the inclusion of the Nixa Assets into Zone 10. However, we find that the Notice to Construct provides evidence of the integration benefits of the Nixa Assets to Zone 10 as the integration of the Nixa Assets into the SPP footprint within Zone 10 allowed SPP to plan more efficient upgrades to preserve reliability on the system.

71.     Participants on exceptions argue that GridLiance failed to meet its burden to show economic benefits from the Nixa Assets to Zone 10 customers. We affirm the Initial Decision's finding that a showing of economic benefits was not necessary.[202] While economic benefits may be relevant evidence to show that the costs of transmission facilities are allocated in a manner that is at least roughly commensurate with the benefits that they provide, the Commission has never required the showing of any particular benefit to support inclusion of transmission facilities in a zone.

72.     Participants on exceptions argue that the Initial Decision erred in failing to provide a quantification of the benefits. We agree that it is useful to quantify benefits in proceedings involving the integration of existing transmission facilities into an RTO, especially when attempting to compare them to a cost shift dollar figure. However, quantification of benefits is not necessary to a finding that benefits are roughly

---

[201] Initial Decision, 177 FERC ¶ 63,021 at P 125 n.233; SPP Brief Opposing Exceptions at 29-32 (citing Ex. SPP-0026 at 16:1-13, 17:3-14).

[202] Initial Decision, 177 FERC ¶ 63,021 at P 133.

Document Accession #: 20230228-3063          Filed Date: 02/28/2023

commensurate to costs.  As the Eighth Circuit stated when reviewing the Commission's orders in *Tri-State*:

> NPPD emphasizes that neither FERC nor Tri-State attempted to numerically quantify the benefits of placing Tri-State into Zone 17.  However, [*ICC I*] does not support the proposition that FERC must articulate a precise numerical value of benefits.  The [Seventh Circuit] did not suggest that [FERC] has to calculate benefits to the last penny, or for that matter to the last million or 10 million or perhaps 100 million dollars.  Rather, FERC must articulate more benefits than the no benefits or trivial benefits in [*ICC I*].[203]

73.     As we discuss further below, we find that there are more than trivial benefits from the inclusion of the Nixa Assets in Zone 10, as required by controlling precedent.

### C.     Costs vs. Benefits

#### 1.     Initial Decision

74.     The Presiding Judge concluded that the weight of the evidence in the record, relevant precedent, and logic support the finding that the benefits of the Nixa Assets to Zone 10 customers justify the cost shift involved.[204]

75.     The Presiding Judge noted that neither the Commission nor the courts have detailed the precise mechanics of comparing cost shifts and benefits.[205]  Following the Presiding Judge's determination that virtually every witness agreed that the benefits identified in this case are unquantifiable, and therefore a simple dollar-for-dollar comparison is not possible, the Presiding Judge decided to compare the findings in this case on cost shift and benefits with similar findings in cases where the Commission found the benefits and cost shifts were roughly commensurate.[206]  The Presiding Judge found this approach to be logical and legally sound.[207]

---

[203] *NPPD v. FERC*, 957 F.3d at 941 (internal quotations omitted).

[204] Initial Decision, 177 FERC ¶ 63,021 at P 153.

[205] *Id.* P 154.

[206] *Id.*

[207] *Id.*

76.    The Presiding Judge found that the most closely comparable precedent to this case is the *Tri-State* case in which the Commission upheld as just and reasonable the placement of Tri-State's assets into SPP's Zone 17.[208]  In making this determination, the Presiding Judge noted that NPPD challenged the placement of Tri-State's assets, and at every level, the Presiding Judge, the Commission, and the Eighth Circuit found that the benefits justified the $4.3 million cost shift.[209]  The Presiding Judge found that the benefits in this case are very similar to those benefits identified in *Tri-State*, and if similar benefits are roughly commensurate with the $4.3 million cost shift in *Tri-State*, then they should be more than sufficient to justify the lower cost shift in this proceeding.[210]

77.    The Presiding Judge recognized that some participants disputed whether the benefits alleged in this case are comparable to the benefits identified in *Tri-State*.[211]  In response, the Presiding Judge stated that attempts to distinguish the *Tri-State* benefits from the benefits identified in this case highlight immaterial factual differences rather than making meaningful distinctions.[212]  The Presiding Judge stated that, in *Tri-State*, the Commission relied on one method of proving the integration benefits while this case relied on witness testimony and analysis, other documentary evidence, and party admissions.[213]  This difference, the Presiding Judge stated, does not detract from the overall conclusion that both records support similar integration and power transfer benefits.[214]  Similarly, the Presiding Judge stated that it is a proper application of precedent to draw legal conclusions after comparing the facts in this case to those in *Tri-State* because the comparison is expected and is not barred by limitations in the record or by law of the case.[215]

78.    When considering the roughly commensurate test, the Presiding Judge found that neither the Commission nor the various courts of appeal have required the precise proportionate distribution of cost shifts and benefits that ITOs and ARKMO claim is

---

[208] *Id.* P 155.

[209] *Id.*

[210] *Id.*

[211] *Id.* P 156.

[212] *Id.* P 157.

[213] *Id.*

[214] *Id.*

[215] *Id.* P 160.

required.[216] The Presiding Judge stated that ITOs' formulation of the roughly commensurate standard would require the precise quantification of the distribution of benefits among customers that the Seventh Circuit explicitly did not require when it provided the roughly commensurate test in *ICC I*.[217] Additionally, the Presiding Judge noted that the Commission, in the *Tri-State* record, had a cost shift percentage estimate showing that NPPD would be required to pay 60% of the cost of the Tri-State facilities in Zone 17, yet in none of the decisions in the case did the Presiding Judge, the Commission, or the Eighth Circuit discuss the need to find that NPPD received 60% of the benefits in order to find that the benefits were roughly commensurate with the cost shift.[218] The Presiding Judge stated that, in *NPPD v. FERC*, the Eighth Circuit upheld the Commission's finding that there was an articulable and plausible reason to believe that the benefits were roughly commensurate with the costs without quantifying the benefits.[219] The Presiding Judge concluded that ITOs' reading of the roughly commensurate benefits standard had questionable legal support and made little logical or economic sense.[220]

79.     After finding that the benefits that accrue to Zone 10 customers from the Nixa Assets justify the cost shift, the Presiding Judge determined that alternate justifications for the cost shift and/or rate impact are unnecessary.[221] The Presiding Judge stated that SPP's reliance on a simple comparison of the revised Zone 10 rates to those in other zones is insufficient because it does not offer cost analysis safeguards or ensure that Zone 10 rates comport with cost causation principles.[222] Similarly, the Presiding Judge found that GridLiance's attempt to compare the rate impact of including GridLiance's ATRR in Zone 10 rates with hypothetical rate impacts unavailing because such comparisons do not answer whether the actual cost shift in this case is justified by the benefits in accordance with cost causation principles.[223]

---

[216] *Id.* PP 161-162.

[217] *Id.* P 165.

[218] *Id.* P 166.

[219] *Id.* P 167.

[220] *Id.* P 168.

[221] *Id.* P 172.

[222] *Id.* P 173.

[223] *Id.*

## 2.    **Briefs on Exceptions**

80.    ARKMO and ITOs argue that the Initial Decision misapplies precedent on cost causation, misunderstands the "roughly commensurate" standard, and fails to apply the cost-benefit analysis required by the Commission and mandated by the roughly commensurate test.[224]  ARKMO states that the court in *ICC I* found that while the Commission could presume that new transmission lines benefit the entire network, the Commission "cannot use the presumption to avoid the duty of comparing the costs assessed against a party to the burdens imposed or benefits drawn by that party."[225] ARKMO and ITOs argue that roughly commensurate means roughly proportionate, even if the proportions are not precisely determinable, and thus the costs of the Nixa Assets should be allocated proportionate to their use, based upon the decision in *ICC I*.[226]

81.    ARKMO points to the precedent in *ODEC*, where the D.C. Circuit found that it was "grossly disproportionate" to require a customer receiving 47% of benefits from one project and 43% from another to pay all of the costs of both projects.[227]  ITOs argue that this proportionality requirement is rooted in the fundamental principle that rates should be fair.  By contrast, ITOs argue that the Initial Decision's rejection of proportionality was based upon an incorrect conflation with precision; ITOs acknowledge that cost allocation cannot always be precise, but it can still be reviewed to determine whether it is grossly disproportionate.[228]

82.    ARKMO argues that the evidence in the record supports a finding of trivial and incidental benefits at most to the non-City of Nixa customers in Zone 10,[229] and ITOs argue that SPP and GridLiance as proponents have failed to meet their burden to quantify any benefits supporting the rate proposal.  ITOs argue that the claim that it is not

---

[224] ARKMO Brief on Exceptions at 59; ITOs Brief on Exceptions at 20.

[225] ARKMO Brief on Exceptions at 60 (quoting *ICC I*, 576 F.3d at 477).

[226] *Id.* at 64; ITOs Brief on Exceptions at 20.

[227] ARKMO Brief on Exceptions at 65 (quoting *Old Dominion Elec. Coop.*, 898 F.3d 1254, 1260-63 (D.C. Cir. 2018) (*ODEC*)).

[228] ITOs Brief on Exceptions at 23.

[229] ARKMO Brief on Exceptions at 70-73.

necessary to quantify benefits was rejected by the Seventh Circuit, which required the Commission to make some effort to quantify benefits.[230]

83.    ARKMO argues that the Initial Decision erred in rejecting the cost causation principle that rates must reflect in some degree the costs actually caused by the customer who pays them.  ARKMO argues that since 1966, when the City of Nixa began constructing a transmission and distribution system, the Nixa Assets were built solely for the use of the City of Nixa.[231]  ARKMO states that the Initial Decision is correct that Attachment AD of the SPP Tariff does not govern the placement here because it does not address whether cost shifts are justified by the benefits of the facilities at question.  However, ARKMO argues that the Initial Decision failed to address its argument that by relying on Attachment AD to make its placement decision, SPP failed to conduct a cost-causation or cost-benefit analysis and was thus unjust, unreasonable, and unduly discriminatory.[232]

84.    ITOs argue that the benefits to non-City of Nixa Zone 10 customers are not roughly commensurate to the costs, and argue that none of the four GridLiance or SPP witnesses testified that the benefits from the Nixa Assets to non-City of Nixa Zone 10 customers were roughly commensurate with the cost allocation proposal.[233]  ITOs argue that the parties with the burden of proof have failed to provide the required comparative analysis, and in every circumstance there is an inverse relationship between the party that receives the benefits from the Nixa Assets (the City of Nixa) and the parties that pay the costs (non-City of Nixa Zone 10 load).[234]  ITOs argue that the precedent in *Tri-State* shows that the cost shift here is unjust and unreasonable, as there is no mutual agreement to plan and coordinate the development of the Nixa Assets as there was in *Tri-State*.[235]  ITOs also argue that the Commission cannot rely upon SPP's Zonal Placement Process, as it was not filed at the Commission and SPP did not follow it properly by not assessing the cost shifts as part of its process.[236]

---

[230] ITOs Brief on Exceptions at 26 (citing *ICC II*, 756 F.3d at 562-63).

[231] ARKMO Brief on Exceptions at 78.

[232] *Id.* at 81-83.

[233] ITOs Brief on Exceptions at 75.

[234] *Id.* at 76-77.

[235] *Id.* at 79-80.

[236] *Id.* at 82.

### 3. Briefs Opposing Exceptions

85.     SPP, GridLiance, and City Utilities state that the Commission should deny the exceptions taken by participants on exceptions and affirm the Initial Decision's conclusion that correctly found that SPP's proposal to place the Nixa Assets in Zone 10 is just and reasonable and that SPP's filing in this proceeding is just and reasonable.[237]  SPP asserts that the sole issue before the Commission is whether the Initial Decision correctly found that sufficient evidence exists to demonstrate that SPP's proposed placement of the Nixa Assets in SPP pricing Zone 10 is just and reasonable.[238]  GridLiance asserts that many of the benefits provided by the Nixa Assets are undisputed and that they are roughly commensurate with the costs incurred by Zone 10 customers.[239]  For the disputed benefits, GridLiance argues that the opposing parties claim that they do not exist or that they are too small to matter by advancing invalid arguments and either providing no support or misconstruing record evidence.[240]

86.     SPP asserts that it has developed a detailed process for determining how best to add a new transmission owner and that transmission owner's transmission facilities to the SPP system, either through a new transmission pricing zone or inclusion in existing pricing zones.[241]  SPP states that this process, SPP's Zonal Placement Process, is set forth in a document that has been endorsed by SPP's Board of Directors.[242]  SPP further states that the Commission has acknowledged that SPP's criteria to determine zonal placement are appropriate in light of SPP's role as an independent RTO.[243]

87.     In this case, SPP explains that it proposed to place transmission facilities owned by GridLiance (and the associated ATRR) into Zone 10, with the costs recovered through

---

[237] SPP Brief Opposing Exceptions at 1; GridLiance Brief Opposing Exceptions at 1; City Utilities Brief Opposing Exceptions at 1.

[238] SPP Brief Opposing Exceptions at 6-7.

[239] GridLiance Brief Opposing Exceptions at 1.

[240] *Id.* at 1-2.

[241] SPP Brief Opposing Exceptions at 9-10 (citing *Sw. Power Pool, Inc.*, 106 FERC ¶ 61,110, at P 115, *order on reh'g*, 109 FERC ¶ 61,010 (2004); *E. Tex. Elec. Coop., Inc.*, 118 FERC ¶ 61,153, at P 4 (2007); Ex. SPP-001 at 10:4–11).

[242] *Id.* at 10.

