**ORAL ARGUMENT NOT YET SCHEDULED**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

**No. 23-1133**

---

**PARAGOULD LIGHT & WATER COMMISSION,**
**D/B/A PARAGOULD LIGHT, WATER & CABLE - PLWC, ET AL.,**
Petitioners,
v.

**FEDERAL ENERGY REGULATORY COMMISSION,**
Respondent.

---

**On Petition for Review of Orders of the**
**Federal Energy Regulatory Commission**

---

**BRIEF OF INTERVENOR FOR RESPONDENT**
**SOUTHWEST POWER POOL, INC.**

---

Matthew J. Binette
Elizabeth P. Trinkle
WRIGHT & TALISMAN, P.C.
1200 G Street, N.W., Suite 600
Washington, DC 20005-3898
(202) 393-1200
binette@wrightlaw.com
trinkle@wrightlaw.com

*Counsel for*
*Southwest Power Pool, Inc.*

**Dated: November 14, 2023**

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), Intervenor for Respondent Southwest Power Pool, Inc. ("SPP") submits the following:

### A.     Parties and Amici

The parties before this Court and in the lower agency proceedings are identified in the Petitioners' Certificate as to Parties, Rulings, and Related Cases, except that Petitioners' list of parties before the Court does not identify SPP or City Utilities of Springfield, Missouri as Intervenors for Respondent Federal Energy Regulatory Commission.

### B.     Rulings Under Review

*Southwest Power Pool, Inc.*, Order on Initial Decision, Docket No. ER18-99-005, 182 FERC ¶ 61,141 (Feb. 28, 2023) (R.317, JA____);

*Southwest Power Pool, Inc.*, Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, Docket No. ER18-99-007, 183 FERC ¶ 62,048 (May 1, 2023) (R.319, JA____); and

*Southwest Power Pool, Inc.*, Order Addressing Arguments Raised on Rehearing, Docket No. ER18-99-007, 184 FERC ¶ 61,004 (July 5, 2023) (R.322, JA____).

### C.     Related Cases

SPP is unaware of any pending cases related to the current consolidated case.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1, Intervenor for Respondent Southwest Power Pool, Inc. ("SPP") hereby submits the following corporate disclosure statement:

SPP is a non-profit corporation organized under the laws of the state of Arkansas with its principal place of business in Little Rock, Arkansas.  SPP has no parent corporation, and because SPP is a non-profit corporation that does not issue stock, no publicly held corporation owns 10% or more stock in SPP.

Pursuant to the requirement of Circuit Rule 26.1(b) that entities provide a statement of general nature and purpose relevant to the litigation, SPP states that it is an independent regional transmission organization authorized by the Federal Energy Regulatory Commission to administer non-discriminatory open access electric transmission service under the SPP Open Access Transmission Tariff, operate day-ahead and real-time energy, ancillary services, and congestion rights markets, and otherwise oversee the day-to-day operations of the bulk power system of a multi-state region, covering portions of Arkansas, Iowa, Kansas, Louisiana, Minnesota, Missouri, Montana, Nebraska, New Mexico, North Dakota, Oklahoma, South Dakota, Texas, and Wyoming.  As the party that filed the proposal at issue in this case, SPP is the "object of the agency's action" in the challenged orders.  *See Ameren Servs. Co. v. FERC*, 893 F.3d 786, 791-92 (D.C. Cir. 2018).

Respectfully submitted,

 */s/ Matthew J. Binette*
Matthew J. Binette
Elizabeth P. Trinkle
WRIGHT & TALISMAN, P.C.
1200 G Street, N.W., Suite 600
Washington, DC 20005-3898
(202) 393-1200
binette@wrightlaw.com
trinkle@wrightlaw.com

**Counsel for**
**Southwest Power Pool, Inc.**

Dated: November 14, 2023

## TABLE OF CONTENTS

**PAGE**

STATEMENT OF ADDENDUM ...............................................................1

STATEMENT OF THE ISSUES..............................................................1

STATEMENT OF THE CASE.................................................................1

    I.     SPP'S ZONAL RATE DESIGN ..........................................1

    II.    SPP ZONE 10...........................................................................5

    III.   FILING TO INCORPORATE FACILITIES OWNED BY
          GRIDLIANCE AND ASSOCIATED REVENUE
          REQUIREMENT .................................................................9

    IV.   SALE OF THE NIXA ASSETS ........................................11

SUMMARY OF ARGUMENT ..............................................................12

ARGUMENT ..........................................................................................13

    I.     FERC CORRECTLY FOUND SPP'S PROPOSAL JUST AND
          REASONABLE................................................................13

          A.     FERC Properly Determined that Adding the Nixa Assets
                to Zone 10 Comports with the Cost Causation Principle
                and Jurisprudence.......................................................13

          B.     FERC Correctly Rejected Petitioners' Facility-By-
                Facility Interpretation of the Roughly Commensurate
                Standard .................................................................21

    II.    FERC'S DECISION IS SUPPORTED BY SUBSTANTIAL
          EVIDENCE ...................................................................24

iv

A.    The Benefits of the Nixa Assets Are Supported by
       Record Evidence ........................................................................26

B.    Non-Quantified Benefits Are Not "Tiny" or "Trivial" ............29

III.   FERC'S ORDERS ARE CONSISTENT WITH PRECEDENT
       CITED BY PETITIONERS ................................................................32

CONCLUSION ...........................................................................................36

# TABLE OF AUTHORITIES

## COURT CASES                                                     Page

*Coalition of MISO Transmission Customers v. FERC*,
  45 F.4th 1004 (D.C. Cir. 2022)................................................14, 18

*Colorado Interstate Gas Co. v. FPC*,
  324 U.S. 581 (1945)..........................................................34

*Duke Energy Corp. v. FERC*,
  892 F.3d 416 (D.C. Cir. 2018).................................................25

*FERC v. Electric Power Supply Ass'n*,
  577 U.S. 260 (2016)..........................................................24

*Florida Gas Transmission Co. v. FERC*,
  604 F.3d 636 (D.C. Cir. 2010)................................................25

*Fort Pierce Utilities. Authority v. FERC*,
  730 F.2d 778 (D.C. Cir. 1984)................................................20

*Green Development, LLC v. FERC*,
  77 F.4th 997 (D.C. Cir. 2023)................................................25

*Holyoke Gas & Electric Department v. FERC*,
  954 F.2d 740 (D.C. Cir. 1992)................................................20

*Illinois Commerce Comm'n v. FERC*,
  576 F.3d 470 (7th Cir. 2009).......................................14, 22, 30, 34

*Illinois Commerce Comm'n v. FERC*,
  721 F.3d 764 (7th Cir. 2013)..................................19, 23, 30, 31, 34

*Kentucky Municipal Energy Agency v. FERC*,
  45 F.4th 162 (D.C. Cir. 2022)................................................25

*Long Island Power Authority v. FERC*,
  27 F.4th 705 (D.C. Cir. 2022)..........................................14, 18, 20

*LSP Transmission Holdings II, LLC v. FERC*,
    45 F.4th 979 (D.C. Cir. 2022)..................................................................14, 18

*Maine Public Service Co. v. FERC*,
    964 F.2d 5 (D.C. Cir. 1992).........................................................................20

*Midwest ISO Transmission Owners v. FERC*,
    373 F.3d 1361 (D.C. Cir. 2004)............................................................14, 23

*MISO Transmission Owners v. FERC*,
    819 F.3d 329 (7th Cir. 2016) .......................................................................29

*Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile*
    *Insurance Co.*,
    463 U.S. 29 (1983)........................................................................................25

*Nebraska Public Power District v. FERC*,
    957 F.3d 932 (8th Cir. 2020) ....................................................2, 4, 29, 30, 34

*Old Dominion Electric Cooperative v. FERC*,
    898 F.3d 1254 (D.C. Cir. 2018)..............................................................32, 35

*PJM Power Providers Group v. FERC*,
    880 F.3d 559 (D.C. Cir. 2018).....................................................................25

*Sithe/Independence Power Partners, L.P. v. FERC*,
    285 F.3d 1 (2002) ........................................................................................14

*Tejas Power Corp. v. FERC*,
    908 F.2d 998 (D.C. Cir. 1990).....................................................................14

**ADMINISTRATIVE CASES**

*GridLiance High Plains LLC*,
    179 FERC ¶ 61,113 (2022)...........................................................................12

*Indicated SPP Transmission Owners v. Southwest Power Pool, Inc.*,
    162 FERC ¶ 61,213 (2018).........................................................3, 4, 5, 27, 33

*Indicated SPP Transmission Owners v. Southwest Power Pool, Inc.*,
    165 FERC ¶ 61,005 (2018)...................................................................3, 5, 31

*Southern Co. Services, Inc.*,
    116 FERC ¶ 61,247 (2006)...........................................................................20

*Southwest Power Pool, Inc.*,
    106 FERC ¶ 61,110, *order on reh'g*,
    109 FERC ¶ 61,010 (2004)...........................................................................3

*Southwest Power Pool, Inc.*,
    109 FERC ¶ 61,009 (2004), *order on reh'g*,
    110 FERC ¶ 61,137 (2005)...........................................................................1

*Southwest Power Pool, Inc.*,
    112 FERC ¶ 61,355 (2005), *order on reh'g*,
    114 FERC ¶ 61,242 (2006)...........................................................................3

*Southwest Power Pool, Inc.*,
    162 FERC ¶ 61,215 (2018).........................................................................10

*Southwest Power Pool, Inc.*,
    Opinion No. 562, 163 FERC ¶ 61,109 (2018), *order denying
    reh'g,* Opinion No. 562-A, 166 FERC ¶ 61,019 (2019)............................5, 31

*Southwest Power Pool, Inc.*,
    171 FERC ¶ 63,032 (2020).........................................................................10

*Southwest Power Pool, Inc.*,
    174 FERC ¶ 61,116, *order on reh'g*,
    175 FERC ¶ 61,235 (2021).........................................................................10

