**NOT YET SCHEDULED FOR ORAL ARGUMENT**

**No. 23-1133**

In the

# United States Court of Appeals
# For the District of Columbia Circuit

―――――――――――

PARAGOULD LIGHT & WATER COMMISSION, d/b/a PARAGOULD LIGHT,
WATER & CABLE – PLWC, *et al.*,

*Petitioners,*

v.

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent.*

―――――――――――

On Petition for Review of Orders of the Commission

―――――――――――

**FINAL OPENING BRIEF OF PETITIONERS**

―――――――――――

Noel H. Symons
Carrie Mobley
MCGUIREWOODS LLP
888 16th St. NW, Suite 500
Washington, D.C. 20006
(202) 857-1700
*nsymons@mcguirewoods.com*
*cmobley@mcguirewoods.com*

Matthew A. Fitzgerald
MCGUIREWOODS LLP
800 East Canal Street
Richmond, VA 23219
(804) 775-4716
*mfitzgerald@mcguirewoods.com*

December 15, 2023

*Counsel for Petitioners*

*(Additional counsel listed on inside cover)*

Robert A. Weishaar, Jr.
MCNEES WALLACE & NURICK LLC
1200 G Street NW, Suite 800
Washington, DC 20005
T: (202) 898-0688
bweishaar@mcneeslaw.com

Kenneth R. Stark
MCNEES WALLACE & NURICK LLC
100 Pine Street
Harrisburg, PA 17101
T: (717) 237-8000
kstark@mcneeslaw.com

*Counsel for Paragould Light & Water
Commission (d/b/a Paragould Light,
Water & Cable – PLWC), City of
Poplar Bluff Municipal Utilities,
Kennett Board of Public Works, City
of Piggott-AR Municipal Light Water
& Sewer, and City of Malden-Board
of Public Works*

Daniel E. Frank
Allison E. S. Salvia
EVERSHEDS SUTHERLAND (US) LLP
700 Sixth Street, NW, Suite 700
Washington, DC 20001-3980
T: (202) 383-0100
danielfrank@eversheds-
sutherland.com
allisonsalvia@eversheds-
sutherland.com

*Counsel for Western Farmers Electric
Cooperative*

Patrick Smith
Corporate Counsel
THE EVERGY COMPANIES
818 S. Kansas Avenue, P.O. Box 889
Topeka, KS 66601
T: (785) 508-2574
Patrick.Smith@evergy.com

*Counsel for the Evergy Companies*

Timothy T. Mastrogiacomo
Managing Attorney
XCEL ENERGY SERVICES INC.
701 Pennsylvania Ave NW, Suite 250
Washington, D.C. 20004
T: (202) 661-4481
tim.t.mastrogiacomo@xcelenergy.com

*Counsel for Xcel Energy Services Inc.
on behalf of its operating company
affiliate Southwestern Public Service
Company*

Shaun M. Boedicker
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue N.W.
Washington, D.C. 20036
T: (202) 429-3000
sboedicker@steptoe.com

*Counsel for American Electric Power
Service Corporation, on behalf of its
affiliates, Public Service Company of
Oklahoma and Southwestern Electric
Power Company*

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

In accordance with Circuit Rule 28(a)(1) and the Order issued by this Court, the undersigned counsel of record certifies as follows:

**A.    Parties and Amici**

The Petitioners are Paragould Light & Water Commission (d/b/a – Paragould Light, Water & Cable – PLWC), City of Poplar Bluff Municipal Utilities, Kennett Board of Public Works, City of Piggott-AR Municipal Light Water and Sewer, City of Malden-Board of Public Works,[1] Evergy Kansas Central, Inc., Evergy Metro, Inc., Evergy Missouri West, Inc., American Electric Power Service Corporation on behalf of its affiliates Public Service Company of Oklahoma and Southwestern Electric Power Company, Xcel Energy Services Inc. on behalf of its operating company affiliate Southwestern Public Service Company, and Western Farmers Electric Cooperative.  The Respondent is the Federal Energy Regulatory Commission ("Commission").  The following listed parties appeared in the underlying administrative

---

[1] Paragould Light & Water Commission (d/b/a – Paragould Light, Water & Cable – PLWC), City of Poplar Bluff Municipal Utilities, Kennett Board of Public Works, City of Piggott-AR Municipal Light Water and Sewer, and City of Malden-Board of Public Works participated, collectively, in the underlying proceedings as the "ARKMO Cities."

proceedings, Commission Docket Nos. ER18-99-005 and ER18-99-007:

American Electric Power Service Corporation

Arkansas Electric Cooperative Corporation

ARKMO Cities:

    City of Malden-Board of Public Works

    City of Piggott-AR Municipal Light Water and Sewer

    City of Poplar Bluff Municipal Utilities

    Kennett Board of Public Works

    Paragould Light & Water Commission (d/b/a – Paragould Light, Water & Cable – PLWC)

Associated Electric Cooperative, Inc.

Basin Electric Power Cooperative

City of Nixa

City Utilities of Springfield, Missouri

Federal Energy Regulatory Commission

GridLiance High Plains LLC

KAMO Electric Cooperative, Inc.

Kansas City Power & Light Company and KCP & L Greater Missouri Operations Company

Mid-Kansas Electric Company, LLC

Nebraska Public Power District

NextEra Energy Transmission Southwest, LLC

NextEra Energy, Inc.

ii

South Central MCN LLC

Southwest Power Pool, Inc.

Southwestern Power Administration

Sunflower Electric Power Corporation

<u>The Evergy Companies</u>:

> Evergy Kansas Central, Inc.
>
> Evergy Metro, Inc.
>
> Evergy Missouri West, Inc.

Westar Energy, Inc.

Western Farmers Electric Cooperative

Xcel Energy Services Inc.

## B.    Rulings Under Review

Petitioners seek review of the following orders issued by the

Commission:

1.   *Sw. Power Pool, Inc.*, Order on Initial Decision, Docket No. ER18-99-005, 182 FERC ¶ 61,141 (Feb. 28, 2023).  JA366-418 (R.317).

2.   *Sw. Power Pool, Inc.*, Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, Docket No. ER18-99-007, 183 FERC ¶ 62,048 (May 1, 2023). JA438 (R.319).

3.   *Sw. Power Pool, Inc.*, Order Addressing Arguments Raised on Rehearing, Docket No. ER18-99-007, 184 FERC ¶ 61,004 (July 5, 2023).  JA440-59 (R.322).

## C.    Related Cases

This case has not previously been before this Court or any other court.  There are no related cases currently pending in this court or in any other court of which counsel is aware.

Dated: December 15, 2023          Respectfully submitted,

*/s/ Matthew A. Fitzgerald*
Matthew A. Fitzgerald

*Counsel for Petitioners*

CORPORATE DISCLOSURE STATEMENTS

**The Evergy Companies**

Evergy Kansas Central, Inc.; Evergy Metro, Inc.; and Evergy Missouri West, Inc. (collectively the "Evergy Companies"), are wholly owned subsidiaries of Evergy, Inc. ("Evergy").  Evergy is a publicly held company (stock ticker EVRG on the NASDAQ) incorporated in the state of Missouri.  Evergy has no parent company and no publicly held corporation owns 10% or more of its stock.

Evergy, through the Evergy Companies, provides electric service at retail throughout Kansas and Missouri to approximately 1.6 million customers and provides wholesale service to municipalities and cooperatives that in turn serve additional Kansas and Missouri retail customers.

**Paragould Light & Water Commission (d/b/a Paragould Light, Water & Cable – PLWC)**

Paragould Light & Water Commission (d/b/a Paragould Light, Water & Cable – PLWC) is a municipal entity organized under the laws of the State of Arkansas.  Paragould Light & Water Commission receives electric transmission service from Southwest Power Pool, Inc. ("SPP") in SPP pricing Zone 10 and provides wholesale energy supply

and related electricity services to its citizens and businesses in its municipal territory.  Paragould Light & Water Commission is adversely impacted by the rates established in the orders under review.  Paragould Light & Water Commission issues no stock, has no parent corporation, and is not owned in whole or in part by any publicly held corporation.

**City of Poplar Bluff Municipal Utilities**

City of Poplar Bluff Municipal Utilities is a municipal entity organized under the laws of the State of Missouri and is under the jurisdiction of the City Council of the City of Poplar Bluff.  City of Poplar Bluff Municipal Utilities receives electric transmission service from SPP in SPP pricing Zone 10 and provides wholesale energy supply and related electricity services to its citizens and businesses in its municipal territory.  City of Poplar Bluff Municipal Utilities – whose objective is to provide the people of Poplar Bluff with the best light, water, and sewer service at the lowest possible rate – is adversely impacted by the rates established in the orders under review.  City of Poplar Bluff Municipal Utilities issues no stock, has no parent corporation, and is not owned in whole or in part by any publicly held

corporation.

**Kennett Board of Public Works**

Kennett Board of Public Works is a municipal entity organized under the laws of the State of Missouri. Kennett Board of Public Works receives electric transmission service from SPP in SPP pricing Zone 10 and provides wholesale energy supply and related electricity services to its citizens and businesses in its municipal territory. Kennett Board of Public Works is adversely impacted by the rates established in the orders under review. Kennett Board of Public Works issues no stock, has no parent corporation, and is not owned in whole or in part by any publicly held corporation.

**City of Piggott-AR Municipal Light Water and Sewer**

City of Piggott-AR Municipal Light Water and Sewer is a municipal entity organized under the laws of the State of Arkansas. City of Piggott-AR Municipal Light Water and Sewer receives electric transmission service from SPP in SPP pricing Zone 10 and provides wholesale energy supply and related electricity services to its citizens and businesses in its municipal territory. City of Piggott-AR Municipal Light Water and Sewer is adversely impacted by the rates established

in the orders under review.  City of Piggott-AR Municipal Light Water and Sewer issues no stock, has no parent corporation, and is not owned in whole or in part by any publicly held corporation.

**City of Malden-Board of Public Works**

City of Malden-Board of Public Works is a municipal entity organized under the laws of the State of Missouri.  City of Malden-Board of Public Works receives electric transmission service from SPP in SPP pricing Zone 10 and provides wholesale energy supply and related electricity services to its citizens and businesses in its municipal territory.  City of Malden-Board of Public Works is adversely impacted by the rates established in the orders under review.  City of Malden-Board of Public Works issues no stock, has no parent corporation, and is not owned in whole or in part by any publicly held corporation.

**Western Farmers Electric Cooperative**

Western Farmers Electric Cooperative ("WFEC") is a generation and transmission cooperative headquartered in Anadarko, Oklahoma. WFEC owns, operates, and maintains more than 3,800 miles of transmission lines located principally in Oklahoma.  WFEC serves its 21 distribution cooperative member-owners and Altus Air Force Base,

which, in turn, serve the electric needs of their retail customers in Oklahoma, New Mexico, Kansas, and Texas.  None of WFEC's members owns 10% or more of WFEC.

Relevant to this proceeding, WFEC is a Member of SPP, WFEC's transmission facilities in the SPP region are administered through the SPP Open Access Transmission Tariff, and WFEC is a transmission customer of SPP with load in SPP's Zone 10.

## Xcel Energy Services Inc., on behalf of Southwestern Public Service Company

Xcel Energy Services Inc. ("Xcel Energy Services"), on behalf of its public utility affiliate Southwestern Public Service Company ("SPS"), provides the following disclosure statement:

SPS is a New Mexico corporation and an operating utility engaged in the generation, purchase, transmission, distribution, and sale of electric power.  SPS is a wholly-owned utility subsidiary of Xcel Energy Inc. ("Xcel Energy").  There are no other parent corporations or publicly held companies that own a 10% or greater ownership interest in SPS.  SPS's principal place of business is 790 South Buchanan Street, Amarillo, TX 79101.

Xcel Energy Services is a Delaware corporation and the service

ix

company subsidiary of Xcel Energy and provides SPS with an array of services, including making appearances before the Commission and reviewing courts.  There are no other parent corporations or publicly held companies that own a 10% or greater ownership interest in Xcel Energy Services.  Xcel Energy Services' principal place of business is 414 Nicollet Mall, Minneapolis, Minnesota, 55401.

