**NOT YET SCHEDULED FOR ORAL ARGUMENT**

**No. 23-1133**

In the

# United States Court of Appeals
# For the District of Columbia Circuit

———————————

PARAGOULD LIGHT & WATER COMMISSION, d/b/a PARAGOULD LIGHT, WATER & CABLE – PLWC, *et al.*,

*Petitioners,*

v.

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent.*

———————————

On Petition for Review of Orders of the Commission

———————————

**FINAL REPLY BRIEF OF PETITIONERS**

———————————

Noel H. Symons
Carrie Mobley
MCGUIREWOODS LLP
888 16th St. NW, Suite 500
Washington, D.C. 20006
(202) 857-1700
*nsymons@mcguirewoods.com*
*cmobley@mcguirewoods.com*

Matthew A. Fitzgerald
MCGUIREWOODS LLP
800 East Canal Street
Richmond, VA 23219
(804) 775-4716
*mfitzgerald@mcguirewoods.com*

December 15, 2023

*Counsel for Petitioners*

*(Additional counsel listed on inside cover)*

Robert A. Weishaar, Jr.
MCNEES WALLACE & NURICK LLC
1200 G Street NW, Suite 800
Washington, DC 20005
T: (202) 898-0688
bweishaar@mcneeslaw.com

Kenneth R. Stark
MCNEES WALLACE & NURICK LLC
100 Pine Street
Harrisburg, PA 17101
T: (717) 237-8000
kstark@mcneeslaw.com

*Counsel for Paragould Light & Water*
*Commission (d/b/a Paragould Light,*
*Water & Cable – PLWC), City of*
*Poplar Bluff Municipal Utilities,*
*Kennett Board of Public Works, City*
*of Piggott-AR Municipal Light Water*
*& Sewer, and City of Malden-Board*
*of Public Works*

Daniel E. Frank
Allison E. S. Salvia
EVERSHEDS SUTHERLAND (US) LLP
700 Sixth Street, NW, Suite 700
Washington, DC 20001-3980
T: (202) 383-0100
danielfrank@eversheds-
sutherland.com
allisonsalvia@eversheds-
sutherland.com

*Counsel for Western Farmers Electric*
*Cooperative*

Patrick Smith
Corporate Counsel
THE EVERGY COMPANIES
818 S. Kansas Avenue, P.O. Box 889
Topeka, KS 66601
T: (785) 508-2574
Patrick.Smith@evergy.com

*Counsel for the Evergy Companies*

Timothy T. Mastrogiacomo
Managing Attorney
XCEL ENERGY SERVICES INC.
701 Pennsylvania Ave NW, Suite 250
Washington, D.C. 20004
T: (202) 661-4481
tim.t.mastrogiacomo@xcelenergy.com

*Counsel for Xcel Energy Services Inc.*
*on behalf of its operating company*
*affiliate Southwestern Public Service*
*Company*

Shaun M. Boedicker
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue NW
Washington, D.C. 20036
T: (202) 429-3000
sboedicker@steptoe.com

*Counsel for American Electric Power*
*Service Corporation, on behalf of its*
*affiliates, Public Service Company of*
*Oklahoma and Southwestern Electric*
*Power Company*

## TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT .............................................1

ARGUMENT ........................................................................................4

I.   FERC's argument about the law attacks a straw man. .................4

    A.   Basic cost causation principles are undisputed.....................4

    B.   This appeal does not challenge the zonal construct, just a specific zonal placement decision. .......................................6

    C.   Petitioners simply object to the cost shift proposed, and preserved that argument. .......................................................10

    D.   The proper cost causation test is fair to Nixa......................12

    E.   That Nixa's load already joined Zone 10 changes nothing about the cost shift here...........................................14

    F.   The Commission fails to distinguish multiple precedents that answer the core legal question here. ..........17

II.  FERC's factual assessment of benefits does not support the cost shift here. ......................................................................................22

    A.   Many of the key facts are undisputed.................................23

    B.   This particular connection between two balancing authority areas may not benefit anyone, but if it does, it spreads a tiny benefit far beyond Zone 10.........................24

    C.   Grid stability, reliability, planning, and maintenance issues offer no specific benefits to Zone 10. .........................26

    D.   There are no meaningful power flows through the Nixa assets to the rest of Zone 10. ..............................................29

CONCLUSION ....................................................................................32

Tᴀʙʟᴇ ᴏꜰ Aᴜᴛʜᴏʀɪᴛɪᴇs*

**Page(s)**

**Court Cases**

*Allegheny Power v. FERC,*
    437 F.3d 1215 (D.C. Cir. 2006) ............................................................ 29

*Coal. of MISO Transmission Customers v. FERC,*
    45 F.4th 1004 (D.C. Cir. 2022) ..................................................... 1, 4, 5

*ICC v. FERC,*
    576 F.3d 470 (7th Cir. 2009) ......................................................... 17, 18

*ICC v. FERC,*
    721 F.3d 764 (7th Cir. 2013) ................................................................ 18

*ICC v. FERC,*
    756 F.3d 556 (7th Cir. 2014) ................................................................ 17

*LSP Transmission Holdings II, LLC v. FERC,*
    45 F.4th 979 (D.C. Cir. 2022) .............................................................. 19

*\*NPPD v. FERC,*
    957 F.3d 932 (8th Cir. 2020) ............................................... 1, 8, 20, 31

*\*ODEC v. FERC,*
    898 F.3d 1254 (D.C. Cir. 2018) .......................................... 1, 8, 18, 19

**Administrative Cases**

Opinion No. 494, 119 FERC ¶ 61,063 (2007), *remanded on*
    *other grounds, ICC I*, 576 F.3d 470 ................................................... 10

**Other Authorities**

SPP.org, Consolidated Balancing Authority,
    https://spp.org/markets-operations/spp-
    portal/consolidated-balancing-authority/........................................... 25

---

* Authorities "chiefly" relied on under Circuit Rule 28.