[243] *Id.* (citing ITOs Complaint Order, 162 FERC ¶ 61,213 at P 62, *reh'g denied*, 165 FERC ¶ 61,005, at P 23 (2018); *NPPD v. FERC*, 957 F.3d at 932, 941).

Schedule 9 of the Tariff.[244] SPP asserts that the costs of all Schedule 9 transmission facilities in Zone 10 are recovered under that schedule from all Zone 10 customers, including the City of Nixa, even though the incumbent Transmission Owner in that Zone (i.e., Southwestern) was not required to demonstrate that each of its facilities that are included in Zone 10 Schedule 9 rates benefits each customer in the Zone, including the City of Nixa.[245] City Utilities disagree with ARKMO's assertion that the correct application of the roughly commensurate standard requires the Initial Decision to apply a detailed cost benefit analysis to all facilities in Zone 10.[246] SPP argues that no other SPP Transmission Owner has had to show that each of its transmission facilities that it includes in zonal rates provides unique or specific benefits to each customer in the Zone.[247] SPP argues that ITOs demand that SPP and/or GridLiance prove specific benefits to specific customers, but ITOs did not have to make similar showings to include all of their transmission facilities in Schedule 9 zonal rates to be recovered from all of the customers in those Zones.[248]

88.     SPP argues that ITOs and Trial Staff raise "policy considerations" that lack merit.[249] SPP states that ITOs claim the Initial Decision will "send an economic signal to low-cost transmission owners not to join SPP, for fear of being on the losing end of such a cost shift themselves," and that such a signal will jeopardize SPP's growth.[250] SPP asserts that the opposite is true, because SPP has created multi-owner Zones when necessary and SPP's footprint has continued to grow with new Transmission Owners and new customers.[251] SPP explains that its goal has always been to treat all similarly situated entities comparably, which it has done in this case with respect to GridLiance,

---

[244] *Id.* at 11.

[245] *Id.* (citing Initial Decision, 177 FERC ¶ 63,021 at P 81).

[246] City Utilities Brief Opposing Exceptions at 6.

[247] SPP Brief Opposing Exceptions at 11.

[248] *Id.*

[249] *Id.* at 12.

[250] *Id.* (quoting ITOs Brief on Exceptions at 15).

[251] *Id.* at 12 (citing *Sw. Power Pool, Inc.*, 106 FERC ¶ 61,110, at P 115, *order on reh'g*, 109 FERC ¶ 61,010 (2004); *E. Tex. Elec. Coop., Inc.*, 118 FERC ¶ 61,153, at P 4 (2007)).

the Nixa Assets, and the City of Nixa load.[252]  SPP states that it is required by the
Commission to incorporate new Transmission Owners and customers on a
non-discriminatory basis and, by comparing this case to past zonal placement precedents,
the Initial Decision also ensures that SPP continues to provide comparable,
non-discriminatory treatment to all Transmission Owners and customers.[253]

89.    SPP asserts that, contrary to ITOs' claims that the Initial Decision creates an
opportunity for "sleight of hand" by adopting a cost shift "test," this case does not create
any opportunity to game the Zonal Placement Process.[254]  SPP states that it appropriately
placed the Nixa Assets in Zone 10 only after following proper application of its Zonal
Placement Process and holistic consideration of all relevant factors, including whether to
place the Nixa Assets in a new zone.[255]  SPP notes that it and GridLiance introduced a
substantial amount of evidence in this proceeding to enable the Presiding Judge and the
Commission to make a determination that the placement of the Nixa Assets in Zone 10 is
just and reasonable, and the Presiding Judge found ample evidence in this case to
conclude that the benefits of including the Nixa Assets in Zone 10 outweigh any claims
of cost shift.[256]  Similarly, City Utilities argues that the evidence presented by SPP more
than justifies the placement of the Nixa Assets in Zone 10 as well as the resulting costs
shared among all Zone 10 facilities.[257]  GridLiance notes that ITOs made no attempt to
calculate benefits or costs.[258]

90.    SPP states that the fact that the City of Nixa originally built the Nixa Assets to
serve the City of Nixa load is of limited relevance to the assessment of whether including
the Nixa Assets in Zone 10 results in just and reasonable rates to Zone 10 customers.[259]
SPP notes that this same argument can be made for other legacy transmission facilities in

---

[252] *Id.* at 13.

[253] *Id.*

[254] *Id.* at 14.

[255] *Id.* (citing Initial Decision, 177 FERC ¶ 63,021 at P 123; Ex. SPP-001 at 10:1-11).

[256] *Id.*

[257] City Utilities Brief Opposing Exceptions at 7.

[258] GridLiance Brief Opposing Exceptions at 60-61.

[259] SPP Brief Opposing Exceptions at 47 (citing ITOs Brief on Exceptions at 90; ARKMO Brief on Exceptions at 25-26, 59).

Zone 10 and other facilities whose costs are recovered in Schedule 9 zonal rates, but asserts that, in particular, ITOs do not argue about the costs of their legacy facilities being recovered from all zonal customers through Schedule 9 zonal rates without any showing of specific benefits.[260]  SPP states that the City of Nixa pays its share of the costs of all Zone 10 transmission facilities, even though not all of those facilities have been shown to provide "unique" or "specific" benefits (reliability, economic, or otherwise) to the City of Nixa.[261]  SPP claims that, therefore, requiring SPP or GridLiance to show that all Zone 10 customers benefit from the Nixa Assets in a proportion equal to their load ratio shares would result in disparate treatment for both the Nixa Assets and the City of Nixa as compared to the rest of Zone 10.[262]

91.     According to SPP, the roughly commensurate standard requires that the Commission have an articulable and plausible reason to believe that the costs a customer pays are roughly commensurate with the benefits that customer receives.[263]  Therefore, the origin story of a specific transmission facility or set of facilities is a relevant consideration but is not dispositive of whether it confers benefits on the customers paying for that facility, and so it is not determinative in evaluating whether the placement of the Nixa Assets in Zone 10 is just and reasonable.[264]

92.     GridLiance and SPP support the Presiding Judge's reliance on *Tri-State* as the most closely comparable precedent, finding that the benefits derived from placement of the Nixa Assets in Zone 10 are roughly commensurate with the cost shift for all Zone 10 customers.[265]  SPP further supports the Presiding Judge's dismissal of ITOs' arguments regarding a proportionality requirement to the roughly commensurate standard, i.e., that each customer that pays a rate must receive the same quantified benefits from a set of facilities as other customers paying that same rate receive, and if a customer receives

---

[260] *Id.*

[261] *Id.* at 49 (citing Ex. ARK-0076 at 133:10-20).

[262] *Id.* at 50.

[263] *Id.* (citing Initial Decision, 177 FERC ¶ 63,021 at P 53; *ICC I*, 576 F.3d at 477).

[264] *Id.*

[265] GridLiance Brief Opposing Exceptions at 59; SPP Brief Opposing Exceptions at 50-51 (citing Initial Decision, 177 FERC ¶ 63,021 at PP 156, 161).

more benefits, it must pay a precise portion more of the costs of those facilities.[266]  SPP notes that, if this were true, ARKMO should pay more for the Zone 10 facilities to which each interconnects, which the Commission has not required and is contrary to the concept of zonal transmission rates in RTOs.[267]  SPP explains that ITOs' zonal rates would unravel if ITOs' and ARKMO's arguments regarding the roughly commensurate standard were true.[268]

93.  GridLiance asserts that the Initial Decision correctly rejected the argument from ITOs and ARKMO that the benefit-to-cost ratio under the roughly commensurate standard must be proportionate for all customers.[269]  GridLiance argues that *ODEC*, *ICC I*, and *ICC II* are regional cost allocation cases, none of which require the use of cost shift percentages or address the specific zonal placement considerations that arose in *Tri-State*.[270]  GridLiance argues that *ODEC* does not mandate that benefits and costs should be allocated solely on a percentage basis or in proportion to load ratio share.[271]  GridLiance argues that *ICC III* does not support ITOs' assertion that the benefit-to-cost ratio must be proportionate for all customers because the Seventh Circuit upheld the proposed cost allocation method despite allegations that some MISO members would contribute more than they benefit.[272]  GridLiance asserts that there are no cases requiring that specific dollar-for-dollar costs and benefits be assigned to specific customers.[273]

94.  GridLiance argues ITOs' proportionate benefits test is silent on the identity of the 89% of customers that ITOs contend require benefits, yet there is no single non-City of

---

[266] SPP Brief Opposing Exceptions at 51 (citing Initial Decision, 177 FERC ¶ 63,021 at PP 56, 206; *ICC II*, 756 F.3d at 556; Tr. at 1647:12-23, 1661:20-1662:3, 1671:3-25; *id.* at 1640:20-1641:6, 1642:13-18).

[267] *Id.* (citing Ex. SPP-0031 at 28:8-29:8).

[268] *Id.* at 52 (citing ITOs Brief on Exceptions at 19-29; Trial Staff Supplemental Initial Brief at 20 & n.82).

[269] GridLiance Brief Opposing Exceptions at 15.

[270] *Id.* at 16 (citing *ODEC*, 898 F.3d at 1254; *ICC I*, 576 F.3d at 470; *ICC II*, 756 F.3d at 556).

[271] *Id.* at 17.

[272] *Id.* at 18 (citing *ICC III*, 721 F.3d at 764).

[273] *Id.*

Nixa customer that pays 89% of the cost of the Nixa Assets.[274]  GridLiance argues that
adding up the load ratio share of ITOs and ARKMO comes to far less than 89%, and even
if ITOs' proportionate benefits theory applied, ITOs are vastly overstating the benefits
that would need to be demonstrated.[275]  GridLiance argues that under ITOs' proportionate
benefits theory, new entities joining SPP would only be afforded zonal cost allocation if
the new assets provide more benefits to others than they do to the newly joining entities,
but no other transmission owner in SPP, or any RTO, must meet this standard.[276]
GridLiance concludes that ITOs' theory creates a "perverse incentive" for a transmission
owner to minimize an asset's benefits to itself so that the owner can avoid the appearance
of lack of proportionality.[277]

95.     GridLiance argues that the Initial Decision correctly applied the roughly
commensurate standard because it followed Commission precedent, which requires a
case-by-case analysis that does not need to quantify the exact benefits to customers in a
zone.[278]  SPP emphasizes that the roughly commensurate standard requires that the
Commission have an articulable and plausible reason to believe that the costs a customer
pays are roughly commensurate with the benefits that customer receives; the roughly
commensurate standard does not require a comparison of the benefits one customer
receives with respect to the benefits another customer paying the same rate receives.[279]
SPP argues that the Seventh Circuit has clarified that "[w]e do not suggest that the
Commission has to calculate benefits to the last penny, or for that matter to the last
million or ten million or perhaps hundred million dollars."[280]  SPP states that the
Seventh Circuit relied on previous cases, which explain that "we have never required a
ratemaking agency to allocate costs with exacting precision,"[281] and that the Commission
"is not bound to reject any rate mechanism that tracks the cost-causation principle less

---

[274] *Id.* at 20-21.

[275] *Id.* at 21.

[276] *Id.* at 22.

[277] *Id.* at 22-23.

[278] *Id.* at 13.

[279] SPP Brief Opposing Exceptions at 53.

[280] *Id.* (quoting *ICC I*, 576 F.3d at 477).

[281] *Id.* at 54 (quoting *Midwest ISO Transmission Owners v. FERC*, 373 F.3d
at 1369).

than perfectly."[282]  SPP concludes that ITOs' assertions—that a customer paying twice as much costs must receive twice as much benefit—is thus unsupported.[283]  SPP also disagrees with ITOs' reliance on precedent in *ODEC v. FERC*,[284] stating that the Initial Decision instead rightly dismissed such precedent as distinguishable from this case because the zonal nature of the benefits at issue in this proceeding is inapposite to the regional benefits at issue in *ODEC*.[285]  SPP notes that ITOs make no effort to explain why this distinction should be ignored.[286]

96.      Furthermore, SPP states that the Presiding Judge correctly concluded that challenges to SPP's implementation of the Zonal Placement Process are immaterial.[287]  In particular, SPP avers that the Commission has stated that the fact that the Zonal Placement Process is not filed is irrelevant and that the criteria as part of the zonal placement analysis are based on appropriate considerations.[288]  SPP counters that, as demonstrated by the evidence in the record, it did follow the Zonal Placement Process in this proceeding, which included consideration of, *inter alia*, the history of integration in Zone 10, the power flows on the Zone 10 side of the Nixa Assets, and the requirements of Attachment AD of the SPP Tariff.[289]  City Utilities agrees that placing the costs of the Nixa Assets in Zone 10 is consistent with Attachment AD of the SPP Tariff.[290]

---

[282] *Id.*

[283] *Id.* (citing ITOs Brief on Exceptions at 27-29; ARKMO Brief on Exceptions at 66-68).

[284] *Id.* at 56 (citing *ODEC*, 898 F.3d at 1254).

[285] *Id.* at 56-57 (citing Initial Decision, 177 FERC ¶ 63,021 at P 167 n.327).

[286] *Id.* at 57.

[287] *Id.* (citing Initial Decision, 177 FERC ¶ 63,021 at PP 191-195).

[288] *Id.* at 57-58.

[289] *Id.* at 58-60 (citing Ex. SPP-001 at 13:14-17, 13:17-20; Tr. at 91:17-92:5; *OXY USA, Inc. v. FERC*, 64 F.3d 679, 692 (D.C. Cir. 1995); *Cities of Bethany v. FERC*, 727 F.2d 1131, 1136 (D.C. Cir. 1984); *Entergy Servs., Inc.*, 116 FERC ¶ 61,275, at P 32 (2006), *order on clarification*, 119 FERC ¶ 61,013, *order on reh'g*, 119 FERC ¶ 61,187 (2007), *order on reh'g & clarification*, 122 FERC ¶ 61,216 (2008)).