*Southwest Power Pool, Inc.*,
    177 FERC ¶ 63,021 (2021).........................................................................11

*Southwest Power Pool, Inc.*,
    182 FERC ¶ 61,141 (2023)..................................... 1-2, 10, 11, 15, 16, 19, 20,
    26, 28, 29, 32, 35

*Southwest Power Pool, Inc.*,
    184 FERC ¶ 61,004 (2023).................................... 2, 15, 16, 17, 18, 20, 21, 35

## **STATUTES**

5 U.S.C. § 706 ................................................................................... 24

16 U.S.C. § 824d ................................................................................ 12

16 U.S.C. § 825*l* ............................................................................... 25

# GLOSSARY

| | |
|---|---|
| ARKMO Cities | Petitioners Paragould Light & Water Commission (d/b/a – Paragould Light, Water & Cable – PLWC), City of Poplar Bluff Municipal Utilities, Kennett Board of Public Works, City of Piggott-AR Municipal Light Water and Sewer, City of Malden-Board of Public Works |
| Eighth Circuit | United States Court of Appeals for the Eighth Circuit |
| FERC | Respondent Federal Energy Regulatory Commission |
| FERC Br. | Brief for Respondent Federal Energy Regulatory Commission, *Paragould Light & Water Comm'n v. FERC*, No. 23-1133 (D.C. Cir. Nov. 7, 2023) |
| GridLiance | GridLiance High Plains, LLC |
| *Illinois I* | *Ill. Com. Comm'n v. FERC*, 576 F.3d 470 (7th Cir. 2009) |
| *Illinois III* | *Ill. Com. Comm'n v. FERC*, 721 F.3d 764 (7th Cir. 2013) |
| *Indicated Owners I* | *Indicated SPP Transmission Owners v. Sw. Power Pool, Inc.*, 162 FERC ¶ 61,213 (2018) |
| *Indicated Owners II* | *Indicated SPP Transmission Owners v. Sw. Power Pool, Inc.*, 165 FERC ¶ 61,005 (2018) |
| Initial Order | *Sw. Power Pool, Inc.*, Order on Initial Decision, Docket No. ER18-99-005, 182 FERC ¶ 61,141 (Feb. 28, 2023) (R.317, JA____) |
| Midwest Operator | Midcontinent Independent System Operator, Inc. f/k/a Midwest Independent Transmission System Operator, Inc. |
| Nebraska Power | Nebraska Public Power District |

x

| | |
|---|---|
| *Nebraska Power* | *Neb. Pub. Power Dist. v. FERC*, 957 F.3d 932 (8th Cir. 2020) |
| Nixa | City of Nixa, Missouri |
| October 2017 Filing | *Sw. Power Pool, Inc.*, Submission of Tariff Revisions to Incorporate South Central MCN LLC's Formula Rate, Docket No. ER18-99-000 (Oct. 18, 2017) |
| P | Paragraph number in a FERC order |
| Pet. Br. | Opening Brief of Petitioners, *Paragould Light & Water Comm'n v. FERC*, No. 23-1133 (D.C. Cir. Sept. 8, 2023) |
| Petitioners | Paragould Light & Water Commission (d/b/a – Paragould Light, Water & Cable – PLWC), City of Poplar Bluff Municipal Utilities, Kennett Board of Public Works, City of Piggott-AR Municipal Light Water and Sewer, City of Malden-Board of Public Works, Evergy Kansas Central, Inc., Evergy Metro, Inc., Evergy Missouri West, Inc., American Electric Power Service Corporation on behalf of its affiliates Public Service Company of Oklahoma and Southwestern Electric Power Company, Xcel Energy Services Inc. on behalf of its operating company affiliate Southwestern Public Service Company, and Western Farmers Electric Cooperative |
| R. | Record item number in the Certified Index to the Record |
| Rehearing Order | *Sw. Power Pool, Inc.*, Order Addressing Arguments Raised on Rehearing, Docket No. ER18-99-007, 184 FERC ¶ 61,004 (July 5, 2023) (R.322, JA____) |
| RTO | Regional Transmission Organization |
| Seventh Circuit | United States Court of Appeals for the Seventh Circuit |

| | |
|---|---|
| Southwestern Administration | Southwestern Power Administration, a federally owned power marketing administration |
| SPP | Southwest Power Pool, Inc. |
| Tariff | Southwest Power Pool, Inc. Open Access Transmission Tariff, Sixth Revised Volume No. 1, as may be amended from time to time |
| Tri-State | Tri-State Generation and Transmission Cooperative |
| Zone | As defined in Section I.1 of the SPP Open Access Transmission Tariff: "The geographic area of the facilities of a Transmission Owner or a specific combination of Transmission Owners as specified in Schedules 7, 8, and 9 of the SPP Tariff, which is used both for determining transmission rates and for planning and operation of the SPP transmission system." |

## STATEMENT OF ADDENDUM

In addition to the statutes and regulations contained in the addendum to Respondent Federal Energy Regulatory Commission's ("FERC") brief, Brief for Respondent Federal Energy Regulatory Commission, *Paragould Light & Water Comm'n v. FERC*, No. 23-1133 (D.C. Cir. Nov. 7, 2023) ("FERC Br."), relevant statutes and provisions of the Southwest Power Pool, Inc. ("SPP") Open Access Transmission Tariff ("Tariff") that are cited in this brief are set forth in the Addendum to this brief.

## STATEMENT OF THE ISSUES

SPP adopts FERC's Statement of the Issues.  FERC Br. at 1-3.

## STATEMENT OF THE CASE

SPP adopts FERC's Statement of the Case, *id.* at 3-23, with the following supplementations.

## I.    SPP'S ZONAL RATE DESIGN

SPP is an Arkansas not-for-profit corporation, which FERC authorized as a regional transmission organization ("RTO") in 2004.  *Sw. Power Pool, Inc.*, 109 FERC ¶ 61,009 (2004), *order on reh'g*, 110 FERC ¶ 61,137 (2005).  SPP employs a "license plate" zonal rate design for purposes of establishing rates for transmission service, which divides SPP's multi-state, multi-transmission owner footprint into separate transmission pricing Zones based largely on geography.  *Sw. Power Pool,*

*Inc.*, 182 FERC ¶ 61,141, at P 3 (2023) ("Initial Order") (R.317, JA___), *reh'g denied*, 184 FERC ¶ 61,004 (2023) ("Rehearing Order") (R.322, JA___-JA___); *see also Neb. Pub. Power Dist. v. FERC*, 957 F.3d 932, 934-35 (8th Cir. 2020) ("*Nebraska Power*") (describing SPP's zonal construct and rates); SPP Tariff § I.1 (defining "Zone" as the "*geographic area* of the facilities of a Transmission Owner or a specific combination of Transmission Owners as specified in Schedules 7, 8, and 9" (emphasis added)) (Addendum at A-3).

SPP's Tariff specifies a zonal revenue requirement for each pricing Zone that is calculated by summing the individual revenue requirements for each transmission owner with facilities in the Zone. Transmission customers taking network transmission service for delivery to their load pay a monthly demand charge for the pricing Zone where their load is located. That charge is calculated by multiplying a customer's percentage share of the total load in the Zone (i.e., its "load-ratio share") by the total zonal revenue requirement. Initial Order at P 3 & n.3 (R.317, JA___-JA___); *see also* Ex. SPP-001 at 17-18 (R.296, JA___-JA___) (explaining zonal rates). When a new transmission owner's facilities are added to an existing pricing Zone, the revenue requirement for the facilities and any associated load not already included in the zonal load are added to that Zone's zonal revenue requirement and total zonal load, respectively. Initial Order at P 3 (R.317, JA___-JA___).

In conditionally granting SPP RTO status in 2004, FERC specifically directed SPP, among other things, to develop a process for incorporating new transmission owners into SPP and "providing appropriate compensation for their transmission facilities, whether by establishing such entities as separate pricing [Z]ones *or incorporating such entities into existing pricing [Z]ones.*" *Sw. Power Pool, Inc.*, 106 FERC ¶ 61,110, at P 115 (emphasis added), *order on reh'g*, 109 FERC ¶ 61,010 (2004). In the same proceeding in which SPP filed Tariff revisions to comply with that directive, FERC accepted certain other Tariff provisions governing the incorporation of a new transmission owner's existing facilities into SPP, "*even though those provisions could result in cost shifts*." *Indicated SPP Transmission Owners v. Sw. Power Pool, Inc.*, 162 FERC ¶ 61,213, at P 65 ("*Indicated Owners I*") (emphasis added) (citing *Sw. Power Pool, Inc.*, 112 FERC ¶ 61,355, at PP 38, 41 (2005), *order on reh'g*, 114 FERC ¶ 61,242 (2006)), *reh'g denied*, 165 FERC ¶ 61,005 (2018) ("*Indicated Owners II*"). Thus, the concept of multi-owner Zones and the potential for so called "cost shifts" resulting from adding a new transmission owner to SPP were ordered by FERC and baked into SPP's zonal rate design from the outset of SPP's operation as an RTO.

Consistent with FERC's directive in the SPP RTO formation proceeding, when a new transmission owner seeks to place transmission facilities under SPP's Tariff, SPP examines the facilities in relation to the existing SPP transmission

system and determines whether the facilities should be placed in a newly-created Zone or in an existing SPP Zone with other SPP-operated facilities. *Indicated Owners I* at PP 18, 72-73 (describing the factors and process); *see also Nebraska Power*, 957 F.3d at 935 ("Since 2004, SPP has expanded its geographical footprint by establishing new rate zones for larger transmission providers and by placing smaller transmission providers into existing zones.). To make this determination, SPP created a "zonal placement process" under which SPP employs a series of relevant criteria to determine whether the transmission facilities proposed for inclusion are sufficiently integrated with the transmission system or systems of one or more current SPP transmission owners, or whether the proposed facilities form their own coherent system and are not interdependent with existing SPP transmission facilities. *Nebraska Power*, 957 F.3d at 936-37 (summarizing the zonal criteria SPP employed in making a just and reasonable decision to place transmission facilities in an existing zone in that case); *see also* Ex. SPP-001 at 10-17 (R.296, JA___-JA___) (explaining SPP's zonal placement process and criteria, and their application in this case).