Xcel Energy is a Minnesota corporation and a holding company under the Public Utility Holding Company Act of 2005.  Xcel Energy's principal place of business is 414 Nicollet Mall, Minneapolis, Minnesota, 55401.  Xcel Energy is a publicly-traded company on the NASDAQ under the symbol "XEL."  The Vanguard Group in its most recent financial discloser indicated that it owns 10.18% of Xcel Energy. There are no other parent corporations or publicly held companies that own a 10% or greater ownership interest in Xcel Energy.

Neither Xcel Energy Services nor SPS nor any affiliate, other than Xcel Energy, has issued shares to the public.[2]

---

[2] Xcel Energy Services and certain operating company subsidiaries of Xcel Energy Inc., including SPS, Northern States Power Company, a Minnesota corporation, Northern States Power Company, a Wisconsin corporation, and Public Service Company of Colorado, have issued first mortgage bonds and other debt securities that are publicly traded.  A

**American Electric Power Service Corporation on behalf of its affiliates Public Service Company of Oklahoma and Southwestern Electric Power Company**

American Electric Power Service Corporation ("AEPSC") is a corporation organized and existing under the laws of the State of New York. AEPSC is a wholly-owned subsidiary of American Electric Power Company, Inc. ("AEP"), a New York corporation whose common stock is held by the public and traded on the NASDAQ Stock Market under the symbol "AEP." AEP has no parent company. Certain institutional investors including Vanguard may from time to time hold 10 percent or more of the outstanding shares of AEP but to AEP's knowledge no publicly-held company has a 10 percent or greater ownership interest in AEP.

Among its many subsidiaries, AEP owns nine electric operating companies and seven transmission companies and is a joint owner in several additional transmission companies. AEPSC provides a variety of administrative and technical services to AEP's affiliates, including Public Service Company of Oklahoma ("PSO") and Southwestern

---

complete list of all debt securities of Xcel Energy Inc. and its subsidiaries is available at the Xcel Energy Inc. website (www.xcelenergy.corn) under Investor Information.

Electric Power Company ("SWEPCO"), on behalf of which AEPSC

participated in the proceedings before the Federal Energy Regulatory

Commission that resulted in the Orders as to which review is sought in

this Court.  PSO is a corporation organized and existing under the laws

of Oklahoma.  SWEPCO is a corporation organized and existing under

the laws of Delaware.  Both PSO and SWEPCO are wholly-owned

subsidiaries of AEP.

Dated: December 15, 2023       Respectfully submitted,

                               */s/ Matthew A. Fitzgerald*
                               Matthew A. Fitzgerald

                               *Counsel for Petitioners*

TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................... 1

JURISDICTIONAL STATEMENT .................................................. 3

STATEMENT OF THE ISSUE .................................................... 4

STATUTES AND REGULATIONS.............................................. 4

STATEMENT OF THE CASE ..................................................... 5

    A.    Regulatory Framework ....................................... 5

    B.    Procedural History ............................................ 10

STANDARD OF REVIEW ....................................................... 14

SUMMARY OF THE ARGUMENT ............................................ 15

STANDING............................................................................ 19

ARGUMENT ........................................................................ 21

I.    Adding the Nixa assets to Zone 10 created an unjust and unreasonable cost shift. ................................................ 21

    A.    The 'roughly commensurate' requirement and the general rule against cost shifts are well settled. ................. 21

    B.    Moving the Nixa assets into Zone 10 inflicts millions in costs on other Zone 10 members, but the benefits of the Nixa assets accrue entirely to Nixa itself. ........................... 26

II.    FERC's justifications for the cost shift all fail. .............................. 31

    A.    FERC misapplies the law by asserting that Nixa-unique benefits count as benefits to the rest of Zone 10. ...... 32

        1.    The City of Nixa is not a victim of the cost shift. ........ 33

        2.    The Nixa assets alone are the correct level of generality to consider given the current proposal. ...... 38

    B.    The Nixa assets confer essentially no benefit to non-Nixa members of Zone 10. .................................................. 47

        1.    The Commission never even asserted that the Nixa assets benefit non-Nixa Zone 10 members roughly commensurate with their imposed costs. ........ 47

xiii

2.  Supposed "benefits" the Commission found to
non-Nixa Zone 10 members are not supported by
record evidence and cannot stand. ............................... 49

III.  Case law does not support FERC's action here. ........................... 57

A.  The Commission's decision contradicts *NPPD v. FERC*. ..... 57

B.  The Commission's decision contradicts *ODEC v. FERC*. ..... 61

CONCLUSION ............................................................................. 64

# TABLE OF AUTHORITIES*

**Page(s)**

## Court Cases

*BNP Paribas Energy Trading GP v. FERC,*
    743 F.3d 264 (D.C. Cir. 2014) ............................................................ 22

*Czyzewski v. Jevic Holding Corp.,*
    580 U.S. 451 (2017) ............................................................ 20

*El Paso Elec. Co. v. FERC,*
    76 F.4th 352 (5th Cir. 2023) ................................................23, 25-26

*Encino Motorcars, LLC v. Navarro,*
    579 U.S. 211 (2016) ............................................................ 44

*FERC v. Elec. Power Supply Ass'n,*
    577 U.S. 260 (2016) ............................................................ 14

*Finberg v. U.S. Dep't of Agric.,*
    6 F.4th 1332 (D.C. Cir. 2021) ....................................... 49, 55

*Ill. Com. Comm'n v. FERC,*
    576 F.3d 470 (7th Cir. 2009) ..................................5, 10, 20, 22, 25, 37

*Ill. Com. Comm'n v. FERC,*
    756 F.3d 556 (7th Cir. 2014) ......................................25-26, 38

*K N Energy, Inc. v. FERC,*
    968 F.2d 1295 (D.C. Cir. 1992) ........................................... 22

*Manin v. Nat'l Transp. Safety Bd.,*
    627 F.3d 1239 (D.C. Cir. 2011) .......................................48-49

*Midwest ISO Transmission Owners v. FERC,*
    373 F.3d 1361 (D.C. Cir. 2004) ....................................... 15, 22

---

\* Authorities "chiefly" relied on under Circuit Rule 28.

xv

*Nat'l Ass'n of Regul. Util. Comm'rs v. FERC*,
  475 F.3d 1277 (D.C. Cir. 2007) ............................................. 21

*\*Neb. Pub. Power Dist. v. FERC*,
  957 F.3d 932 (8th Cir. 2020) ..... 2-3, 9-10, 15, 18-19, 23, 25, 27, 38, 40,
  45-46, 57-61

*\*Old Dominion Elec. Coop. v. FERC*,
  898 F.3d 1254 (D.C. Cir. 2018) .. 14-15, 18-19, 21-22, 25, 36, 41, 44-45,
  61-64

*Pac. Gas & Elec. Co. v. FERC*,
  373 F.3d 1315 (D.C. Cir. 2004) .......................................... 15

*Sithe/Indep. Power Partners v. FERC*,
  285 F.3d 1 (D.C. Cir. 2002) ............................................... 15

## Administrative Cases

*Indicated SPP Transmission Owners v. Sw. Power Pool, Inc.*,
  162 FERC ¶ 61,213 (2018), *reh'g denied*, 165 FERC ¶
  61,005 (2018) .................................... 7, 8, 9, 23, 24, 42, 44, 46

*Indicated SPP Transmission Owners v. Sw. Power Pool, Inc.*,
  165 FERC ¶ 61,005 (2018) ............................................. 7, 24

*PJM Interconnection, L.L.C.*, Opinion No. 494, 119 FERC ¶
  61,063 (2007), *remanded on other grounds*, *ICC I*, 576
  F.3d 470 ................................................................. 20, 46

*Sw. Power Pool, Inc.*, Opinion No. 562, 163 FERC ¶ 61,109
  (2018), *reh'g* denied, Opinion No. 562-A, 166 FERC ¶
  61,019 (2019) ........................................................... 9, 59, 60

*Sw. Power Pool, Inc.*, Opinion No. 579, 180 FERC ¶ 61,192
  (2022), *reh'g denied*, Opinion No. 579-A, 182 FERC ¶
  61,014 (2023) ................................................................. 9

*Sw. Power Pool, Inc.*,
  106 FERC ¶ 61,110 (2004) ............................................ 5, 45

*Sw. Power Pool, Inc.*,
   177 FERC ¶ 63,021 (2021).............................................................. 13, 26

*Sw. Power Pool, Inc.*,
   89 FERC ¶ 61,284 (1999), *order on reh'g*, 98 FERC ¶ 61,038 (2002) ..5

*Transmission Planning & Cost Allocation by Transmission
   Owning & Operating Pub. Utils.*, Order No. 1000,
   136 FERC ¶ 61,051 (2011)................................................................ 23

**Statutes**

5 U.S.C. § 706(2)(A) ........................................................................ 4

16 U.S.C. § 824d(a) .............................................................. 5, 15, 21

16 U.S.C. § 825*l*(b) .................................................................... 3, 19

**Other**

Brief for Respondent,
   *ODEC*, 898 F.3d 1254 (D.C. Cir. 2018) (Nos. 17-1040, 17-1041),
   2017 WL 4804733.................................................................... 64

GLOSSARY

| | |
|---|---|
| ARKMO Cities | ARKMO consists of the following customers within Zone 10: Paragould Light & Water Commission (d/b/a Paragould Light, Water & Cable); City of Poplar Bluff Municipal Utilities; Kennett Board of Public Works; City of Piggott-AR Municipal Light, Water & Sewer; and the City of Malden- Board of Public Works |
| Complaint | *Indicated SPP Transmission Owners v. Sw. Power Pool, Inc.*, Complaint and Request for Fast Track Processing, Docket No. EL18-20-000 (filed Oct. 13, 2017), JA465-99 |
| Complaint Order | *Indicated SPP Transmission Owners v. Sw. Power Pool, Inc.*, 162 FERC ¶ 61,213 (2018) |
| Complaint Reh'g Order | *Indicated SPP Transmission Owners v. Sw. Power Pool, Inc.*, 165 FERC ¶ 61,005 (2018) |
| NPPD | Nebraska Public Power District |
| Order | *Sw. Power Pool, Inc.*, Order on Initial Decision, 182 FERC ¶ 61,141 (2023) (R.317), JA366-418 |
| Order Rejecting Contested Settlement | *Sw. Power Pool, Inc.*, 174 FERC ¶ 61,116 (2021) (R.163), JA54-74 |
| Reh'g Br. | *Sw. Power Pool, Inc.*, Joint Request for Rehearing of the ARKMO Cities and the Indicated SPP Transmission Owners, Docket No. ER18-99-005 (filed Mar. 29, 2023) (R.318), JA420-37 |
| Reh'g Order | *Sw. Power Pool, Inc.*, Order Addressing Arguments Raised on Rehearing, 184 FERC ¶ 61,004 (2023) (R.322), JA440-59 |

RTO                          Regional Transmission Organization

SPP                          Southwest Power Pool, Inc.

## INTRODUCTION

The Nixa assets are about ten miles of lower-voltage electric transmission line and substations built by the City of Nixa, Missouri. The question presented in this case is who should pay for the Nixa assets.

The key facts are straightforward.  The City of Nixa planned and built the Nixa assets to serve the City of Nixa.  Consistent with that plan, virtually all the power that flows through the Nixa assets is consumed by the city.  Without the Nixa assets, Nixa would go dark.

 At the same time, the Nixa assets hardly serve the surrounding areas in Missouri and Arkansas.  In particular, the chances that the Nixa assets could prevent a blackout outside Nixa in the rest of the Southwest Power Pool ("SPP")'s nearby Zone 10 are less than 1 in 38,000.  And well below 1 percent of the electricity flowing through the Nixa assets is consumed by non-Nixa customers in Zone 10, including the ARKMO Cities, which are located more than 200 miles from Nixa. And so, from 1984 until the rate change accepted by the Commission ruling in this case, the City of Nixa paid the costs of the Nixa assets.

But the Commission here found it just and reasonable to shift 89

1

percent of the Nixa assets' costs from Nixa to the rest of the Zone 10 customers.  By adding the Nixa assets to Zone 10, the rate proposal would cause a 22 percent rate increase to the rest of Zone 10—the steepest rate increase ever in an SPP zonal placement case.