## GLOSSARY

| | |
|---|---|
| ARKMO Cities | ARKMO consists of these customers within Zone 10: Paragould Light & Water Commission (d/b/a Paragould Light, Water & Cable); City of Poplar Bluff Municipal Utilities; Kennett Board of Public Works; City of Piggott-AR Municipal Light, Water & Sewer; and the City of Malden- Board of Public Works |
| Complaint Order | *Indicated SPP Transmission Owners v. Sw. Power Pool, Inc.*, 162 FERC ¶ 61,213 (2018) |
| ICC | Illinois Commerce Commission |
| NPPD | Nebraska Public Power District |
| Order | *Sw. Power Pool, Inc.*, Order on Initial Decision, 182 FERC ¶ 61,141 (2023) (R.317), JA366-418 |
| Order Rejecting Contested Settlement | *Sw. Power Pool, Inc.*, 174 FERC ¶ 61,116 (2021) (R.163), JA54-74 |
| Reh'g Br. | *Sw. Power Pool, Inc.*, Joint Request for Rehearing of the ARKMO Cities and the Indicated SPP Transmission Owners, Docket No. ER18-99-005 (filed Mar. 29, 2023) (R.318), JA420-37 |
| Reh'g Order | *Sw. Power Pool, Inc.*, Order Addressing Arguments Raised on Rehearing, 184 FERC ¶ 61,004 (2023) (R.322), JA440-59 |
| RTO | Regional Transmission Organization |
| SPP | Southwest Power Pool, Inc. |

### INTRODUCTION AND SUMMARY OF ARGUMENT

The issue here is who should pay for the Nixa assets.  For many years, the City of Nixa paid.  After all, Nixa itself designed, planned, and built the Nixa assets to serve itself.  Under the new proposal accepted by the Commission, the Nixa assets would join Zone 10.  The rest of Zone 10 would assume 89 percent of the costs of the Nixa assets, representing $1.6 million in the first year, a 22 percent rate increase.

Petitioners, including multiple customers in Zone 10, have a simple argument.  Cost causation principles require costs to be allocated "roughly commensurate" with benefits, which requires "comparing the costs assessed against a party to the . . . benefits drawn by that party." *Coal. of MISO Transmission Customers v. FERC*, 45 F.4th 1004, 1009 (D.C. Cir. 2022).

Here, that simply means that the Commission must analyze, and find, that the rest of Zone 10 receives benefits from the Nixa assets roughly commensurate with paying most of their costs.  *E.g.*, *ODEC v. FERC*, 898 F.3d 1254, 1261 (D.C. Cir. 2018) (finding it improper for a utility to pay 100 percent of the costs of upgrade projects when it would receive less than 50 percent of the benefits); *NPPD v. FERC*, 957 F.3d

1

932, 941 (8th Cir. 2020) (accepting a cost shift when the existing zone customers "greatly benefitted" from the facilities whose costs they would assume).

The Commission rejected that legal argument.  JA394-95, Order P 65.  Instead, the Commission insisted that undisputed, tremendous benefits to Nixa itself provide a reason why the rest of Zone 10 should pay for the Nixa assets.  JA394-95, *id.* (finding it "appropriate . . . to consider the benefits of the Nixa Assets to all Zone 10 customers, including the City of Nixa.").  This does not make sense.

On the law, the Commission mostly attacks a straw man.  It refuses to acknowledge that the proper scope of the analysis is the Nixa assets, even though the Nixa assets are the exact scope of the proposal before the Commission.  And the Commission refuses to acknowledge any difference between Nixa and the rest of Zone 10, even though the cost shift at hand is from one to the other.

On the facts, the Commission argues that *some* benefits derive across Zone 10 from the Nixa assets.  FERC Br. 57-66.  But an occasional comment that the benefits, mainly to Nixa, were also "shared among customers within the zone," JA395, Order P 66, or "do not go

entirely to the City of Nixa," JA396, *id.* at P 68, falls far short of the proper legal standard.  The Commission does not even *contend* that those supposed benefits are roughly commensurate with a 22 percent rate increase, or with assuming 89 percent of the costs of the Nixa assets.  It has all but admitted the opposite.  On rehearing, the Commission stated that because it disagreed with Petitioners' legal argument, the Commission was "not persuaded . . . that the [order] must be reversed because non-City of Nixa customers do not accrue benefits specifically from the Nixa assets sufficient to meet this proportionality requirement."  JA457, Reh'g Order P 27.

Ultimately, the Commission never found that the benefits of the Nixa assets to the *rest of Zone 10* are *roughly commensurate* with the cost shift here.  Nor does the Commission argue that now.  Thus, if this Court finds that the law requires that analysis, the Court should vacate the Commission's orders and require it to be done.  There is no need for this Court to delve in depth into supposed benefits of the Nixa assets, though the overwhelming evidence from two trials leaves no doubt of the outcome of such an analysis, properly conducted.

ARGUMENT

## I.   FERC's argument about the law attacks a straw man.

The Commission is right that the core of this appeal is about the law.  FERC Br. 60 (correctly noting that any apparent factual dispute really returns to the proper legal test), FERC Br. 54 ("Petitioners' complaint here is truly about 'the legal test'").  Legal arguments (not factual ones) decide this case.

### A.   Basic cost causation principles are undisputed.

The cost causation test should be clear.  The Commission admits that "costs must be allocated 'in a manner that is at least roughly commensurate' with benefits."  FERC Br. 29 (quoting *Coal. of MISO Transmission Customers*, 45 F.4th at 1009).  That "is determined by comparing the costs assessed against a party to the . . . benefits drawn by that party."  45 F.4th at 1009.  Even SPP recites that the Commission "is required to compare the costs assessed against a party to the benefits drawn by that party" and concedes that is "true."  SPP Br. 34.