[290] City Utilities Brief Opposing Exceptions at 1.

97.     GridLiance argues that the Commission previously determined in *Tri-State* that *ICC I* and Order No. 494 do not support the argument that cost shifts that are "too high" are unjust and unreasonable.[291]  GridLiance explains that the Eighth Circuit upheld the Commission's determination, distinguishing the *Tri-State* zonal placement case from the RTO-wide rate change case that was proposed in *ICC I*.[292]  GridLiance quotes the Eighth Circuit stating that what is required is "an articulable and plausible reason to believe that the benefits are at least roughly commensurate with the costs."[293]

98.     GridLiance argues that SPP's placement of the Nixa Assets in Zone 10 is consistent with the Commission's comparability, cost causation, and roughly commensurate principles.[294]  GridLiance argues that the Commission recognizes that it has accepted SPP Tariff provisions in the past even though they could result in cost shifts.[295]  GridLiance concludes that comparability requires that the Nixa Assets be accorded rolled-in rate treatment, which is the same rate treatment as facilities currently in Zone 10 rates.[296]

### 4.     **Commission Determination**

99.     We affirm the Presiding Judge's finding that the benefits from the Nixa Assets justify the costs of their inclusion into Zone 10.  As noted above, the Commission has found that if an existing transmission owner and its customers in a zone benefit from a new transmission owner's facilities, then it may be just and reasonable for some cost responsibility for the new transmission owner's facilities to shift to the existing transmission owner and its customers.[297]  By contrast, "cost shifts that result in significant rate increases to customers, but which are unaccompanied by commensurate benefits, are unjust and unreasonable."[298]  Ultimately, the Commission must determine whether the benefits of the Nixa Assets to the customers of Zone 10 are roughly

---

[291] GridLiance Brief Opposing Exceptions at 14.

[292] *Id.* at 14-15.

[293] *Id.* at 62 (quoting *NPPD v. FERC,* 957 F.3d at 941).

[294] *Id.* at 80.

[295] *Id.*

[296] *Id.* at 82.

[297] ITOs Complaint Order, 162 FERC ¶ 61,213 at P 63.

[298] *Tri-State*, 163 FERC ¶ 61,109 at P 191.

commensurate with the costs of the Nixa Assets in order to justify their inclusion within the zone.

100.    The Initial Decision relies upon the Commission's decision in *Tri-State* to support its finding that the benefits here justify the costs.  While we agree that the Commission's decision in *Tri-State* provides useful precedent for proceedings involving zonal placement in SPP, we agree with ARKMO and ITOs that the Initial Decision ignores important distinctions between the two proceedings.  Most notably, the transmission facilities in *Tri-State* were constructed pursuant to a joint agreement between Tri-State and NPPD, under which Tri-State and NPPD transmission facilities were developed and operated as an integrated whole for the parties' joint use and mutual benefit.[299]  The Commission in *Tri-State* found, in part, that NPPD benefitted from the Tri-State transmission facilities because NPPD used them to serve its load and that otherwise NPPD would have had to construct its own facilities to serve its load.[300]  Such coordination does not exist here.

101.    However, as the Commission said in the ITOs Complaint Order, we evaluate cost shifts on a case-by-case basis, and the distinctions between this proceeding and the facts in *Tri-State* do not mean that the zonal placement proposed by SPP is not just and reasonable here.  We find that, based upon the evidence presented as a whole, the benefits to Zone 10 customers from the Nixa Assets are roughly commensurate with their costs and that SPP's filing is thus just and reasonable.  We base this determination on the reliability and power transfer benefits to the customers in Zone 10 and the City of Nixa in particular, but mostly on the extensive integration benefits from the Nixa Assets to Zone 10 customers as developed at hearing.[301]  The Commission has long recognized the value of integrated transmission to network transmission customers.  The Commission has a long-standing policy of rolling in the costs of networked transmission facilities into rates – including the types of zonal rates at issue here – because "the transmission network is a single interconnected system serving and benefiting all transmission customers and it is this interconnected nature that makes for a reliable system consistently providing for the delivery of electric energy to all customers."[302]

---

[299] *Id.* P 192.

[300] *Id.* P 194.

[301] Initial Decision, 177 FERC ¶ 63,021 at PP 123-124.

[302] *City of Anaheim*, 113 FERC ¶ 61,091, at P 34 (2005).  *See also Ne. Tex. Elec. Coop., Inc.*, Opinion No. 474, 108 FERC ¶ 61,084, at P 47 (2004) ("Due to the integrated nature of the transmission network, network facilities benefit all network users.  It does

102.     We find that these extensive integration benefits are roughly commensurate with the costs of the Nixa Assets to Zone 10 members.  Consistent with the cost causation principle, we find that it is just and reasonable to allocate the costs of the Nixa Assets to transmission customers in Zone 10, who benefit from the integration of the Nixa Assets.

103.     ARKMO and ITOs argue that the Commission should read "roughly commensurate" to mean "roughly proportionate" such that any costs of a facility should be distributed proportionate to its usage.  Such a reading is contrary to Commission precedent and inconsistent with how costs are allocated within SPP.  As the Initial Decision correctly noted, the Commission has not required the precise quantification of the distribution of benefits to other customers in other zonal placement cases.[303]  We do not view the Seventh Circuit decisions in *ICC I* and *ICC II* or the D.C. Circuit's decision in *ODEC* as requiring any such proportionality finding.[304]  However, as the Initial Decision points out, even if one were to read them as such, those decisions do not necessarily apply to zonal placement decisions such as this one.[305]  Indeed, it is impossible to square a proportionality requirement as argued for by ARKMO and the ITOs with the zonal rates as approved by the Commission in SPP.  As SPP points out in its brief, such a requirement would require a demonstration that any facility provides all other customers in a zone with benefits proportionate to their load-ratio share before its costs could be included in zonal rates, a nearly impossible task and contrary to the purpose of zonal rates in the first place.[306]

---

not matter whether the facilities were installed to meet a particular customer's request for service.").

    [303] Initial Decision, 177 FERC ¶ 63,021 at P 166.

    [304] *See Midwest Indep. Trans. Sys. Operator, Inc.*, 137 FERC ¶ 61,074, at P 121 (2011) (finding that the Seventh Circuit in *ICC I* did not require a utility-by-utility cost benefit analysis), *aff'd in part*, *ICC III*, 721 F.3d at 774.

    [305] *See* Initial Decision, 177 FERC ¶ 63,021 at P 167 (citing Remand Order, 174 FERC ¶ 61,116 at P 39; ITOs Complaint Order, 162 FERC ¶ 61,213 at P 70); *see also NPPD v. FERC*, 957 F.3d at 941 (distinguishing zonal placement case from the RTO-wide rate change in *ICC I* and *ICC II*).

    [306] SPP Brief Opposing Exceptions at 52.

Docket No. ER18-99-005                                          - 48 -

### D.   Other Issues

#### 1.   Initial Decision

104.    The Presiding Judge stated that alternative proposals from ITOs and ARKMO to mitigate the rate impact of the placement of the Nixa Assets in Zone 10 are unsupported.[307]  The Presiding Judge stated that ITOs proposed to mitigate the cost shift by including both the City of Nixa's load and the Nixa Assets in Zone 10 for operational and planning purposes, but to assign all of the costs of the Nixa Assets directly to the City of Nixa's load through a subzonal charge.[308]  However, the Presiding Judge expressed uncertainty as to whether ITOs presented the proposal as a formal alternative.[309]  The Presiding Judge also noted that while ARKMO initially proposed to allocate the costs of the Nixa Assets to both Zones 3 and 10, ARKMO later softened its support of the proposal before abandoning it in favor of ITOs' subzonal rate proposal.[310]

105.    Despite remaining unclear about whether ITOs and ARKMO planned to advance the alternative proposals for adoption by the Commission, the Presiding Judge rejected them in the interest of clarity.[311]  The Presiding Judge stated that there was no need to consider whether alternative placements or mitigation proposals were more appropriate because the Presiding Judge previously determined that the proposed zonal placement satisfies cost causation principles as articulated by the Commission and the Courts of Appeals.[312]  The Presiding Judge noted that Trial Staff and City Utilities pointed out that the Commission has limited authority under section 205 of the FPA to impose an entirely new rate scheme in place of the proposal in the SPP Filing.[313]

106.    The Presiding Judge found that ARKMO and ITOs could pursue their alternative proposals under section 206 of the FPA, but the Presiding Judge asserted that their

---

[307] Initial Decision, 177 FERC ¶ 63,021 at P 181.

[308] *Id.* P 182.

[309] *Id.*

[310] *Id.* P 183.

[311] *Id.* P 186.

[312] *Id.*

[313] *Id.*

advocacy in this proceeding did not meet the required burden of proof.[314]  The Presiding Judge stated that neither ITOs nor ARKMO demonstrated that the SPP Filing is unjust and unreasonable, and there is a substantial question in the record about whether the alternative placement and mitigation proposals are themselves just and reasonable.[315]

## 2. <u>Briefs on Exceptions</u>

107.    ARKMO and ITOs argue that the Initial Decision erred and shifted the burden of proof by requiring them to meet an FPA section 206 burden to demonstrate an alternative replacement rate that is just and reasonable.[316]  ITOs argue that, under FPA section 205, the filing party (i.e., SPP) bears the burden of proof to show that its proposal is just and reasonable, and that the Initial Decision impermissibly shifts the burden to them at several points to deny the existence of benefits.[317]  ARKMO and ITOs argue that SPP's proposed cost allocation should be rejected; SPP can choose among any alternatives that meet the cost causation principle and propose, under FPA section 205, a new cost allocation at least roughly in line with benefits.[318]

108.    ITOs state that the subzonal rate proposal was offered to demonstrate that mitigation is possible, in contrast to the claims of SPP.  ITOs argue that the subzonal rate mitigation proposal is not "patently unduly discriminatory" as the proposal is just and reasonable and consistent with principles of cost causation.  ITOs argue that comparability does not require the same rates for customers that are not similarly situated, and that other facilities in Zone 10 such as the Southwestern facilities provide broader benefits to the Zone than the Nixa Assets.[319]

---

[314] *Id.* P 187.

[315] *Id.*

[316] ARKMO Brief on Exceptions at 91; ITOs Brief on Exceptions at 83-84.

[317] ITOs Brief on Exceptions at 83-84.

[318] ARKMO Brief on Exceptions at 92; ITOs Brief on Exceptions at 85.

[319] ITOs Brief on Exceptions at 87-88.

### 3.    Briefs Opposing Exceptions

109.    SPP states that the Presiding Judge correctly dismissed ITOs' mitigation proposals.[320]  SPP asserts that, because the initial filing was submitted pursuant to FPA section 205, the sole issue in this proceeding is whether SPP's proposal to include the Nixa Assets and ATRR in Zone 10 is just and reasonable; the issue at hand is not whether some other proposal may or may not be just and reasonable or preferable.[321]  SPP and GridLiance argue that ARKMO's and ITOs' alternative proposals cannot be imposed or adopted in this case.[322]

110.    GridLiance argues that rate mitigation is not necessary because the rate impacts are small in dollar terms, rate impacts are declining, there is no rate shock, and rates in Zone 10 with the Nixa Assets included are lower than the rates in half of all SPP rate zones.[323]  GridLiance argues that no party has shown that rate mitigation or other remedies are required, especially after SPP and GridLiance met their burden to demonstrate that the decision to place the Nixa Assets in Zone 10 is just and reasonable.[324]  SPP argues that the "mitigation" alternatives proposed by ITOs and ARKMO fail on their merits, and the Presiding Judge was right to reject these alternatives, and the Commission should reject them as well.[325]

111.    SPP states that the Presiding Judge correctly labeled ITOs' proposal for a subzonal rate for the City of Nixa as "patently unduly discriminatory," arguing that this subzonal rate would result in a rate calculation for the City of Nixa that differs from how SPP calculates rates for every other SPP Transmission Customer and that uses a calculation methodology that does not exist under the SPP Tariff.[326]  Moreover, SPP states that this proposal appears to impose a "pancaked rate," which the Commission wanted to avoid because it would require SPP to treat the Nixa Assets and other Zone 10 facilities as separate transmission systems based on historical ownership and to charge the City of

---

[320] SPP Brief Opposing Exceptions at 60 (citing Initial Decision, 177 FERC ¶ 63,021 at P 186).

[321] *Id.* at 60-61.

[322] *Id.* at 61; GridLiance Brief Opposing Exceptions at 77.

[323] GridLiance Brief Opposing Exceptions at 77.

[324] *Id.*

[325] SPP Brief Opposing Exceptions at 62 (citing ITOs Brief on Exceptions at 84).

[326] *Id.* (citing Initial Decision, 177 FERC ¶ 63,021 at P 187 n.362).

Nixa separately calculated charges for service across those two systems, which violates Commission policy.[327]

112.    GridLiance argues that the creation of a subzone, even for a limited time period, would be unduly discriminatory to the City of Nixa and also require changes to the SPP Tariff, which would require a section 206 proceeding.[328]  SPP contends that no other Zone 10 customer has been segregated from the other customers for purposes of tracking its legacy costs and ITOs are advocating that the City of Nixa should be treated differently under the SPP Tariff from any other SPP network service customer.[329]  SPP asserts that such proposal is not supported by precedent.[330]  SPP further explains that Zone 10 rates cannot be so neatly divided into the City of Nixa's "legacy costs" and "non-City of Nixa" customers' "legacy costs" because each Zone 10 customer is distinct, but not distinctly tied to a facility or common set of "legacy costs."[331]

113.    Additionally, SPP rejects ARKMO's proposal to split the Nixa Assets between Zone 3 and Zone 10 because the entirety of the City of Nixa load is included in Zone 10.[332]  SPP notes that, though there may be other proposals where placement of a Transmission Owner's systems is disbursed among multiple SPP Zones, each zonal placement case involves a case-by-base evaluation and thus a split of assets across

---

[327] *Id.* at 63-64 (citing *Reg'l Transmission Orgs.*, Order No. 2000, FERC Stats. & Regs., ¶ 31,089, at 31,174-75 (1999) (cross-reference at 89 FERC ¶ 61,285), *order on reh'g*, Order No. 2000-A, FERC Stats. & Regs., ¶ 31,092 (2000) (cross-referenced at 90 FERC ¶ 61,201), *petitions for review dismissed sub nom. Pub. Util. Dist. No. 1 v. FERC*, 272 F.3d 607 (D.C. Cir. 2001)).