SPP's zonal placement criteria reflect SPP's responsibility to plan for the reliable and cost-effective expansion of the SPP transmission system and administer non-discriminatory open access transmission service over its transmission owners' facilities. Ex. SPP-001 at 11 (R.296, JA___); *see also Indicated Owners I* at PP 72-

73 (stating that SPP takes appropriate factors into consideration); *Indicated Owners II* at PP 19-20.   As FERC previously determined, this responsibility includes appropriate consideration of a "variety of issues . . . including the scope, configuration, and operational characteristics of the new owner's transmission facilities and the existing SPP system, and the implications that the zonal placement will have for transmission planning and system reliability."   *Indicated Owners I* at P 62.   As FERC has also made clear, what matters in these "zonal placement" proceedings is whether *the resulting rate* is just and reasonable.   *See Sw. Power Pool, Inc.*, Opinion No. 562, 163 FERC ¶ 61,109, at P 208 (2018) (emphasis added), *reh'g denied,* Opinion No. 562-A, 166 FERC ¶ 61,019 (2019), *aff'd Nebraska Power.*

## II.   SPP ZONE 10

Prior to the SPP Tariff filing that initiated this proceeding, Zone 10 consisted solely of transmission facilities owned by a single transmission owner, Southwestern Power Administration ("Southwestern Administration"), a federally owned power marketing agency.   Ex. SPP-001 at 8-9 (R.296, JA___-JA___).   While all of Southwestern Administration's transmission system is available for use by SPP under the Tariff, only a portion of Southwestern Administration's revenue requirement is included in the Tariff, because Southwestern Administration also continues to serve certain customers separately outside of the Tariff under legacy contracts, consistent with its federal statutory obligations, unless or until those

5

contracts expire by their own terms. *Id.* at 8-9, 19 (R.296, JA___-JA___, JA___). Because of its unique federally owned and non-FERC jurisdictional status, Southwestern Administration's participation in SPP and SPP's use of Southwestern Administration's transmission system is governed by a separate agreement between the two entities, which is incorporated as Attachment AD of the SPP Tariff. *Id.* at 9 (R.296, JA___). Relevant here, Attachment AD requires that when a Southwestern Administration legacy customer's contract expires and that customer converts to SPP transmission service, SPP is obligated to place that customer's load in Zone 10. *Id.* at 15-16 (R.296, JA___-JA___); *see also* Tariff, Attachment AD, Art. II § 1(b) (Addendum at A-4). Each time load converts from historical Southwestern Administration transmission service to SPP network transmission service, Southwestern Administration adds a portion of its overall transmission system revenue requirement into SPP Zone 10 rates approximating the costs associated with the Southwestern Administration facilities used to serve that customer. Ex. SPP-001 at 19 (R.296, JA___).

Numerous SPP transmission customers take service in Zone 10. Among these customers are Petitioners the ARKMO Cities, each of which takes service under a separate network agreement with SPP, each of which is interconnected at a different point of the Zone 10 transmission system, and each of which relies primarily on a unique subset of Zone 10 facilities to serve its loads. Outside of this proceeding and

a few related proceedings, there is no formal group of SPP customers known as the "ARKMO Cities," and certainly no such entity taking service under the SPP Tariff as a unified group of customers. Collectively, in 2019, the ARKMO Cities accounted for well less than half of the load in Zone 10; by 2021, that percentage had decreased to less than a quarter of the total zonal load. *See* Ex. GHP-0227 at 1 (confidential version) (R.298).[1]

Petitioner Western Farmers Electric Cooperative is a transmission owner with its own SPP pricing Zone where the vast majority of its load is located. In 2019, Western Farmers Electric Cooperative did not have any load in Zone 10, but in 2021 it accounted for an exceedingly small percentage of Zone 10 load. *Id.* (R.298). An affiliate of Petitioner American Electric Power similarly has had small amounts of load in the Zone at certain times during this long litigation and not at other times.

---

[1]    The raw load data used to derive the general percentages discussed herein was filed with FERC under seal as part of the confidential version of Ex. GHP-0227 (R.298) because it contains customer-specific data that SPP customarily treats as confidential. Because the percentages identified herein do not reveal any confidential, customer-specific load data, SPP is not required to file this brief under seal. However, because the raw load data on which these percentages are based is part of the administrative record, it is available to the Court even though it is not included in the Deferred Joint Appendix, should the Court wish to verify the accuracy of the percentages. Fed. R. App. P. 17(b)(3) ("All parts of the record retained by the agency are a part of the record on review for all purposes and, if the court or a party so requests, must be sent to the court regardless of any prior stipulation."); Circuit Rule 30(b) ("Any portion of the record, whether or not included in an appendix, may be relied upon by the parties and by the court.").

Petitioners the Evergy Companies and Xcel Energy Services Inc. have no load in Zone 10 and thus do not pay any of the costs at issue in this proceeding.  As a group, Petitioners have never accounted for anywhere near half of the load paying the costs of the collective transmission system in Zone 10; the vast majority of load in the Zone is served by entities who are neither petitioners nor intervenors here.

In 2017, the City of Nixa, Missouri ("Nixa") began taking SPP network transmission service upon expiration of its historical transmission service contract with Southwestern Administration.  Ex. SPP-001 at 15-17 (R.296, JA___-JA___).  As required by Attachment AD of its Tariff, SPP "placed" Nixa's load in Zone 10 and began selling Zone 10 network transmission service to Nixa.  *Id.* (R.296, JA___-JA___).  As of that date, Nixa began paying its load-ratio share of the revenue requirement associated with *all* transmission facilities in Zone 10, *including* transmission facilities interconnected with and directly serving the Arkansas cities of Paragould and Piggott, and the Missouri cities of Kennett, Malden, and Poplar Bluff (i.e., the "ARKMO Cities").  At the time, Nixa's load-ratio share was higher than the 11% that Petitioners claim is at issue in this proceeding, *see* Ex. GHP-0227 at 1 (confidential version) (R.298), resulting in Nixa picking up the tab for a significant percentage of the discrete subset of facilities used to serve each of the ARKMO Cities.  This occurred automatically and by virtue of SPP's FERC-approved zonal rate design, even though no showing had been made that Nixa caused

those facilities to be constructed or received any quantifiable or measurable benefits from them, and without any objection from the ARKMO Cities or other Petitioners about the obvious "cost shift" from the ARKMO Cities to Nixa. Later, when Western Farmers Electric Cooperative began taking Zone 10 transmission service for a very small portion of load, Nixa began paying its load-ratio share for the transmission facilities used to serve that load as well, again by virtue of the long-ago FERC-approved SPP zonal rate construct and without objection by Western Farmers Electric Cooperative or any other Petitioner.

## III. FILING TO INCORPORATE FACILITIES OWNED BY GRIDLIANCE AND ASSOCIATED REVENUE REQUIREMENT

In October 2017, SPP filed with FERC revisions to its Tariff to add a revenue requirement for a set of transmission facilities (the "Nixa Assets") owned by GridLiance High Plains, LLC (f/k/a South Central MCN LLC) ("GridLiance") upon transfer of functional control of those facilities to SPP. *Sw. Power Pool*, *Inc.*, Submission of Tariff Revisions to Incorporate South Central MCN LLC's Formula Rate, Docket No. ER18-99-000 (Oct. 18, 2017) ("October 2017 Filing") (R.1, JA___-JA___). As part of that filing, SPP proposed to place the Nixa Assets and revenue requirement into Zone 10, where GridLiance became the second transmission owner in the Zone (along with Southwestern Administration).

Several parties, including Petitioners, filed comments opposing aspects of the October 2017 Filing. FERC issued an order on March 15, 2018, accepting the

October 2017 Filing subject to refund and establishing hearing and settlement procedures. *Sw. Power Pool, Inc.*, 162 FERC ¶ 61,215, at PP 1, 32-33 (2018). Settlement procedures reached an impasse, and the parties proceeded to hearing.

After a hearing conducted before a FERC administrative law judge, but before the judge could issue her decision, GridLiance and Petitioners the ARKMO Cities reached a settlement of the issues in this proceeding, and requested that SPP file it on their behalf. *See* Initial Order at P 7 (R.317, JA___-JA___). The transmission-owning Petitioners here, who collectively are responsible for virtually none of the rates at issue in this proceeding, opposed the ARKMO Cities' settlement. *Sw. Power Pool, Inc*., 171 FERC ¶ 63,032, at P 83 (2020) (presiding judge's certification of settlement, noting the transmission owners' attenuated interests as largely non-payers of the rate at issue).

On February 18, 2021, FERC rejected the ARKMO Cities' settlement and remanded this proceeding to its Office of Administrative Law Judges to resume hearing procedures. *Sw. Power Pool, Inc*., 174 FERC ¶ 61,116, at PP 1, 31, 46, *order on reh'g*, 175 FERC ¶ 61,235 (2021). FERC concluded that it was not able to approve the ARKMO Cities' settlement based upon the record, specifically because it found "that there is insufficient evidence in the record for [FERC] to make a determination on *whether and the extent to which there are cost shifts involved in the placement of the Nixa Assets into Zone 10 or benefits that may accrue that would*

10

*justify any such cost shifts.*"  *Id.* at P 40.  On rehearing, FERC elaborated that the second hearing should focus on supplementing the record as to the cost shifts/rate impacts and benefits of the inclusion of the Nixa Assets in Zone 10 to customers as a whole.  *Sw. Power Pool, Inc.*, 175 FERC ¶ 61,235, at P 32.