By approving this rate scheme, the Commission acted arbitrarily, capriciously, and contrary to law.  No benefits flow to the rest of Zone 10 from the Nixa assets that are "roughly commensurate" with assuming most of the annual costs of the Nixa assets.  The Commission did not even *assert* that any roughly commensurate benefits existed to the rest of Zone 10.  Instead, the Commission held that benefits *to Nixa itself* as a new member of Zone 10 justified spreading costs to the rest of Zone 10—a textbook unlawful cost shift to others not receiving a benefit.

Indeed, the Commission approached this zonal placement case very differently than another zonal placement case within SPP just a few years ago.  *See Neb. Pub. Power Dist. v. FERC*, 957 F.3d 932 (8th Cir. 2020) ("*NPPD*").  Even though Petitioners here did not have the burden of proof, Petitioners followed the *NPPD* case closely, gathered experts and evidence, and proved exhaustively that no benefits exist here like the benefits that warranted the (far less impactful) cost shift

2

in *NPPD*.  Rather than recognize the lack of roughly commensurate benefits and reject the cost shift, the Commission misconstrued the law. It found that meaningful benefits to Nixa (and Nixa alone) warranted spreading the costs of the Nixa assets to the rest of Zone 10, despite hardly a scintilla of benefit to the rest of Zone 10.  This Court should grant the petition and reject the Commission's reasoning and conclusions.

## JURISDICTIONAL STATEMENT

This Court has appellate jurisdiction under 16 U.S.C. § 825*l*(b). The Commission entered its initial order on February 28, 2023.  JA366-418, *Sw. Power Pool, Inc.*, Order on Initial Decision, 182 FERC ¶ 61,141 (2023) ("Order") (R.317).  Petitioners timely requested rehearing on March 29, 2023.  JA420-37 (R.318).  The Commission entered its notice recognizing the denial of rehearing by operation of law on May 1, and Petitioners timely petitioned for review on May 22.  Doc. 2000593.

The Commission then issued an order addressing the arguments raised on rehearing on July 5, 2023.  JA440-59, *Sw. Power Pool, Inc.*, Order Addressing Arguments Raised on Rehearing, 184 FERC ¶ 61,004 (2023) ("Reh'g Order") (R.322).  Petitioners amended their petition for

review to specify that rehearing order on July 17, 2023.  Doc. 2008223.

### STATEMENT OF THE ISSUE

The Commission approved a proposed cost allocation under which almost all of the costs of the Nixa assets—ten miles of lower-voltage transmission line built by the City of Nixa alone, to serve that city—will be borne by customers that receive no benefit from them.  Adding the Nixa assets to Zone 10 spread the assets' sunk costs mostly onto other customers who use none of the power those lines carry and see no reliability benefit from them.  Even so, the Commission imposed 89 percent of the costs of the Nixa assets onto those other customers, raising their rates by more than 20 percent.  The question is whether the Commission's act in approving the cost shift was contrary to law or arbitrary and capricious.

### STATUTES AND REGULATIONS

The Administrative Procedure Act, 5 U.S.C. § 706(2)(A) states that "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

The Federal Power Act requires the rates addressed in this case to

4

be "just and reasonable," and states that "any such rate or charge that is not just and reasonable is hereby declared to be unlawful." 16 U.S.C. § 824d(a).

STATEMENT OF THE CASE

## A.    Regulatory Framework

SPP is a Regional Transmission Organization ("RTO") authorized by the Commission. *Sw. Power Pool, Inc.*, 106 FERC ¶ 61,110 (2004). As is the case with other RTOs, SPP was built upon the bedrock idea that there should be no involuntary reallocation of sunk costs[1] of transmission facilities a utility built before it joined the RTO. SPP historically prevented such shifting of sunk costs by using license plate rates. *See Sw. Power Pool, Inc.*, 89 FERC ¶ 61,284, 61,888 (1999), *order on reh'g*, 98 FERC ¶ 61,038 (2002). Through a license plate rate, customers in a particular pricing Zone within SPP pay only the single rate of that Zone for transmission service. The rate is based on the cost of the transmission facilities in the Zone where the customers are located. *See* JA231, Exh. ARK-63 at 1 (Schedule 9) (R.296); JA234, Exh.

---

[1]    A "sunk cost" is a "cost that has already been incurred." *Ill. Com. Comm'n v. FERC*, 576 F.3d 470, 473 (7th Cir. 2009) ("*ICC I*").

5

ARK-64 at 1 (SPP Tariff Section 34.1) (R.296) (calculating the monthly demand charge).

SPP still uses license plate rates. JA39, Tr. 294 (Hooton) (R.92); JA35, Tr. 55 (Locke) (R.91). Customers in a pricing Zone pay a Monthly Demand Charge, equal to their load ratio share times 1/12 of the annual zonal transmission costs (less certain specified amounts). *See* JA234, Exh. ARK-64 at 1 (SPP Tariff § 34.1) (R.296). In a single-transmission-owner Zone, the zonal annual Zone transmission costs are the costs of that single transmission owner. In a multi-transmission-owner Zone, such as Zone 10 is now, each transmission owner's costs are combined. Each customer then pays a portion of the total annual costs based on its load ratio share—the size of its load relative to the other loads in the pricing Zone, measured at times of peak system use. *See* JA234, Exh. ARK-64 at 1; JA236, Exh. ARK-65 (defining Load Ratio Share under the SPP Tariff) (R.296). So within each Zone, each network customer's transmission service charge is based on its load ratio share—its fair piece of the overall zonal transmission cost pie.

Typically, when a new transmission owner is integrated into an existing Zone, SPP proposes that its annual transmission costs and its

6

load be added to the existing Zone's totals. Thus, the total costs increase, but so does the amount of load responsible for paying those costs. *E.g.*, *Indicated SPP Transmission Owners v. Sw. Power Pool, Inc.*, 162 FERC ¶ 61,213 at P 2 (2018) ("Complaint Order"), *reh'g denied*, 165 FERC ¶ 61,005 (2018) ("Complaint Reh'g Order"). Unless the average cost of the new transmission owner's system is roughly the same as the existing Zone's average cost, adding a new transmission owner to an existing Zone causes rates for some customers to go down, and rates for others to go up. Complaint Order, 162 FERC ¶ 61,213, at P 3. That is a cost shift.

Until recently, when SPP placed a new joining transmission owner into an existing Zone, the resulting blended rate (and any cost shifts) were consensually accepted, sometimes through settlement. *See* JA319, Exh. S-5 at 23 (R.296).

In 2017, a group of transmission owners (including some of the Petitioners here) filed a complaint with the Commission. They explained that SPP had "increasingly" been adding small, relatively expensive transmission owners to existing pricing Zones. JA469, JA473, *Indicated SPP Transmission Owners v. Sw. Power Pool, Inc.*,

7

Complaint and Request for Fast Track Processing at 1, 5, Docket No. EL18-20-000 (filed Oct. 13, 2017) ("Complaint"). The transmission owners contended that SPP's zonal placement decisions were "not based on cost causation or benefits" but instead on "factors like geography" and size of revenue requirement that "have no bearing on cost allocation." JA482, *id.* at 14.

The complaint alleged that the resulting cost shifts were inconsistent with cost causation principles. Existing customers in the Zones would see their rates rise as they assumed responsibility for paying for transmission facilities not planned or built to serve them. Meanwhile, customers of the joining small transmission owners would see their rates drop as cost responsibility would shift mostly off of them and onto the others in their new Zone. JA471, Complaint at 3. The transmission owners' group urged the Commission to find that the tariff was unjust and unreasonable, and to amend the tariff to prevent such cost shifts. JA489-90, JA495, Complaint at 21-22, 27.

The Commission refused to find the tariff *per se* unjust and unreasonable. Complaint Order, 162 FERC ¶ 61,213, at P 62. Instead, it required a "case-by-case" examination of each such integration

8

proposal "for compliance with the cost causation principle."  Complaint Order, 162 FERC ¶ 61,213, at P 69.

Since then, other than this case, only two such zonal integration cases have been litigated and decided.  One was decided by the Commission, but not on the issue of cost causation.  In that case, the Commission ultimately found that the assets at issue should be excluded from the zonal rate because they were not jurisdictional transmission facilities at all.  *Sw. Power Pool, Inc.*, Opinion No. 579, 180 FERC ¶ 61,192 at P 2 (2022), *reh'g denied*, Opinion No. 579-A, 182 FERC ¶ 61,014 (2023).

The other zonal integration case was fully litigated as a question of just and reasonable cost causation.  The Commission approved SPP's integration proposal, which added Tri-State to Zone 17 over the objections of the Nebraska Public Power District (NPPD), the main existing Zone 17 transmission owner.  *See Sw. Power Pool, Inc.*, Opinion No. 562, 163 FERC ¶ 61,109 (2018), *reh'g denied*, Opinion No. 562-A, 166 FERC ¶ 61,019 (2019).  The Eighth Circuit agreed with the Commission.  *NPPD*, 957 F.3d 932.  The court found that the Tri-State facilities provided benefit to NPPD's customers "roughly commensurate"

9

with the cost shift caused by adding the Tri-State facilities to the Zone. *NPPD*, 957 F.3d at 941 (citing *ICC I*, 576 F.3d at 477).  After the non-jurisdictional case and the *NPPD* case, this is the third SPP zonal placement case since the Commission announced that cost causation would be evaluated case-by-case.

## B.    Procedural History

In October 2017, SPP and the owner of the Nixa assets submitted a rate proposal to the Commission under Section 205 of the Federal Power Act.  SPP proposed to add the costs of the Nixa assets to SPP pricing Zone 10.  JA6, *Sw. Power Pool, Inc.*, Submission of Tariff Revisions to Incorporate South Central MCN LLC's Formula Rate, Docket No. ER18-99-000 at 6 (filed Oct. 18, 2017) (R.1).  The City of Nixa had recently joined SPP as a customer in Zone 10, but not yet as a Transmission Owner in the Zone.  *See* JA306, Exh. ITO-1, at 8 (Schnitzer) (R.296).

The Nixa assets were built by the City of Nixa to serve Nixa's demand for electricity.  *See* JA309, Exh. ITO-10 at 2 (R.296).  The assets consist of approximately ten miles of transmission lines operated at 69 kV and several associated substations.  JA30-31, Joint Stip. of Facts at

13 (R.78).  SPP's rate proposal to add the Nixa assets to Zone 10 called for the highest zonal rate increase ever in SPP—a rate increase well above 20 percent on existing Zone 10 customers.  JA71-72, *Sw. Power Pool, Inc.*, 174 FERC ¶ 61,116 at P 40 (Feb. 18, 2021) ("Order Rejecting Contested Settlement") (R.163); JA336, Exh. SPP-6 at 13 (Locke Rebuttal) (R.296); JA247, Exh. GHP-200 at 3 (Hooton Rebuttal) (R.296).

Several parties, including Petitioners here, contested the rate filing.  Petitioners objected to the cost shift because there were no roughly commensurate benefits warranting the rate increase on the rest of Zone 10.  JA22-23, *Sw. Power Pool, Inc.*, Limited Comments of the Indicated SPP TOs at 2-3, Docket No. ER18-99-000 (filed Nov. 8, 2017) (R.19); JA26, *Sw. Power Pool, Inc.*, Motion to Intervene and Limited Comments of Paragould Light, Water, & Cable *et al.*, at 6, Docket No. ER18-99-000 (filed Nov. 8, 2017) (R.20).  Petitioners objected exactly as the Commission had ordered them to do in the earlier Complaint docket—oppose the cost shift on a case-by-case basis.

The case went to hearing in March 2019 for three days.  Before the Presiding Judge issued an Initial Decision, however, certain parties submitted a settlement agreement to the Commission for its approval.

JA44-46, *Sw. Power Pool, Inc.*, Offer of Settlement and Settlement Agreement, Docket No. ER18-99-004 (filed Aug. 30, 2019) (R.133). Some of the Petitioners here opposed the proposed settlement, urging that it still improperly shifted costs.  JA51-53, *Sw. Power Pool, Inc.*, Initial Comments of the Indicated SPP Transmission Owners Opposing Settlement at 5, 7-8, Docket No. ER18-99-004 (filed Sept. 23, 2019) (R.143).

The Commission rejected the settlement and remanded the case for additional hearing procedures.  JA54, JA74, Order Rejecting Contested Settlement at PP 1, 46.  The Commission said that it did not have a sufficient record to determine whether the proposal complied with cost causation principles.  It directed parties to "engage in this issue more closely" on remand.  JA72, *id.* at P 41.  The Order Rejecting Contested Settlement essentially held that SPP had not met its burden to show that the proposed cost allocation from adding the Nixa assets to Zone 10 was just and reasonable.