The City of Nixa formerly paid 100 percent of the Nixa assets' costs.  The proposal at the Commission called for adding the Nixa assets

4

to Zone 10.  Doing that would shift 89 percent of the Nixa assets' costs—a 22 percent rate increase in the first year—onto the rest of Zone 10. ARKMO Cities, among other Petitioners, are customers in Zone 10 whose rates would be increased.[1]  They contend that no roughly commensurate benefits exist warranting the cost shift.  Before the increased costs are forced on them, the ARKMO Cities and other Petitioners have a right to demand the Commission find "roughly commensurate" benefits.  The Commission refuses to undertake that analysis.

Instead, the Commission misstates Petitioners' argument about the proper scope of cost causation analyses.  The Commission urges that Petitioners would impose a system in which every separate asset and transmission line would be cut up into ten-mile segments and then matched separately to each customer within a zone, and every customer would only pay a bespoke, precisely proportional rate for each piece of

---

[1] SPP points out that the Petitioners here combined represent a minority of the load in Zone 10.  SPP Br. 7-8.  But SPP does not explain why that matters, and it does not.  Under the basic legal test, any "party" being newly allocated significant costs may question whether that party receives any roughly commensurate benefit warranting those costs.  *Coal. of MISO Transmission Customers*, 45 F.4th at 1009.

line and asset.  FERC Br. 35-38, 43 (urging the impossibility of

thousands of permutations).

But cost causation principles do not require that, and Petitioners

have never advocated for such a system.

**B.    This appeal does not challenge the zonal construct,
just a specific zonal placement decision.**

This appeal presents no challenge to the overall zonal construct.

As the Commission explains, SPP is divided into zones.  Within each

zone, each customer pays its pro rata share based on its overall network

transmission use, and the shared pot of costs is the combined total from

all facilities in the zone.  FERC Br. 28-31.  The method does not

"perfectly track any one customer's use of any one transmission asset."

FERC Br. 30.

Petitioners have no objection to this setup.  The challenge here is

exactly what the Commission invited Petitioners to do—object, on a

case-by-case basis, to zonal placement on the ground that no roughly

commensurate benefits warrant the cost shift created if the zonal

placement is accepted.  Complaint Order, 162 FERC ¶ 61,213, at P 69.

In other words, as the Commission itself explained, the proper

time for examining cost causation is in response to a zonal placement

proposal. *Id.* That must mean that the proper scope of the evaluation is the assets involved in the proposed zonal placement. The Commission set this case for hearing—twice—knowing that it needed a fact specific record of the cost causation consequences of this zonal placement rather than one filled with things it already knew about, like its preferences for zonal rates and rolled-in pricing. FERC Br. 30-31.

Petitioners do not seek an asset-by-asset approach to cost allocation, notwithstanding repeated claims to the contrary. *Contra* JA449, Reh'g Order P 15 ("ARKMO and ITOs seek to apply an asset-level, beneficiary-pays rough proportionality requirement."); FERC Br. 22 (to require "such a granular demonstration" "would effectively 'unravel' Southwest's zonal structure in favor of innumerable asset-specific zones"). Rather, Petitioners want the Commission to properly apply its roughly-commensurate standard on a case-by-case basis, as it said it would.

Here, the proposal was to add the "Nixa assets" to Zone 10. The Nixa assets include at least nine facilities built by Nixa at different times over a 28 year span.[2] Petitioners have not singled out any one of

_____

[2] The Nixa Assets consist of facilities in four different substations, as

the Nixa assets, but instead object to the cost shift caused by collectively placing them in Zone 10.

It so happens that this case involves a proposal for just ten miles of transmission assets.  Other cases have involved more.  *E.g.*, *NPPD v. FERC*, 957 F.3d 932 (8th Cir. 2020) (involving 300 miles of Tri-State transmission lines); *ODEC v. FERC*, 898 F.3d 1254 (D.C. Cir. 2018) (involving 80 miles of transmission lines); FERC Br. 47.  That the proposed placement into Zone 10 here involves 10 miles of transmission instead of 80 or 300 or 1,000 does not excuse this zonal placement from the evaluation the Commission promised in response to the Complaint, and that the Federal Power Act mandates.  That is especially true when these 10 miles of transmission lines would cause a 22 percent increase in others' rates.

So the question here is not whether every ten-mile stretch of transmission line serves every customer in Zone 10 on a precisely pro rata basis.  Instead, the question is zonal placement.  Should a *new* and separate pool of assets—the Nixa assets—be added to Zone 10?  Central

---

well as five different sections of transmission line, ranging from 1.24 miles to 3.92 miles each, that were built between 1984 and 2012.  JA30-31, Joint Stip. of Facts at 13 (R.78).

to answering that question is whether the Nixa assets bring roughly commensurate benefits to the Zone 10 group on whom the bulk of its costs will be newly imposed.

Before it belonged to the zonal construct, Nixa paid for the Nixa assets—and as a matter of cost causation, that made perfect sense, because Nixa planned, built, and relies heavily on the Nixa assets. To move the Nixa assets into the Zone 10 pool means to move 89 percent of their costs onto the rest of Zone 10. To justify that requires evidence of meaningful benefit from the Nixa assets to the rest of Zone 10. Such evidence either exists or it doesn't.

Nothing about this analysis portends doom for the zonal construct. To the contrary, refusing to permit unwarranted cost shifts supports the zonal construct.[3]

---

[3] Expert witness Michael Schnitzer even proposed a sub-zonal construct in which Nixa would join Zone 10, yet still pay for the Nixa assets itself. JA304-05, Exh. ITO-1 at 5-6. Contrary to SPP's brief, their expert who claimed many potential problems with a subzone did confirm it was feasible. *Compare* SPP Br. 27, n.4 *with* JA87, Tr. 633 (R.277) ("Q. But it is feasible? A. Yes."). The point is, there are other ways to handle this problem, and if the Court vacates the Commission orders, the Commission will have a new chance to consider them.