[328] GridLiance Brief Opposing Exceptions at 78.

[329] SPP Brief Opposing Exceptions at 63-64 (citing Tr. at 1521:25-1522:1, 1393:21-23).

[330] *Id.* at 65 (citing *ICC I*, 576 F.3d at 477 ("We do not suggest that the Commission has to calculate benefits to the last penny, or for that matter to the last million or 10 million or perhaps 100 million dollars."); *Midwest ISO Transmission Owners v. FERC*, 373 F.3d at 1369 ("[W]e have never required a ratemaking agency to allocate costs with exacting precision."); *Sithe/Indep. Power Partners, L.P. v. FERC*, 285 F.3d at 5 ("FERC is not bound to reject any rate mechanism that tracks the cost-causation principle less than perfectly.")).

[331] *Id.* at 66.

[332] *Id.* at 66-67 (citing Ex. SPP-006 at 37:24-39:18; Ex. SPP-0031 at 37:7-38:13; Tr. at 643:3-18).

multiple zones in another case with substantially different facts does not guide the outcome here.[333]  SPP states that this proposal to split the Nixa Assets lacks merits and the Presiding Judge rightfully disregarded it.[334]

114.   City Utilities argues that assigning any cost responsibility for facilities serving Zone 10 City of Nixa load to City Utilities customers in Zone 3 is inappropriate and that alternative zonal placements at this stage are beyond the Commission's authority under section 205 because such placements would result in an "entirely different rate design" than that originally proposed by SPP in its filing.[335]  Additionally, City Utilities contends that ARKMO's argument to shift at least a portion of the costs of the Nixa Assets to City Utilities customers in Zone 3 is not only inconsistently applied, but is thoroughly refuted by the analysis in the Initial Decision that found SPP's filing satisfied the relevant cost causation principles.[336]

###       4.       Commission Determination

115.   We affirm the Presiding Judge's dismissal of the alternative rate proposals made by intervenors.  Pursuant to FPA section 205, SPP bears the burden of proof with respect to its proposal.  Although ARKMO and the ITOs argue that the Presiding Judge improperly shifted the burden to them, in fact the Initial Decision found that SPP had met its burden under section 205 to show that its proposal was just and reasonable.  Because we affirm the Presiding Judge's finding that SPP's proposal is just and reasonable, we need not consider whether the proposal is more or less reasonable than other alternatives.[337]

---

[333] *Id.* at 67.

[334] *Id.*

[335] City Utilities Brief Opposing Exceptions at 8 (citing *NRG Pwr. Mktg. v. FERC*, 862 F.3d 108, 114-116 (D.C. Cir. 2017); *W. Res. v. FERC*, 9 F.3d 1568, 1578 (D.C. Cir. 1993)).

[336] *Id.* at 9.

[337] *See PJM Interconnection, L.L.C.*, 169 FERC ¶ 61,038, at P 12 (2019) (citing *OXY USA, Inc. v. FERC*, 64 F.3d at 679, 692 (finding that under the FPA, as long as the Commission finds a methodology to be just and reasonable, that methodology "need not be the only reasonable methodology, or even the most accurate one"); *Cities of Bethany v. FERC*, 727 F.2d at 1131, 1136 (when determining whether a rate was just and reasonable, the Commission properly did not consider "whether a proposed rate schedule is more or less reasonable than alternative rate designs")).

Document Accession #: 20230228-3063   Filed Date: 02/28/2023
Docket No. ER18-99-005                                                  - 53 -

<u>The Commission orders</u>:

     The Initial Decision is hereby affirmed, as discussed in the body of this order.

By the Commission.

( S E A L )

                                    Debbie-Anne A. Reese,
                                    Deputy Secretary.

Document Content(s)

ER18-99-005.docx......................................................1

# Exhibit 2

183 FERC ¶ 62,048
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Southwest Power Pool, Inc.                           Docket No. ER18-99-007

NOTICE OF DENIAL OF REHEARING BY OPERATION OF LAW AND
PROVIDING FOR FURTHER CONSIDERATION

(May 1, 2023)

Rehearing has been timely requested of the Commission's order issued on
February 28, 2023, in this proceeding. *Southwest Power Pool*, Inc., 182 FERC ¶ 61,141
(2023). In the absence of Commission action on a request for rehearing within 30 days
from the date it is filed, the request for rehearing may be deemed to have been denied.
16 U.S.C. § 825*l*(a); 18 C.F.R. § 385.713 (2022); *Allegheny Def. Project v. FERC*,
964 F.3d 1 (D.C. Cir. 2020) (en banc).

As provided in 16 U.S.C. § 825*l*(a), the request for rehearing of the above-cited
order filed in this proceeding will be addressed in a future order to be issued consistent
with the requirements of such section. As also provided in 16 U.S.C. § 825*l*(a), the
Commission may modify or set aside its above-cited order, in whole or in part, in such
manner as it shall deem proper.

Kimberly D. Bose,
Secretary.

Document Accession #: 20230501-3006     Filed Date: 05/01/2023

Document Content(s)

ER18-99-007.docx.......................................................1

# Exhibit 3

184 FERC ¶ 61,004
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Willie L. Phillips, Acting Chairman;
James P. Danly, Allison Clements,
and Mark C. Christie.

Southwest Power Pool, Inc.                    Docket No. ER18-99-007

ORDER ADDRESSING ARGUMENTS RAISED ON REHEARING

(Issued July 5, 2023)

1.      On February 28, 2023, the Commission issued an order[1] addressing exceptions to an Initial Decision issued on December 6, 2021.[2]  The Initial Decision concerned disputes arising from Southwest Power Pool, Inc.'s (SPP) proposal to revise its Open Access Transmission Tariff (Tariff) to include the annual transmission revenue requirement (ATRR) of transmission facilities associated with the City of Nixa, Missouri (City of Nixa), owned by GridLiance High Plains LLC (GridLiance),[3] in one of SPP's existing transmission pricing zones, SPP Pricing Zone 10 (Zone 10), for purposes of rate recovery (Nixa Assets).  In the Initial Decision, the Presiding Judge concluded that SPP's proposal to incorporate the Nixa Assets in Zone 10 is consistent with cost causation principles and is otherwise just and reasonable.  In the Order on Initial Decision, the Commission affirmed the Initial Decision.  On March 29, 2023, a joint request for rehearing was filed by the ARKMO Cities (ARKMO)[4] and a group of SPP transmission owners (ITO).[5]

---

[1] *Sw. Power Pool, Inc.*, 182 FERC ¶ 61,141 (2023) (Order on Initial Decision).

[2] *Sw. Power Pool, Inc.*, 177 FERC ¶ 63,021 (2021) (Initial Decision).

[3] GridLiance was formerly known as South Central MCN LLC.

[4] ARKMO consists of the following customers within Zone 10:  Paragould Light Water & Cable; Paragould Light Commission; Poplar Bluff Municipal Utilities; Kennett Board of Public Works; City of Piggott Municipal Light, Water & Sewer; and the City of Malden.

[5] ITOs filing the request for rehearing consist of the following transmission owners:  Evergy Kansas Central, Inc., Evergy Metro, Inc., and Evergy Missouri West, Inc.; American Electric Power Service Corporation, on behalf of its affiliates Public

2.      Pursuant to *Allegheny Defense Project v. FERC*,[6] the rehearing request filed in this proceeding may be deemed denied by operation of law. However, as permitted by section 313(a) of the Federal Power Act (FPA),[7] we are modifying the discussion in the Order on Initial Decision and continue to reach the same result in this proceeding, as discussed below.[8]

## I.      **Background**

3.      SPP uses a zonal rate design, pursuant to which its footprint is separated into a number of transmission pricing zones for purposes of establishing transmission service rates. The Tariff specifies a zonal ATRR for each pricing zone that is based on the sum of the ATRRs for each transmission owner in the zone. Generally, the charges for Network Integration Transmission Service (network service) in a pricing zone are calculated by multiplying a customer's percentage share of total load in the zone (i.e., its load ratio share) by the zonal ATRR.[9] When a new transmission owner is added to an existing pricing zone, the ATRR for its transmission facilities in the zone and any associated load not already included in the zonal load are added to the existing zone's

---

Service Company of Oklahoma and Southwestern Electric Power Company; Xcel Energy Services Inc., on behalf of its affiliate Southwestern Public Service Company; and Western Farmers Electric Cooperative.

      [6] 964 F.3d 1 (D.C. Cir. 2020) (en banc).

      [7] 16 U.S.C. § 825*l*(a) ("Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b), the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.").

      [8] *Allegheny Def. Project*, 964 F.3d at 16-17. The Commission is not changing the outcome of the Order on Initial Decision. *See Smith Lake Improvement & Stakeholders Ass'n v. FERC*, 809 F.3d 55, 56-57 (D.C. Cir. 2015).

      [9] *See* SPP, Tariff, pt. III (Network Integration Transmission Service), § 34.1 (Monthly Demand Charge) (3.0.0); *see also id.*, Schedule 9 (Network Integration Transmission Service) (9.0.0). Schedule 9 under SPP's Tariff describes that the transmission customer taking network service shall pay a monthly demand charge for the SPP Pricing Zone where the load is located.

zonal ATRR and total load.  Rates for point-to-point transmission service are also based on the zonal ATRR and load, and are set forth in Attachment T of the Tariff.[10]

4.      In 2017, SPP instituted a new Transmission Owner Zonal Placement Process (Zonal Placement Process) to review and determine zonal placement for existing transmission facilities that new SPP transmission-owning members propose to include under the SPP Tariff.  A group of SPP transmission owners challenged the SPP Zonal Placement Process, arguing that allocating the costs of a new SPP member's transmission facilities to existing customers of a zone results in an unjust and unreasonable cost shift between new and existing transmission customers.[11]  Although the Commission denied the complaint,[12] the Commission also stated that parties may challenge the placement of a new transmission owner's facilities in a transmission pricing zone.[13]

5.      The Nixa Assets consist of approximately 10 miles of transmission lines and related facilities interconnected to Southwestern Power Administration (Southwestern) in Zone 10 and to City Utilities of Springfield, Missouri (City Utilities) in SPP Pricing Zone 3 (Zone 3).[14]  On October 18, 2017, SPP submitted proposed Tariff revisions to add an ATRR and a formula rate template and implementation protocols for the Nixa Assets. SPP explained that it had used its Zonal Placement Process to place the facilities in Zone 10.  Several parties protested SPP's filing, raising concerns about the rate impact on

---

[10] *See* Order on Initial Decision, 182 FERC ¶ 61,141 at P 3 n.4 (summarizing Schedules 8, 9, 10 regarding point-to-point service).

[11] *Indicated SPP Transmission Owners v. Sw. Power Pool, Inc.*, 162 FERC ¶ 61,213 (ITOs Complaint Order), *reh'g denied*, 165 FERC ¶ 61,005 (2018) (ITOs Complaint Rehearing Order).

[12] Order on Initial Decision, 182 FERC ¶ 61,141 at P 4 (summarizing the basis for the Commission's denial of the complaint in the ITOs Complaint Order and ITOs Complaint Rehearing Order).

[13] ITOs Complaint Order, 162 FERC ¶ 61,213 at P 74.

[14] GridLiance acquired the Nixa Assets from the City of Nixa on April 1, 2018. Missouri Joint Municipal Electric Utility Commission then acquired the Nixa Assets from GridLiance on May 19, 2022.  *See Sw. Power Pool*, 179 FERC ¶ 61,134, at P 1, 4 (2022).

Document Accession #: 20230705-3018          Filed Date: 07/05/2023
Docket No. ER18-99-007                                                          - 4 -

customers in Zone 10.  On March 15, 2018, the Commission set the Tariff revisions for hearing and settlement judge procedures.[15]

6.          On August 30, 2019, SPP submitted an offer of settlement in the hearing docket on behalf of GridLiance and ARKMO.  The Commission issued an order on February 18, 2021 rejecting the contested settlement and remanding the proceeding to the Chief Administrative Law Judge to resume hearing procedures.[16]  The Commission found that there was insufficient evidence in the record to determine whether and the extent to which there are cost shifts involved in the placement of the Nixa Assets in Zone 10 or benefits that may accrue that would justify any such cost shifts.[17]  The Commission noted in particular that "this issue [regarding the benefits that may accrue to justify any cost shift] was not thoroughly briefed because many of the parties argued that the cost shift issue was outside the scope of the proceeding."[18]

7.          On December 6, 2021, the Presiding Judge issued the Initial Decision, which addressed three general issues:  (1) whether, and to what extent, the placement of the Nixa Assets in Zone 10 involves a cost shift; (2) whether benefits accrue to Zone 10 customers as a result of placing the Nixa Assets in Zone 10; and (3) whether the benefits justify the cost shift.  The Presiding Judge determined that SPP's proposal to incorporate the Nixa Assets in Zone 10 is consistent with cost causation principles and is otherwise just and reasonable.[19]  Specifically, the Presiding Judge found that:  (1) the placement of the Nixa Assets in Zone 10 will result in a $1.8 million cost shift to Zone 10 customers; (2) the Nixa Assets accrue substantial, specific, but unquantifiable benefits (i.e., integration benefits, reliability enhancements, and support for power transfers) to Zone 10 customers; and (3) those benefits justify the cost shift involved in the placement

---

[15] *Sw. Power Pool, Inc.*, 162 FERC ¶ 61,215 (Hearing Order), *order on reh'g and clarification*, 164 FERC ¶ 61,120 (2018) (Rehearing Order).