Following the second hearing, a second presiding judge issued an "initial decision" finding SPP's proposal just and reasonable and consistent with the cost causation principle.  *Sw. Power Pool, Inc.*, 177 FERC ¶ 63,021 (2021).  On February 28, 2023, FERC issued its Initial Order affirming the judge's decision, concluding that SPP's proposal to incorporate the Nixa Assets into Zone 10 is consistent with cost causation principles and is otherwise just and reasonable as demonstrated by the record evidence of benefits.  Initial Order at PP 11, 99, 102 (R.317, JA___, JA___-JA___, JA___).  FERC upheld and fortified its determination on rehearing.  *See generally* Rehearing Order (R.322, JA___-JA___).

## IV.  SALE OF THE NIXA ASSETS

On the eve of the second hearing, the United States District Court for the Western District of Missouri, Southern Division, granted summary judgment in favor of the Missouri Joint Municipal Electric Utility Commission as to a "Co-Development Agreement" between that commission and GridLiance, finding that the municipal commission was entitled to purchase the Nixa Assets from GridLiance.  *Mo. Joint Mun. Elec. Util. Comm'n v. GridLiance High Plains, LLC*,

No. 6:19-cv-03338-MDH, 2021 U.S. Dist. LEXIS 104638 (W.D. Mo. June 3, 2021). On December 10, 2021, after the second hearing concluded, GridLiance applied for FERC authorization to sell the Nixa Assets to the Missouri municipal commission, which FERC granted on May 19, 2022. *GridLiance High Plains LLC*, 179 FERC ¶ 61,113 (2022). Accordingly, GridLiance is no longer the owner of the Nixa Assets.

## SUMMARY OF ARGUMENT

The sole issue before this Court is whether FERC correctly concluded that the rates resulting from SPP's proposed placement of Nixa Assets in Zone 10 are just and reasonable under the Federal Power Act. 16 U.S.C. § 824d(a). As FERC rightly concluded, the answer is yes, and this Court should affirm.

First, FERC properly found that inclusion of the Nixa Assets in Zone 10 is just and reasonable notwithstanding that they were originally built to serve Nixa. This is because, upon their integration, the Nixa Assets provide benefits to Zone 10 customers, including Nixa, and Nixa pays a share of the costs of facilities that primarily serve other Zone 10 customers. This is consistent with how zonal license plate rates in an RTO work. In accepting SPP's proposal, FERC properly rejected Petitioners' call for a Nixa versus "non-Nixa" assessment of costs and benefits and Petitioners' attempt to inject a stricter project-specific benefit requirement into the "roughly commensurate" standard.

12

Having appropriately dispensed with Petitioners' flawed legal theories, FERC then examined the totality of the evidence presented and correctly found that the Nixa Assets provide benefits to Zone 10 justifying the inclusion of their costs in Zone 10 rates. FERC did not need to do a precise quantification of costs and benefits, because doing so is not required by cost causation jurisprudence. While Petitioners offered what they claim was contrary evidence, FERC weighed all the evidence, and the weight FERC accorded is entitled to this Court's deference.

Finally, contrary to Petitioners' claims, FERC's orders are consistent with prior cost-causation precedent, as FERC explained both in its orders and on brief. The Petition for Review should therefore be denied.

## ARGUMENT

## I.    FERC CORRECTLY FOUND SPP'S PROPOSAL JUST AND REASONABLE

### A.    FERC Properly Determined that Adding the Nixa Assets to Zone 10 Comports with the Cost Causation Principle and Jurisprudence

Petitioners insist that because the Nixa Assets were originally built to serve the city of Nixa and are relied upon by Nixa to serve its load, the benefits of adding the Nixa Assets to Zone 10 cannot be roughly commensurate with the associated costs. Pet. Br. at 31. Claiming a rate increase to "the rest of Zone 10," Petitioners aver that adding the Nixa Assets to the Zone "lift[s] most of the Nixa Assets annual costs off Nixa and place[s] them on other protesting customers" while offering

13

"essentially zero benefits" to other Zone 10 customers. *Id.* at 27, 31. However, these arguments reflect both a fundamental misunderstanding of zonal rate design and misapplication of the cost-causation principle to zonal rate constructs.

The cost-causation principle has "never required a ratemaking agency to allocate costs with exacting precision." *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1369 (D.C. Cir. 2004). Similarly, FERC "'is not bound to reject any rate mechanism that tracks the cost-causation principle less than perfectly.'" *Sithe/Indep. Power Partners, L.P. v. FERC*, 285 F.3d 1, 5 (2002) (citing *Tejas Power Corp. v. FERC*, 908 F.2d 998, 1005 (D.C. Cir. 1990)). FERC also "need not 'consider cost allocation on a project-by-project basis,'" because 'FERC must ensure only that there is 'some resemblance' between costs and benefits.'" *LSP Transmission Holdings II, LLC v. FERC*, 45 F.4th 979, 994 (D.C. Cir. 2022) (quoting *Long Island Power Auth. v. FERC*, 27 F.4th 705, 715 (D.C. Cir. 2022)); *accord Coal. of MISO Transmission Customers v. FERC*, 45 F.4th 1004, 1020-21 (D.C. Cir. 2022). All that is required is that FERC have an "articulable and plausible" reason to believe that the costs customers pay are roughly commensurate with the benefits they receive. *Ill. Com. Comm'n v. FERC*, 576 F.3d 470, 477 (7th Cir. 2009) ("*Illinois I*").[2] As such, FERC evaluates zonal rate constructs to

---

[2]     To avoid confusion, this brief adopts the nomenclature for the *Illinois Commerce Commission v. FERC* series of cases adopted in FERC's brief,

determine "both the benefits to Zone 10 customers as a whole and whether those benefits are shared among customers within the zone." Initial Order at P 66 (R.317, JA___).

FERC properly concluded that evaluation of the benefits in this proceeding should focus on "the benefits of the Nixa Assets to all Zone 10 customers – including the City of Nixa." Initial Order at P 29 (R.317, JA___). FERC's rejection of Petitioners' faulty Nixa versus "non-Nixa" premise is well grounded both in precedent and the underlying procedural record.

SPP's license plate zonal rate construct requires transmission customers taking network service to pay a monthly demand charge for the SPP pricing Zone where the load is located, the amount of which is determined by multiplying the customer's load-ratio share times a percentage of the zonal revenue requirement for all transmission facilities in the Zone. Rehearing Order at P 16 (R.322, JA___-JA___). Nixa is a Zone 10 customer like all other Zone 10 customers. As such, from the perspective of SPP transmission service under the Tariff, Nixa is no different than any other customer taking network transmission service under the Tariff, including the city of Piggott, Arkansas, or Western Farmers Electric Cooperative, or the city of Carthage, Missouri—another network transmission

---

even though this brief refers to only two Illinois cases and FERC's brief refers to three.

service customer in Zone 10 that represents a substantial portion of the zonal load and is neither an ARKMO City nor Nixa—or for that matter the Evergy Companies in their respective Zones. Each customer is required by the Tariff to pay its load-ratio share of all of the facilities that comprise the Zone in which the customer is located. Therefore, segregating Zone 10 into two groups of "Nixa" and "non-Nixa" is a distinction neither required by precedent nor recognized or achievable in SPP's zonal rate construct, and doing so is not justified by the evidentiary record. Initial Order at PP 64, 103 (R.317, JA___, JA___); Rehearing Order at P 25 (R.322, JA___).

As FERC explained, Nixa divested the Nixa Assets and was a Zone 10 customer before the Nixa Assets were placed into Zone 10. Initial Order at P 30 (R.317, JA___). Despite Petitioner's dismissal of this fact as irrelevant, Nixa is on equal footing with all other Zone 10 customers for purposes of evaluating whether the benefits of adding the Nixa Assets to Zone 10 are roughly commensurate with the costs charged to that Zone precisely because Nixa pays its load-ratio share of total Zone 10 costs just like everybody else. Rehearing Order at P 17 n.56 (R.322, JA___) ("So, like ARKMO, the City of Nixa has been paying for network service based on the costs of the Zone 10 transmission system as a whole according to its load-ratio share, irrespective of whether or to what extent it benefits from any particular transmission asset within that system."). There is no basis to discriminate

16

or treat Nixa differently than all other Zone 10 customers. Indeed, flipping Petitioner's argument on its head, Nixa pays a share of the costs of serving other Zone 10 customers, including the distinct subset of transmission facilities interconnecting to and serving each of the individual ARKMO Cities, without any showing of specific benefits, resulting (in Petitioners' own terms) in a "cost shift" to Nixa from assets used primarily to serve "non-Nixa" customers. Rehearing Order at P 20 & n.62 (R.322, JA___-JA___).

That is precisely how zonal rates in an RTO are designed to work—each customer pays a share of the total zonal transmission system, but each customer does not necessarily receive any particular level of benefits from any particular individual facility comprising the zone. To use Petitioners' words, zonal rates are designed so that "within each Zone, each network customer's transmission service charge is based on its load-ratio share—its *fair piece of the overall zonal transmission cost pie*." Pet. Br. at 6 (emphasis added). This is true even though each customer does not eat from the entire pie, but instead is served primarily by only a slice. At the risk of belaboring the pie metaphor, while individual ARKMO Cities may be paying some of the costs of Nixa's piece of pie, Nixa is also paying its load-ratio share of the costs of feeding the ARKMO Cities. Each receives a roughly commensurate share of the benefits of the overall zonal transmission system, in exchange for paying their load-ratio share of the zonal transmission system costs.