The Commission thus ordered the parties back to a supplemental hearing.  In August 2021, the parties held an eight-day hearing in which 113 additional exhibits, including 12 pieces of testimony by 8

witnesses, and approximately 1,400 additional pages of transcript were added to the record of this case.  The supplemental hearing established several key facts:

- The proposal in this case (based on 2021 load data) was for Nixa to pay only 11 percent of the costs of the Nixa assets, and for the non-Nixa Zone 10 customers to pay 89 percent.  JA375, Order P 20.

- Almost all of the power that flows over the Nixa assets is consumed by Nixa.  JA243, Exh. ARK-76 at 78 (Locke) (R.296).

- Without the Nixa assets, Nixa would "go dark", JA126, Tr. 1272 (Tsoukalis) (R.283), but there is only a remote possibility that loss of the Nixa assets would cause an outage affecting other Zone 10 customers.  JA120-21, Tr. 1053-1054 (Tsoukalis) (R.280).

- At most, less than 1 percent of flows over the Nixa assets serve load in the ARKMO Cities. JA102-03, Tr. 993-994 (Tsoukalis) (R.280); JA104-05, Tr. 998-999 (Tsoukalis) (R.280).

The Presiding Judge recommended that the Commission approve the rate proposal.  *Sw. Power Pool, Inc.*, 177 FERC ¶ 63,021, at PP 153,

188 (2021). The Commission agreed. JA366, Order P 2.

Petitioners timely sought rehearing on several issues, all related to cost causation. JA420-37, *Sw. Power Pool, Inc.*, Joint Request for Rehearing of the ARKMO Cities and the Indicated SPP Transmission Owners, Docket No. ER18-99-005 (filed Mar. 29, 2023) ("Reh'g Br.") (R.318). The Commission denied rehearing on all points. JA440-59, Reh'g Order.

Petitioners timely appealed to this Court.

### STANDARD OF REVIEW

"Under the arbitrary-and-capricious standard of review, we uphold FERC decisions if the agency has 'examined the relevant considerations and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made.'" *Old Dominion Elec. Coop. v. FERC*, 898 F.3d 1254, 1260 (D.C. Cir. 2018) ("*ODEC*") (quoting *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 292 (2016)).

Using this "deferential" standard, the Court does "not require FERC, in applying the cost-causation principle, to utilize a particular formula or to allocate costs with exacting precision." *ODEC*, 898 F.3d

at 1260 (citations omitted).  But this Court does "set aside orders when FERC's allocation of costs was either unreasonable, *see Pac. Gas & Elec. Co. v. FERC*, 373 F.3d 1315, 1322 (D.C. Cir. 2004), or inadequately explained, *see Sithe/Indep. Power Partners v. FERC*, 285 F.3d 1, 4-5 (D.C. Cir. 2002)." 898 F.3d at 1260 (adding that "[s]o too have other reviewing courts").

In particular, the Commission has "acknowledge[d] that it must have an articulable and plausible reason to believe that the benefits of placing [a facility into a certain Zone] are at least roughly commensurate with the costs allocated to [the objecting parties]." *NPPD*, 957 F.3d at 939-40.  Courts must "evaluate compliance with this [cost-causation] principle by comparing the costs assessed against a party to the . . . benefits drawn by that party." *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1368 (D.C. Cir. 2004); *see also NPPD*, 957 F.3d at 940 (applying the same rule).

## SUMMARY OF THE ARGUMENT

Adding the Nixa assets to SPP's Zone 10 created an unlawful cost allocation.  Under the Federal Power Act, all rates must be "just and reasonable." 16 U.S.C. § 824d(a).  Just and reasonable rates require

15

that the costs imposed on a party for electric facilities be roughly commensurate with the benefits drawn by that party from those facilities.  The Commission and courts have agreed that the "roughly commensurate" standard applies in zonal placement cases like this one.  Thus, the governing rule should be clear.

When the Commission approved placing the Nixa assets into Zone 10, it shifted 89 percent of their annual costs from the City of Nixa onto other Zone 10 customers.  That created a substantial 22-percent rate increase on the rest of Zone 10.  The problem is that the Nixa assets were built by the City of Nixa, to serve the City of Nixa.

The Nixa assets provide no meaningful benefits to the rest of Zone 10, including the ARKMO Cities.  Expert studies found no reliability benefits to the rest of Zone 10 from the Nixa assets, and even found that the City of Nixa itself uses nearly all of the power that flows into the Nixa assets.  Any benefits to the rest of Zone 10 were so small that a main debate among the experts was whether the supposed benefits were within the margin of error—that is, whether any benefits exist at all.  Thus, the Commission's conclusion that the Nixa assets' cost should be mostly borne by these other Zone 10 customers was arbitrary and

capricious.

The agency made two main errors.

First, the Commission found that benefits the Nixa assets provide to the City of Nixa itself count as benefits to Zone 10 and thus justify spreading costs across all of Zone 10. This theory does not make sense. Nixa is not a victim of this cost shift; it is the beneficiary. Originally Nixa paid 100 percent of the Nixa assets' annual costs, and after the Commission's decision it paid only 11 percent. The proper analysis requires asking whether the others—who formerly paid zero and then took on 89 percent of the annual costs—receive benefits roughly commensurate with that stake, or not. (And conversely, whether Nixa, whose cost responsibility decreased by 89 percent, is still paying its fair share).

Second, the Commission wrongly denied that examining the Nixa assets alone is the right way to approach the "roughly commensurate" analysis. Thus, the Commission arbitrarily refused to address whether benefits flow from the Nixa assets specifically to non-Nixa Zone 10 members that are "roughly commensurate" with their newly-assigned costs.

17

But the Nixa assets *are* the right level of granularity in this case. In fact, the Nixa assets are the full scope of the rate proposal that SPP made and that the Commission considered, and therefore, the proper scope of the objections also.  Suggesting that no one can object to zonal placements when they are proposed at the facility level cannot be right. All zonal placements involve facilities.  The Commission and the courts frequently do cost causation analyses on a facility-by-facility basis, precisely because different facilities have different beneficiaries.

In short, the Commission did the wrong analysis.  The Commission never even *asserted* that the Nixa assets offer benefits roughly commensurate with their costs to non-Nixa Zone 10 customers. Nor are the supposed benefits claimed by the Commission actually supported by record evidence.  No meaningful integration, planning, power transfer, or other benefits exist for the rest of Zone 10.

Last, the Commission's decision in this case contradicts *NPPD v. FERC*, 957 F.3d 932 (8th Cir. 2020) and *ODEC v. FERC*, 898 F.3d 1254 (D.C. Cir. 2018).

In *NPPD*, the court accepted a far less impactful cost shift that was justified by extensive integration between the existing and joining

facilities.  In that case, the existing members of the SPP Zone relied on the new joining facilities to serve their need for electricity, and both the Commission and the court found it just and reasonable for them to take on cost responsibility for those facilities.  No similar facts support the cost shift here.  This case was litigated at the Commission with *NPPD* closely in mind, and Petitioners proved exhaustively the absence of any benefits like the ones that justified the cost shift in that case.  Yet the Commission approved the cost shift to the rest of the Zone anyway.

In *ODEC*, the Commission tried to allow the allocation of the entire cost of two projects onto the single utility that proposed them, despite a showing that more than half the benefits went to others.  This Court refused to allow such a "grossly disproportionate" mismatch of costs and benefits.  898 F.3d at 1264.  The Court should follow its reasoning in *ODEC* and reject the even more starkly disproportionate cost allocation proposed here, where some customers are being asked to bear almost all the costs but receive (at most) almost no benefits.

## STANDING

Petitioners have standing.  They are "aggrieved by an order issued by [FERC]" under 16 U.S.C. § 825*l*(b).  The orders here find that all

19

customers in SPP's Zone 10 must pay for the Nixa assets.

Most of the Petitioners here are customers in SPP's Zone 10, and so the rates they pay meaningfully increased because of the challenged orders. JA376, Order P 22 ("ARKMO notes the presentation by Trial Staff of the current 21-22% rate increase to Zone 10 customers"); JA25, *Sw. Power Pool, Inc.*, Motion to Intervene and Limited Comments of Paragould Light, Water, & Cable, *et al.* at 3, Docket No. ER18-99-000 (filed Nov. 8, 2017) (R.20) ("The ARKMO Cities are a group of municipal electric companies all in Zone 10"). Financial injury from a challenged government action is adequate to show Article III standing. *See Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017).

Likewise, all Petitioners are members of SPP, and thus are endangered by cost-shifting decisions on zonal placement within SPP. Cost shifts destabilize regional transmission organizations like SPP by creating incentives for high-cost utilities to join and low-cost utilities to depart. Opinion No. 494, 119 FERC ¶ 61,063, at PP 57-58 (2007), *remanded on other grounds*, *ICC I*, 576 F.3d 470 (discussing the "potential risk to RTO membership if [the Commission] were to impose substantial shifts in cost responsibility" and the "destabiliz[ing]" effect

20

on RTOs).  All existing participants in SPP have an interest in avoiding cost shifts when new participants join, and in preserving the stability of the RTO.  The challenged orders injure that interest and correcting them would redress that injury under Article III.

**ARGUMENT**

## I.    Adding the Nixa assets to Zone 10 created an unjust and unreasonable cost shift.

### A.    The 'roughly commensurate' requirement and the general rule against cost shifts are well settled.

The Federal Power Act requires that "[a]ll rates and charges made . . . in connection with the transmission or sale of electric energy . . . be just and reasonable."  16 U.S.C. § 824d(a).  To be "just and reasonable," a rate must follow the cost-causation principle.

The cost-causation principle is that "costs are to be allocated to those who cause the costs to be incurred and reap the resulting benefits."  *Nat'l Ass'n of Regul. Util. Comm'rs v. FERC*, 475 F.3d 1277, 1285 (D.C. Cir. 2007).  *See also ODEC*, 898 F.3d at 1255 (adding that

21

the "cost-causation principle" has been recognized "[f]or decades" by "the Commission and the courts").

The Commission need not "utilize a particular formula," nor "allocate costs with exacting precision." *ODEC*, 898 F.3d at 1260. But "all approved rates [must] reflect to some degree the costs actually caused by the customer who must pay them." *K N Energy, Inc. v. FERC*, 968 F.2d 1295, 1300 (D.C. Cir. 1992). The principle is a "matter of making sure that burden is matched with benefit." *BNP Paribas Energy Trading GP v. FERC*, 743 F.3d 264, 268 (D.C. Cir. 2014). "Not surprisingly, we evaluate compliance with this unremarkable principle by comparing the costs assessed against a party to the burdens imposed or benefits drawn by that party." *Midwest ISO Transmission Owners*, 373 F.3d at 1368.

While the Commission receives deference to its expertise on rate matters, it "is not authorized to approve a pricing scheme that requires a group of utilities to pay for facilities from which its members derive no benefits, or benefits that are trivial in relation to the costs sought to be shifted to its members." *ICC I*, 576 F.3d at 476. That is, the Commission "may never approve unjust and unreasonable rates by

allocating costs to those who reap little to no benefit, nor may it choose not to allocate costs to those who *cause* the costs to be incurred and reap the resulting benefits." *El Paso Elec. Co. v. FERC*, 76 F.4th 352, 362 (5th Cir. 2023).

The Commission has long agreed that it must ensure that benefits are at least "roughly commensurate" with the costs it imposes. Order No. 1000, 136 FERC ¶ 61,051, at P 586 (2011) ("The cost of transmission facilities must be allocated to those within the transmission planning region that benefit from those facilities in a manner that is at least roughly commensurate with estimated benefits.").

The Commission has even agreed that the "roughly commensurate" standard applies in zonal placement cases like this one. "FERC acknowledges that it must have an articulable and plausible reason to believe that the benefits of placing Tri-State in Zone 17 are at least roughly commensurate with the costs allocated to NPPD and its customers." *NPPD*, 957 F.3d at 939-40 (approving a different zonal placement within SPP).