The Commission alleges that Petitioners seek to protect incumbents. FERC Br. 32. But opposing an unwarranted cost shift is not protectionism. Petitioners have no objection to *proper* expansion of RTOs. And the Commission has recognized that substantial shifts of sunk costs can destabilize RTOs by encouraging high-cost utilities to join and low-cost utilities to depart. Opinion No. 494, 119 FERC ¶ 61,063 at P 43 (2007).

### C.     Petitioners simply object to the cost shift proposed, and preserved that argument.

Petitioners are simply objecting to the scope of the proposal made to the Commission. Petitioners did not design the proposal SPP brought to the Commission—which was to add the Nixa assets (alone) to Zone 10. That proposal was to lift most of the costs of Nixa assets from a single customer (Nixa) and place them onto the rest of the customers in Zone 10. JA311, Exh. ITO-25 at 13 (R.296) (Schnitzer explaining the reduction in Nixa's cost responsibility); JA135-36, Tr. 1785-1786 (R.289).

The Commission says that Petitioners did not preserve below the argument that they must be able to challenge a proposal at the

10

Commission on the scope it presents. FERC Br. 50. That is false. On

rehearing below, Petitioners said:

> While some facts do not require a customer-specific analysis, these facts do, in part. That is because the reallocation of costs proposed by SPP in the rate at issue is a reallocation from a single customer to the other customers in Zone 10. The [law] requires the Commission to evaluate the fairness of the rate proposal put before it under the roughly commensurate standard, so there must be some comparison between the single entity that is shifting costs, Nixa, and the multiple entities to whom the costs will be shifted—the rest of Zone 10. The nature of the comparison, and which customers it applies to, is dictated by the rate proposal made by SPP.

JA434, Reh'g Br. 22.

Petitioners thus made clear on rehearing at the Commission that

"the nature of the comparison, and which customers it applies to, is

dictated by the rate proposal made by SPP." JA434, *id.*

These parties had a status quo—Nixa paid for the Nixa assets,

and everyone including Nixa paid *pro rata* for everything else. If the

question is whether the Nixa assets should be moved onto the backs of

the rest of Zone 10, the rest of Zone 10 must be able to challenge that

decision as unjustified by cost causation.

To say that because the cost shift happens to be about a single

asset, the cost shift cannot be tested makes no sense. Under that

theory, the Commission could add any single project anywhere in the country to Zone 10, no matter whether it served local customers.[4]

### D.    The proper cost causation test is fair to Nixa.

The Commission and SPP next contend that Petitioners' view of the law would be unfair to Nixa.  They argue that the rest of Zone 10 should pay for the Nixa assets because Nixa pays for facilities that serve the rest of Zone 10.  FERC Br. 38; SPP Br. 8, 12, 17-18.  They say that "Nixa pays a share of the costs of facilities that primarily serve other Zone 10 customers," essentially "picking up the tab" for facilities that really serve the ARKMO Cities and others.  SPP Br. 12, 8, 17-18.

This argument fails.  In short, the other facilities in Zone 10, all owned by Southwestern Power Administration, were planned, built, and serve all of Zone 10, including Nixa.  SPP even admits a "long history of service by Southwestern Administration . . . to the Nixa load."  SPP Br. 27.  The Commission admits that "Nixa originally purchased

---

[4] This is not hyperbole.  After all, the evidence shows that for redundancy and grid stability, any tiny benefit offered by the Nixa assets extends equally to zones and areas far beyond Zone 10.  *See infra*, at 24-27.  Under the Commission's theory that the Nixa assets' placement cannot be challenged because they are a single asset, it could have put them in any zone.

transmission service directly from the Southwestern Power Administration." FERC Br. 14.

Witnesses confirmed that Southwestern planned and built its facilities to serve an area that includes Nixa. JA129, Tr. 1457 (R.285) ("Nixa pays a charge to [Southwestern] which reflects an allocation of the pool of assets that [Southwestern] uses and has built to serve all Zone 10 customers, including Nixa"); JA132, Tr. 1716 (R.289) (Southwestern built its transmission lines to connect dams in the area to load).

Consistent with this, before Nixa joined Zone 10 it paid its share of Southwestern's costs through a separate contractual arrangement. JA353-54, ITO Br. on Exceptions at 88-89 (R.301) (explaining the arrangement). The bottom line is that Nixa and the rest of Zone 10 *are* similarly situated for sharing the costs of the rest of the facilities in Zone 10. JA128, Tr. 1456 (R.285) (explaining that all of Zone 10, including Nixa, "are similarly situated in that they take service from [Southwestern] and have historically"). The Commission's footnote asserting that the Petitioners never asserted that Nixa's costs "would meet the rough proportionality requirement," JA452, Reh'g Order P 20

n.62, is false. *Contra* JA353, ITO Br. on Exceptions at 88 (asserting that "Nixa and other customers in Zone 10 are similarly situated when it comes to allocation of the [Southwestern] costs, but not the Nixa costs").

Moreover, no one has brought any challenge to the allocation of Southwestern costs. If Nixa ever believes it is not receiving roughly commensurate benefits from the Southwestern costs it pays, it is welcome to file a complaint with the Commission. But Nixa has never complained. There is no unfairness to Nixa.

### E.    That Nixa's load already joined Zone 10 changes nothing about the cost shift here.

The Commission refused to analyze this cost shift at what it called the "sub-zonal" level—which means, it refused to analyze the actual cost shift from Nixa onto the rest of Zone 10. The Commission's concern may come from the fact that Nixa itself already joined Zone 10.

If this mattered, then anyone could defeat the cost causation test by staggering the entry of load and transmission assets into a zone. But it doesn't matter—especially not in this case.