[16] *Sw. Power Pool, Inc.*, 174 FERC ¶ 61,116 (Remand Order), *order on reh'g*, 175 FERC ¶ 61,235 (2021) (Remand Rehearing Order).

[17] Remand Order, 174 FERC ¶ 61,116 at P 40.

[18] *Id.* P 41 (citing *Sw. Power Pool, Inc.*, Opinion No. 562, 163 FERC ¶ 61,109, at P 157 (2018) (*Tri-State*), *order on reh'g*, Opinion No. 562-A, 166 FERC ¶ 61,019 (2019) (*Tri-State Rehearing*)).

[19] Initial Decision, 177 FERC ¶ 63,021 at PP 2, 188, 206.

of the Nixa Assets in Zone 10.[20]  On January 5, 2022, ARKMO and ITOs, among others, filed briefs on exceptions to the Initial Decision.[21]

8.      In the Order on Initial Decision, the Commission affirmed the findings that SPP's proposal to include the ATRR for the Nixa Assets in Zone 10 is just and reasonable and consistent with the cost causation principle and, accordingly, accepted SPP's proposed Tariff revisions.[22]  As to the amount of the cost shift, the Commission determined that the Presiding Judge properly balanced competing evidence to reach the finding that the cost shift at issue in this proceeding should be calculated as GridLiance's proposed ATRR for the Nixa Assets, which is $1.8 million.[23]  In doing so, the Commission rejected arguments that the proper amount of the cost shift should be measured by the amount or percentage of the Gridliance ATRR for the Nixa Assets  that will be paid by non-City of Nixa customers rather than the full amount of the GridLiance ATRR.[24]  The Commission explained that "the City of Nixa is already a Zone 10 customer and the Commission's evaluation of the cost shift to Zone 10 customers can and should incorporate costs paid by the City of Nixa as well as other customers in that zone."[25]

9.      The Commission also affirmed the Presiding Judge's finding that the Nixa Assets provide benefits that accrue to Zone 10 customers, concluding that the record supports the finding that the Nixa Assets provide integration, reliability, and power transfer benefits to Zone 10 customers.[26]  Responding to "the main argument raised on exceptions" that the benefits that the Nixa Assets provide allegedly accrue mostly, if not entirely, to the City of Nixa rather than other Zone 10 customers, the Commission found

---

[20] *Id.* PP 77, 122, 153.

[21] *See* Order on Initial Decision, 182 FERC ¶ 61,141 at P 9 (also noting the filing of briefs opposing exceptions).

[22] *Id.* P 11.

[23] *Id.* P 29.

[24] *Id.* P 30.

[25] *Id.* (noting that the City of Nixa's transmission rates would increase upon inclusion of the Nixa Assets in Zone 10, like other transmission customers, and "[r]emoving the City of Nixa from the cost shift figure would thus give an incomplete view of the total cost shift amount").

[26] *Id.* P 64; *see also id.* PP 67-70 (discussing the integration and reliability benefits in greater detail); *id.* PP 71-72 (affirming determinations that quantification of benefits and a showing of economic benefits are not necessary).

Document Accession #: 20230705-3018          Filed Date: 07/05/2023
Docket No. ER18-99-007                                                          - 6 -

that the Presiding Judge properly evaluated the benefits of the Nixa Assets to all Zone 10 customers—including the City of Nixa—rather than restricting his findings to non-City of Nixa customers.[27]  In doing so, the Commission explained that "under SPP's zonal rate design, all customers in a pricing zone pay a rate based on the ATRRs associated with all transmission facilities in that zone, regardless of which facilities may have previously been used to provide service to a specific customer prior to the customer or the Transmission Owner joining the [Regional Transmission Organization (RTO)]."[28]

10.     Under the case-by-case analysis applicable to evaluation of cost shifts, the Commission also affirmed the Presiding Judge's finding that the benefits to Zone 10 customers from the Nixa Assets are roughly commensurate with their costs, and therefore SPP's proposal to include the Nixa Assets in Zone 10 was just and reasonable.[29]  The Commission "base[d] this determination on the reliability and power transfer benefits to the customers in Zone 10 and the City of Nixa in particular, but mostly on the extensive integration benefits from the Nixa Assets to Zone 10 customers . . . ."[30]  In reaching this conclusion, the Commission found that ARKMO and ITOs' arguments that the Commission should treat the "roughly commensurate" standard as requiring that any costs of a facility should be distributed "roughly proportionate" to the usage of that specific facility were "contrary to Commission precedent and inconsistent with how costs are allocated within SPP."[31]  Specifically, the Commission explained that it would be "impossible to square a proportionality requirement as argued for by ARKMO and the ITOs with the zonal rates as approved by the Commission in SPP."[32]  The Commission

---

[27] *Id.* P 65 (noting that the City of Nixa no longer owns the Nixa Assets, did not own them at the time it joined SPP, and will pay for a portion of the cost of these assets like other Zone 10 members).

[28] *Id.*

[29] *Id.* PP 99, 101.

[30] *Id.* P 101 (discussing the Commission's "long-standing policy of rolling in the costs of networked transmission facilities into rates—including the types of zonal rates at issue here—because 'the transmission network is a single interconnected system serving and benefiting all transmission customers and it is this interconnected nature that makes for a reliable system consistently providing for the delivery of electric energy to all customers.'" (quoting *City of Anaheim*, 113 FERC ¶ 61,091, at P 34 (2005))); *see also id.* P 102.

[31] *Id.* P 103.

[32] *Id.* ("[S]uch a requirement would require a demonstration that any facility provides all other customers in a zone with benefits proportionate to their load-ratio share before its costs could be included in zonal rates, a nearly impossible task and contrary to

further stated that it did not read "the Seventh Circuit decisions in *ICC I* and *ICC II* or the D.C. Circuit's decision in *ODEC* as requiring any such proportionality finding,"[33] but even if one were to read them as such, these decisions do not necessarily apply to zonal placement decisions such as this one.[34]

11.     Finally, the Commission affirmed the Presiding Judge's dismissal of the alternative rate proposals made by intervenors.[35]  The Commission concluded that, having affirmed the Presiding Judge's finding that SPP's proposal is just and reasonable, it "need not consider whether the proposal is more or less reasonable than other alternatives."[36]

## II.     **Request for Rehearing**

12.     On rehearing, ARKMO and ITOs argue that the Commission erred in affirming the Initial Decision because the Commission should have directed its focus specifically to the non-City of Nixa transmission customers in comparing the impacts of the cost shift and any benefits of including the Nixa Assets in Zone 10.[37]  They state that the Commission was required to undertake a "rough proportionality" analysis to determine whether the costs that the non-City of Nixa customers would pay for the Nixa Assets

---

the purpose of zonal rates in the first place.").

[33] *Id.* (citing *Midwest Indep. Transmission Sys. Operator, Inc.*, 137 FERC ¶ 61,074, at P 121 (2011) (*MISO*) (finding that the Seventh Circuit did not require a utility-by-utility cost benefit analysis), *aff'd in part Ill. Commerce Comm'n v. FERC*, 721 F.3d 764, 774 (7th Cir. 2013) (*ICC III*)); *see also Ill. Commerce Comm'n v. FERC*, 576 F.3d 470 (7th Cir. 2009) (*ICC I*); *Ill. Commerce Comm'n v. FERC*, 756 F.3d 556 (7th Cir. 2014) (*ICC II*); *Old Dominion Elec. Coop.*, 898 F.3d 1254, 1260-63 (D.C. Cir. 2018) (*ODEC*).

[34] Order on Initial Decision, 182 FERC ¶ 61,141 at P 103 (citing Initial Decision, 177 FERC ¶ 63,021 at P 167; *Neb. Pub. Power Dist. v. FERC*, 957 F.3d 932, 941 (8th Cir. 2020) (*NPPD v. FERC*)).

[35] *Id.* P 115.

[36] *Id.*

[37] *See, e.g.*, Rehearing Request at 1-4, 6-7 (arguing that the costs fall disproportionately on the non-City of Nixa customers whereas the benefits of the Nixa Assets accrue primarily or exclusively to the City of Nixa); *id.* at 28-44.

Docket No. ER18-99-007                                                      - 8 -

were proportionate to the benefits they receive from those assets, but did not do so.[38]
They contend that the "rough proportionality" requirement is not impossible to
implement or inconsistent with SPP's existing zonal rate construct[39] and that the Order on
Initial Decision misunderstood controlling precedent—particularly *ICC I*, *ICC II*, and
*ODEC*—in concluding that those cases did not mandate this rough proportionality
requirement and, in any event, did not apply to this sort of zonal placement proposal.[40]

13.     ARKMO and ITOs further urge that the cost shift must be viewed not in terms of
the $1.8 million ATRR of the Nixa Assets that would be included in the aggregate
Zone 10 ATRR, but instead in terms of the percentage of the costs for those assets that
would be borne by the non-City of Nixa customers because the City of Nixa is the
"beneficiary" rather than the "victim" of the cost shift.[41]  Relatedly, ARKMO and ITOs
contend that such a proportionality analysis is a more useful metric to weigh costs and
benefits than comparing the cost shift in nominal dollar terms to non-monetized benefits
of including the Nixa Assets in Zone 10.[42]

14.     ARKMO and ITOs also argue that the Commission should have adopted their
"rough proportionality" approach to the "roughly commensurate" standard and examined
how the benefits of the Nixa Assets, as compared to their costs, accrue to the City of Nixa
versus non-City of Nixa customers.[43]  In particular, they argue that the various benefits

---

[38] *Id.* at 9, 14-25.

[39] *Id.* at 15-18.

[40] *Id.* at 18-25 (arguing that comparison of costs and benefits are foundational
principles of cost causation and that a customer-specific analysis is required; that the
Eighth Circuit's decision in *NPPD v. FERC* and the Commission's decision in *MISO*
support rejection of SPP's proposal here; and that "rough" proportionality rather than
precision is all that is required).

[41] *See id.* at 8, 11-14 (arguing that while the City of Nixa's Zone 10 transmission
rates will go up as a result of including the Nixa Assets in Zone 10, its overall costs will
go down).

[42] *See id.* at 26-28 (also arguing that the Commission should have considered that
the rate impact of adding the Nixa Assets is substantial).

[43] *See id.* at 31-32 ("The subsequent errors of the Order stem largely from that first
error . . . .  We do not repeat here the above discussion of why the Order was wrong to
rely on benefits to Nixa as a basis for allocating costs to Non-Nixa Zone 10 Customers.
Instead we explain why the Order's weighing of costs and benefits is incorrect under a
proper application of the roughly commensurate standard.").

from including the Nixa Assets in Zone 10 identified in the Initial Decision (and affirmed in the Order on Initial Decision) cannot justify accepting SPP's zonal placement proposal because those benefits accrue disproportionately to the City of Nixa and do not sufficiently benefit non-City of Nixa Zone 10 customers.[44]  More specifically, ARKMO and ITOs assert that the integration benefits accrue primarily or solely to the City of Nixa, to the extent they exist; that non-City of Nixa customers receive only limited reliability benefits from the Nixa Assets that do not justify assigning them the costs of those assets; that any power transfer benefits accrue almost entirely to the City of Nixa; and that the Commission failed to require quantification of the benefits of the Nixa Assets or did not consider evidence of the quantification of the benefits associated with the Nixa Assets.[45]  Finally, ARKMO and ITOs urge that there are policy reasons for adopting their proportionality requirement, including ensuring there are proper incentives for transmission owners to join SPP.[46]

## III.   **Discussion**

15.     ARKMO and ITOs' arguments on rehearing center around their claim that a cost shift associated with a zonal placement decision under SPP's Tariff cannot be just and reasonable unless each customer (or group of customers)[47] that will bear some portion of the costs of those assets (or group of assets) is deriving a benefit from those specific assets that is "roughly proportionate" to those costs.[48]  In fact, they argue that ensuring

---

[44] *See id.* at 9-10; *see id.* at 28-46.  ARKMO and ITOs also argue that GridLiance and SPP failed to quantify the benefits of the Nixa Assets and that ARKMO's efforts to quantify the benefits of those assets reflects that those benefits accrue disproportionately to the City of Nixa.  *See id.* at 46-47.

[45] *See id.* at 28-46.

[46] *See id.* at 47-49 (also reiterating ARKMO and ITOs' view that the proportionality standard is important to ensure cost causation).

[47] As discussed further below, here, ARKMO and ITOs focus on the "non-Nixa customers," but the same arguments ARKMO and ITOs make regarding cost causation would readily apply to considering smaller subsets of the non-City of Nixa Zone 10 customers or individual Zone 10 customers.  Similarly, their proportionality proposal would also require assessing the benefits of specific transmission assets rather than a group of assets.