17

Petitioners make much of the history of the Nixa Assets, including that "Nixa alone" built the Nixa Assets to serve load. Pet. Br. at 49. While the origin story of a specific transmission facility or set of facilities is a relevant consideration, it is not dispositive of whether it is just and reasonable to spread the costs of that facility across the broader transmission zone when the facility is put under the Tariff. Nixa is a Zone 10 customer subject to the same Schedule 9 rates as all other Zone 10 customers, paying a share of the costs of all Zone 10 facilities irrespective of whether each specific facility in Zone 10 provides specific benefits to Nixa. *See* Rehearing Order at P 20 & n.62 (R.322, JA___-JA___) (noting that Nixa has not been shown to benefit from other Zone 10 facilities serving Petitioners in a manner that would satisfy Petitioners' proportionality requirement); *id.* at P 18 n.57 (R.322, JA___) (noting that there has been no showing that each customer in Zone 10 derives benefits from each of the other "non-Nixa" facilities in Zone 10 in proportion to that customer's load). As such, FERC appropriately found no basis to distinguish between Nixa and "non-Nixa" when assessing the benefits and costs of the Nixa Assets. FERC is only required to show that costs are "roughly commensurate" with benefits, which this and other courts have determined does not require the type of customer-by-customer, facility-by-facility evaluation that Petitioners demand here. *LSP Transmission Holdings II   v. FERC*, 45 F.4th at 994; *Coal. of MISO Transmission Customers v. FERC*, 45 F.4th at 1020-21; *Long Island Power Auth. v.*

18

*FERC*, 27 F.4th at 715; *Ill. Com. Comm'n v. FERC*, 721 F.3d 764, 774 (7th Cir. 2013) (finding no need to show that each customer benefits equally from each facility) ("*Illinois III*").

Indeed, in evaluating SPP's proposal, FERC followed precedent by not accepting Petitioners' invitation to treat Nixa separately and discriminatorily when assessing the benefits of SPP's proposal. As FERC noted, when it rejected the ARKMO Cities' settlement with GridLiance, it found the record lacking and remanded the case to develop a more thorough record that the Nixa Assets provide benefits "roughly commensurate to costs incurred. Accordingly, we evaluate both the benefits to *Zone 10 customers as a whole* and whether those benefits are shared among customers within the zone." Initial Order at P 66 (R.317, JA___). On rehearing, FERC clarified that benefits are evaluated on a zonal basis:

> SPP's zonal rate construct does not attempt to measure each transmission customer's benefit from each transmission asset included in the zonal [annual revenue requirement]. Nor does it charge each customer transmission costs on an asset-by-asset basis. Instead, under that zonal construct, the costs and benefits associated with network service in a zone are assessed on an aggregate level, with each customer paying for transmission service based on its load ratio share, which reflects its total use of the aggregate assets in the zone. *Even if a customer does not benefit from a particular transmission asset in a manner roughly commensurate with its load ratio share, this does not demonstrate that the customer is not overall receiving roughly commensurate benefits from the transmission assets within the zone as compared to the zonal rates it is paying under SPP's Tariff.*

19

Rehearing Order at P 17 (emphasis added) (R.322, JA___).

FERC's orders under review here make clear that this approach is consistent with its longstanding policy of rolling the costs of networked transmission facilities into rates. *See* Initial Order at P 101 (R.317, JA___); *So. Co. Servs., Inc.*, 116 FERC ¶ 61,247, at PP 17-18 (2006) (explaining that rolled-in pricing is appropriate when the relevant facilities are integrated into the network because, "as part of the network, the added facilities benefit all users of the network"). This Court has affirmed FERC's use of rolled-in pricing for integrated transmission facilities. *See, e.g.*, *Me. Pub. Serv. Co. v. FERC*, 964 F.2d 5, 8-9 (D.C. Cir. 1992) (citing *Holyoke Gas & Elec. Dep't v. FERC*, 954 F.2d 740, 743 (D.C. Cir. 1992); *Ft. Pierce Utils. Auth. v. FERC*, 730 F.2d 778, 782 & n.11 (D.C. Cir. 1984)).

The bottom line is that Nixa pays its share of the costs of all Zone 10 transmission facilities, even though not all of those individual facilities have been shown to provide unique, specific, or proportionate benefits (reliability, economic, or otherwise) to Nixa on an individualized basis. *See* Ex. ARK-0076 at 133 (R.296, JA___). This is entirely unsurprising in light of how RTO zonal rates are designed and work, as FERC properly found in rejecting Petitioners' false Nixa versus "non-Nixa" cost/benefit dichotomy. *Long Island Power Auth. v. FERC*, 27 F.4th at 715.[3]

---

[3]     Moreover, while Petitioners devote several pages on brief to arguing that FERC should look at this case at the *facility* level of granularity, Pet. Br. at

**B.** **FERC Correctly Rejected Petitioners' Facility-By-Facility Interpretation of the Roughly Commensurate Standard**

In Petitioner's view, FERC is obligated to evaluate only "whether the others in Zone 10 are receiving benefits from the Nixa assets that would warrant taking on a large share of their costs."  Pet Br. at 36.  In essence, Petitioners argue that FERC and the Court must look at individual facilities in isolation, and if a customer receives *more* benefits from that particular facility than other customers receive, it must pay precisely *more* of the rate for that facility, regardless of the circumstances or the relationship of the facility to other facilities or customers.  This retooling of the roughly commensurate standard to compare individual facilities on a customer-by-customer basis fails to "square with the existing zonal rate construct under the SPP Tariff," Rehearing Order at P 16 (R.322, JA___), and is not required by cost causation jurisprudence.  FERC therefore rightly rejected Petitioners' invocation of a "hyper-granular" cost causation framework.  FERC Br. at 34.

Neither FERC nor the courts have ever required such detailed accounting of individualized benefits and costs.  All the roughly commensurate standard requires is that FERC have an articulable and plausible reason to believe that the costs a

---

38-46, that is exactly what FERC did—it examined the benefits and costs of the Nixa Assets.  What it did not do, however, was parse the Zone into the artificial Nixa versus "non-Nixa" dichotomy on a facility-specific basis, which is not required by precedent.

21

customer pays are roughly commensurate with the benefits that customer receives; it does not require a comparison of the benefits one customer receives from a particular facility vis-à-vis the benefits another customer paying the same rate receives from that facility. *See Illinois I*, 576 F.3d at 477 ("If it cannot quantify the benefits to the midwestern utilities . . . but it has an articulable and plausible reason to believe that the benefits are at least roughly commensurate with those utilities' share of total electricity sales in PJM's region, then fine; [FERC] can approve PJM's proposed pricing scheme on that basis."). Courts have made clear that "[w]e do not suggest that [FERC] has to calculate benefits to the last penny, or for that matter to the last million or ten million or perhaps hundred million dollars." *Illinois I*, 576 F.3d at 477 (citations omitted). Thus, Petitioners' concept that a customer receiving, for example, twice as much benefit from a particular facility must pay twice as much of that facility's costs is not required, and Petitioners' point to no precedent that would mandate such an outcome.

This Court agrees that such particularized matching is not required. For example, in *Midwest ISO Transmission Owners*, this Court affirmed a cost allocation method where transmission owners were allocated between 60% and 70% of the RTO's operating costs despite pointing to no showing that they were receiving precisely 60% to 70% of the benefits or that customers paying the other 30% to 40% of the costs were receiving only 30% to 40% of the benefits. *Midwest ISO*

22

*Transmission Owners v. FERC*, 373 F.3d at 1370. If Petitioners are correct, the Court would necessarily have had to reject that cost allocation unless it was convinced that the owners in that case were receiving fully 60% or 70% of the benefits of the organization as compared to other customers. Likewise in *Illinois III*, the United States Court of Appeals for the Seventh Circuit ("Seventh Circuit") affirmed FERC's approval of a proposal to allocate 100% of the costs of certain transmission facilities to load even though both FERC and the court acknowledged that generators (including independent generators not affiliated with load) benefitted from the projects at issue. *Illinois III*, 721 F.3d at 777-78. Under Petitioners' misconstruction of the roughly commensurate standard, that cost allocation scheme would necessarily be rejected because customers paying 100% of the costs were not receiving 100% of the benefits, and other customers were receiving some benefits from the facilities despite paying 0% of the costs. The Seventh Circuit—the very same court that first articulated the "roughly commensurate" standard—disagreed, finding that such "crude" matching of costs and benefits among respective customers sufficed to satisfy the cost causation principle and roughly commensurate standard. *Illinois III*, 721 F.3d at 775. Tellingly, the Seventh Circuit expressly rejected the very construction of the roughly commensurate standard that Petitioners advocated both before FERC and here—i.e., a proportionality requirement. *Id.* at 774 ("None of these eligibility criteria ensures that every utility in [the RTO's] vast region will

benefit from every MVP project, *let alone in exact proportion to its share* of the MVP tariff." (emphasis added)).

In short, nothing in cost causation precedent requires FERC adopt the stringent facility-specific benefit test that Petitioners demand. The Court should affirm FERC's refusal to do so.

## II.    FERC'S DECISION IS SUPPORTED BY SUBSTANTIAL EVIDENCE

Once the Court dispenses with the Petitioners' constrained view of the cost causation principle and their false "Nixa/non-Nixa" dichotomy, all that is left for the Court to decide is whether the record shows benefits to Zone 10 from inclusion of the Nixa Assets are roughly commensurate with the cost of those assets. FERC's finding that the Nixa Assets provide roughly commensurate benefits to Zone 10 was supported by substantial evidence, and any contrary evidence claimed by Petitioners does not undermine that finding.

This Court reviews FERC's orders under the Administrative Procedure Act, and must uphold FERC's decisions unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Such review is narrow, and the Court may not substitute its judgment for FERC's, but instead must affirm FERC's action if it "has 'examine[d] the relevant [considerations] and articulate[d] a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'" *FERC v. Elec.*

24

*Power Supply Ass'n*, 577 U.S. 260, 292 (2016) (alterations in original) (quoting

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43

(1983)). The Court must affirm FERC's actions "so long as FERC examined the

relevant data and articulated a rational connection between the facts found and the

choice made," *PJM Power Providers Grp. v. FERC*, 880 F.3d 559, 562 (D.C. Cir.