23

In a predecessor proceeding involving many of the same parties, the Commission agreed that it should and would apply the same cost causation analysis to zonal placement cases like this one. Complaint Order, 162 FERC ¶ 61,213, at P 69 ("Compliance with the cost causation principle is evaluated by comparing the costs assessed against a party to the burdens imposed or benefits drawn by that party."); *id.* (adding that shifting costs sometimes is proper, if a party derives meaningful benefit from facilities but has not been contributing to paying for them). The Commission even acknowledged "the requirement to find an articulable and plausible reason to believe that the benefits customers receive from the transmission facilities are at least roughly commensurate with the costs allocated to them." Complaint Reh'g Order, 165 FERC ¶ 61,005, at P 23.

The Commission even reiterated this view earlier in this case. JA76-77, Reh'g Order Rejecting Contested Settlement, at P 30 (R.195) (confirming that the key question here would be "comparing the costs assessed against a party to the burdens imposed or benefits drawn by that party" in allocating costs).

24

Thus, the legal rule here is simple and should be undisputed. The Commission orders here must give "articulable and plausible reasons to believe that the benefits are at least roughly commensurate with the costs" it imposes on Petitioners. *NPPD*, 957 F.3d at 942; *ICC I*, 576 F.3d at 477. To lawfully spread the costs of the Nixa assets to Zone 10 members who have not previously been paying for them, the Commission must have plausible reasons to believe that the Nixa assets provide those members with benefits at least "roughly commensurate" with the costs. The Commission also cannot "choose not to allocate costs to those who cause the costs to be incurred and reap the resulting benefits." *El Paso Elec. Co.*, 76 F.4th at 362. In other words, cost causation requires that everyone pays roughly their share.

Unless the "roughly commensurate" test is plausibly satisfied, the Commission orders are arbitrary and capricious. *See, e.g.*, *ODEC*, 898 F.3d at 1260 (holding that the Commission acted arbitrarily and capriciously by foreclosing cost sharing for high voltage projects that provided significant regional benefits); *ICC I*, 576 F.3d at 477-78 (holding that the Commission acted arbitrarily and capriciously by approving an unjustified cost shift); *Ill. Com. Comm'n v. FERC*, 756

25

F.3d 556, 565 (7th Cir. 2014) ("*ICC II*") (same); *El Paso Elec. Co.*, 76
F.4th at 366 (reversing a Commission order for being inconsistent with
the cost causation principle).

> **B.    Moving the Nixa assets into Zone 10 inflicts millions
> in costs on other Zone 10 members, but the benefits of
> the Nixa assets accrue entirely to Nixa itself.**

The Nixa assets are about ten miles of transmission lines operated
at 69 kV, and several associated substations. The City of Nixa built the
Nixa assets between 1984 and 2012. They connected the James River
Power Station to the City of Nixa and to a larger 161 kV transmission
line. 177 FERC ¶ 63,021, at PP 10-11.

For decades, Nixa paid 100 percent of the costs of the Nixa assets.
In June 2017, Nixa joined SPP, but continued to pay 100 percent of the
Nixa assets' cost. JA308, Exh. ITO-6 at 2 (R.296) (confirming that Nixa
still paid for the Nixa assets until March 31, 2018, when the Nixa
assets were added to Zone 10).

SPP then proposed adding the Nixa assets to its existing Zone 10.
The Commission ultimately approved it. JA410-11, Order P 99. The
effect was to spread the Nixa assets' costs beyond Nixa and across the
rest of Zone 10 customers on a load ratio share basis. Nixa's load ratio

share was about 11 percent. So adding the Nixa assets to Zone 10 meant that 89 percent of the annual costs of the Nixa assets would be paid by non-Nixa Zone 10 customers. JA375, Order P 20. This represented a shift of about $1.6 million in one year alone. JA91-92, Tr. 794-795 (Hooton) (R.278). It also created a substantial rate impact—a rate increase on the rest of Zone 10 of more than 22 percent. JA78, Tr. 592 (Locke) (R.277); JA135, Tr. 1785 (Deters) (R.289).

Never had the Commission approved such a steep rate impact in an SPP zonal placement case. JA237, Exh. ARK-74 at 2 (R.296) (showing prior zonal integration cases and resulting rate impacts). The Commission acknowledged early on that its "review of the record shows there may be a significant rate increase for Zone 10 customers upon the inclusion of the Nixa Assets" and noted that the proposed increase "is higher than any other that has previously been approved in SPP, including the 8% increase approved [in the *NPPD* case]." JA71-72, Order Rejecting Contested Settlement P 40.

To warrant such a severe cost shift—lifting most of the Nixa assets' annual costs off Nixa and placing them on other protesting customers—requires that the rest of Zone 10 receive benefit from the

Nixa assets "roughly commensurate" with paying these steep costs. No

such benefit exists. The problem is that the Nixa assets provide

meaningful benefits *only to Nixa*. Meanwhile, the ARKMO Cities, for

instance, are 200 miles away. The evidence is straightforward.

First, the City of Nixa alone planned and built the Nixa assets to

serve load in the City of Nixa. JA309, Exh. ITO-10 at 2 (R.296) ("The

Nixa assets were built by the City of Nixa to ensure reliable electric

service for its residents."); JA248, Exh. GHP-200 at 13 (Hooton) (R.296)

(admitting that only Nixa caused the Nixa assets to be built); JA244-45,

Exh. ARK-76 at 105-06 (Locke) (R.296) (Nixa was the "causer" of the

Nixa assets).

Second, no one disputes that the Nixa assets are critical to Nixa

itself. Without the Nixa assets, Nixa would "go dark" at "tremendous"

cost. JA126, Tr. 1272 (Tsoukalis) (R.283) ("[I]f the Nixa assets went on

an outage or they didn't exist, the whole City of Nixa would go dark . . .

it would lose load and that would have tremendous economic value

obviously to that community.").

Third, in sharp contrast, the Nixa assets are not needed to serve

customers in the rest of Zone 10. JA131, Tr. 1605 (Schnitzer) (R.287);

28

JA101, Tr. 971 (Tsoukalis confirming that the Zone 10 transfers he modeled would be possible without the Nixa assets) (R.280); JA240, Exh. ARK-76 at 75 (Locke) (R.296).  Moreover, it would be nearly impossible for the Nixa assets to prevent an outage in the rest of Zone 10.  In the usual 'one element out of service' assessment, the Nixa assets provided zero reliability benefits to the rest of Zone 10.  JA115-16, Tr. 1046-1047 (Tsoukalis) (R.280); JA316, Exh. ITO-38REV at 60 (Puga) (R.296) (showing in more than 300 single-contingency conditions, zero new violations would occur without the Nixa assets).  Even in a more extreme '*two*-elements out of service' analysis, the Nixa assets might prevent trouble in the rest of Zone 10 in only 1 out of 38,000 contingencies.  And even that 1-in-38,000 possibility would not necessarily mean an outage.  JA117-22, Tr. 1050-1055 (Tsoukalis) (R.280); JA317-18, Exh. ITO-38REV at 67-68 (Puga) (R.296).

Transmission lines are built for reliability—to keep the lights on. The Nixa assets absolutely keep the lights on in Nixa.  But it is hard to even *imagine* a scenario in which they keep the lights on anywhere else.

Fourth, similarly, Nixa consumes almost all power that enters the Nixa assets.  JA242, Exh. ARK-76 at 77 (Locke) (R.296) (agreeing that

metered flow data showed that power flows into the Nixa assets are largely consumed by Nixa). In a specific effort to create a scenario in which power moving through the Nixa assets would be used elsewhere in Zone 10, one expert studying the power flow models "intentionally ignored" Nixa as a load, because if he had not, "100 percent of the power would go there." JA124-25, Tr. 1175, 1218 (Tsoukalis) (R.281).

And even *ignoring* Nixa, no meaningful power flows through the Nixa assets to serve the rest of Zone 10. The best any expert could do was to find, under unrealistic circumstances, that about 1/3 of 1 percent of the system peak load of the ARKMO Cities is served by power flowing through the Nixa assets. JA102-03, JA104-05, Tr. 993-994, 998-999 (Tsoukalis) (R.280). Even that number required erasing Nixa from the calculation—and then what was left still did not amount to anything. All should agree that "Nixa uses the Nixa assets to serve its load a lot more than other Zone [10] customers do." JA240-41, Exh. ARK-76 at 75-76 (Locke) (R.296). At the first hearing, SPP's witness ran seven power flow analyses and none showed flows of even 1 percent to other customers in Zone 10. JA337-38, Exh. SPP-6 at 26-27 (Locke) (R.296).

30

Tellingly, when the Commission offered a second chance (the second hearing), despite its burden of proof, SPP conducted no further tests.

These are baseline facts. Nixa alone built the Nixa assets, and built them to serve Nixa alone. Nixa relies heavily on them. The odds that anyone else in Zone 10 will one day rely on the Nixa assets to avoid a blackout are below 1 in 38,000. The odds of anyone else in Zone 10 even consuming any power that has flowed through the Nixa assets are well below 1 percent. None of these facts are seriously in dispute. The Commission did not reject any of them.

Instead, the Commission largely justified the cost shift by trying to change the analysis. Zero, or essentially zero, benefits can never be roughly commensurate with a shift of 89 percent of the associated costs, or a rate increase of 22 percent, amounting to $1.6 million in the first year alone. The Commission's conclusion that the Nixa assets' costs should be spread across all of Zone 10 is arbitrary and capricious and should be reversed.

## II.    FERC's justifications for the cost shift all fail.

The Commission found that, "based upon the evidence presented as a whole, the benefits to Zone 10 customers from the Nixa assets are

roughly commensurate with their costs and that SPP's filing is thus just and reasonable." JA411, Order P 101. This conclusion is arbitrary and capricious. It hinges on a legal error that allowed the Commission to ignore the key facts showing no benefit to the rest of Zone 10 from the Nixa assets.

Along the way, the Commission also arbitrarily and capriciously chose to ignore the evidence of rate impact—the significant increase in rates on existing Zone 10 customers. JA380, Order P 32 ("we find it is not necessary to rely on the rate impact evidence in the record"). The Commission cannot properly ignore relevant evidence when assessing a cost shift. JA380, *id.* (accepting that "both cost shifts and rate impacts . . . could be relevant issues for determining whether a placement was just and reasonable").

### A. FERC misapplies the law by asserting that Nixa-unique benefits count as benefits to the rest of Zone 10.

The key error is the Commission's view that benefits the Nixa assets provide to Nixa itself provide an adequate reason to charge the rest of Zone 10 for the Nixa assets.

The Commission gave two reasons for this. First, it found that Nixa itself is now part of Zone 10 (as a customer), so benefits to Nixa are benefits to Zone 10 generally. JA394-95, Order P 65; JA457, Reh'g Order P 27. Second, it found that the "roughly commensurate" test should not be applied at the asset level, but only across the Zone "as a whole." JA395, JA412, Order PP 66, 103; JA448-52, Reh'g Order PP 15-21. Both reasons are arbitrary and capricious.

### 1.    The City of Nixa is not a victim of the cost shift.

The Commission held that "it was appropriate . . . to consider the benefits of the Nixa assets to all Zone 10 customers, including the City of Nixa." JA395, Order P 65. In fact, the Commission seems to acknowledge that its Order would fail the roughly commensurate test if the test applied specifically to the other Zone 10 customers. JA457, Reh'g Order P 27 ("[W]e are not persuaded . . . that the Order . . . must be reversed because non-City of Nixa customers do not accrue benefits specifically from the Nixa Assets sufficient to meet this proportionality requirement."). The Commission assessed the cost shift as $1.8 million to all of Zone 10, including Nixa. Nixa had divested the Nixa assets and joined SPP earlier. JA456-57, Reh'g Order P 26. Thus, as the

33

Commission saw it, Nixa's rates rose along with the rest of Zone 10 when the Nixa assets are added.  JA379, Order PP 29-30.  This is both a factual falsehood and a legal error.

First, the factual falsehood is very simple.  Under the proposal the Commission approved, Nixa's cost responsibility for paying for the Nixa assets dropped from 100 percent to 11 percent.