Nixa's load joining Zone 10 did not change Nixa's cost responsibilities for the Nixa assets. *See* JA308, Exh. ITO-6 at 2. Nor

14

did it change Nixa's cost responsibility for Southwestern service. JA353-54, ITO Br. on Exceptions at 88-89.

The change came only when the Nixa assets were added to Zone 10. And because that change was unfair and unreasonable, it should be rejected. Not only does it increase rates for everyone else in the zone by 22 percent, it also gives Nixa the windfall of an 89 percent decrease in cost responsibility for the Nixa assets.

Meanwhile, the Commission's insistence on looking at Zone 10 "as a whole," FERC Br. 49, which means including Nixa, makes it impossible to even assess this cost shift, for two reasons.

First, viewing Zone 10 as a whole, including Nixa, makes it impossible to even *see* this cost shift. The Commission found that there is a "cost shift" of $1.8 million annually, onto all of Zone 10. JA372, JA379, Order PP 13, 29. But the cost shift is not $1.8 million onto all of Zone 10—it is $1.6 million onto the non-Nixa customers in Zone 10. Meanwhile Nixa's cost responsibility changed from $1.8 million to $200,000 annually. Viewing the "cost shift" as $1.8 million across all of Zone 10 thus makes no sense. Who are the costs being shifted *from*, if

15

not Nixa?  No witness advocated a theory that there was a cost shift from no one to everyone.  Yet that is what the Commission found.

Second, even once the cost shift is identified, the Commission's view makes it impossible to test it.  The Nixa assets keep the lights on in Nixa.  Given their extreme importance to Nixa, their costs are going to appear justified for *any* zone, of any size, anywhere, that includes Nixa.  *E.g.*, JA396-97, Order P 69 (finding "significant reliability benefits to the City of Nixa," yet admitting "limited" reliability benefits to the rest of Zone 10).  In other words, the Commission's view makes it impossible to reject *any* proposed zonal project because the proposing utility could argue that the benefits it receives alone are enough to satisfy the roughly-commensurate standard for the Zone as a whole.

Thus, the Commission's view makes it impossible to look the cost shift in the face and ask—does it fit cost causation to move 89 percent of the Nixa assets' costs off Nixa and onto the rest of Zone 10?  In the Commission's view, that question never gets asked and certainly never answered.  And that is the problem.

**F.    The Commission fails to distinguish multiple precedents that answer the core legal question here.**

The Commission offers hardly any case law to support its path. Instead, it devotes a section of its brief to distinguishing the multiple precedents that lay out and explain the correct path. The Commission's contention that this case is unique and lacks parallels in prior cost causation cases fails.

The Commission first focuses on the *Illinois Commerce Commission* cases. FERC Br. 40-44. The Commission says that the *ICC* cases were not zonal placement cases, and that the Seventh Circuit ultimately approved pro rata cost sharing for the projects at issue (in one of the Commission's three tries across three cases).

True enough, the *ICC* cases were not zonal placement cases. But the principles announced were broadly applicable governing legal standards, not "stray quotations." *Contra* FERC Br. 40. The court held that the Commission was "not authorized to approve a pricing scheme that requires a group of utilities to pay for facilities from which its members derive no benefits, or benefits that are trivial in relation to the costs sought to be shifted to its members." *ICC v. FERC*, 576 F.3d 470, 476 (7th Cir. 2009) ("*ICC I*"); *ICC v. FERC*, 756 F.3d 556, 564 (7th Cir.

17

2014) ("*ICC II*") (holding that the Commission failed to satisfy this test a second time). That is exactly what is happening here.

The Commission emphasizes *ICC III*, in which the court approved its cost allocation for transmission lines carrying wind power. But in that case, the 16 projects at issue were high voltage transmission lines hundreds of miles long. The Commission eventually proved that the set of projects would provide hundreds of millions of dollars of benefit, through cheaper power generation, reduced losses in transmission, and reduced reserve margin losses. *ICC v. FERC*, 721 F.3d 764, 774 (7th Cir. 2013) ("*ICC III*"). The Commission also showed that these "savings would be spread almost evenly across all Midwest ISO Planning Regions," and were "impossible to allocate . . . with any precision across MISO members." *Id*. Thus, unlike here, the Commission ultimately *satisfied* its "duty of comparing the costs assessed against a party to the . . . benefits drawn by that party." *ICC I*, 576 F.3d at 477.

Next, the Commission urges that *Old Dominion Electric Cooperative v. FERC* is irrelevant. FERC Br. 44-46. But *ODEC* is a straightforward case and its principles are instructive. *See* 898 F.3d at 1260 ("Application of the cost-causation principle is simple here."). No

one denies that the scope in that case was two specific projects—rebuilds of aging transmission lines in Virginia. *Id.* at 1257. Analyses showed the projects would bring meaningful regional benefits, and that Dominion itself would receive less than 50 percent of the benefits. Accordingly, this Court rejected a plan for Dominion to pay the entire costs.

As this Court later noted, "For the two high voltage projects at issue, the entities paying all of the costs would enjoy less than half of the benefits, which we held amounted to a wholesale departure from the cost-causation principle." *LSP Transmission Holdings II, LLC v. FERC*, 45 F.4th 979, 995 (D.C. Cir. 2022). The same "wholesale departure" and "severe misallocation of the costs of such projects," is happening here, where the rest of Zone 10 is set to pay most of the costs of the Nixa assets for hardly any benefits. *ODEC*, 898 F.3d at 1261. Like this case, *ODEC* involved specific, identifiable assets, and specific, identifiable utilities bearing the cost.

Last, the Commission tries to distinguish *NPPD v. FERC*. The Commission contends that this case is "much more complicated" than

19

*NPPD*, largely because there was a "dominant entity" in existing zone 17 in that case.  FERC Br. 46-48.  The attack on *NPPD* fails.