[48] *See* Rehearing Request at 10 (issue statement asserting that "[i]t was error to conclude that a proportionality analysis, or some other kind of comparative analysis, is not required to determine whether a cost shift meets the roughly commensurate standard"); *see also, e.g.*, *id.* at 2 ("[T]he Commission never even addressed whether the Non-Nixa Zone 10 Customers are receiving benefits roughly commensurate to their

this requirement is satisfied is the "only meaningful way" to satisfy cost causation when assessing a cost shift related to a zonal placement of transmission assets, and that the Commission erred by failing to adopt this approach.[49]  And ARKMO and ITOs further argue that this first supposed error—that the Commission did not apply this rough proportionality requirement—led the Commission to reach an erroneous determination as to whether the costs and benefits of the Nixa Assets support their inclusion in Zone 10.[50] While we refer below to this proposed requirement as "rough proportionality" for the sake of concision, we note that this label fails to capture the full gist of ARKMO and ITOs' argument.[51]  Instead, ARKMO and ITOs seek to apply an asset-level, beneficiary-pays rough proportionality requirement.[52]

16.     We disagree with ARKMO and ITOs' view that rough proportionality is the only appropriate way to approach cost causation under SPP's zonal placement process and we sustain the Commission's decision not to adopt this requirement in this case.  ARKMO and ITOs' approach does not square with the existing zonal rate construct under the SPP Tariff.  Under that construct, a transmission customer taking network service shall pay a monthly demand charge for the SPP Pricing Zone where the load is located.[53]  The

---

allocated share of costs . . . ."); *id.* at 8 ("[T]he Non-Nixa Zone 10 Customers receive little to no benefit from the Nixa Assets . . . ."); *id.* at 19.

[49] *Id.* at 14 (asserting that "[r]ough proportionality is the only meaningful way to view cost causation" in this context; "rough proportionality is required").

[50] *See supra* P 14 & note 43.

[51] With this in mind, ARKMO and ITOs' argument that "commensurate" and "proportionate" are synonyms, *see* Rehearing Request at 19, is irrelevant because their rhetorical labelling of their test as a "rough proportionality" requirement does not fully and accurately capture the nature of the requirement they propose.

[52] *See id.* at 14 ("Here the Commission is mistakenly requiring Non-Nixa Zone 10 Customers to pay [for the Nixa Assets] proportionate to 'population' (load), rather than 'use' (benefits)"); *id.* at 16 (urging that SPP should address the Nixa Assets through a construct in which it would "put[ ] a new TO into an appropriate pre-existing zone, but creat[e] a subzonal rate for the legacy asset costs that only the load for which the legacy assets were built would pay"); *id.* at 22 (arguing that, on these facts a "customer-specific analysis" is required); ITO Brief on Exceptions at 5 ("SPP's rate proposal must be rejected, without prejudice to SPP submitting a revised rate proposal to fully recover GHP's ATRR from the customers that benefit from the Nixa Assets . . . ."); *id.* at 28.

[53] *See* SPP, Tariff, Schedule 9 (9.0.0).

amount of this demand charge is "determined by multiplying [the customer's] Load Ratio Share times one twelfth (1/12) of the Zonal [ATRR]" less certain amounts.[54]

17.    As evident in this formula/calculation, SPP's zonal rate construct does not attempt to measure each transmission customer's benefit from each transmission asset included in the zonal ATRR.  Nor does it charge each customer transmission costs on an asset-by-asset basis.  Instead, under that zonal construct, the costs and benefits associated with network service in a zone are assessed on an aggregate level, with each customer paying for transmission service based on its load ratio share, which reflects its total use of the aggregate assets in the zone.[55]  Even if a customer does not benefit from a particular transmission asset in a manner roughly commensurate with its load ratio share, this does not demonstrate that the customer is not overall receiving roughly commensurate benefits from the transmission assets within the zone as compared to the zonal rates it is paying under SPP's Tariff.[56]

18.    Consistent with this approach, SPP's Tariff delineates zones in terms of "[t]he geographic area of the facilities of a Transmission Owner or specific combination of Transmission Owners as specified in Schedules 7, 8, and 9 [of the Tariff]."[57]  Nothing in

---

[54] *See id.* pt. III, § 34.1 (3.0.0).

[55] *See id.* (reflecting that the zonal costs of the transmission system are apportioned based on load ratio share, which reflects a customer's total use of the zonal transmission system).  This approach is consistent with the Commission's longstanding policy of rolling in the costs of networked transmission facilities into rates.  *See* Order on Initial Decision, 182 FERC ¶ 61,141 at P 101; *So. Co. Servs., Inc.*, 116 FERC ¶ 61,247, at PP 17-18 (2006) (explaining that rolled-in pricing is appropriated when the relevant facilities are integrated into the network because, "as part of the network, the added facilities benefit all users of the network," and that the Commission has "repeatedly affirmed that a showing of any degree of integration suffices for a facility to be a network facility").

[56] So, like ARKMO, the City of Nixa has been paying for network service based on the costs of the Zone 10 transmission system as a whole according to its load ratio share, irrespective of whether or to what extent it benefits from any particular transmission asset within that system.

[57] SPP, Tariff, pt. I, § 1, Definition XYZ (2.0.0) (definition of "Zone"); *see also Sw. Power Pool, Inc.*, 89 FERC ¶ 61,284, at 61,889 (1999) (approving SPP's use of zonal rates, under a proposal in Docket No. ER99-4392, containing an identical definition of "Zone").  As to Zone 10 in particular, we note that the record does not reflect that each customer in Zone 10 derives benefits from each of the existing transmission facilities in that zone that are roughly proportionate to that customer's load ratio share.

Docket No. ER18-99-007                                                    - 12 -

this definition suggests that zones are defined to ensure that every customer or customer group in a zone benefits from every particular transmission asset or set of assets in that zone in rough proportion to its load ratio share. Indeed, we cannot see how this could be accomplished short of delineating zones based on how each asset is used,[58] which would effectively eliminate SPP's zonal rate construct.[59]

19.     Put another way, ARKMO and ITOs presume that SPP's zonal rate construct contemplates a specific transmission customer (or groups thereof) paying for each specific transmission facility included in the zonal ATRR in proportion to its usage of that facility. But ARKMO and ITOs' premise is inconsistent with the zonal rate construct in SPP's Tariff. In other words, ARKMO and ITOs are seeking a fundamentally different cost allocation approach for the Nixa Assets, under which the costs of the Nixa Assets would be assigned proportionate to the particular usage of those assets by specific transmission customers or groups of customers, than is prescribed by SPP's zonal rate construct. We are not persuaded that, in considering SPP's zonal placement proposal, we must apply a "proportionality requirement" that amounts to a new cost allocation method[60] that is inconsistent with the zonal rate construct that is used for all of the other assets already included in the Zone 10 ATRR.

20.     In addition, adopting ARKMO and ITOs' "proportionality requirement" for the Nixa Assets would not result in evenhanded treatment of the Nixa Assets as compared to transmission assets already included in the zonal ATRR without applying this requirement.[61] Under SPP's zonal rate construct, transmission customers taking network

---

[58] That only "rough" proportionality would be required under this approach, Rehearing Request at 15-16, 23-24, does not remedy this concern given the number of permutations as to how different transmission customers may benefit from different assets.

[59] *See* Order on Initial Decision, 182 FERC ¶ 61,141 at P 103 ("As SPP points out in its brief, such a requirement would require a demonstration that any facility provides all other customers in a zone with benefits proportionate to their load-ratio share before its costs could be included in zonal rates, a nearly impossible task and contrary to the purpose of zonal rates in the first place."); SPP Brief Opposing Exceptions at 52-53 ("Indeed, for the ITOs' and ARKMO Cities' construction of the roughly commensurate standard to be true, the ITOs' own zonal rates would unravel." (citation omitted)).

[60] *See, e.g.*, Rehearing Request at 16 (arguing that SPP would still have "rate options" to address the Nixa Assets, and particularly that it could "create[ ] a subzonal rate" for such assets).

[61] Failure to provide such evenhanded treatment might discourage transmission owners from deciding to participate in SPP. *See Regional Transmission Orgs.*, Order No.

Document Accession #: 20230705-3018          Filed Date: 07/05/2023

service in a zone—as the City of Nixa has—shoulder the costs of transmission assets already included in the zonal ATRR on a load ratio share basis, thereby bearing a portion of the costs for those assets, irrespective of the extent to which those transmission customers use each of those particular assets. ARKMO and ITOs have not demonstrated why the Nixa Assets should be subject to a more stringent "proportionality requirement" than other transmission assets previously included in the zonal ATRR.[62]

21.     ARKMO and ITOs argue that their proportionality requirement is consistent with SPP's zonal rate construct because, like zonal rates, the proportionality requirement is a means of addressing cost shifts.[63] However, this argument ignores that zonal rates and the proportionality requirement approach the distribution of costs (and, therefore, avoiding unjust and unreasonable cost shifts) in fundamentally different and conflicting ways, as explained above. Moreover, that the Commission stated in Order No. 2000 that "problems associated with cost-shifting are not easily resolved by means other than the use of license plate rates"[64] does not support a different result here given that we have explained that ARKMO and ITOs' preferred allocation approach is inconsistent with SPP's existing zonal rate construct reflected in the Tariff.[65]

---

2000, FERC Stats. & Regs. ¶ 31,089, at 31,028 (1999) (cross-referenced at 89 FERC ¶ 61,285), *order on reh'g*, Order No. 2000-A, FERC Stats. & Regs. ¶ 31,092 (2000) (cross-referenced at 90 FERC ¶ 61,201), *aff'd sub nom. Pub. Util. Dist. No. 1 of Snohomish Cty. v. FERC*, 272 F.3d 607 (D.C. Cir. 2001) (noting the Commission's view that "as a matter of policy, we should strongly encourage transmission owners to participate voluntarily in RTOs").

[62] ITOs' assertion that Southwestern built its facilities to serve all of its load, including the City of Nixa, ITOs Brief on Exceptions at 87-89, implies that applying the "proportionality requirement" as they propose results in evenhanded treatment of the Nixa Assets. However, ITOs do not suggest that the transmission facilities that the City of Nixa is paying for under the zonal rate construct would meet the rough proportionality requirement that is ITOs' proposed basis for excluding the Nixa Assets from Zone 10. *See infra* P 21 note 68.

[63] Rehearing Request at 16 (citing SPP, Proposal for Recognition as Independent System Operator and Regional Transmission Organization, Docket No. EL00-39-000, at 15 n.36 (filed Dec. 30, 1999) (SPP RTO Proposal)).

[64] Order No. 2000, FERC Stats. & Regs. ¶ 31,089, at 31,177. In the cited portion of the SPP RTO Proposal, *see supra* note 63, SPP was quoting this portion of Order No. 2000.

[65] Put differently, arguing that SPP's zonal rate construct and a proportionality requirement both might (in different ways) help address cost shifts does not change that

22.     ARKMO and ITOs also attempt to align their proposed proportionality requirement with SPP's zonal rate construct by arguing that RTO zones will be ordinarily configured to allocate the costs of transmission facilities to the customers for whom they were constructed.[66]  We agree that, in a typical case, we expect that a transmission asset should be included in the same zone as the customers for whom they were constructed and continue to serve.[67]  But this principle does not establish that zones generally, or SPP Pricing Zones in particular, have been or must be constructed to ensure that each customer benefits from each asset in the zone in rough proportion to the costs it pays for that specific asset, or that new assets that may be included in a zone must meet such a requirement.[68]

23.     Precedent governing principles of cost causation supports our conclusion that ARKMO and ITOs' proportionality requirement is not, in fact, required.[69]  In *ICC III*, the

---

these are two opposed approaches to cost allocation, the former of which eschews the analysis of the usage of particular assets on which the latter depends.  *Cf. supra* P 18 (explaining that applying ARKMO and ITOs' rough proportionality requirement to zonal rates would require delineating zones on the level of how individual assets are used, which would amount to undermining the zonal rate construct).

[66] Rehearing Request at 16 (citing *PJM Interconnection, L.L.C.*, Opinion No. 494, 119 FERC ¶ 61,063, at P 42 (2007), *reh'g denied*, Opinion No. 494-A, 122 FERC ¶ 61,082 (2008), *remanded on other grounds by ICC I*, 576 F.3d 470).

[67] Opinion No. 494, 119 FERC ¶ 61,063 at P 42 ("It is therefore consistent with principles of cost causation to continue to allocate the costs of these facilities to the customers for whom they were constructed and whom they continue to serve to date."); *see also id.* PP 48-56 (reversing an initial decision that found that zonal rates were unjust and unreasonable because some transmission assets provided benefits beyond the zone that would pay for their costs).  Consistent with this principle, placing the Nixa Assets in Zone 10 ensures that the City of Nixa will continue to bear a portion of the costs for those assets.

[68] *See supra* PP 16-19 (explaining that SPP's zonal cost construct takes an opposing approach).  For similar reasons, ARKMO and ITOs' citation to *Tri-State* in connection with their argument that Southwestern "planned and built its facilities to serve all load in the zone, including Nixa" but that the City of Nixa facilities were not built for every customer in Zone 10, Rehearing Request at 17-18, does not address the inconsistency between a proportionality requirement and SPP's zonal rate construct.  *See id.*; *see also supra* P 18 note 57; *cf.* Order on Initial Decision, 182 FERC ¶ 61,141 at PP 100-01 (recognizing how the facts in *Tri-State* were distinguishable from this case).

[69] *See* Order on Initial Decision, 182 FERC ¶ 61,141 at P 103 & nn.304-05.