2018) (internal quotation marks omitted), and FERC's factual findings are

conclusive if supported by substantial evidence. 16 U.S.C. § 825*l*(b) (Addendum at

A-1); *Green Dev., LLC v. FERC*, 77 F.4th 997, 1003 (D.C. Cir. 2023). Substantial

evidence "requires more than a scintilla, but can be satisfied by something less than

a preponderance of evidence." *Duke Energy Corp. v. FERC*, 892 F.3d 416, 420 (D.C.

Cir. 2018) (internal quotation marks omitted). The Court "do[es] not ask whether

record evidence could support the petitioner's view of the issue, but whether it

supports [FERC's] ultimate decision." *Fla. Gas Transmission Co. v. FERC*, 604

F.3d 636, 645 (D.C. Cir. 2010); *see also Ky. Mun. Energy Agency v. FERC*, 45 F.4th

162, 174 (D.C. Cir. 2022) (framing the question as not whether reasonable minds

could have reached a different conclusion, but only whether substantial evidence

supported FERC's conclusion and whether the agency reasonably explained its

decision).

SPP and GridLiance submitted substantial evidence of the benefits of the Nixa

Assets to Zone 10. While Petitioners go to great lengths to describe for the Court

the evidence they submitted, it is not the Court's job to weigh the competing evidence as the trier of fact. Instead, the Court is bound to defer to FERC's factual findings and conclusions when they are based on substantial evidence, which SPP and GridLiance submitted in the record and FERC relied upon in its orders.

### A. The Benefits of the Nixa Assets Are Supported by Record Evidence

The record contained substantial evidence to support FERC's determination that placement of the Nixa Assets and revenue requirement in Zone 10 rates is just and reasonable. FERC correctly determined that "the Nixa Assets provide integration, reliability, and power transfer benefits to Zone 10 customers." Initial Order at P 64 (R.317, JA___). Consistent with prior zonal placement cases, the strongest evidence of such benefits are the integration benefits identified by SPP's witness, as supported by GridLiance's witnesses. Initial Order at P 67 (R.317, JA___-JA___).

SPP's witness in the underlying proceeding testified extensively as to the integration benefits associated with placement of the Nixa Assets in Zone 10. In both pre-filed testimony and at hearing, he explained that SPP applies a set of criteria to determine whether to create a new, standalone pricing Zone for a new transmission owner's existing facilities, or to place facilities in an existing pricing Zone and, if so, which Zone. Ex. SPP-001 at 10 (R.296, JA___). Under SPP's process, if the new facilities do not merit creation of a separate Zone as was the case

26

here (and no party seriously argued otherwise[4]), SPP applies certain criteria to determine the most appropriate existing Zone in which to place the new facilities. Ex. SPP-001 at 14-15 (R.296, JA___-JA___); Tr. at 129 (Locke) (R.139, JA___). FERC previously recognized that SPP's criteria appropriately consider a "variety of issues . . . including the scope, configuration, and operational characteristics of the new owner's transmission facilities and the existing SPP system, and the implications that the zonal placement will have for transmission planning and system reliability." *Indicated Owners I* at P 62.

In this case, SPP applied its criteria and determined that Zone 10 was the correct zone for inclusion of the Nixa Assets. Several factors pointed in favor of Zone 10, including (among others): (1) the long history of service by Southwestern Administration (whose facilities comprised the entirety of Zone 10 at the time) to the Nixa load; (2) the direct connection of the Nixa Assets to the Nixa load—which SPP was contractually obligated to include in Zone 10 pursuant to Attachment AD; and (3) the greater level of flows on the Zone 10 side of the Nixa Assets, as compared to other SPP Zones. Tr. at 91-92 (Locke) (R.139, JA___). Each of these factors

---

[4]    The Petitioners erroneously claim that SPP's witness "admitted that a sub-zonal rate proposal would be feasible." Pet. Br. at 41 (citing Tr. at 633 (Locke) (R.277, JA___)). Petitioners omit that SPP's witness testified at length about the practical problems and discrimination that such a proposal would create. Tr. at 622-626, 640-642 (Locke) (R.277, JA___-JA___); Ex. SPP-006 at 34-37 (R.296, JA___-JA___).

27

demonstrates substantial integration between the Nixa Assets and Zone 10. Given SPP's evidentiary showing, FERC was justified in finding the strong integration evidence provided by SPP to be sufficient to support its finding that the Nixa Assets provide benefits to Zone 10 customers that are roughly commensurate with the costs. Initial Order at PP 67-68 (R.317, JA___-JA___).

In addition to SPP's evidence of integration with Zone 10, GridLiance provided substantial evidence of integration in the form of planning and centralized dispatch benefits. Ex. GHP-0229 at 12-13 (R.296, JA___-JA___) (explaining benefits of the Nixa Assets). FERC fully explained why this additional evidence supported a finding of specific benefits to Zone 10, and why Petitioners' arguments to the contrary were unavailing. Initial Order at P 68 (R.317, JA___).

FERC also found reliability benefits to Zone 10 associated with the Nixa Assets. Initial Order at PP 69-70 (R.317, JA___- JA___). While FERC found the integration benefits most compelling, it correctly noted the record evidence of reliability and power transfer benefits to Zone 10 customers as well. Initial Order at P 101 (R.317, JA___). While Petitioners attempt to cloud the reliability benefits discussion by mischaracterizing a "Notification to Construct" introduced at hearing by SPP as a "red herring" and claiming that it "was about a project built to eliminate an overload on the Nixa assets," Pet Br. at 54, what they fail to tell the Court is that the overload was *caused* by other facilities and flows in Zone 10. Initial Order at

P 70 (R.317, JA___).  Grouping the Nixa Assets with Zone 10 and requiring Zone 10 to pay for an upgrade to address an overload resulting from its facilities is consistent with cost causation.  *See id.*  Far from being a "red herring," the Notification to Construct reinforced the reliability and planning benefits of the Nixa Assets to Zone 10.  *Id.* (R.317, JA___).  Likewise, Petitioners attempt to diminish other transfer benefits merely because they may also accrue outside of Zone 10, Pet. Br. at 50-51, is unavailing because such "spillover" is not fatal to FERC's chosen cost allocation.  *MISO Transmission Owners v. FERC*, 819 F.3d 329, 336 (7th Cir. 2016) (noting that modest spillover of benefits does not render a cost allocation unjust); *cf. Nebraska Power*, 957 F.3d at 941 ("*Because of the very nature of zones*, [Nebraska Power] will receive more benefits from being in close proximity to Tri-State than the western facilities of *Illinois Commerce I* would have received from distant facilities." (emphasis added)).

### B.    Non-Quantified Benefits Are Not "Tiny" or "Trivial"

As FERC rightly concluded, the fact that many of the benefits in this proceeding are by all accounts unquantifiable does not render them trivial or otherwise less meaningful in evaluating whether SPP's proposal is just and reasonable.  Initial Order at P 72 (R.317, JA___-JA___).  In fact, the record reflects that *all* active participants in the underlying proceeding admitted that it would be difficult, if not impossible, to quantify all of the benefits that accrue to Zone 10

29

customers.  Tr. at 614-15 (Locke) (R.277, JA___-JA___), 912 (Holland) (R.280,

JA___) (explaining that reliability benefits are difficult to quantify), 1360 (Busbee)

(same) (R.283, JA___), 1597 (Schnitzer) (R.287, JA___) (stating that benefits "do[]

not have to be monetized per se"), 1737 (Puga) (R.289, JA___) (acknowledging that

certain benefits are "hard to quantify"), 1772 (Deters) (R.289, JA___) (agreeing that

some benefits may not be reducible to "a specific dollar value").

   The notion that benefits cannot always and do not need to be quantified has

been recognized both by FERC and the courts.  For example, in *Nebraska Power*,

the United States Court of Appeals for the Eighth Circuit ("Eighth Circuit") stated:

> [Nebraska Public Power District ("Nebraska Power")] emphasizes that neither FERC nor Tri-State attempted to numerically *quantify* the benefits of placing Tri-State into Zone 17.  However, [*Illinois I*] does not support the proposition that FERC must articulate a precise numerical value of benefits. The [Seventh Circuit] did '"not suggest that [FERC] has to calculate benefits to the last penny, or for that matter to the last million or ten million or perhaps hundred million dollars."' Rather, FERC must articulate more benefits than the '"no benefits"' or trivial benefits in [*Illinois I*]. . . . To be sure, the benefits cannot be calculated with precision.

*Nebraska Power*, 957 F.3d at 941 (quoting *Illinois I*, 576 F.3d at 477).

   That court further analogized to *Illinois III*, a case involving cost allocation in

the (then) Midwest Independent Transmission System Operator, Inc. ("Midwest

Operator"), where the Seventh Circuit affirmed a cost allocation "although some

benefits could not be calculated in advance."  *Nebraska Power*, 957 F.3d at 941-42

30

(citing *Illinois III*, 721 F.3d at 775). The *Illinois III* court also affirmed the Midwest Operator's cost allocation even though "[n]one of the[] eligibility criteria ensures that every utility in [Midwest Operator's] vast region will benefit from every MVP project, let alone in exact proportion to its share of the MVP tariff." *Illinois III*, 721 F.3d at 774. All that mattered was that FERC determined, based on the evidence, that the utilities received unquantified benefits overall.

As the record and precedent make clear, benefits cannot always be quantified in such a way as to make a cost-benefit analysis accurate or useful. SPP does not conduct a cost-benefit analysis as part of its zonal placement process and has never conducted a cost-benefit analysis to support placement of facilities in an existing Zone over the course of its history as an RTO, nor has FERC mandated that SPP do so. *See, e.g.*, *Indicated Owners II* at PP 10-11 (explaining that the Tariff is not unjust and unreasonable because it does not require SPP to provide specific cost or benefit showings); *cf.* Opinion No. 562-A at P 12 (explaining that FERC "declined to make a generic determination that SPP or any other RTO has an obligation to consider cost shifts when making zonal placement decisions"). SPP also did not conduct such an analysis with its legacy transmission owners (including the Petitioners) at the time those transmission owners' facilities were absorbed under SPP's Tariff (and neither did those owners), and such an analysis has never been done for existing facilities on a facility-by-facility, customer-by-customer basis, as Petitioners have demanded

31

this Court require here.  *See* Initial Order at P 87 (summarizing SPP's brief opposing exceptions to the administrative law judge's decision).  The inability to quantify the benefits FERC identified in this proceeding and compare them mathematically to the costs is not fatal and does not render such benefits "trivial" or "tiny," as Petitioners suggest.  *See, e.g.*, Pet. Br. at 50, 56.