Nixa built the Nixa assets to serve Nixa, and for decades, only Nixa paid for them.  Nixa then joined SPP in 2017, became a Zone 10 customer, and divested the Nixa assets.  JA379, Order P 30.  But after Nixa joined SPP and before the Nixa assets were added to Zone 10, Nixa continued to pay 100 percent of the Nixa assets' costs.  JA308, Exh. ITO-6 at 2 (R.296) (confirming that Nixa still paid for the Nixa assets until March 31, 2018, the day the Nixa assets were added to Zone 10).  Nixa kept paying for the Nixa assets, and properly so—just not as part of its SPP rate.  JA308, *id*.  In other words, before the Nixa assets were added to Zone 10, Nixa was paying 100 percent of the costs of the Nixa assets, *plus* its Zone 10 rate.  After the assets were added, Nixa paid only 11 percent of the costs of the Nixa assets as an addition to its

Zone 10 rate.  So Nixa's overall costs fell by 89 percent of the costs of the Nixa assets.

The Commission selectively points out that Nixa's "transmission rates *under Zone 10* will increase upon inclusion of the Nixa assets just as will the transmission rates of other Zone 10 customers."  JA379, Order P 30 (emphasis added).  True, but misleading.  It is a shell game to suggest that Nixa faced new costs when in fact Nixa's responsibility for the Nixa assets changed from 100 percent to 11 percent—a reduction of about $1.6 million in Nixa's transmission costs.  JA91-92, Tr. 794-795 (Hooton) (R.278) (explaining that the cost shift is $1.8 million "subtract[ing] out of that the [11 percent] piece that Nixa pays").

The record is plain that Nixa's costs went down, not up, and that the costs for other customers in Zone 10 went up as a direct result.  No witness denied this.  JA432, Reh'g Br. 13; JA135-36, Tr. 1785-1786 (Deters) (R.289); JA238-39, Exh. ARK-76 at 44-45 (R.296).  The Commission dodged this baseline fact by rewriting the legal test.

That Nixa and the Nixa assets joined Zone 10 in two steps—first adding the city as a customer, and then soon after adding the assets as

35

a cost—does not matter. It provides no reason to obscure the obvious reallocation of sunk costs from Nixa onto the rest of Zone 10.

After all, the basic test is whether a party receives benefits from facilities "roughly commensurate" with the costs that same party must pay for the facilities. That same test would apply regardless of time sequence or sunk costs—to cost allocation for new facilities as well as considering re-allocating costs of older ones. *See, e.g.*, *ODEC*, 898 F.3d at 1261 (applying the "roughly commensurate" test to two new proposed projects). The fact that this case involves a reallocation of *sunk* costs only makes the unfairness of "grossly disproportionate" cost allocation clearer.

Second, the related legal error is the Commission's decision that it should count benefits to Nixa as reasons that shifting costs onto the rest of Zone 10 is just and reasonable. JA379, Order P 30.

That makes no sense. The rate proposal here is to reallocate sunk costs from Nixa to others in Zone 10. So the question is whether the others in Zone 10 are receiving benefits from the Nixa assets that would warrant taking on a large share of their costs. The record here shows

that the answer is unequivocally no.  Instead, Nixa will continue to be the exclusive beneficiary.

If the Commission's rationale made sense, it would be hard to imagine an unjust or unreasonable cost shift ever occurring.  The Commission could always simply combine those who benefit from a facility with those who do not, and then find benefits to the combined group and spread costs evenly to the entire group.

Courts have rejected that exact line of thinking.  *See, e.g.*, *ICC I*, 576 F.3d 470 (refusing to allow the Commission to set cost allocation at pro rata equally across an entire RTO when there was no evidence that utilities far from the projects being built would receive the same benefits as those nearby).  Indeed, in that case "FERC's counsel reluctantly conceded that if Commonwealth Edison would derive only $1 million in expected benefits from Project Mountaineer, for which it is being asked to chip in (by its estimate) $480 million, the disparity between benefit and cost would be unreasonable."  *Id.* at 476.  As the court added, "[t]he concession was prudent."  *Id.*

The Seventh Circuit made clear that the Commission cannot allocate costs to a broad group without reasonably specific reasons to

37

believe all members of the group will see "roughly commensurate" benefits. *ICC II*, 756 F.3d at 564 ("repairing a major pothole in a city would incidentally benefit traffic in the city's suburbs, because some suburbanites commute to the city. So they should pay a share of the cost of repair, but a share proportionate to their use of the street with the pothole rather than proportionate to their population.").

In sum, the Commission's idea that benefits to Nixa warranted shifting costs onto the rest of Zone 10 is arbitrary and capricious. It ignores the key facts—that Nixa's overall costs went down while all the others in Zone 10 went up. Unlike in *NPPD*, this reallocation of costs did not correct previously misaligned benefits and costs, but instead created misalignment where before there was none. And it relies on the arbitrary fact that Nixa joined Zone 10 in two steps, which should not matter.

> **2.  The Nixa assets alone are the correct level of generality to consider given the current proposal.**

On rehearing, the Commission defended its Order by urging that the "roughly commensurate" standard does not apply at all to specific assets being added to zonal rates. JA448-52, Reh'g Order PP 15-21.

38

The Commission thought that such an approach "does not square" with the Tariff, which provides that the costs of each asset added to a zone will be added to the zonal rate. JA449-50, Reh'g Order P 16.

As the Commission explained it, the point of zonal rates is that everyone in a zone pays a flat rate based on the total costs of the zone's facilities. Zonal rates, said the Commission, do not even try to measure benefits flowing from each separate transmission line (or asset) to each customer. JA449-50, *id*. Thus, any analysis of benefits must address assets and customers "as a whole" and not separately. JA395, Order P 66. *See also* JA412, *id*. at P 103 (urging that it would be "nearly impossible" and "contrary to the purpose of zonal rates in the first place" to show benefit from every facility to every customer commensurate with equal shares of the costs). Thus, the Commission refused to apply the "roughly commensurate" standard to compare the benefits of the Nixa assets to their costs to non-Nixa zone 10 customers. JA457, Reh'g Order P 27. This conclusion is arbitrary and capricious for at least five reasons.

First, Petitioners here are entitled to challenge the justness and reasonableness of the actual proposal at the Commission. Petitioners

have never advocated that every zonal placement issue must be analyzed asset by asset.  But here, SPP proposed to add a single asset to Zone 10.  Thus, the customers of Zone 10 must be entitled to object on that same scope.  If SPP can propose adding a single asset, then inherently the question on cost causation will be whether that single asset offers benefits roughly commensurate with its costs.  If not, the Commission should reject the zonal placement or otherwise change the cost allocation.

While the Commission seeks to couch its objection as being to a facility-by-facility approach, the effect is to shield the zonal rate itself from scrutiny.  The Commission's position that a single asset is the wrong scope of analysis would mean it is impossible for anyone to object to any SPP proposal to place single assets into any zone, no matter how useless to almost all customers in the zone, and no matter the resulting change in the zonal rate.  That is not how the Federal Power Act works.

Second, it is not "nearly impossible," JA412, Order P 103, to assess the benefits at the asset level.  "Roughly commensurate" is not a precise requirement.  *NPPD*, 957 F.3d at 940.  For instance, this Court in *ODEC* found it grossly disproportionate for a utility to pay 100

40

percent of the costs but receive less than 50 percent of the benefits for two specific transmission line projects. *ODEC*, 898 F.3d at 1260-63.

Here, the disparity is even worse than in *ODEC*. Clear evidence shows little to no benefit to Petitioners in exchange for 89 percent of the costs. The Commission cannot fall back on saying it is hard to analyze costs and benefits when the parties have already analyzed them and offered evidence at length about it.

Nor is there any suggestion that somehow the Commission has done the best it could do in cost allocation here. The Commission chose to ignore suggestions about potential rate alternatives because it found that "SPP's proposal is just and reasonable," so the Commission "need not consider whether the proposal is more or less reasonable than other alternatives." JA417, Order P 115.

But Petitioners did offer alternatives—including a subzone for the Nixa assets. These alternatives show that it was in fact possible to add the Nixa assets to SPP in a just and reasonable fashion. JA307, Exh. ITO-1 at 18 (Schnitzer) (R.296) (outlining a sub-zonal proposal to keep the City of Nixa in Zone 10 but leave the costs of the Nixa assets in a sub-Zone so Nixa alone would still pay them as a legacy asset cost);

41

JA87, Tr. 633 (Locke) (R.277) (admitting that a sub-zonal rate proposal would be feasible).

Third, the Commission's theory that it should not analyze the Nixa assets on the asset level conflicts with the Commission's own earlier positions, both in related cases and in this one.

In 2018, in response to an earlier complaint by some of the Petitioners, the Commission adopted a case-by-case application of the roughly commensurate standard. *Complaint Order*, 162 FERC ¶ 61,213, at P 69. The complainants had argued that the SPP Tariff should be changed to avoid allowing any cost shifts in zonal placements. The Commission rejected that argument by holding that cost allocation in each zonal placement could be challenged in the accompanying specific rate case—exactly what the Petitioners did here. *Id.* at P 74 ("[P]arties have the right to protest the proposed placement of a new transmission owner in an existing Zone when SPP makes the filing . . . to add the [costs] of the new owner to the existing Zone's [costs].") And the Commission was express in holding that the scope of such a challenge could include "compliance with the cost causation principle." *Id.* at P 69.

42

In other words, the Commission's holding here that evaluation of cost causation "does not square" with the Tariff's zonal rate structure directly contradicts its prior holding that this proceeding is exactly the right place for such an evaluation. In that prior holding, the Commission said there was no need to change the Tariff because cost causation could be challenged in proceedings like this one. To imply now that the Tariff bars such a challenge is a shell game.

The Commission also contradicted itself even within this case. In 2021, the Commission rejected a settlement here because the parties failed to show that cost causation was satisfied. JA71-72, Order Rejecting Contested Settlement at PP 40-41. The Commission cited evidence that rates in Zone 10 would jump if the Nixa assets were added. JA71-72, *id.* at P 40. It found "insufficient evidence in the record for the Commission to make a determination on whether and the extent to which there are cost shifts involved in the placement of the Nixa assets into Zone 10 or benefits that may accrue that would justify any such cost shifts." JA71, *id.*; JA72, *id.* at P 41 ("[W]e are not convinced that the record in this case shows that sufficient benefits will accrue to Zone 10 customers to justify the Settlement."). The

43

Commission then remanded for a further hearing and directed the parties to evaluate the cost shift issues and benefits "more closely." JA72, *id.* at P 41. That hearing led to the orders on appeal here.

In other words, for several years now, this case has been litigated on the premise that the core question was what benefits the Nixa assets provide, and to whom, as key aspects of proper cost causation. The Commission itself even said so, twice: "The language of the SPP Tariff does not preclude the Commission from then accepting or rejecting SPP's filing based on case-specific facts and circumstances." Complaint Order, 162 FERC ¶ 61,213, at P 74, quoted at JA368, Order P 4. The Commission's denial that the Nixa assets are the right level of specificity conflicts with that. *Cf.* JA449-50, Reh'g Order P 16.

The Commission offers no reason to support its sudden turnabout. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (an "unexplained inconsistency" by an agency "is a reason for holding an interpretation to be an arbitrary and capricious change" from the agency's earlier position).

Fourth, the Commission often *does* evaluate cost allocation on a facility by facility or customer-by-customer basis. In *ODEC*, the case

concerned specific proposals to rebuild "two high-voltage [transmission] lines" and both the Commission and the Court readily assessed the cost allocation for those specific facilities. 898 F.3d at 1255.

The Commission and court also performed a customer-specific cost allocation analysis in *NPPD*. 957 F.3d at 939-40 ("FERC acknowledges that it must have an articulable and plausible reason to believe that the benefits of placing Tri-State in Zone 17 are at least roughly commensurate with the costs allocated *to NPPD and its customers*.") (emphasis added).

Fifth, zonal rates are meant to prevent, not cause, cost shifts. The Commission's contrary suggestion fails. In fact, SPP's original zonal rate structure aimed to "avoid the problems associated with cost-shifting." JA462-64, *Sw. Power Pool, Inc.*, Proposal for Recognition at 19-20 & n.36, Docket No. EL00-39-000 (filed Dec. 30, 1999) (outlining the license plate rate construct later approved by the Commission at *Southwest Power Pool, Inc.*, 106 FERC ¶ 61,110 (2004)).

The Commission has long been clear that Zones in regional transmission organizations should "continue to allocate the costs of these facilities to the customers for whom they were constructed and

whom they continue to serve."  Opinion No. 494, 119 FERC ¶ 61,063 at

P 42 (2007).