To begin, the Commission does not dispute the law as stated in *NPPD*:  that it must evaluate cost causation by comparing the benefits *to a party* against the costs assessed to *that party*.  "FERC acknowledges that it must have an articulable and plausible reason to believe that the benefits of placing Tri-State in Zone 17 are at least roughly commensurate with the costs allocated *to NPPD and its customers*."  957 F.3d at 939-40 (emphasis added).

NPPD was the incumbent in Zone 17, and so the question was whether NPPD benefited from Tri-State's facilities in a way roughly commensurate with sharing their costs pro rata.  957 F.3d at 941.  The Commission, and later the Eighth Circuit, found roughly commensurate benefits based on facts all must concede are not present here: Tri-State and NPPD had built their facilities together, interconnected them in multiple locations, operated them as one, and relied on each other's facilities to reach their load.  *Id.* ("Because NPPD has greatly benefitted from Tri-State's facilities, it is likely that some of the costs have been

caused by NPPD."); JA411, Order P 100 (admitting that the "coordination" relied on in *NPPD* "does not exist here").

The "equivalent" to Tri-State and its facilities here is Nixa and the Nixa assets. An equivalent to NPPD's customers is the ARKMO Cities—incumbent customers in the zone whose costs will rise and who question whether the benefits are roughly commensurate to the cost shift. There is no support in *NPPD* or in the legal standard for the Commission's suggestion that NPPD's "dominant" position in Zone 17 had anything to do with the analysis. *Contra* FERC Br. 47. It does not warrant applying any different standard here.

The court in *NPPD* considered Tri-State's 300 miles of facilities as one whole because that was the scope of the proposal: to add Tri-State's facilities. *Contra* FERC Br. 47 (suggesting that the court did not disaggregate different assets across Tri-State's territory). Tri-State had 300 miles; Nixa has 10 miles.

The Commission made a key mistake here that it did not make in *NPPD.* The Commission lumped Nixa into Zone 10 and then assessed benefits zone-wide, explicitly including Nixa. It thus refused to

examine the cost shift (from Nixa onto the rest of Zone 10) and whether it was warranted.

But in *NPPD*, neither the Commission nor the Eighth Circuit made that mistake. They looked the cost shift in the face and found it warranted. All acknowledged that NPPD's rates would rise eight percent by adding Tri-State's facilities. They asked whether benefits to NPPD from the Tri-State facilities warranted the cost shift, and found the answer was yes. No one relied on Tri-State facilities' benefit to Tri-State as a reason why NPPD should pay for them. No one said that Zone 17 "as a whole" benefits because Tri-State's facilities serve and are essential to Tri-State. But that is exactly what happened here when the Commission suggested that Petitioners would have prevailed had they "demonstrated . . . that costs and benefits would be grossly disproportionate at the level of the zone as a whole." FERC Br. 49.

## II.  FERC's factual assessment of benefits does not support the cost shift here.

The Commission devotes the final sections of its brief to urging as a factual matter that the Nixa assets bring benefits to all of Zone 10—both Nixa and the rest.

To be clear, legal arguments (not factual ones) control the outcome

22

in this case.  The Commission's fatal omission here is that it never ruled below that any benefits from the Nixa assets to the *rest of Zone 10* warrant a cost shift of 89 percent of the Nixa assets' annual costs.  Nor does the Commission argue that now.  Thus, this Court should vacate and remand the Commission's orders for a proper analysis.

Even so, the factual arguments show how far the Commission is from finding sufficiently commensurate benefits to the rest of Zone 10 to justify this cost shift.  *See* FERC Br. 57-66.  The Commission failed to identify any real benefit that the Nixa assets provide to the rest of Zone 10 at all, much less benefits commensurate with paying almost all the costs of the Nixa assets.

## A.    Many of the key facts are undisputed.

It is undisputed that the City of Nixa relies heavily on the Nixa assets and receives tremendous benefits from them.  Indeed, Nixa planned and built the Nixa assets to serve itself.  Without them, Nixa would "go dark."  Accordingly, for many years, Nixa paid 100 percent of the costs of the Nixa assets.  No party disputes any of these facts.

No party disputes the cost shift at hand, either.  That is, under the Commission's orders, Nixa changed from paying 100 percent of the Nixa

23

assets' annual costs to 11 percent.  The other 89 percent, representing

$1.6 million in the first year, and a 22 percent rate increase, became the

responsibility of the rest of Zone 10.  Because of this, Nixa's overall

rates went down, and the rates for the rest of Zone 10 went up.  This

cost shift was the steepest rate increase in SPP zonal placement history.

Again, the Commission does not dispute any of these facts.  The

Commission offers only that the 22 percent rate increase *may* decline in

later years, FERC Br. 56, which hardly undermines the core facts here.

> **B.    This particular connection between two balancing
> authority areas may not benefit anyone, but if it does,
> it spreads a tiny benefit far beyond Zone 10.**

The Commission asserts that the Nixa assets bring redundancy

benefits to Zone 10 by providing an additional connection between two

"balancing authority" areas.  FERC Br. 60-62.  But any supposed

redundancy benefit is akin to a drop in a swimming pool.

The Commission's own record cites show that any such benefits

(the drop) are diluted equally over an area vastly larger than Zone 10.

*See* JA113-14, Tr. 1026-1027 (R.280) (agreeing that "the Nixa Assets

provide the same redundancy benefit to Zone 10 that they provide to the

Southwestern Power Administration and SPP balancing area

authorities"); JA266, GHP-0234REV at 14 ("The Nixa Assets also provide a redundancy benefit to both the SWPA and SPP BAAs by adding an additional path between the two areas."). The SPP balancing authority area is all of SPP, representing 19 zones (the swimming pool).[5] *See* JA232-33, Exh. ARK-63 at 2-3. No witness gave any reason to think that connecting two broad balancing authority areas would provide any more benefit to Zone 10 than any of the surrounding zones.