U.S. Court of Appeals for the Seventh Circuit upheld the Commission's acceptance[70] of a pro rata regional cost allocation for "multi-value projects."[71]  It did so notwithstanding that "[n]one of [the] eligibility criteria ensures that every utility in MISO's vast region will benefit from every [multi-value project], let alone in exact proportion to its share of the [multi-value project] tariff" and despite arguments that the Commission "fail[ed] to determine the costs and benefits of the projects subregion by subregion and utility by utility."[72]  Likewise, and contrary to ARKMO and ITOs' suggestion that *NPPD v. FERC* favors their position,[73] the Eighth Circuit in that case upheld a zonal placement decision without requiring a demonstration that the facilities at issue benefitted existing customers in the zone proportionate to their load ratio share.[74]

24.     We are also not persuaded by ARKMO and ITOs' argument that the Order on Initial Decision erred in concluding that *ICC I*, *ICC II*, and *ODEC* did not mandate that zonal placement proposals be assessed according to the sort of asset-level proportionality requirement that ARKMO and ITOs advocate.[75]  In *ICC I* and *ICC II*, the Seventh Circuit was reviewing the Commission's determination that PJM Interconnection, L.L.C. (PJM) was required to change the cost allocation requirements for new high-voltage facilities from its previous zonal (license plate) rate design and approving a region-wide pro rata (postage stamp) rate design.[76]  The court held that although the Commission need not "calculate benefits to the last penny, or for that matter to the last million or ten million or perhaps hundred million dollars," the Commission had failed to establish that the pro rata rate design it approved would comport with the requirement that utilities in the region derived benefits from the transmission system that were "roughly commensurate" with

---

[70] *See Midwest Indep. Trans. Sys. Operator, Inc.*, 137 FERC ¶ 61,074, at P 121 (2011) (finding that the Seventh Circuit in *ICC I* did not require a utility-by-utility cost benefit analysis).

[71] *ICC III,* 721 F.3d at 773.

[72] *Id.* at 774.

[73] *See* Rehearing Request at 20, 23-24.

[74] 957 F.3d at 941.

[75] *See* Rehearing Request at 18-25; Order on Initial Decision, 182 FERC ¶ 61,141 at P 103 (explaining that the Commission did "not view the Seventh Circuit decisions in *ICC I* and *ICC II* or the D.C. Circuit's decision in *ODEC* as requiring any such proportionality finding" and that, regardless, "[t]hose decisions do not necessarily apply to zonal placement decisions such as this one")).

[76] *See ICC I*, 576 F.3d at 474; Opinion No. 494, 119 FERC ¶ 61,063 at PP 1, 4.

their costs.[77]  The court did not suggest, let alone mandate, a facility-level, beneficiary-pays proportionality requirement to ensure principles of cost causation were satisfied.  Moreover, neither *ICC I* nor *ICC II* addressed an argument that the Commission must adopt such a requirement for zonal placement; our decision here necessarily conforms to the particular requirements of SPP's zonal rate construct.

25.     Similarly, we disagree that *ODEC* supports ARKMO and ITOs' argument.  There, the D.C. Circuit set aside the Commission's approval of an amendment to PJM's tariff that eliminated regional cost allocation for high-voltage transmission lines included in PJM's regional transmission plan to satisfy individual utilities' planning criteria.[78]  The court did so because the amendment prohibited regional cost allocation "for *all* projects included in the regional plan only to satisfy the planning criteria of individual utilities—*including* for high-voltage lines" even though it was "undisputed [that] high-voltage power lines produce significant regional benefits," thereby "produc[ing] a severe misallocation of the costs of those projects."[79]  The court in *ODEC* did not, however, require that the Commission adopt a facility-level "beneficiary pays" approach, like ARKMO and ITOs' proportionality requirement, to address this concern or suggest that SPP's zonal rate construct (which does not involve such a facility-level analysis of costs and benefits) is impermissible.  In fact, the *ODEC* court explicitly recognized the narrowness of its holding.[80]  In short, as the Order on Initial Decision explained, nowhere

---

[77] *See ICC I*, 576 F.3d at 477; *see also id.* at 475 (noting that the "objections to the Commission's ruling pivot[ed] on an asymmetry" in the types of assets used in different areas of the PJM region, with relatively low-voltage transmission facilities in the west of the PJM region, and relatively high voltage facilities in the east of the PJM region); *ICC II*, 756 F.3d at 561 (explaining that the court was not holding "that postage-stamp pricing is appropriate only for the postal service" but rather that the Commission had, in its order following remand, still failed to establish that this postage stamp design would meet the "roughly commensurate" standard based on the facts in the record).

[78] *See ODEC*, 898 F.3d at 1256-57, 1264 (explaining that the amendment instead required that the costs of those projects be borne by the local zone of the transmission owner that filed the planning criteria); *see also id.* at 1255.  The court also set aside two Commission orders applying this amended approach.  *See id.* at 1257-59, 1264.

[79] *Id.* at 1260-61 (discussing the Elmont-Cunningham project as an illustration of how the amendment to PJM's tariff would result in such a misallocation of the costs of that project) (emphasis in original).

[80] *See id.* at 1263-64 ("[W]e hold only that FERC did not adequately justify its approval of the amendment at issue here, which prohibited cost sharing for a category of high-voltage projects conceded to have significant regional benefits, and which did so only because those projects reflected the planning criteria of individual utilities"); *cf. also*

do *ICC I*, *ICC II*, or *ODEC* mandate a facility-level proportionality requirement of the sort ARKMO and ITOs suggest as a general matter, and particularly did not do so in the context of zonal placement of transmission assets.

26.     In the Order on Initial Decision, the Commission also rejected arguments that the cost shift associated with the Nixa Assets must be measured in terms of the costs of the Nixa Assets that will be paid by non-City of Nixa customers, and instead affirmed the Presiding Judge's finding that the cost shift at issue was the proposed $1.8 million ATRR for the Nixa Assets.[81]   We sustain this conclusion.  It is not contested that the City of Nixa had divested the Nixa Assets and converted to SPP's network service prior to inclusion of the Nixa Assets in Zone 10.[82]  Nor do ARKMO and ITOs' arguments on rehearing casting the City of Nixa as a "beneficiary" and non-City of Nixa customers as "victims" of the cost shift[83] change the facts of this case:  including the Nixa Assets in Zone 10 will result in a $1.8 million increase in the zonal ATRR, a portion of which will be borne by the City of Nixa based on its load ratio share under SPP's existing Tariff.[84]  Under these circumstances, considering the cost shift in terms of the $1.8 million ATRR of the Nixa Assets ensures that we do not take an incomplete view of the impacts of placing the Nixa Assets in Zone 10 by focusing only on how including the assets in Zone 10 impacts the non-City of Nixa customers.  Considering the full picture of the costs and benefits of the Nixa Assets to all Zone 10 customers is also consistent with SPP's zonal rate construct, which does not evaluate the costs and benefits of transmission assets in a

---

*Long Island Power Auth.*, 27 F.4th at 714 (recognizing the narrow nature of the holding in *ICC II*, explaining that this case did not require a cost-benefit analysis to quantify project benefits).

[81]  *See* Order on Initial Decision, 182 FERC ¶ 61,141 at PP 29-30.  Contrary to ARKMO and ITOs' argument, the Commission did not determine that "no justification [for the cost shift at issue here] would be required."  Rehearing Request at 13.  The Commission in the Order on Initial Decision weighed the costs and benefits of including the Nixa Assets in Zone 10 and evaluated the whole picture of the cost impact of including the Nixa Assets in Zone 10.

[82]  Order on Initial Decision, 182 FERC ¶ 61,141 at P 30.

[83]  Rehearing Request at 10-13.

[84]  While we recognize that the remainder of the costs of the Nixa Assets, as incorporated into the zonal ATRR, will be borne by non-City of Nixa customers based on each of their load ratio shares, we need not restrict our analysis to consider the cost shift only in these terms.

zone at the level of how individual customers use each of those assets, as explained above.

27.      Having sustained the Commission's determination that ARKMO and ITOs' proportionality requirement is inconsistent with SPP's existing zonal rate construct, we also reject ARKMO and ITOs' arguments on rehearing that depend on the application of such a requirement.[85]  Thus, we are not persuaded by ARKMO and ITOs' arguments that the Order on Initial Decision must be reversed because non-City of Nixa customers do not accrue benefits specifically from the Nixa Assets sufficient to meet this proportionality requirement.[86]  Likewise, we reject the argument that the Commission should have considered whether this proportionality requirement was met rather than (or in addition to) comparing the $1.8 million cost shift to the non-monetized benefits of the Nixa Assets.[87]

28.      ARKMO and ITOs also argue that the benefits of the Nixa Assets were not sufficiently quantified and that, to the extent they were quantified, that quantification reflects that the Nixa Assets do not provide proportionate benefits to the non-City of Nixa customers.[88]  We are not persuaded by these arguments, for the reasons stated in the Order on Initial Decision[89] and because, as explained above, ARKMO and ITOs' arguments focusing on the extent to which they derive benefits specifically from the Nixa Assets are inconsistent with SPP's zonal rate design.  Moreover, the Order on Initial

---

[85] We further sustain the Commission's conclusions as to the benefits associated with the Nixa Assets and the Commission's comparison of those benefits versus the costs of placing the Nixa Assets in Zone 10.  *See* Order on Initial Decision, 182 FERC ¶ 61,141 at PP 64-73, 99-102.

[86] *See* Rehearing Request at 28-47; *see also supra* P 14 & note 43 (noting ARKMO and ITOs' acknowledgment that these arguments are based on the application of their proposed proportionality requirement).

[87] *See* Rehearing Request at 26-28.  For the reasons stated in the Order on Initial Decision, 182 FERC ¶ 61,141 at P 32, we also sustain the Commission's determination that it was not necessary to rely on the rate impact evidence in the record.

[88] Rehearing Request at 46-47 (arguing that "the record does contain non-monetary quantification that establish that Non-Nixa Zone 10 Customers get almost no benefits from the Nixa Assets and yet will pay almost all costs").

[89] Order on Initial Decision, 182 FERC ¶ 61,141 at PP 71-72 (explaining that the Commission has not required the showing of any particular benefit or quantification of benefits to support inclusion of transmission facilities in a zone); *see also, e.g.*, Initial Decision, 177 FERC ¶ 63,021 at PP 131 & n.253, 154.

Decision relied principally on the extensive integration benefits from the Nixa Assets to Zone 10 customers,[90] which we continue to find are not quantifiable.[91] We also note that, contrary to ARKMO and ITOs' arguments, the Commission did not ignore the record evidence that they identify as to the reliability benefits of the Nixa Assets.[92]

29.    We also disagree with ARKMO and ITOs' arguments that the Order on Initial Decision will create counterproductive incentives for transmission owners with low-cost facilities not to join SPP and for transmission owners with high-cost facilities to join SPP.[93] We have previously rejected similar arguments in the ITOs Complaint Order, and find the arguments that ARKMO and ITOs raise here unpersuasive for similar reasons.[94] Moreover, as to ARKMO and ITOs' proposed proportionality requirement in particular, these policy arguments do not remedy the inconsistency between this proposal and SPP's zonal rate construct.[95]

---

[90] *See* Order on Initial Decision, 182 FERC ¶ 61,141 at PP 67-68, 70, 101-102 (summarizing those benefits and finding they are roughly commensurate with the costs of the Nixa Assets to the Zone 10 customers). Contrary to ARKMO and ITOs' claim, the Commission did not rely on SPP's unfiled Zonal Placement Process in concluding that those benefits would accrue to Zone 10 customers. *See* Rehearing Request at 37-39.

[91] On rehearing, ARKMO and ITOs do not explain what further quantification of such integration benefits would be possible or necessary.

[92] *See* Order on Initial Decision, 182 FERC ¶ 61,141 at PP 42, 65, 69.

[93] Rehearing Request at 47-49 (also arguing that failing to adopt a proportionality requirement creates a standard for assessing zonal placement proposals that is too permissive).

[94] ITOs Complaint Order, 162 FERC ¶ 61,213 at P 72 (noting, among other things, that there are powerful, preexisting incentives to join RTOs regardless of cost shifting, and the effects of any cost shift are just one of many factors that an entity would consider in deciding whether to join an RTO).

[95] ARKMO and ITOs' suggestion that the Order on Initial Decision erred in accepting SPP's proposal under the law of the case doctrine, *see, e.g.*, Rehearing Request at 6-7 (arguing that the Commission previously determined that the evidence in the initial filing and first hearing did not show that the inclusion of the Nixa Assets in Zone 10 was just and reasonable and that the second hearing merely validated that same result), is also without merit. The Commission observed in the Remand Order that the issue of the cost shift, and particularly the benefits of inclusion of the Nixa Assets "was not thoroughly briefed because many of the parties argued that the cost shift issue was outside the scope of the proceeding." 174 FERC ¶ 61,116 at P 41; *see also* Remand Rehearing Order,

Document Accession #: 20230705-3018     Filed Date: 07/05/2023

Docket No. ER18-99-007                                                                                    - 20 -

<u>The Commission orders</u>:

     In response to the request for rehearing, the Order on Initial Decision is hereby modified and the result sustained, as discussed in the body of this order.

By the Commission.

( S E A L )

Debbie-Anne A. Reese,
Deputy Secretary.

---

175 FERC ¶ 61,235 at P 31 (noting that "the Commission did not rule on the merits of the proposed Tariff revisions or the Settlement itself"). This issue has now been addressed at length by the parties in the record and the Presiding Judge in the Initial Decision, and we make our decision on the basis of the record and briefing now before us.

Document Content(s)

ER18-99-007.docx.......................................................1

# Exhibit 4

Service List for ER18-99-000 Southwest Power Pool, Inc.