## III.  FERC'S ORDERS ARE CONSISTENT WITH PRECEDENT CITED BY PETITIONERS

Petitioners cite two prior cases—the 8th Circuit's *Nebraska Power* and this Court's *Old Dominion Electric Coop. v. FERC*, 898 F.3d 1254 (D.C. Cir. 2018)— to argue that FERC's decision violates relevant precedent.  Pet. Br. at 57-64.  Petitioners are wrong in both instances.

First, Petitioners claim that FERC's decision conflicts with *Nebraska Power*.  Pet. Br. at 59-61.  Not true.  Petitioners attempt to suggest that the Eighth Circuit engaged in a customer-specific analysis of the costs and benefits of the individual transmission facilities at issue there, and thus FERC's failure to engage in a similar customer-specific assessment of costs and benefits here violates the *Nebraska Power* precedent.  However, as FERC points out, FERC Br. at 47, the fact that FERC and the Eighth Circuit evaluated the benefits and costs of the new facilities to Nebraska Power in the *Nebraska Power* case is entirely unsurprising, as Nebraska Power was both the *dominant* transmission owner and served *virtually all* of the load in the Zone (prior to the entry of Tri-State Generation and Transmission Cooperative ("Tri-

32

State")).  Here, there are numerous transmission customers serving load in Zone 10, including the ARKMO Cities (who collectively serve less than half of the zonal load), Nixa itself (which serves a significant portion of the total zonal load), and several other customers who, collectively with Nixa, serve the vast majority of load. *See supra* Statement of the Case Section II (discussing load make up in Zone 10). FERC correctly looked at the costs and benefits to *all* of these customers, consistent with how FERC and the court evaluated the totality of costs and benefits to the Zone at issue in *Nebraska Power*.

Petitioners also oddly claim that "*different* facts" between *Nebraska Power* and this case "should lead to the *opposite* result."  Pet. Br. at 59 (emphasis added). Such an approach—i.e., if the circumstances of one SPP zonal placement proceeding do not match the facts in another case, the cases must be decided in opposite directions—squarely contradicts FERC's prior admonition that zonal placement determinations involve *case-by-case* adjudication.  *Indicated Owners I* at PP 62-69 (explaining the need for case-by-case adjudication to address the myriad of facts involved in each individual situation).  That *Nebraska Power* and this case involve different facts is not in any way dispositive of the outcome.  All that matters is that FERC weighed the evidence of costs and benefits and rendered a decision consistent with that evidence, which is exactly what FERC did both in its decisions underlying *Nebraska Power* and here.

33

Petitioners also argue that *Nebraska Power* stands for the proposition that FERC is required to compare the costs assessed "against a party to the benefits drawn by that party." Pet. Br. at 60 (citing *Nebraska Power*, 957 F.3d at 940). While that is true, that is not the end of the matter. In *Nebraska Power*, the Eighth Circuit found that, under one proposed measure, Tri-State was the net beneficiary of the joint Tri-State/Nebraska Power system by approximately $1 million per year, but under an alternative measure, Nebraska Power was the net beneficiary by about $550,000. The court found that, regardless of which measure was more accurate, and despite Nebraska Power's claim that it was paying 60% of the costs of Tri-State's facilities, FERC's approval of the cost allocation there was just and reasonable nevertheless. *Nebraska Power*, 957 F.3d at 942. This stands to reason, as not all benefits can be quantified and "[a]llocation of costs is not a matter for the slide-rule. It involves judgment on a myriad of facts. It has no claim to an exact science." *Colo. Interstate Gas Co. v. FPC*, 324 U.S. 581, 589 (1945); *Illinois III*, 721 F.3d at 775 (allowing for "crude" comparisons); *Illinois I*, 576 F.3d at 477 (FERC need not calculate to the penny or even to millions of dollars). Here, FERC weighed the competing evidence provided by all sides and rendered a decision based on the evidence it found most compelling, exercising its judgment on the myriad of facts involved.

Notably, the *Nebraska Power* court made no effort to determine whether Nebraska Power's share of the costs as compared to Tri-State's share of the costs

34

resulted in Nebraska Power having an equal percentage share of the benefits. Under Petitioners' logic, the court would necessarily have had to reject the proposal for failure to track the respective magnitudes of costs and benefits that each of Nebraska Power and Tri-State received in order to ensure precise matching.

Petitioners next argue that this Court's holding in *Old Dominion* undermines FERC's decision here. Pet. Br. at 62-64. FERC rightly dismissed Petitioners' construction of *Old Dominion*. Initial Order at P 103 (R.317, JA___); Rehearing Order at P 24 (R.322, JA___-JA___). Despite Petitioners' apparent insistence that *Old Dominion* required a facility-by-facility, customer-by-customer analysis, Pet. Br. at 63 ("And the analysis *was* at the 'asset' or 'facility-level.'"), *Old Dominion* involved the Court's rejection of a *categorical exclusion* from regionwide cost allocation for a *category* of projects that provided regional benefits. *Old Dominion*, 898 F.3d at 1263 ("[W]e fail to see how a *categorical refusal* to permit any regional cost sharing for an important *category* of projects conceded to produce significant regional benefits can be reconciled with the background principle. To the contrary, the cost-causation principle *prevents regionally beneficial projects from being arbitrarily excluded from cost sharing*—a necessary corollary to ensuring that the costs of such projects are allocated commensurate with their benefits." (emphasis added)). Here, Petitioners seek a categorical exclusion, for any transmission facility

that was built originally to serve one customer, from zonal cost allocation in a Zone serving multiple customers, contrary to *Old Dominion*.

## CONCLUSION

For the foregoing reasons, the Court should deny the Petition for Review.

Respectfully submitted,

 */s/ Matthew J. Binette*
Matthew J. Binette
Elizabeth P. Trinkle
WRIGHT & TALISMAN, P.C.
1200 G Street, N.W., Suite 600
Washington, DC 20005-3898
(202) 393-1200
binette@wrightlaw.com
trinkle@wrightlaw.com

**Counsel for**
**Southwest Power Pool, Inc.**

Dated:  November 14, 2023

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | | |
|---|---|---|
| Paragould Light & Water Commission | ) | |
| (d/b/a – Paragould Light, Water & | ) | |
| Cable – PLWC), et al., | ) | |
| Petitioners, | ) | |
| v. | ) | No. 23-1133 |
| Federal Energy Regulatory Commission, | ) | |
| Respondent. | ) | |

**CERTIFICATE OF COMPLIANCE**

Pursuant to Rules 32(a)(7)(B) and 32(g)(1) of the Federal Rules of Appellate

Procedure, the undersigned certifies that the foregoing brief complies with the

applicable type-volume limitations.  The brief was prepared using a proportionally

spaced type (Times New Roman, 14 point) and contains 8,707 words, excluding the

parts of the document exempted by Fed. R. App. P. 32(f).  This certificate was

prepared in reliance on the word-count function of the word-processing system

(Microsoft Word 2016) used to prepare the brief.

Dated at Washington, DC this 14th day of November 2023.

Respectfully submitted,

*/s/ Matthew J. Binette*
Matthew J. Binette
WRIGHT & TALISMAN, P.C.
1200 G Street N.W., Suite 600
Washington, DC  20005-3898

***Attorney for
Southwest Power Pool, Inc.***

## ADDENDUM

Federal Power Act § 313, 16 U.S.C. § 825*l*.......................................................... A-1

Tariff § I.1 (Definitions – Z)................................................................. A-3

Tariff, Attachment AD Art. II § 1(b) ................................................... A-4

*Note: All appended Tariff excerpts are from the Tariff as it is currently in effect; however, the language has not changed since the commencement of the underlying agency proceeding.*

ices. The amounts collected under this section shall be deposited in the Treasury to the credit of miscellaneous receipts. All printing for the Federal Power Commission making use of engraving, lithography, and photolithography, together with the plates for the same, shall be contracted for and performed under the direction of the Commission, under such limitations and conditions as the Joint Committee on Printing may from time to time prescribe, and all other printing for the Commission shall be done by the Director of the Government Publishing Office under such limitations and conditions as the Joint Committee on Printing may from time to time prescribe. The entire work may be done at, or ordered through, the Government Publishing Office whenever, in the judgment of the Joint Committee on Printing, the same would be to the interest of the Government: *Provided*, That when the exigencies of the public service so require, the Joint Committee on Printing may authorize the Commission to make immediate contracts for engraving, lithographing, and photolithographing, without advertisement for proposals: *Provided further*, That nothing contained in this chapter or any other Act shall prevent the Federal Power Commission from placing orders with other departments or establishments for engraving, lithographing, and photolithographing, in accordance with the provisions of sections 1535 and 1536 of title 31, providing for interdepartmental work.

(June 10, 1920, ch. 285, pt. III, §312, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 859; amended Pub. L. 113–235, div. H, title I, §1301(b), (d), Dec. 16, 2014, 128 Stat. 2537.)

### Editorial Notes

#### CODIFICATION

''Sections 1535 and 1536 of title 31'' substituted in text for ''sections 601 and 602 of the Act of June 30, 1932 (47 Stat. 417 [31 U.S.C. 686, 686b])'' on authority of Pub. L. 97–258, §4(b), Sept. 13, 1982, 96 Stat. 1067, the first section of which enacted Title 31, Money and Finance.