In other words, zonal placement is meant to be, and usually is, a

reasonably fair match of benefits and costs.  Some zones have a single

transmission owner that built its facilities to serve its customers.  *See*

JA228-30, Exh. ARK-62 at 11-13 (R.296) (showing that 9 of the 19

Zones in SPP were still single-owner Zones).  Or, a Zone will combine

two or more collaborating transmission owners whose systems have

long served each other's customers.  *See NPPD*, 957 F.3d at 941

(accepting a combined zonal placement where "NPPD used Tri-State's

facilities to serve its customers . . . and both could not reach their

customers without using the other's facilities").  Neither of these is the

case here.

In sum, nothing about zonal rates prevents analysis of a single

asset when a proposal is made to add a single asset to a Zone.  Zonal

rates are no exception to cost causation principles, as precedent and

common sense reflect.   As the Commission has said, the Tariff and its

zonal rate structure do not preclude application of principles of cost

causation.  Complaint Order, 162 FERC ¶ 61,213, at P 74.

**B.    The Nixa assets confer essentially no benefit to non-Nixa members of Zone 10**.

Because of these legal errors, the Commission never did the right analysis.  It never even *contended* that the Nixa assets offer benefits roughly commensurate with their costs to *non-Nixa* Zone 10 members.  To the contrary, the Commission seems to concede the point.  JA457, Reh'g Order P 27.  Thus, once the Court agrees that the proper analysis here requires a finding of benefits to the rest of Zone 10 customers roughly commensurate with the costs they must pay for the Nixa assets, the Commission's orders should be vacated.

**1.    The Commission never even asserted that the Nixa assets benefit non-Nixa Zone 10 members roughly commensurate with their imposed costs.**

The Commission's insistence on viewing Zone 10 "as a whole" meant that the Nixa assets' supposed benefits generally included—and relied heavily on—undisputed benefits to Nixa itself.  JA379, Order P 30 ("First, participants argue that the proper measure of the cost shift is the amount of the Nixa assets that will be paid by non-City of Nixa customers . . . We disagree."); JA379, *id.* ("[T]he Commission's evaluation of the cost shift to Zone 10 customers can and should incorporate costs paid by the City of Nixa.").  The Commission added

47

that a "proper[] evaluat[ion]" of "the benefits of the Nixa Assets" must be "to all Zone 10 customers—including the City of Nixa—rather than . . . to non-City of Nixa customers."  JA394, Order P 65.

After specifying that costs and benefits to Nixa itself must be included, the Commission went on to find "benefits that accrue to Zone 10 customers."  JA394-95, Order PP 64-65.  The Commission found that "the Nixa assets provide integration, reliability, and power transfer benefits to Zone 10 customers."  JA394, Order P 64; JA411, *id.* at P 101.  When the Commission discusses "benefits to customers in Zone 10," JA394-95, *id.* at PP 64-65, it generally means benefits to Nixa, or at least benefits that rely heavily on the undeniably extensive benefits Nixa itself receives.  JA411, *id.* at P 101.

The Commission's orders spend only a few sentences claiming any benefits flow at all to non-Nixa Zone 10 members.  JA396, Order P 68.  To be clear, the Commission never even has asserted that these benefits to non-Nixa Zone 10 customers are roughly commensurate with a 22 percent rate increase or with bearing 89 percent of the annual costs of the Nixa assets.  So even if the Court credits the supposed benefits the Commission found, they cannot support the orders below.  *See Manin v.*

48

*Nat'l Transp. Safety Bd.*, 627 F.3d 1239, 1245 (D.C. Cir. 2011) (the court "generally may not uphold agency action on a basis other than that relied upon by the agency"). And in any event, the benefits the Commission did find are illusory.

> **2.    Supposed "benefits" the Commission found to non-Nixa Zone 10 members are not supported by record evidence and cannot stand.**

Even the few unsupported sentences the Commission offered to show benefit to non-Nixa Zone 10 customers lack factual support in the record and cannot stand. That is, on this "record as a whole, no reasonable factfinder could have made the same finding as the agency," meaning "substantial evidence is lacking" to support any finding of meaningful benefits to other Zone 10 customers from the Nixa assets. *Finberg v. U.S. Dep't of Agric.*, 6 F.4th 1332, 1336 (D.C. Cir. 2021).

The sole benefits that the Commission clearly attributed to *non-Nixa* Zone 10 customers are "integration benefits." JA396, Order P 68 (disagreeing that integration benefits are limited to Nixa). Integration benefits, as the Commission saw them, mean that the Nixa assets "provide an additional path for power flows that could be used by other customers in Zone 10" and "serve as a tie between two [balancing

49

authority areas] and between two transmission pricing Zones." JA395, Order P 67.  Being under SPP's control means that the Nixa assets "can be planned more effectively and operated more reliably."  JA396, *id.*  It also means that the Nixa assets "are part of the system-wide planning models and can be used in central dispatch for the benefit of Zone 10 customers."  Finally, the Commission suggested that the Nixa assets may allow maintenance shutdowns or other outages to occur "during peak conditions," which would benefit all of Zone 10.  JA396, *id.* at P 68.

    These rationales all fall apart under scrutiny.

    First, the reallocation of sunk costs proposed here is to the non-Nixa customers in Zone 10.  That means to be of use in the roughly commensurate analysis, the benefits must flow to *those* customers. Benefits to a vastly larger group of customers—such as, for instance, all of SPP, or the entire eastern American power grid—do not support inflicting meaningful costs solely onto non-Nixa Zone 10 customers. The problem with the generic and supposed "integration" benefits the Commission found is that they are tiny benefits spread thin across a *much* larger group than just Zone 10.  Accordingly, they do not support

the cost allocation, as the Commission itself found at an earlier stage of this proceeding.  JA72, Order Rejecting Contested Settlement at P 41.

The Commission bundles its benefits analysis generally into the category of "integration."  Most of the transmission systems in the country east of the Rocky Mountains are integrated with one another. This vast network is the "Eastern Interconnect."  Within this network, power flows on all facilities, including the Nixa assets.  *See* JA312, Exh. ITO-38REV at 8 (Puga) (R.296) ("[I]n an electric transmission network, in which multiple paths exist for the electricity to flow between two nodes, power will flow on all paths but will favor the 'path(s) of least resistance.'").

Benefits modeling showed that the Nixa assets provide very small benefits through integration for any transaction anywhere in the Eastern Interconnect that has an uninterrupted path to and from the Nixa assets.  JA107-09, Tr. 1013-1015 (Tsoukalis) (R.280).  Distant loads benefit the same or more from the Nixa assets than non-Nixa customers in Zone 10 do.  JA107-12, Tr. 1013-1018.

A main dispute among the witnesses at trial was whether the tiny *Zone 10* benefits measured by this modeling even exceed the margin of

error.  JA313, Exh. ITO-38REV at 18 (Puga) (R.296) (urging that the modeling showed benefits "smaller than the minimum thresholds commonly accepted" as meaningful, showing that the models' findings "lack[] sufficient materiality to be applied in cost allocation").

The Commission offers no plausible basis why a very small benefit spread thin across most of the country supports reallocation of sunk costs only to non-Nixa customers in SPP Zone 10.  The same problem applies to other supposed benefits.  JA114, Tr. 1027 (R.280) (Tsoukalis admitting that general redundancy benefits accrue to everyone, not limited to Zone 10); JA240, Exh. ARK-76 at 75 (Locke) (R.296) (access to SPP benefits); JA123, Tr. 1072 (Tsoukalis) (R.281) (same); JA101, Tr. 971 (Tsoukalis) (R.280) (same); JA81, Tr. 618 (Locke) (R.277) (same).

Second, the Nixa assets do not "provide an additional path for power flows that could be used by other customers in Zone 10."  JA395, Order P 67.  Seven different power flow analyses conducted by SPP all showed that less than 1 percent of flows serving the ARKMO Cities flow on the Nixa Assets.  JA337-38, Exh. SPP-6 at 26-27 (Locke) (R.296).  Indeed, Nixa itself consumes almost all power entering the Nixa assets.  JA242, ARK-76 at 77 (Locke).  Less than 1/3 of 1 percent of load in the

ARKMO Cities are served by the Nixa assets.  JA102, Tr. 993
(Tsoukalis) (R.280).

   Third, nor does it make sense that the Nixa assets facilitate
maintenance or other outages.  Only in 1 out of 38,000 scenarios would
the Nixa assets have any role in preventing a blackout—and even if
that exact scenario were to occur, which would require *two* assets being
out of service at the same time—the odds of blackout remain low.
JA117-22, Tr. 1050-1055 (Tsoukalis) (R.280).  The Commission itself
admitted that "reliability" benefits to the rest of Zone 10 were "limited."
JA396-97, Order P 69 (accepting that the reliability benefits of the Nixa
assets were mainly to Nixa, admitting that analyses found "only one
contingency" in which the Nixa assets mattered to the rest of Zone 10,
and conceding that "even in that case they provided only a limited
reliability benefit," but even so, finding "adequate evidence" of *some*
benefit).

   No one ever cited any maintenance project anyone might have in
the rest of Zone 10 that would require using the Nixa assets.  JA356,
Trial Staff Br. on Exceptions 45 (R.307).  The Commission's hint that a
1-in-38,000 chance of a benefit, in a dual-outage contingency, creates

53

meaningful reliability benefits is arbitrary and capricious. *Contra* JA457-58, Reh'g Order P 28 (citing supposed "reliability benefits").

Fourth, there is no "planning" benefit to the rest of Zone 10. The Nixa assets were not jointly planned. They were planned and built years ago, by Nixa alone, to serve Nixa alone. The Commission cited a Notice to Construct project as "anecdotal evidence in support of the integration and reliability benefits for Zone 10 customers." JA397, Order P 70 (also admitting the Notice to Construct was "not . . . a separate benefit"). Yet the Notice to Construct was about a project built to eliminate an overload on the Nixa assets, which again, only serve Nixa. JA344, Exh. SPP-26 at 16 (Locke) (R.297); JA101, Tr. 971 (Tsoukalis); JA397, Order P 70 (the Notice to Construct involved "upgrades to the Nixa assets"). And as the Commission itself found, the "costs related to the Notice to Construct are not relevant to the cost shift at issue here." JA379, Order P 31. The Notice to Construct is a red herring.

On top of supposed "integration benefits," or perhaps as part of them, the Commission stated that it relied on "power transfer benefits" to Zone 10. JA394, JA411, Order PP 64, 101. The Commission never

explained *what* power transfer benefits, or why, even after the

rehearing petition flagged the missing rationale.  JA437, Reh'g Br. 40

(arguing that the Order committed a failure of reasoned decisionmaking

for mentioning but never supporting its assertion that power transfer

benefits exist).  *See Finberg*, 6 F.4th at 1336 ("Agency action is arbitrary

and capricious if the agency fails to adequately explain" itself).  Here,

the Commission failed to adequately explain itself.

Ultimately, the power flow analyses showed that Nixa itself

consumes almost all of the power flowing into the Nixa assets.  Only

small fractions of 1 percent of the power that flows through the Nixa

assets is used in the rest of Zone 10.  JA102-03, JA105-06, Tr. 993-994,

999-1000 (Tsoukalis) (R.280); JA268, Exh. GHP-234REV at 16

(Tsoukalis) (R.296); JA243, Exh. ARK-76 at 78 (Locke) (R.296).  Indeed,

the modeled flows between sources and sinks in Zone 10 would likely be

possible even if the Nixa assets did not exist.  JA101, Tr. 971

(Tsoukalis) (R.280).  There are no "power transfer benefits" to the rest of

Zone 10 from the Nixa assets.

Finally, because cost allocation analysis is comparative, the

supposed benefits to non-Nixa Zone 10 customers must be weighed

55

against those received by Nixa.  Given the proposed cost allocation, one would expect that non-Nixa customers would receive most of the benefits, but the opposite is true.  An outage of the Nixa assets could cause the City of Nixa to "go dark" with "tremendous" financial consequences to Nixa.  JA126, Tr. 1272 (Tsoukalis) (R.283).  While non-Nixa customers do not need the Nixa assets to access the SPP market, Nixa does.  JA240, Exh. ARK-76 at 75 (Locke) (R.296); JA123, Tr. 1072 (Tsoukalis) (R.281); JA101, Tr. 971 (Tsoukalis) (R.280); JA81, Tr. 618 (Locke) (R.277); JA310, Exh. ITO-25 at 9 (Schnitzer) (R.296).  Anecdotal evidence of some maintenance work whose cost allocation is not at issue here, and generalized benefits shared with all of SPP or even most of the country, simply do not compare.