And those supposed redundancy benefits that are spread across a huge region are also tiny. After accounting for the fact that Nixa itself consumes nearly all power flows over the Nixa assets, the remaining available power flows are not significant enough to create redundancy benefits to anyone else anywhere (other than Nixa, which benefits from being directly connected to two balancing areas). JA314-15, ITO-38REV at 43-44 (Puga). "The miniscule power flows that Mr. Tsoukalis points to are not nearly sufficient to substitute for another transmission path between the SWPA and SPP Balancing Authority Areas and so do not provide the redundancy benefits" that the Commission now presses.

---

[5] *See* SPP.org, Consolidated Balancing Authority, https://spp.org/markets-operations/spp-portal/consolidated-balancing-authority/ (last visited Dec. 4, 2023).

JA314-15, *id.*  Redundancy benefits are an insignificant drop diluted in a very large swimming pool.

### C.    Grid stability, reliability, planning, and maintenance issues offer no specific benefits to Zone 10.

The Commission points to supposed "grid stability" enhanced by the Nixa assets.  FERC Br. 62-63.  Again, the Commission is grasps at straws.

Grid stability is a nearly nationwide benefit, not a reason for a slice of Missouri and Arkansas to foot this bill.  The Commission earlier acknowledged that benefits "general in nature and not specific to Zone 10 customers" would not warrant a cost shift onto Zone 10 alone.  JA72, Order Rejecting Contested Settlement at P 41.  Even now, the Commission concedes that these claimed "benefits might not accrue primarily to the specific petitioners."  FERC Br. 62.  Thus, the Commission does not appear to back away from its original assessment "that the evidence presented of reliability benefits to non-City of Nixa customers is limited," although Nixa itself would "go dark" without the Nixa assets.  JA396-97, Order P 69.

The Commission also brings up the "N-1-1" analysis.  FERC Br. 63.  But what the Commission says, and tacitly accepts, undermines its

position.  The Commission says that an expert found twelve N-1-1 contingencies "in which the Nixa assets reduce overload on nearby assets."  FERC Br. 63.

The Commission ignores that in the usual "one-element-out-of-service," or N-1, analysis, hundreds of scenarios found *zero* reliability benefits from the Nixa assets.  Op. Br. 29.

The Commission also does not dispute that the twelve contingencies it identifies are out of 38,000 scenarios.  So the Nixa assets help reduce overload somewhere in about 0.03 percent of *dual-outage* scenarios.  JA317, ITO-38REV at 67.

Last, the Commission ignores that even among those twelve scenarios, nearly all of the potentially overloaded assets would not be in Zone 10, but in Zone 3.  JA120, JA122, Tr. 1053, 1055 (R.280).  Indeed, only *one scenario* where there were two other facilities out at the same time as a Nixa outage during a time when the system is most taxed would slightly increase overload for one single facility in Zone 10.  JA122, Tr. 1055 ("Q. So you looked at 38,000 pairings, and out of those, in summer peak conditions, you came up with one increase of six percent overload for one facility in Zone 10.  Is that an accurate

27

summary?  A. That's fair.").  In the orders below, the Commission accepted that the "Nixa assets helped to address only one contingency within Zone 10, and even in that case they provided only a limited reliability benefit."  JA396-97, Order P 69.

The Commission argues that the Nixa assets benefit Zone 10 by offering future regional planning and maintenance benefits.  FERC Br. 62-64.  But the Commission still identifies no maintenance project anyone might have in the rest of Zone 10 that would require the Nixa assets.  Op. Br. 53.

In discussing future planning, the Commission returns to the Notice to Construct.  The Commission urges that the Nixa assets helped SPP diagnose a problem and efficiently fix it, and adds that a second upgrade project involved terminal upgrades.  FERC Br. 64.

But again, these problems fixed were problems on the Nixa assets themselves.  JA99, Tr. 905 (R.280) ("not only did our line [the Nixa assets] have to be upgraded, but so did the terminal equipment a couple years later . . . at the . . . Nixa substation").  Additionally, costs associated with the Notice to Construct were paid for under a different rate, not at issue in this case.  JA137-38, Tr. 1814-1815 (R.289) (Notice

28

to Construct costs are allocated through Schedule 11); JA397, Order P 70 ("The Schedule 11 costs associated with the Notice to Construct are not relevant to this proceeding").  Finally, the terminal upgrade, like the Notice to Construct, was done to strengthen and maintain the Nixa assets themselves.  JA99, Tr. 905 (R.280) (Holland).  These projects show no regional planning that would expand the benefits of the Nixa assets beyond Nixa.

### D.    There are no meaningful power flows through the Nixa assets to the rest of Zone 10.

Finally, the Commission suggests that there are "meaningful" power flows to the rest of Zone 10 from the Nixa assets.  FERC Br. 61.  The Commission also leans on this same analysis to support its assertion of "power transfer benefits."  FERC Br. 65 (calling power transfer benefits "substantiated by the same power-flow analysis").[6]  As

---

[6] The Commission says that it adopted by reference the Administrative Law Judge's findings on power transfer benefits.  FERC Br. 65.  But nothing in the Commission's orders that says that.  *Id.* (citing JA381, JA394, Order PP 35, 64).  The Commission *affirmed* the ALJ, JA394, Order P 64, but it provided several pages of its own reasoning.  Without clear adoption language, this Court should not look through Commission orders and on to the earlier ALJ's reasoning.  *Cf. Allegheny Power v. FERC*, 437 F.3d 1215, 1220 (D.C. Cir. 2006) (the Commission "affirmed the ALJ's roll-in order 'for the reasons stated by the ALJ'").  Doing so would only add complexity and confusion, and unmoor the

for power flow, the Commission contends that the Nixa assets "serve as many as 1,000 typical households" beyond Nixa itself.  FERC Br. 66 (in other places they hint that it might be 1,300 or 1,700).  There are at least two problems with this analysis.