Contacts marked ** must be postal served

| Party | Primary Person or Counsel of Record to be Served | Other Contact to be Served |
|---|---|---|
| American Electric Power Service Corporation | | Jim Jacoby<br>Manager, RTO Regulatory SPP<br>1201 Elm Street<br>Suite 800<br>Dallas, TEXAS 75270<br>jwjacoby@aep.com |
| American Electric Power Service Corporation | | Richard Ross<br>Direct RTO Policy West<br>American Electric Power Service Corporation<br>212 E 6th St<br>Tulsa, OKLAHOMA 74119<br>rross@aep.com |
| American Electric Power Service Corporation | Stacey Burbure<br>American Electric Power Service Corporation<br>801 Pennsylvania Avenue, NW<br>Washington DC, DISTRICT OF COLUMBIA 20004<br>UNITED STATES<br>slburbure@aep.com | Kate Daley<br>American Electric Power Service Corporation<br>1 Riverside Plaza<br>Columbus, OHIO 43215<br>kbdaley@aep.com |
| Arkansas Electric Cooperative Corporation | Jennifer Loiacano<br>Staff Attorney<br>Arkansas Electric Cooperative Corporation<br>1 Cooperative Way<br>Little Rock, ARKANSAS 72209<br>UNITED STATES<br>jennifer.loiacano@aecc.com | |
| ARKMO Cities | Kenneth Stark<br>McNees Wallace & Nurick LLC<br>100 PINE ST<br>HARRISBURG, PENNSYLVANIA 17101<br>UNITED STATES<br>kstark@mcneeslaw.com | Robert A Weishaar, JR<br>McNees Wallace & Nurick LLC<br>1200 G Street, NW<br>Suite 800<br>Washington, DISTRICT OF COLUMBIA 20005<br>bweishaar@mcneeslaw.com |
| Associated Electric Cooperative, Inc. | Nicole Allen<br>Partner<br>Thompson Coburn LLP<br>1909 K Street NW<br>Suite 600<br>Washington, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>nallen@thompsoncoburn.com | Brian Prestwood<br>SVP General Counsel and CCO<br>Associated Electric Cooperative, Inc.<br>2814 S. Golden Ave.<br>Springfield, MISSOURI 65807<br>bprestwood@aeci.org |
| Basin Electric Power Cooperative | Nicole Allen<br>Partner<br>Thompson Coburn LLP<br>1909 K Street NW<br>Suite 600<br>Washington, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>nallen@thompsoncoburn.com | Tom Christensen<br>Basin Electric Power Cooperative<br>5126 DRIFTWOOD LN<br>BISMARCK, NORTH DAKOTA 58503<br>tomc@bepc.com |
| Basin Electric Power Cooperative | | Jesse Halpern<br>Thompson Coburn LLP<br>1909 K St NW<br>Suite 600<br>Washington, DISTRICT OF COLUMBIA 20006<br>jhalpern@thompsoncoburn.com |
| City of Nixa | Robert Daileader<br>Nixon Peabody LLP<br>799 9th Street N.W.<br>Suite 500<br>Washington, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>rdaileader@nixonpeabody.com | Douglas K Colvin<br>Douglas Colvin City of Nixa El<br>City of Nixa<br>1111 W. kathryn<br>P.O. Box 395<br>Nixa, MISSOURI 65714<br>dcolvin@nixa.com |
| City Utilities of Springfield, Missouri | John Coyle<br>Duncan & Allen LLP<br>Suite 700<br>1730 Rhode Island Avenue, N.W.<br>Washington, DISTRICT OF COLUMBIA 20036-3115<br>UNITED STATES<br>jpc@duncanallen.com | |

| | | |
|---|---|---|
| Federal Energy Regulatory Commission | Michael Loatman<br>Commission Staff Counsel<br>888 First St. NE<br>Washington, DISTRICT OF COLUMBIA 20426<br>UNITED STATES<br>Michael.Loatman@ferc.gov | Debora E. Lyon<br>Trial Attorney<br>Commission Staff Counsel<br>888 First Street NE<br>Routing Code:AL-2.2<br>Mail Stop: 3A-13<br>Washington, DISTRICT OF COLUMBIA 20426<br>Debora.Lyon@ferc.gov |
| GridLiance High Plains LLC | Gregory Jones<br>GridLiance High Plains LLC<br>2050 M ST NW<br>WASHINGTON, DISTRICT OF COLUMBIA 20036<br>UNITED STATES<br>gregoryjones@paulhastings.com | Brett Hooton<br>President<br>GridLiance High Plains LLC<br>201 East John Carpenter Freeway<br>Suite 900<br>Irving, TEXAS 75062<br>brett.hooton@gridliance.com |
| GridLiance High Plains LLC | Leah Kaiser<br>GridLiance High Plains LLC<br>750 17th St. NW<br>#900<br>Washington, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>leah.kaiser@huschblackwell.com | Janet Virga<br>GridLiance High Plains LLC<br>201 East John Carpenter Freewway<br>Irving, TEXAS 75062<br>christi.curry@gridliance.com |
| GridLiance High Plains LLC | | Jay Carriere<br>Vice President, Federal Govern<br>GridLiance High Plains LLC<br>201 East John Carpenter Freeway<br>Suite 900<br>Irving, TEXAS 75062<br>jcarriere@gridliance.com |
| KAMO Electric Cooperative, Inc. | Nicole Allen<br>Partner<br>Thompson Coburn LLP<br>1909 K Street NW<br>Suite 600<br>Washington, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>nallen@thompsoncoburn.com | Theodore J Hilmes<br>CEO<br>KAMO Electric Cooperative, Inc.<br>500 S KAMO DR<br>VINITA, OKLAHOMA 74301<br>thilmes@kamopower.com |
| Kansas City Power & Light Company and KCP & L Greater Missouri Operations Company | Denise Buffington<br>Sr Dir Federal Regulatory Affa<br>Kansas City Power & Light Company<br>PO Box 418679<br>Kansas City,MISSOURI 64141-9879<br>UNITED STATES<br>Denise.Buffington@evergy.com | |
| McGuireWoods LLP | Carrie Mobley<br>McGuireWoods LLP<br>888 16th St. NW, Suite 500 Black Lives Matter Plaza<br>Washington, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>cmobley@mcguirewoods.com | Noel Symons<br>Attorney<br>McGuireWoods LLP<br>888 16TH ST NW STE 500<br>BLACK LIVES MATTER PLAZA<br>WASHINGTON, DISTRICT OF COLUMBIA 20006<br>nsymons@mcguirewoods.com |
| McGuireWoods LLP | | Maha Saad<br>McGuireWoods LLP<br>888 16th Street NW, Suite 500<br>Black Lives Matter Plaza<br>Washington, DISTRICT OF COLUMBIA 20006<br>msaad@mcguirewoods.com |
| Mid-Kansas Electric Company, LLC | Adrienne Clair<br>Thompson Coburn LLP<br>Thompson Coburn LLP<br>1909 K ST NW STE 600<br>WASHINGTON, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>aclair@thompsoncoburn.com | Ala Tamimi<br>VP Transmission Planning and P<br>425 S 119TH ST W<br>WICHITA, KANSAS 67235<br>atamimi@sunflower.net |
| Mid-Kansas Electric Company, LLC | | Ray Bergmeier<br>rbergmeier@sunflower.net |
| Nebraska Public Power District | David D'Alessandro<br>ddalessandro@stinson.com | Jonathan Trotta, ESQ<br>Davis Wright Tremaine LLP<br>Davis Wright Tremaine LLP<br>1301 K ST NW<br>SUITE 500 EAST<br>WASHINGTON, DISTRICT OF COLUMBIA 20005<br>jonathantrotta@dwt.com |

| | | |
|---|---|---|
| Nebraska Public Power District | | Harold Had田 Nebraska Public Power District 1414 15th Street Columbus, NEBRASKA 68601 hlhadla@nppd.com |
| NextEra Energy Transmission Southwest, LLC | W. Mason Emnett Senior Attorney Florida Power & Light Company 801 Pennsylvania Ave., N.W. Suite 220 Washington, DISTRICT OF COLUMBIA 20004 UNITED STATES mason.emnett@fpl.com | |
| NextEra Energy, Inc. | Travis Contratto Attorney 700 Universe Blvd Juno Beach, FLORIDA 33408 UNITED STATES Travis.Contratto@nee.com | Justin P Moeller Senior FERC Counsel 801 Pennsylvania Ave., NW Suite 220 Washington, DISTRICT OF COLUMBIA 20004 justin.moeller@fpl.com |
| South Central MCN LLC | Linda Walsh Husch Blackwell LLP 750 17th Street NW Washington DC, DISTRICT OF COLUMBIA 200067 UNITED STATES linda.walsh@huschblackwell.com | Sylvia J. S. Bartell Husch Blackwell Husch Blackwell LLP 750 17th Street, NW Suite 900 Washington, DISTRICT OF COLUMBIA 20006 sylvia.bartell@huschblackwell.com |
| South Central MCN LLC | | Kathryn L Patton VP, Associate General Counsel GridLiance Holdco, LP 201 E John Carpenter Fwy Suite 900 Irving, TEXAS 75062 kpatton@gridliance.com |
| Southwest Power Pool, Inc. | Matthew Binette Attorney Wright & Talisman, P.C. 1200 G Street, N.W. Suite 600 Washington, DISTRICT OF COLUMBIA 20005-3898 UNITED STATES binette@wrightlaw.com | Nicole Wagner Manager-Regulatory Policy Southwest Power Pool Inc. 201 WORTHEN DR LITTLE ROCK, ARKANSAS 72223 jwagner@spp.org |
| Southwest Power Pool, Inc. | | Michael Riley Southwest Power Pool, Inc. 201 Worthen Drive Little Rock, ARKANSAS 72223 michael.b.riley@spp.org |
| Southwest Power Pool, Inc. | Carrie Mobley McGuire Woods LLP 888 16th St. NW, Suite 500 Black Lives Matter Plaza Washington, DISTRICT OF COLUMBIA 20006 UNITED STATES cmobley@mcguirewoods.com | Noel Symons Attorney McGuire Woods LLP 888 16TH ST NW STE 500 BLACK LIVES MATTER PLAZA WASHINGTON, DISTRICT OF COLUMBIA 20006 nsymons@mcguirewoods.com |
| Southwest Power Pool, Inc. | Tessie Kentner Managing Attorney 201 WORTHEN DR LITTLE ROCK, ARKANSAS 72223 UNITED STATES tkentner@spp.org | |
| Southwestern Power Administration | | Laurence J. Yadon General Counsel Southwestern Power Administration One West Third Street Tulsa, OKLAHOMA 74103 larry.yadon@swpa.gov |
| Sunflower Electric Power Corporation | Adrienne Clair Thompson Coburn LLP Thompson Coburn LLP 1909 K ST NW STE 600 WASHINGTON, DISTRICT OF COLUMBIA 20006 UNITED STATES aclair@thompsoncoburn.com | Ray Bergmeier rbergmeier@sunflower.net |
| Sunflower Electric Power | | Ala Tamimi VP Transmission Planning and P |

| Corporation | | |
|---|---|---|
| | | 425 S Topeka St W<br>WICHITA, KANSAS 67235<br>atamimi@sunflower.net |
| The Evergy Companies | Denise Buffington<br>Sr Dir Federal Regulatory Affa<br>The Evergy Companies<br>PO Box 418679<br>Kansas City,MISSOURI 64141-9879<br>UNITED STATES<br>Denise.Buffington@evergy.com | James Flucke<br>Manager, Federal Regulatory Af<br>The Evergy Companies<br>1200 Main<br>Kansas City, MISSOURI 64105<br>jim.flucke@evergy.com |
| Westar Energy, Inc. | Patrick Smith<br>Corporate Counsel<br>Evergy, Inc.<br>818 S KANSAS AVE<br>TOPEKA, KANSAS 66612<br>UNITED STATES<br>Patrick.Smith@evergy.com | |
| Western Farmers Electric Cooperative | Daniel Frank<br>Partner<br>Eversheds Sutherland (US) LLP<br>700 Sixth Street, N.W.<br>Suite 700<br>Washington, DISTRICT OF COLUMBIA 20001-3980<br>UNITED STATES<br>DanielFrank@eversheds-sutherland.com | Matthew A. Caves<br>Senior Manager, Legal & Regula<br>Western Farmers Electric Cooperative<br>707 N.E. 7th St.<br>Anadarko, OKLAHOMA 73005<br>matt.caves@wfec.com |
| Western Farmers Electric Cooperative | Allison Salvia<br>Eversheds Sutherland (US) LLP<br>700 6TH ST NW<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>AllisonSalvia@eversheds-sutherland.com | |
| Wright & Talisman, P.C. | Ayah Manalastas<br>Paralegal<br>Wright & Talisman, P.C.<br>1200 G St., N.W.<br>Suite 600<br>Washington, D.C., DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>manalastas@wrightlaw.com | Wendy B Warren<br>Wright & Talisman, P.C.<br>1200 G Street, N.W.<br>Suite 600<br>Washington, DISTRICT OF COLUMBIA 20005<br>warren@wrightlaw.com |
| Wright & Talisman, P.C. | Angela Martin<br>Paralegal<br>Southwest Power Pool, Inc.<br>201 Worthern Drive<br>Little Rock, ARKANSAS 72223<br>UNITED STATES<br>amartin@spp.org | Elizabeth Trinkle<br>Wright & Talisman, P.C.<br>Wright & Talisman P.C.<br>1200 G Street NW<br>Washington, DISTRICT OF COLUMBIA 20005<br>trinkle@wrightlaw.com |
| Xcel Energy Services Inc. | Timothy Mastrogiacomo<br>Lead Assistant General Counsel<br>Xcel Energy Services Inc.<br>701 Pennsylvania Avenue NW<br>Suite 250<br>Washington, DISTRICT OF COLUMBIA 20004<br>UNITED STATES<br>tim.t.mastrogiacomo@xcelenergy.com | William Grant<br>Director Strategic Planning<br>Xcel Energy Operating Companies<br>600 S Taylor<br>Amarillo, TEXAS 79105<br>william.a.grant@xcelenergy.com |
| Xcel Energy Services Inc. | | bernard liu<br>Sr. Trans. Tariff Consultant<br>414 Nicollet Mall Fl 7<br>Minneapolis, MINNESOTA 55401<br>bernard.liu@xcelenergy.com |