### Statutory Notes and Related Subsidiaries

#### CHANGE OF NAME

''Director of the Government Publishing Office'' substituted for ''Public Printer'' in text on authority of section 1301(d) of Pub. L. 113–235, set out as a note under section 301 of Title 44, Public Printing and Documents.

''Government Publishing Office'' substituted for ''Government Printing Office'' in text on authority of section 1301(b) of Pub. L. 113–235, set out as a note preceding section 301 of Title 44, Public Printing and Documents.

## § 825*l*. Review of orders

### (a) Application for rehearing; time periods; modification of order

Any person, electric utility, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, electric utility, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. The application for rehearing shall set forth specifically the ground or grounds upon which such ap-

plication is based. Upon such application the Commission shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing. Unless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied. No proceeding to review any order of the Commission shall be brought by any entity unless such entity shall have made application to the Commission for a rehearing thereon. Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b), the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.

### (b) Judicial review

Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the United States court of appeals for any circuit wherein the licensee or public utility to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part. A copy of such petition shall forthwith be transmitted by the clerk of the court to any member of the Commission and thereupon the Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of title 28. Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure to do so. The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceedings before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings which, if supported by substantial evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of the original order. The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court of the United States

upon certiorari or certification as provided in section 1254 of title 28.

**(c) Stay of Commission's order**

The filing of an application for rehearing under subsection (a) shall not, unless specifically ordered by the Commission, operate as a stay of the Commission's order. The commencement of proceedings under subsection (b) of this section shall not, unless specifically ordered by the court, operate as a stay of the Commission's order.

(June 10, 1920, ch. 285, pt. III, § 313, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 860; amended June 25, 1948, ch. 646, § 32(a), 62 Stat. 991; May 24, 1949, ch. 139, § 127, 63 Stat. 107; Pub. L. 85–791, § 16, Aug. 28, 1958, 72 Stat. 947; Pub. L. 109–58, title XII, § 1284(c), Aug. 8, 2005, 119 Stat. 980.)

### Editorial Notes

#### Codification

In subsec. (b), "section 1254 of title 28" substituted for "sections 239 and 240 of the Judicial Code, as amended (U.S.C., title 28, secs. 346 and 347)" on authority of act June 25, 1948, ch. 646, 62 Stat. 869, the first section of which enacted Title 28, Judiciary and Judicial Procedure.

#### Amendments

2005—Subsec. (a). Pub. L. 109–58 inserted "electric utility," after "Any person," and "to which such person," and substituted "brought by any entity unless such entity" for "brought by any person unless such person".

1958—Subsec. (a). Pub. L. 85–791, § 16(a), inserted sentence to provide that Commission may modify or set aside findings or orders until record has been filed in court of appeals.

Subsec. (b). Pub. L. 85–791, § 16(b), in second sentence, substituted "transmitted by the clerk of the court to" for "served upon", substituted "file with the court" for "certify and file with the court a transcript of", and inserted "as provided in section 2112 of title 28", and in third sentence, substituted "jurisdiction, which upon the filing of the record with it shall be exclusive" for "exclusive jurisdiction".

### Statutory Notes and Related Subsidiaries

#### Change of Name

Act June 25, 1948, eff. Sept. 1, 1948, as amended by act May 24, 1949, substituted "court of appeals" for "circuit court of appeals".

## § 825m. Enforcement provisions

**(a) Enjoining and restraining violations**

Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this chapter, or of any rule, regulation, or order thereunder, it may in its discretion bring an action in the proper District Court of the United States or the United States courts of any Territory or other place subject to the jurisdiction of the United States, to enjoin such acts or practices and to enforce compliance with this chapter or any rule, regulation, or order thereunder, and upon a proper showing a permanent or temporary injunction or decree or restraining order shall be granted without bond. The Commission may transmit such evidence as may be available

concerning such acts or practices to the Attorney General, who, in his discretion, may institute the necessary criminal proceedings under this chapter.

**(b) Writs of mandamus**

Upon application of the Commission the district courts of the United States and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have jurisdiction to issue writs of mandamus commanding any person to comply with the provisions of this chapter or any rule, regulation, or order of the Commission thereunder.

**(c) Employment of attorneys**

The Commission may employ such attorneys as it finds necessary for proper legal aid and service of the Commission or its members in the conduct of their work, or for proper representation of the public interests in investigations made by it or cases or proceedings pending before it, whether at the Commission's own instance or upon complaint, or to appear for or represent the Commission in any case in court; and the expenses of such employment shall be paid out of the appropriation for the Commission.

**(d) Prohibitions on violators**

In any proceedings under subsection (a), the court may prohibit, conditionally or unconditionally, and permanently or for such period of time as the court determines, any individual who is engaged or has engaged in practices constituting a violation of section 824u of this title (and related rules and regulations) from—

    (1) acting as an officer or director of an electric utility; or

    (2) engaging in the business of purchasing or selling—

        (A) electric energy; or

        (B) transmission services subject to the jurisdiction of the Commission.

(June 10, 1920, ch. 285, pt. III, § 314, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 861; amended June 25, 1936, ch. 804, 49 Stat. 1921; June 25, 1948, ch. 646, § 32(b), 62 Stat. 991; May 24, 1949, ch. 139, § 127, 63 Stat. 107; Pub. L. 109–58, title XII, § 1288, Aug. 8, 2005, 119 Stat. 982.)

### Editorial Notes

#### Codification

As originally enacted subsecs. (a) and (b) contained references to the Supreme Court of the District of Columbia. Act June 25, 1936, substituted "the district court of the United States for the District of Columbia" for "the Supreme Court of the District of Columbia", and act June 25, 1948, as amended by act May 24, 1949, substituted "United States District Court for the District of Columbia" for "district court of the United States for the District of Columbia". However, the words "United States District Court for the District of Columbia" have been deleted entirely as superfluous in view of section 132(a) of Title 28, Judiciary and Judicial Procedure, which states that "There shall be in each judicial district a district court which shall be a court of record known as the United States District Court for the district", and section 88 of Title 28 which states that "the District of Columbia constitutes one judicial district".

#### Amendments

2005—Subsec. (d). Pub. L. 109–58 added subsec. (d).

Southwest Power Pool, Inc.,Open Access Transmission Tariff, Sixth Revised Volume No. 1
Filing Category:          Normal                              Filing Date:              12/07/2022
FERC Docket:             ER23-00567-000                 FERC Action:           Accept
FERC Order:              183 FERC ¶ 61,151                                      Order Date:
          05/26/2023
Effective Date:           02/06/2023                          Status:                    Effective
Definitions XYZ, 1 Definitions XYZ (3.0.0)

## XYZ - Definitions

**Zonal Annual Transmission Revenue Requirement:** The revenue requirements for facilities in each Zone and the Accredited Revenue Requirement(s), if any, that are allocated to the Zone in accordance with Attachment J to this Tariff as set forth in Attachment H, Table 1, Column (3).

**Zonal Planning Criteria:** In each Zone, the set of measuring systems and performance standards that is used for assessing the actual or projected ability of the Transmission System to deliver power to load reliably. Zonal Planning Criteria for Zone 10 shall be subject to Attachment AD of the Tariff.

**Zonal Reliability Upgrades:** Those upgrades included in and constructed pursuant to the SPP Transmission Expansion Plan in order to ensure the reliability of the Transmission System identified because of application of Zonal Planning Criteria. Zonal Planning Criteria for Zone 10 shall be subject to Attachment AD of the Tariff.

**Zonal Upgrades:** Network Upgrades, requested by a Transmission Owner, that are a Transmission Material Modification(s) to the Transmission System and are needed for storm damage/Force Majeure replacement, failed equipment replacement, or age and condition replacement.

**Zone:** The geographic area of the facilities of a Transmission Owner or a specific combination of Transmission Owners as specified in Schedules 7, 8, and 9.

Southwest Power Pool, Inc.,Open Access Transmission Tariff, Sixth Revised Volume No. 1
Filing Category:        Normal                Filing Date:            05/14/2018
FERC Docket:        ER18-01590-000        FERC Action:            Accept
FERC Order:        Delegated Letter Order                Order Date:        06/29/2018
Effective Date:        04/01/2018                Status:                Effective
Attachment AD Article II, Attachment AD Article II (0.0.0)

ARTICLE II

TRANSMISSION TRANSACTIONS UNDER SOUTHWESTERN'S TARIFF
AND CONTRACTS

Section 1.   Transmission Transactions.   (a)   Except as noted in Section 1(i), Section 1(ii), and Section 5 of this Article II, the following Transmission Transactions which use the System of Southwestern are specifically excluded from the provisions of the SPP Tariff, and Southwestern's Tariff or contracts shall apply to these Transmission Transactions:

\*\*\*

(b)     It shall be the intent of this Article II that once point-to-point and network transmission transactions specifically expire or are terminated, they shall be allowed to transition to the SPP Tariff; Provided, That, any contract service to metered loads or Network Service under Southwestern's Tariff that are converted to transmission service under the SPP Tariff shall be considered in Southwestern's Zone.

\*\*\*

A-4

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | | |
|---|---|---|
| Paragould Light & Water Commission | ) | |
| (d/b/a – Paragould Light, Water & | ) | |
| Cable – PLWC), et al., | ) | |
| Petitioners, | ) | |
| v. | ) | No. 23-1133 |
| Federal Energy Regulatory Commission, | ) | |
| Respondent. | ) | |

**CERTIFICATE OF SERVICE**

Pursuant to Rule 25 of the Federal Rules of Appellate Procedure and Rule 25(f) of the Circuit Rules of this Court, I hereby certify that I have, this 14th day of November 2023, served the foregoing via the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Respectfully submitted,

*/s/ Matthew J. Binette*
Matthew J. Binette
WRIGHT & TALISMAN, P.C.
1200 G Street, N.W., Suite 600
Washington, DC 20005-3898

*Attorney for*
*Southwest Power Pool, Inc.*