In sum, even taking the Commission at its word, it did not hold that benefits to non-Nixa Zone 10 customers were "roughly commensurate" with raising their rates 22 percent or charging them 89 percent of the annual costs of the Nixa assets.  And even the handful of supposed "benefits" the Commission did identify lack substantial evidence in the record.  They are, at best, "trivial" benefits, and so do not justify the reallocation of sunk costs the Commission approved here.

*NPPD*, 957 F.3d at 940 ("FERC is not authorized to approve a pricing scheme that requires a group of utilities to pay for facilities from which its members derive no benefits, or benefits that are trivial in relation to the costs sought to be shifted to its members.").

Adding Nixa's assets as a piece of the Zone 10 pie inflicts costs on the rest of Zone 10 that only make sense if the other members of Zone 10 can eat that piece of the pie too. But they can't. The Commission's order should be vacated as arbitrary, capricious, and contrary to law.

## III. Case law does not support FERC's action here.

Finally, the Commission denies that case law requires it to compare benefits and costs to Petitioners from adding the Nixa assets to Zone 10. JA453-54, Reh'g Order P 23; JA453-56, *id.* at PP 23-25 ("Precedent governing principles of cost causation supports our conclusion that [petitioners'] proportionality requirement is not, in fact, required."). The Commission misinterprets the case law.

### A. The Commission's decision contradicts *NPPD v. FERC*.

The Eighth Circuit's recent decision in *NPPD v. FERC* is the most instructive here. Both cases are about whether the Commission properly added certain assets to a Zone in SPP. SPP added Tri-State

57

facilities to Zone 17 in that case, just as it wants to add the Nixa assets to Zone 10 here.  There, an existing Zone 17 customer (NPPD) objected, denying that "the benefits that NPPD and the other Zone 17 facilities receive from Tri-State's transmission facilities [were] at least roughly commensurate with the costs allocated [to them]."  957 F.3d at 934.

The governing law was the same as it should be here.  The Eighth Circuit understood that the Commission had to apply the "roughly commensurate" test.  957 F.3d at 941 ("To satisfy cost-causation principles, there must be an articulable and plausible reason to believe that the benefits are at least roughly commensurate with the costs of placing Tri-State into Zone 17.").  The Commission needed to "examine how much use or how much benefit *NPPD would get* from Tri-State's placement in Zone 17."  *Id.* at 941 (emphasis added); *id.* (adding that the Commission "must articulate more benefits than . . . 'no benefits' or trivial benefits").

In *NPPD*, the "roughly commensurate" test was satisfied.  The court found that the Commission "expressed several benefits" to NPPD warranting the sharing of Tri-State's costs.  In particular, "NPPD used Tri-State's facilities to serve its customers, the two entered into an

58

Agreement to operate as a single entity, and both could not reach their customers without using the others' facilities." *Id*. at 941. The court concluded that "NPPD has greatly benefitted from Tri-State's facilities," thus making it just and reasonable for NPPD's customers to assume responsibility for a share of their costs (amounting to an 8 percent rate increase). *Id*.; Order 562-A, 166 FERC ¶ 61,019 at P 20 (2019) (noting that the proposed cost shift "would translate to an eight percent increase in existing Zone 17 rates").

The law in this case is the same as *NPPD*—and different facts should lead to the opposite result. In the wake of *NPPD*, and well aware of that decision, the parties here enlisted experts and set out to quantify any supposed "benefits" to Petitioners from the Nixa assets. The analyses in the record here found no meaningful benefit. Certainly there is no benefit comparable to that in *NPPD*. And the rate impact is much greater—22 percent compared to 8 percent.

The Commission struggled with, and ultimately failed to distinguish, *NPPD*. In its initial Order, the Commission seemed to admit that the facts in *NPPD* posed a stronger case than this one for a just and reasonable zonal placement. JA411, Order P 100 (conceding

59

that "the transmission facilities in *Tri-State* were constructed pursuant to a joint agreement between Tri-State and NPPD . . . and operated as an integrated whole for the parties' joint use and mutual benefit. . . . Such coordination does not exist here."). On rehearing, the Commission asserted that "the Eighth Circuit in that case upheld a zonal placement decision without requiring a demonstration that the facilities at issue benefited existing customers in the Zone proportionate to their load share." JA454, Reh'g Order P 23.

That assessment is wrong. The *NPPD* Court held that NPPD was using Tri-State's facilities (and had to use them) to serve its load, and those facilities had been designed and built as part of the same unit as NPPD's facilities. Thus, the *NPPD* Court held that those facilities provided a benefit to NPPD "roughly commensurate" with NPPD assuming a share of their costs, warranting a rate increase to NPPD of up to 8 percent. 957 F.3d at 937. The Eighth Circuit *did* "compar[e] the costs assessed against *a party* to the benefits drawn *by that party*." 957 F.3d at 940 (emphasis added). So did the Commission in that case. 166 FERC ¶ 61,019, at P 5 ("[T]he benefits that NPPD and its customers

60

receive from Tri-State's transmission facilities are at least roughly commensurate with the costs allocated to NPPD.").

Yet here, the Commission did the opposite. It refused to "compare the costs assessed against [Petitioners] to the benefits drawn by [Petitioners]." *NPPD*, 957 F.3d at 940. Instead, it wrongly insisted that benefits to Nixa itself justified spreading the Nixa assets' costs to the rest of Zone 10.

Properly viewed, this case is *NPPD*—with dispositively different facts. But instead of rejecting the cost shift, the Commission misapplied the law to reach the same result (accepting the cost shift) on opposite facts. This Court should vacate the agency's orders.

## B. The Commission's decision contradicts *ODEC v. FERC*.

The Commission also wrongly found that *Old Dominion Electric Cooperative v. FERC* was off point. JA455-56, Reh'g Order P 25; JA412, Order P 103. Like *NPPD*, *ODEC* applied the same legal principles the Commission ignores here.

In *ODEC*, the dispute was over cost responsibility for two specific projects. Dominion proposed the two projects, which were rebuilds of aging high-voltage transmission lines in central Virginia. 898 F.3d at

61

1257. The Commission placed the entire cost of the projects onto Dominion. But a "critical point" was "undisputed: high voltage power lines produce significant regional benefits within the PJM network." *Id.* at 1260. As this Court observed, under an earlier "methodology previously endorsed by FERC as fairly matching costs to benefits, Dominion was estimated to enjoy only about 47% of the benefits from [one project] and 43% of the benefits from [the other]." *Id.* at 1261.

The Court thus rejected the Commission's conclusion that Dominion should "pay all of the costs of both projects." 898 F.3d at 1261. The Court held that the Commission's act did "not amount to a quibble about 'exacting precision,'" but "involve[d] a wholesale departure from the cost-causation principle." *Id.* The Court found the Commission's decision arbitrary and capricious and set it aside. *Id.* at 1264.

The gist of *ODEC* is that the Commission must reasonably match benefits and costs. It cannot saddle one utility with 100 percent of the costs of transmission facilities when it receives less than 50 percent of the benefits of those facilities. By extension, those proven to receive

62

hardly any benefits of transmission facilities cannot be saddled with most (89 percent) of the facility's costs.

Here, the Commission did "not view . . . the D.C. Circuit's decision in *ODEC* as requiring any such proportionality finding" between benefits and costs at the asset level.  JA412, Order P 103; JA455-56, Reh'g Order P 25.  But *ODEC* did require the Commission to impose costs commensurate with actual beneficiaries of the projects.  And the analysis *was* at the "asset" or "facility-level."  JA455-56, Reh'g Order P 25.  The *ODEC* case was about cost responsibility for two specific projects—a total of just 80 miles of high-voltage transmission line across central Virginia.

No one is arguing that *every* cost-causation analysis always must occur at the individual facility level.  The point is, whether the proposal is to allocate the costs of a single facility or many facilities at once, the usual cost causation test applies.

The Commission adds that ODEC was not a zonal placement case, and does "not necessarily apply to zonal placement decisions such as this one."  JA412, Order P 103.  It offers no reason why not.  Nor does the Commission offer any reason why the cost causation principles in

63

*ODEC* do not bind the Commission here.  In fact, *ODEC* is a strong parallel to this zonal placement case.  In the Commission's own words, *ODEC* was "like many cost allocation cases" and "concern[ed] whether a smaller or larger group of ratepayers will be responsible for particular costs."  Brief for Respondent FERC, *ODEC*, 898 F.3d 1254 (D.C. Cir. 2018) (Nos. 17-1040, 17-1041), 2017 WL 4804733, at *14-15 (adding that "[a]s is typical in cost allocation cases, the issue presented is whether . . . the Commission acceptably identified and matched project benefits and beneficiaries.").  The same is true here.

## Conclusion

The Petition should be granted and the Commission's orders vacated as contrary to law or arbitrary and capricious under the APA.

Dated:  December 15, 2023                    Respectfully submitted,

                                             */s/ Matthew A. Fitzgerald*

Robert A. Weishaar, Jr.                      Matthew A. Fitzgerald
McNees Wallace & Nurick LLC                  McGuireWoods LLP
1200 G Street NW, Suite 800                  Gateway Plaza
Washington, DC 20005                         800 East Canal Street
T: (202) 898-0688                            Richmond, VA 23219
bweishaar@mcneeslaw.com                      T: (804) 775-4716
                                             mfitzgerald@mcguirewoods.com
Kenneth R. Stark

MCNEES WALLACE & NURICK LLC
100 Pine Street
Harrisburg, PA 17101
T: (717) 237-8000
kstark@mcneeslaw.com

*Counsel for Paragould Light & Water
Commission (d/b/a Paragould Light,
Water & Cable – PLWC), City of
Poplar Bluff Municipal Utilities,
Kennett Board of Public Works, City
of Piggott-AR Municipal Light Water
& Sewer, and City of Malden-Board
of Public Works*

Daniel E. Frank
Allison E. S. Salvia
EVERSHEDS SUTHERLAND (US) LLP
700 Sixth Street, NW, Suite 700
Washington, DC 20001-3980
T: (202) 383-0100
danielfrank@eversheds-
sutherland.com
allisonsalvia@eversheds-
sutherland.com

*Counsel for Western Farmers Electric
Cooperative*

Timothy T. Mastrogiacomo
Managing Attorney
XCEL ENERGY SERVICES INC.
701 Pennsylvania Ave NW, Suite 250
Washington, D.C. 20004
T: (202) 661-4481
tim.t.mastrogiacomo@xcelenergy.com

Noel H. Symons
Carrie Mobley
MCGUIREWOODS LLP
888 16th Street NW, Suite 500
Washington, D.C. 20006
T: (202) 857-2929
nsymons@mcguirewoods.com
cmobley@mcguirewoods.com

Patrick Smith
Corporate Counsel
THE EVERGY COMPANIES
818 S. Kansas Ave, P.O. Box 889
Topeka, KS 66601
T: (785) 508-2574
Patrick.Smith@evergy.com

*Counsel for the Evergy
Companies and on behalf of all
Petitioners*

Shaun M. Boedicker
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue N.W.
Washington, D.C. 20036
T: (202) 429-3000
sboedicker@steptoe.com

*Counsel for American Electric
Power Service Corporation, on
behalf of its affiliates, Public
Service Company of Oklahoma
and Southwestern Electric Power
Company*

*Counsel for Xcel Energy Services Inc.*
*on behalf of its operating company*
*affiliate Southwestern Public Service*
*Company*

### CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) because this brief contains 12,846 words, excluding the parts exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) because this brief has been prepared in a proportionally spaced 14-point Century Schoolbook font using Microsoft Word.

Dated:  December 15, 2023          */s/ Matthew A. Fitzgerald*
                                   Matthew A. Fitzgerald

                                   *Counsel for Petitioners*

67

## CERTIFICATE OF SERVICE

I hereby certify that on December 15, 2023, the foregoing was filed electronically with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system.  All participants in the case are registered CM/ECF users and the system will serve them.

Dated:  December 15, 2023          */s/ Matthew A. Fitzgerald*
Matthew A. Fitzgerald

*Counsel for Petitioners*

68