First, this is just another way to say that less than 1/3 of 1 percent of power flows on the Nixa assets serve the rest of Zone 10.  The same witness, Tsoukalis, who produced all house-serving estimates conceded that the flow serving the rest of Zone 10 was 0.29 percent, representing between 261 and 1,073 houses served at peak to average load.  JA291, GHP-250 at 16; JA102, Tr. 993 (R.280) (Tsoukalis admitting that in his analysis none of the ARKMO Cities receive more than 1/3 of 1 percent of the power flows).  Repackaging 1/3 of 1 percent into service to a few hundred houses essentially means the Commission agrees on the minimal power-flow contributions of the Nixa assets represented by the

---

Commission's conclusions from the reasons it actually did give over several pages of its own analysis.  Power transfer benefits—if they are unique from the points already addressed—are stated by the Commission as a reason why Zone 10 should pay for the Nixa assets, but are never explained.  *See* JA394-98, JA410-11, Order PP 64-73, 99-101.

1/3 of 1 percent figure.  How this tiny benefit could warrant the cost shift here, the Commission never explains.

Second, equally important, the Commission ignores a key point: that the same analysis that yielded the "1,000 household" number *intentionally omitted* Nixa's households.  JA125, Tr. 1218 (R.281).  In the expert's own words: "If you were to run a shift factor analysis and look at, do the Nixa Assets support transfers that sink in the City of Nixa, if we made one of those sinks the City of Nixa, then 100 percent of the power would go there."  JA125, *id.*  Tsoukalis had to pull all of Nixa's households and industrial load out of the equation to show any service at all to the rest of Zone 10.

In sum, it is incorrect for the Commission to suggest that, on an ordinary basis, the Nixa assets serve a thousand or more homes in the rest of Zone 10.  And even if it were true, that still reflects at most a tiny 1/3 of 1 percent benefit being exchanged for a steep 22 percent rate increase.  *NPPD*, 957 F.3d at 941 ("FERC must articulate more benefits than … 'no benefits' or trivial benefits.").

If the amount of actual benefits the Commission found here to the rest of Zone is "roughly commensurate" with a cost shift of 89 percent,

31

involving $1.6 million and a 22 percent rate increase in the first year,

then "roughly commensurate" has lost all meaning.

## CONCLUSION

The Petition should be granted and the Commission's orders

vacated as contrary to law or arbitrary and capricious under the APA.

Dated:  December 15, 2023                    Respectfully submitted,

                                             */s/ Matthew A. Fitzgerald*

Robert A. Weishaar, Jr.                      Matthew A. Fitzgerald
MCNEES WALLACE & NURICK LLC                  MCGUIREWOODS LLP
1200 G Street NW, Suite 800                  Gateway Plaza
Washington, DC 20005                         800 East Canal Street
T: (202) 898-0688                            Richmond, VA 23219
bweishaar@mcneeslaw.com                      T: (804) 775-4716
                                             mfitzgerald@mcguirewoods.com

Kenneth R. Stark                             Noel H. Symons
MCNEES WALLACE & NURICK LLC                  Carrie Mobley
100 Pine Street                              MCGUIREWOODS LLP
Harrisburg, PA 17101                         888 16th Street NW, Suite 500
T: (717) 237-8000                            Washington, D.C. 20006
kstark@mcneeslaw.com                         T: (202) 857-2929
                                             nsymons@mcguirewoods.com
*Counsel for Paragould Light & Water*        cmobley@mcguirewoods.com
*Commission (d/b/a Paragould Light,*
*Water & Cable – PLWC), City of*
*Poplar Bluff Municipal Utilities,*          Patrick Smith
*Kennett Board of Public Works, City*        Corporate Counsel
*of Piggott-AR Municipal Light Water*        THE EVERGY COMPANIES
*& Sewer, and City of Malden-Board*          818 S. Kansas Ave, P.O. Box 889
*of Public Works*                            Topeka, KS 66601
                                             T: (785) 508-2574
                                             Patrick.Smith@evergy.com

Daniel E. Frank
Allison E. S. Salvia
EVERSHEDS SUTHERLAND (US) LLP
700 Sixth Street, NW, Suite 700
Washington, DC 20001-3980
T: (202) 383-0100
danielfrank@eversheds-
sutherland.com
allisonsalvia@eversheds-
sutherland.com

*Counsel for Western Farmers Electric
Cooperative*

Timothy T. Mastrogiacomo
Managing Attorney
XCEL ENERGY SERVICES INC.
701 Pennsylvania Ave NW, Suite 250
Washington, D.C. 20004
T: (202) 661-4481
tim.t.mastrogiacomo@xcelenergy.com

*Counsel for Xcel Energy Services Inc.
on behalf of its operating company
affiliate Southwestern Public Service
Company*

*Counsel for the Evergy
Companies and on behalf of all
Petitioners*
Shaun M. Boedicker
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue NW
Washington, D.C. 20036
T: (202) 429-3000
sboedicker@steptoe.com

*Counsel for American Electric
Power Service Corporation, on
behalf of its affiliates, Public
Service Company of Oklahoma
and Southwestern Electric Power
Company*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) because this brief contains 6,489 words, excluding the parts exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) because this brief has been prepared in a proportionally spaced 14-point Century Schoolbook font using Microsoft Word.

Dated:  December 15, 2023          */s/ Matthew A. Fitzgerald*
                                   Matthew A. Fitzgerald

                                   *Counsel for Petitioners*

## CERTIFICATE OF SERVICE

I hereby certify that on December 15, 2023, the foregoing was filed electronically with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system.  All participants in the case are registered CM/ECF users and the system will serve them.

Dated:  December 15, 2023          */s/ Matthew A. Fitzgerald*
                                   Matthew A. Fitzgerald

                                   *Counsel for Petitioners*

35