# In the United States Court of Appeals for the District of Columbia Circuit

### No. 23-1133

_____

PARAGOULD LIGHT & WATER COMMISSION, D/B/A PARAGOULD LIGHT, WATER & CABLE – PLWC, *et al.*,

*Petitioners,*

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent.*

_____

ON PETITION FOR REVIEW OF ORDERS OF THE FEDERAL ENERGY REGULATORY COMMISSION

_____

## BRIEF FOR RESPONDENT
## FEDERAL ENERGY REGULATORY COMMISSION

_____

Matthew R. Christiansen
General Counsel

Robert H. Solomon
Solicitor

J. Houston Shaner
Attorney

For Respondent
Federal Energy Regulatory
Commission
Washington, DC 20426

Final Brief: December 26, 2023

# CIRCUIT RULE 28(a)(1) CERTIFICATE

## A. Parties and Amici

The parties before this Court are identified in Petitioners' Rule 28(a)(1) certificate.

## B. Rulings Under Review

1. Order on Initial Decision, *Sw. Power Pool, Inc.*, 182 FERC ¶ 61,141 (Feb. 28, 2023), R.317, JA366–419 ("Affirming Order");

2. Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, *Sw. Power Pool, Inc.*, 183 FERC ¶ 62,048 (May 1, 2023), R.319, JA438–39; and

3. Order Addressing Arguments Raised on Rehearing, *Sw. Power Pool, Inc.*, 184 FERC ¶ 61,004 (July 7, 2023), R.322, JA440–60 ("Rehearing Order").

## C. Related Cases

This case has not previously been before this Court or any other court. Counsel is not aware of any related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

*/s/ J. Houston Shaner*
J. Houston Shaner

December 26, 2023

# TABLE OF CONTENTS

STATEMENT OF THE ISSUES .................................................................. 1

STATUTORY AND REGULATORY PROVISIONS ................................ 3

STATEMENT OF THE CASE .................................................................. 3

    I.    The Federal Power Act .......................................................... 3

    II.    Regional Transmission Organizations ................................. 5

    III.    The Southwest Power Pool and Its Pricing Zones ................. 8

    IV.    The City of Nixa and the Nixa Assets ................................. 12

    V.    The Proceedings Below ......................................................... 15

    VI.    The Challenged Orders ........................................................ 17

SUMMARY OF ARGUMENT ................................................................ 23

ARGUMENT ........................................................................................ 25

    I.    Standard of Review .............................................................. 25

    II.    The Commission Appropriately Applied the Cost
        Causation Principle .............................................................. 27

        A.    The Commission reasonably applied the cost
            causation principle to Zone 10 as a whole. .................. 28

        B.    The Commission reasonably rejected Petitioners'
            "proportionality" theory. ............................................ 31

        C.    No Court precedent compelled the Commission to
            override Southwest's zonal rate structure .................. 40

        D.    Prior agency proceedings did not compel the
            Commission to override Southwest's zonal rate
            structure. ...................................................................... 48

E.     No other reason compelled the Commission to override Southwest's zonal rate structure ................... 50

III.    The Commission Appropriately Assessed the Costs of Placing the Nixa Assets in Zone 10. ..................................... 53

IV.    The Commission Appropriately Assessed the Benefits of Placing the Nixa Assets in Zone 10. ................................... 57

A.     Petitioners mischaracterize the Commission's assessment of benefits. ................................................ 57

B.     Substantial record evidence supports the benefits of zonal placement. ......................................................... 59

CONCLUSION ......................................................................... 67

# TABLE OF AUTHORITIES

## Court Cases

*Ala. Elec. Coop., Inc. v. FERC,*
    684 F.2d 20 (D.C. Cir. 1982) ......................................... 5, 28, 34, 36

*Allegheny Power v. FERC,*
    437 F.3d 1215 (D.C. Cir. 2006)....................................................... 65

*Ameren Servs. Co. v. FERC,*
    893 F.3d 786 (D.C. Cir. 2018)......................................................... 33

*Cities of Bethany v. FERC,*
    727 F.2d 1131 (D.C. Cir. 1984)....................................................... 52

*Coal. of MISO Transmission Customers v. FERC,*
    45 F.4th 1004 (D.C. Cir. 2022) ...................................................... 29

*Columbia Gas Transmission Corp. v. FERC,*
    477 F.3d 739 (D.C. Cir. 2007)........................................................ 27

*Consol. Edison of N.Y., Inc. v. FERC,*
    45 F.4th 265 (D.C. Cir. 2022) ...................................... 35, 39, 44, 51

*Constellation Mystic Power, LLC v. FERC,*
    45 F.4th 1028 (D.C. Cir. 2023) ................................................ 25, 26

*Del. Div. of Pub. Advoc. v. FERC,*
    3 F.4th 461 (D.C. Cir. 2021) .......................................................... 26

*Del. Riverkeeper Network v. FERC,*
    45 F.4th 104 (D.C. Cir. 2022) ...................................... 26, 59, 64, 66

*FCC v. Prometheus Radio Project,*
    141 S. Ct. 1150 (2021) .................................................................. 35

*FERC v. Elec. Power Supply Ass'n,*
    577 U.S. 260 (2016) ....................................................... 26, 27, 56

*FirstEnergy Serv. Co. v. FERC,*
    758 F.3d 346 (D.C. Cir. 2014) ......................................... 37

*Fla. Mun. Power Agency v. FERC,*
    315 F.3d 362 (D.C. Cir. 2003) ..................................... 9, 30

*Ill. Com. Comm'n v. FERC,*
    576 F.3d 470 (7th Cir. 2009) ("*Illinois I*") ..................... 7, 40, 41, 42

*Ill. Com. Comm'n v. FERC,*
    721 F.3d 764 (7th Cir. 2013) ("*Illinois III*") ................................ 8, 42

*Ill. Com. Comm'n v. FERC,*
    756 F.3d 556 (7th Cir. 2014) ("*Illinois II*") ............... 8, 40, 41, 42, 43

*In re Permian Area Rate Cases,*
    390 U.S. 747 (1968) .................................................... 4, 5

*KN Energy, Inc. v. FERC,*
    968 F.2d 1295 (D.C. Cir. 1992) .................................. 28, 31

*Long Island Power Auth. v. FERC,*
    27 F.4th 705 (D.C. Cir. 2022) ........................... 28, 37, 43

*LSP Transmission Holdings II, LLC v. FERC,*
    45 F.4th 979 (D.C. Cir. 2022) ........................................ 46

*Metro. Wash. Airports Auth. Pro. Fire Fighters Ass'n Loc. 3217*
    *v. United States,* 959 F.2d 297 (D.C. Cir. 1992) ............................ 28

*Midwest ISO Transmission Owners v. FERC,*
    373 F.3d 1361 (D.C. Cir. 2004) .................................... 5, 6

*Morgan Stanley Cap. Grp. Inc. v. Pub. Util. Dist. No. 1 of Snohomish*
    *Cty., Wash.,* 554 U.S. 527 (2008) ....................................... 4

*Nat'l Pork Producers Council v. Ross,*
    598 U.S. 356 (2023) ............................................... 40, 46

*Neb. Pub. Power Dist. v. FERC,*
    957 F.3d 932 (8th Cir. 2020) ..................................... 7, 9, 42, 47, 52

*Old Dominion Elec. Coop. v. FERC,*
    898 F.3d 1254 (D.C. Cir. 2018)................................. 5, 28, 44, 45, 52

*Pub. Serv. Elec. & Gas Co. v. FERC,*
    989 F.3d 10 (D.C. Cir. 2022) ........................................................28

*Reiter v. Sonotone,*
    442 U.S. 330 (1979) ......................................................................40

*S.C. Pub. Serv. Auth. v. FERC,*
    762 F.3d 41 (D.C. Cir. 2014) ..................................................29, 39

*Sithe/Indep. Power Partners, L.P. v. FERC,*
    285 F.3d 1 (D.C. Cir. 2002) ....................................................35, 36

*Transmission Access Pol'y Study Grp. v. FERC,*
    225 F.3d 667 (D.C. Cir. 2000)........................................................10

*W. Area Power Admin. v. FERC,*
    525 F.3d 40 (D.C. Cir. 2008) ........................................................29

*W. Mass. Elec. Co. v. FERC,*
    165 F.3d 922 (D.C. Cir. 1999)....................................................6, 30

**Administrative Cases**

*Indicated SPP Transmission Owners v. Sw. Power Pool, Inc.,*
    162 FERC ¶ 61,213 (2018) ("Complaint Order") ......... 11, 12, 49, 52

*N.Y. Indep. Sys. Operator, Inc.,*
    136 FERC ¶ 61,165 (2011) ............................................................63

*Nat'l R.R. Passenger Corp. v. PPL Elec. Utils. Corp.,*
    171 FERC ¶ 61,237 (2020) ......................................................10, 31

*PJM Interconnection, LLC,*
    Opinion No. 494, 119 FERC ¶ 61,063 (2007)................................52

*S. Cent. MCN LLC*,
162 FERC ¶ 61,214 (2018) ............................................................. 14

*S. Co. Servs., Inc.*,
116 FERC ¶ 61,247 (2006) ............................................................. 30

*Sw. Power Pool, Inc.*,
163 FERC ¶ 61,109 (2018) ...................................................... 48, 55

*Sw. Power Pool, Inc.*,
166 FERC ¶ 61,019 (2019) ............................................................. 48

## Statutes

Administrative Procedure Act

5 U.S.C. § 706 ............................................................................. 26

Federal Power Act

16 U.S.C. § 824d ........................................................ 1, 3, 4, 38, 55

16 U.S.C. § 824e ................................................................... 4, 37

## Regulations

18 C.F.R. § 35.2 ............................................................................. 4

Regional Transmission Organizations,
65 Fed. Reg. 810 (Jan. 6, 2000) ("Order 2000") ................. 6, 7, 8, 39

## Other Authorities

*Fast Facts*, SW. POWER POOL (2022),
https://www.spp.org/about-us/fast-facts/ ........................................ 9

# GLOSSARY

| | |
|---|---|
| Affirming Order | Order on Initial Decision, *Sw. Power Pool, Inc.*, 182 FERC ¶ 61,141 (Feb. 28, 2023), R.317, JA366–419 |
| Br. | Opening brief for Petitioners |
| City or Nixa | The City of Nixa, Missouri |
| Commission or FERC | Respondent Federal Energy Regulatory Commission |
| Complaint Order | Order Denying Complaint, *Indicated SPP Transmission Owners v. Sw. Power Pool, Inc.*, 162 FERC ¶ 61,213 (Mar. 15, 2018) |
| GridLiance | GridLiance High Plains, LLC |
| Initial Decision | Initial Decision, *Sw. Power Pool, Inc.*, 177 FERC ¶ 63,021 (Dec. 6, 2021), R.293, JA139–227 |
| Nixa Assets | A set of transmission facilities proposed for inclusion in Southwest Zone 10 and comprised of approximately 10.82 miles of transmission lines, plus associated equipment |
| P | Paragraph in a FERC order |
| Presiding Judge | The Presiding Administrative Law Judge in the proceedings below |
| R. | Record item number in the Certified Index to the Record |

## GLOSSARY

Remand Order

Order Rejecting Contested Settlement, *Sw. Power Pool, Inc.*, 174 FERC ¶ 61,116 (Feb. 18, 2021), R.163, JA54–75

Rehearing Order

Order Addressing Arguments Raised on Rehearing, *Sw. Power Pool, Inc.*, 184 FERC ¶ 61,004 (July 7, 2023), R.322, JA440–60

Southwest

Intervenor for Respondent Southwest Power Pool, Inc.

Tariff

Southwest's Open Access Transmission Tariff, Sixth Rev. Vol. No. 1

# In the United States Court of Appeals for the District of Columbia Circuit

### No. 23-1133

———————

PARAGOULD LIGHT & WATER COMMISSION, D/B/A PARAGOULD LIGHT, WATER & CABLE – PLWC, *et al.*,

*Petitioners*,

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent.*

———————

ON PETITION FOR REVIEW OF ORDERS OF THE FEDERAL ENERGY REGULATORY COMMISSION

———————

## BRIEF FOR RESPONDENT FEDERAL ENERGY REGULATORY COMMISSION

———————

## STATEMENT OF THE ISSUES

This case concerns the ratemaking process for bulk electric power transfers. The Federal Energy Regulatory Commission ("Commission" or "FERC") must ensure, under the Federal Power Act, that such rates are "just and reasonable." 16 U.S.C. § 824d(a). That is far from a self-executing standard. Rates must reflect some alignment of costs and benefits from the power services provided. But there is a diverse array of potential benefits, some not easily measured, and the Commission

must simultaneously consider how rate designs fit with its other objectives, including the gradual integration of the nation's transmission infrastructure under non-profit Regional Transmission Organizations.

The specific rates here arise from the placement of certain transmission facilities ("Nixa Assets") near the City of Nixa, Missouri, into one of the geographic pricing zones administered by the multi-state Southwest Power Pool, Inc. ("Southwest").  Each Southwest zone sets rates that reflect a customer's use of the collection of transmission assets in that zone, but not necessarily its use of any single asset.  With that structure in mind, the Commission found that the Nixa Assets would provide several benefits to Southwest Zone 10, most notably through deeper integration and shared value.

Petitioners, a mix of Zone 10's incumbent municipal customers and large transmission owners from other zones, opposed inclusion of the Nixa Assets.  They demanded that any change show clear net benefits to each of them—without regard for shared benefits to the City of Nixa or the zone more generally.  The Commission, after hearings and record development before an Administrative Law Judge, rejected

that demand as an unnecessarily strict view of the Federal Power Act and as unworkable with the administrative structure of Southwest's zone-based rates.

Thus, the issues presented are:

1. Did the Commission, in affirming the findings of the Presiding Judge after evidentiary hearings, act reasonably in assessing the costs and benefits of the Nixa Assets at the level of the Southwest pricing zone?

2. Were the Commission's findings on the benefits of the Nixa Assets supported by substantial record evidence?

## STATUTORY AND REGULATORY PROVISIONS

Pertinent statutes and regulations are contained in the Addendum to this brief.

## STATEMENT OF THE CASE

### I. The Federal Power Act

The Federal Power Act requires all rates for wholesale electricity transactions to be "just and reasonable," a requirement the Commission is charged to enforce.  16 U.S.C. § 824d(a).  The Commission fulfills this

duty in part by reviewing tariffs[1] and contracts submitted to it by regulated utilities. *Id.* § 824d(c)–(d). The Commission may also review rates "upon its own motion or upon complaint." *Id.* § 824e(a).

Determining whether a rate is "just and reasonable" is no simple task, and the Commission must necessarily "reconcil[e] diverse and conflicting interests." *In re Permian Area Rate Cases*, 390 U.S. 747, 767 (1968). Often that means balancing the interests of electricity consumers, favoring lower rates, against suppliers, who must receive enough of a return to attract investment. *See Morgan Stanley Cap. Grp. Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cnty., Wash.*, 554 U.S. 527, 532 (2008). Other times, the Commission must consider administrative burdens, including how finely it can calibrate rates for a body of regulated entities. *See, e.g.*, *In re Permian Area Rate Cases*, 390 U.S. at 756–61, 776–77 (noting considerations of feasibility and practicality supporting area-wide rates for gas producers).

One consistent guide is the cost causation principle, which holds that "the rates charged for electricity should reflect the costs of

---

[1] A tariff is a document setting forth "generally applicable" rates, as opposed to rates in a bilateral contract. 18 C.F.R. § 35.2(c)(1).

providing it." *Old Dominion Elec. Coop. v. FERC*, 898 F.3d 1254, 1255 (D.C. Cir. 2018) (citing *Ala. Elec. Coop., Inc. v. FERC*, 684 F.2d 20, 27 (D.C. Cir. 1982)).  Ideally, rates do so by allocating costs "against a party to the burdens imposed or benefits drawn by that party." *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1368 (D.C. Cir. 2004).  But that precise of an allocation is "little more than an ideal." *Ala. Elec. Coop.*, 684 F.2d at 27.  Cost allocation is instead "much less a science than an art," in no small part because "[c]ost itself is an inexact standard and may, in a particular set of circumstances, serve as the basis for several different rates." *Id.*  Ultimately, the cost-benefit distribution must fall within a "zone of reasonableness." *Id.* (quoting *In re Permian Area Rate Cases*, 390 U.S. at 797).

## II.    Regional Transmission Organizations

Over two decades ago, the Commission began a campaign to improve competition and efficiency on the nation's interstate electric grid, and, to that end, it encouraged electric utilities to join Regional Transmission Organizations.  *See Midwest ISO Transmission Owners*, 373 F.3d at 1364–65.  To join, a utility would cede operational control of its transmission facilities to the organization, which would manage the

facilities of its members as a single, integrated system. *See id.* at 1364. The organization would then provide non-discriminatory access to customers through rates set by a single, region-wide tariff. *Id.*

The Commission expected several benefits from this regional grid integration: better competition, better operational efficiency, better planning, better maintenance coordination, better reliability, and less discriminatory access to transmission service. *See id.* The Commission, like this Court, presumed that improvements to an integrated grid benefited all users of that grid, even enough to "roll in" the costs of such improvements over system-wide rates. *See, e.g.*, *W. Mass. Elec. Co. v. FERC*, 165 F.3d 922, 927–28 (D.C. Cir. 1999). In fact, the benefits of integration might lower rates over time, so the Commission adopted the "objective" (but not a mandate) for "all transmission-owning entities in the Nation, including non-[regulated] utility entities, to place their transmission facilities under the appropriate" regional organization. Regional Transmission Organizations, 65 Fed. Reg. 810, 811 (Jan. 6, 2000) ("Order 2000").

Because the Regional Transmission Organization charges standardized rates through a single tariff, those rates will almost never

perfectly follow the benefits to each individual entity. *See id.* at 916 ("A single access rate would mean that the customers of low-cost transmission providers would see a rate increase and high-cost transmission providers would be concerned about not meeting their revenue requirements."). In other words, regional integration carries "the potential for cost shifting . . . ." *Id.* Public input overwhelmingly identified "license plate rates" as the best accommodation for this issue. *See id.* at 916–17.

License plate rates group the regional organization into geographic pricing zones, and "customers in each zone pay rates based on the cost of transmission facilities in that zone." *Neb. Pub. Power Dist. v. FERC*, 957 F.3d 932, 934 (8th Cir. 2020). This structure represents a middle path between two extremes. On the one hand, rates might be set uniformly across a regional organization spanning several states. But the potential disparity in benefits grows at the region-wide level, so the potential for cost shifts is aggravated. *See, e.g.*, *Ill. Com. Comm'n v. FERC*, 576 F.3d 470, 476 (7th Cir. 2009) ("*Illinois I*") (finding a regional organization-wide rate unreasonable where costs exceeded benefits by $479 million for at least one member). On the

"opposite extreme," rates might take a "'beneficiary pays' approach" and try to match costs exactly to benefits received. *Ill. Com. Comm'n v. FERC*, 756 F.3d 556, 560 (7th Cir. 2014) ("*Illinois II*"). That approach, however, must first be feasible—an especially thorny issue when many of the benefits from regional integration are not directly quantifiable, or when the Regional Transmission Organization expands to ever more members and infrastructure. *Cf. Ill. Com. Comm'n v. FERC*, 721 F.3d 764, 774–75 (7th Cir. 2013) ("*Illinois III*") (sustaining rates where benefits were multi-faceted and difficult to quantify, and costs could not be allocated "in exact proportion" to each utility). License plate rates try to avoid the worst of these extremes: The relative proximity of zones avoids the largest cost shifts but also recognizes the need for administrative efficiency. *Cf.* Order 2000, 65 Fed. Reg. at 917 (concluding that, "although license plate rates are not necessarily an ideal method for fixed cost recovery," nothing shows they "produce[] significant harms . . . .").

## III. The Southwest Power Pool and Its Pricing Zones

Southwest is a large Regional Transmission Organization with members in fifteen states across the central part of the country,

approximately 72,000 miles of transmission assets, and half-a-million square miles of service territory.[2] Like other Regional Transmission Organizations, Southwest has adopted its own license plate-style pricing zones. *See, e.g.*, *Neb. Pub. Power Dist.*, 957 F.3d at 934. Southwest began with fifteen pricing zones when it first received approval as a Regional Transmission Organization in 2004; by 2017, Southwest had grown to eighteen zones, many of which embraced multiple transmission-owning members. *See* Sw. Submission of Tariff Revisions 8 n.38, R.1, JA8.

Southwest's Tariff offers "network service,"[3] which allows a customer to meet its power demand, called "load," from generators or transmission providers located anywhere on the transmission network. *See Fla. Mun. Power Agency v. FERC*, 315 F.3d 362, 363 (D.C. Cir. 2003). In effect, this treats the grid as a single, integrated system. *See id.* Customers benefit from the ability to seek cheaper, cleaner, or

---

[2] *Fast Facts*, SW. POWER POOL (2022), https://www.spp.org/about-us/fast-facts/.

[3] The Tariff formally refers to network service as "Network Integration Transmission Service." *See, e.g.*, Affirming Order P 3, JA367.

otherwise more preferable power from resources much farther afield than their local monopoly. *Transmission Access Pol'y Study Grp. v. FERC*, 225 F.3d 667, 681, 724–25 (D.C. Cir. 2000).

But since customers receive the benefits of the full network, the Commission has long required that they pay for their full load, too. *See id.* at 724–25. This cost allocation, known as "load ratio" or "load ratio share" pricing, does not permit customers to pay only for their actual use of network resources (if, for example, they meet some of their load with their own private power generation). *See id.* at 725–26; *see also Nat'l R.R. Passenger Corp. v. PPL Elec. Utils. Corp.*, 171 FERC ¶ 61,237 PP 40–43 (2020). Network service, then, assumes integration of the supply *and* demand sides of the grid.

The network-service rates for Southwest's pricing zones follow this model. On the supply side, Southwest determines the annual revenue required to support each transmission owner's assets within the zone; these individual revenue requirements are then added together to form a zone-wide annual revenue requirement. *See* Sw. Submission of Tariff Revisions 2, JA2. On the demand side, each customer's load ratio is calculated as a fraction of the zone's total load. *E.g.*, Affirming Order

P 3, JA366–67.  That load ratio is then multiplied by the zone-wide transmission revenue requirement, producing the customer's "load ratio share."[4]  *Id.*  This method weighs the customer's total use of the zone's assets against the total costs of those assets.

This rate structure was the focus of an earlier, unsuccessful challenge.  Shortly before the events giving rise to this case, a group of incumbent transmission owners (including nearly all of the transmission-owning Petitioners here) filed a complaint against Southwest with the Commission.  *See Indicated SPP Transmission Owners v. Sw. Power Pool, Inc.*, 162 FERC ¶ 61,213 P 1 (2018) ("Complaint Order").  These incumbents effectively sought to prohibit the addition of any new transmission owners to existing zones.  *See id.* P 3.  A new transmission owner would almost never add revenue requirements and additional load in exact proportion to the zone's existing ratio, so rates would rise for someone (either the incumbent customers or the new customers).  *Id.*  This result, according to the

---

[4] The load ratio share is then divided by twelve to produce a monthly demand charge.  *See, e.g.*, Rehearing Order P 16, JA449–50.

complainants, was inherently unjust and unreasonable because some cost shift would occur. *See id.* PP 3–4.

The Commission issued a 2018 order ("Complaint Order") denying the complaint. *Id.* P 60. Cost shifts, the Commission explained, are not *per se* unjust and unreasonable; they might be justified on a case-by-case basis by the benefits of a new addition, just as the Commission had held in past decisions. *Id.* PP 61–69. The Commission therefore preserved the complainants' opportunity to challenge individual zonal additions "based on case-specific facts and circumstances." *Id.* P 73.

## IV. The City of Nixa and the Nixa Assets

The City of Nixa is located near Springfield, Missouri, and operates its own electric utility. *See* Joint Stipulation of Facts 3, JA29. Near the City are the Nixa Assets, which consist primarily of ten miles of transmission lines. *Id.* at 4–5, JA30–31. As shown in Figure 1 below, these lines link the infrastructure of Southwest Zones 3 and 10. Ex. GHP-0234REV 5 fig.1, R.296, JA257. More specifically, they connect transmission facilities of the federal Southwestern Power Administration in Zone 10 with those of the City Utilities of Springfield in Zone 3, including the latter's James River Power Station. *Id.* They

also thereby connect the territories of the neighboring "balancing authorities" charged with maintaining grid stability in each area. *Id.* at 4, JA256. Along the way, the Nixa Assets also connect to substations serving the City of Nixa's customer load. *Id.* at 5 fig.1, JA257.



**Figure 1: Diagram of the Nixa Assets and Surrounding Area**

Like many other utilities in the footprint of Zone 10, the City of Nixa originally purchased transmission service directly from the Southwestern Power Administration. *See* Ex. SPP-001 8–9, R.296, JA322–23. The City converted to Southwest Power Pool's network service in mid-2017, however, and Southwest added the City's load to Zone 10, the only option allowed by the Tariff. *See id.* at 15–16, JA329–30. The City then began paying Zone 10 rates for network service based on its load share ratio. *See* Rehearing Order P 17 n.56, JA450. Other transmission customers in the Zone 10 footprint, comprising substantial amounts of load, were also expected to convert to Southwest's network service as their contracts with the Southwestern Power Administration expired. *See* Ex. SPP-001 20–21, JA334–35; *see also* Sw. Submission of Tariff Revisions 12, JA12. To that point, Zone 10 customers had funded only a small fraction of the Southwestern Power Administration transmission system they used. *See* Sw. Submission of Tariff Revisions 11–12, JA11–12.

In the same period, the City agreed to sell the Nixa Assets to GridLiance High Plains LLC ("GridLiance"), an independent transmission owner. *See S. Cent. MCN LLC*, 162 FERC ¶ 61,214 P 1

(2018).[5]  The Commission approved that sale in 2018.  *See id.*  In anticipation of that approval, Southwest filed with the Commission Tariff revisions that would incorporate the Nixa Assets into Zone 10.  *See* Sw. Submission of Tariff Revisions 1–2, JA1–2.  Thus began this case.

## V.    The Proceedings Below

The municipal Petitioners, the transmission-owning Petitioners, and others intervened.  *See, e.g.*, ARKMO Mot. to Intervene 1, JA24.  The parties proceeded to a three-day hearing in March 2019, and, by mid-2019, GridLiance and the municipal Petitioners reached a settlement in principle.  *See* Joint Mot. 1, JA40.  The transmission-owning Petitioners, however, contested the settlement.  *See* Remand Order P 13, JA58.  The Commission rejected that settlement in an order ("Remand Order") remanding the proceedings to an Administrative Law Judge.  *See id.* P 46, JA74.  The Commission found the record lacking because there was "insufficient evidence" to determine either the cost shifts or the benefits of placing the Nixa Assets into Zone 10.  *See id.* P

---

[5] GridLiance formerly operated as South Central MCN LLC. Initial Decision P 13 n.17, JA146.

40, JA71–72.  The Commission then remanded the matter for the Judge to determine if "customers as a whole within Zone 10 will benefit from the Settlement."  *Id.* P 43, JA72.

After another round of hearing and briefs, the Presiding Judge issued the Initial Decision.  He first found a cost shift of $1.8 million, equal to the annual revenue requirement for the Nixa Assets added to Zone 10 rates.  Initial Decision P 77, JA167–68.  This measure included that part of the revenue requirement that would be paid by the City of Nixa, since it was now a Zone 10 customer, too.  *Id.* PP 80–82, JA169–70.  He next found substantial and specific benefits to Zone 10 customers.  *Id.* P 122, JA185.

"Most compelling" were "integration benefits" identified by Southwest and GridLiance witnesses, including better "joint planning and coordination of maintenance" in Zone 10.  *Id.* PP 123–24, JA186.  Next was a reliability benefit; here, the Presiding Judge credited testimony of a GridLiance witness who explained that the Nixa Assets helped Zone 10 address "N-1-1 contingencies," an electric industry term for the sequential loss of two facilities.  *Id.* P 125, JA187.  Third, the Nixa Assets "facilitate[d] power transfers" within Zone 10 and between

Zone 10 and neighboring areas. *Id* P 126, JA188. Technical analysis by a GridLiance expert demonstrated this benefit, and the Presiding Judge found that analysis credible against attempts to mitigate it. *Id.* While these benefits could not be easily quantified, *id.* P 131, JA191, they still justified the cost shift caused by adding the Nixa Assets, *id.* P 153, JA199. The proposed Tariff revisions were thus just and reasonable. *Id.* P 206, JA223.

The municipal and transmission-owning Petitioners each filed exceptions to the Initial Decision with the Commission.

## VI. The Challenged Orders

The Commission unanimously affirmed the Presiding Judge's Initial Decision, agreeing that adding the Nixa Assets to Southwest Zone 10 is consistent with the cost causation principle and therefore "just and reasonable." Affirming Order P 11, JA371. The Commission first rejected Petitioners' calls to frame costs solely in terms of those paid by Zone 10 customers other than the City of Nixa. *Id.* P 30, JA379. Since the City joined Zone 10 as a network-service customer before the Nixa Assets were added, the City would pay higher zonal rates along with other customers; completeness thus required consideration of its

higher rates, too. *Id.* The Commission also rejected calls to frame costs as a percentage increase in rates. *Id.* P 32, JA380. Although such percentages could be relevant to cost causation, the Commission did not need to rely on them here since it had clear evidence on the dollar amount of the cost shift. *Id.* The Commission therefore affirmed the finding of a $1.8 million cost shift. *Id.* P 29, JA379.

The Commission also affirmed the Presiding Judge's finding of integration, reliability, and power-transfer benefits. *Id.* P 64, JA394. As with costs, the Commission rejected arguments to exclude benefits to the City of Nixa, now a Zone 10 customer. *Id.* P 65, JA394–95. The Remand Order, in fact, had called for assessing benefits to Zone 10 as a whole, including the City. *Id.* P 66, JA395.

Like the Presiding Judge, the Commission found compelling integration benefits to Zone 10. *Id.* P 67, JA395–96. Customers could directly use the Nixa Assets in network service, and the same assets created redundant paths for power flows "to serve load or access the market." *Id.* Those flows were supported by the technical analysis of GridLiance's expert witness, on which the Presiding Judge had relied to

find power transfer benefits. *See id.* P 67 & n.193, JA395 (citing Initial Decision P 100, JA178); *see also* Initial Decision P 126, JA188.

The Nixa Assets also tied together both Southwest pricing zones and neighboring balancing authorities. *Id.* P 67, JA395–96. Zone 10 facilities could now be "'planned more effectively and operated more reliably'" with the Nixa Assets under Southwest's control. *Id.* (quoting GridLiance Br. Opposing Exceptions 39). Southwest could also better coordinate maintenance outages of Zone 10 assets. *Id.* P 68, JA396. All of these benefits "improve[d] the ability of [Southwest] to serve *all* of the customers of Zone 10," not just the City of Nixa. *Id.* (emphasis added).

To illustrate these benefits, the Commission pointed to the "Notice to Construct project." *Id.* P 70, JA397. While the City of Springfield operated the James River Power Plant just north of Nixa, Zone 10 customers enjoyed a phenomenon called "counterflow" preventing overload of their transmission system. *Id.* But the Power Plant had retired its generating units, and Southwest, through the Notice to Construct project, ordered upgrades to fill the gap. *Id.* It was able to do

so thanks in part to control over the Nixa Assets; alternative upgrades would have been less efficient. *Id.*

Beyond integration, the Nixa Assets also improved the reliability of the Zone 10 grid. *Id.* P 69, JA396–97. That was especially true for the reliability of power flows to the City of Nixa. *Id.* Reliability benefits to the rest of Zone 10 were real but more "limited." *Id.*

Given this suite of benefits, the Commission affirmed "the Presiding Judge's finding that the benefits from the Nixa Assets justify the costs of their inclusion into Zone 10." *Id.* P 99, JA410. More specifically, the Commission concluded that, "based upon the evidence presented as a whole, the benefits to Zone 10 customers from the Nixa Assets are roughly commensurate with their costs . . . ." *Id.* P 101, JA411. This conclusion rested "mostly on the extensive integration benefits . . . to Zone 10 customers"—benefits similar to those that had justified the Commission's long-time policy of "rolling in" the costs of network facilities to network-wide rates. *Id.* P 101 & n.302, JA411–12. In fact, the integration benefits alone were substantial enough to justify the costs of the Nixa Assets. *Id.* P 102, JA412. That justification was reinforced by the "reliability and power transfer benefits to the

customers of Zone 10 and the City of Nixa in particular . . . ." *Id.* P 101, JA411. The proposed rates were therefore consistent with the Federal Power Act's "just and reasonable" standard. *Id.* P 115, JA417.

In reaching this result, the Commission rejected Petitioners' argument that the law required what they called "roughly proportionate" benefits. *Id.* P 103, JA412. While that label might sound simple, it masks a complex demand: To Petitioners, "any facility [must] provide[] *all* other customers in a zone with benefits proportionate to their load-ratio share before its costs could be included in zonal rates . . . ." *Id.* (emphasis added). But that, the Commission said, was "a nearly impossible task and contrary to the purpose of zonal rates in the first place." *Id.*

The Petitioners nonetheless doubled down on "rough proportionality" in their application for agency rehearing. That framework, they said, "is the only meaningful way to view cost causation" in this case. Reh'g Req. 14, JA433. In particular, the Commission had to exclude the City of Nixa, a Zone 10 customer, from any consideration of costs or benefits; the proper focus was the individual Petitioners. The Commission had, for instance, "first err[ed]

by considering benefits to Nixa" rather than focusing solely on other Zone 10 customers, namely, Petitioners. *Id.* at 28, JA436. "The subsequent errors" by the Commission "stem[med] largely from that first error." *Id.* Similarly, even costs paid by Nixa had to be excluded— only the proportion paid by Petitioners should matter. *See id.* at 11, JA431. Petitioners' conception of "proportionality" was the only means to consider non-quantifiable benefits, too. *Id.* at 26, JA435.

The Commission rejected this theory. *See* Rehearing Order P 16, JA449. As the Commission explained, Petitioners' theory "does not square with the existing zonal rate construct" built into Southwest's Tariff, *id.*, which "does not attempt to measure each transmission customer's benefit from each transmission asset included in the zonal" revenue requirement, *id.* P 17, JA450. Southwest had never required such a granular demonstration for the assets primarily used by the municipal Petitioners or the assets owned by the other Petitioners. *Id.* P 20 & n.62, JA451–52. To require that now would effectively "unravel" Southwest's zonal structure in favor of innumerable asset-specific zones, *id.* P 18, JA450–51, plus treat the City of Nixa unfairly

compared to customers who entered Zone 10 earlier, *id.* P 20 & n.61, JA451–52.

Zonal rates, instead, are aimed at costs and benefits on the "aggregate level" of the zone—the compromise position long motivating zonal or license plate rates. *Id.* P 17, JA450. These rates ensure the customer receives "roughly commensurate benefits" from the collection of transmission across the zone was a whole. *Id.*

Petitioners sought relief from this Court.

## SUMMARY OF ARGUMENT

This case turns largely on one question: At what level of granularity or generality must the Commission compare costs and benefits when determining whether a rate is "just and reasonable" under the Federal Power Act? This dispute arose from a proposed placement in one of Southwest's geographic pricing zones, and the Commission, following evidentiary hearings, agreed with the Presiding Judge that a zone-wide approach is appropriate. That choice ensured Southwest customers pay rates that are roughly commensurate to their use of the total set of assets in a zone, and cost causation principles demand no more than that degree of relationship.

Petitioners would have the Court upend not only the Commission's decision but the entire premise on which many other Southwest rates, and those of other Regional Transmission Organizations, are founded. In their view, rates violate the cost causation principle unless they correspond to each customer's specific usage of each transmission asset. The Commission rightly rejected that approach, which would be entirely infeasible. Southwest's zonal rates do not attempt such an individualized, asset-specific matching of costs and benefits; the sheer number of rates needed for each customer-facility pairing would be impractical. In this case, it would also mean discriminatory treatment of the smallest and newest entrants to the Southwest organization—a clear signal to other potential entrants to stay out.

Courts have never laid down a rule of law mandating Petitioners' preferred approach. Nor has the Commission, against the backdrop of a zonal placement of facilities, ever required Petitioners' degree of granularity; the Commission's orders reasonably chose the zone as the level of analysis. Nothing else compels customer- and facility-specific analysis.

Resolving this question of law disposes of most of this case. The lack of customer- and facility-specific framing undergirds Petitioners' chief complaint against the Commission's view of the cost shift, and that leaves them only to quibble about the Commission's use of a dollar figure that was a more conservative and less speculative choice than the rate-increase percentage they demand.

Their criticisms of the Commission's benefit findings also require extreme granularity whenever they demand exclusion of benefits to the City of Nixa—and even when they attempt to reframe the Commission's own findings about non-Nixa benefits. That leaves them with only the option of disputing the evidentiary foundations of the zone-wide benefits. But substantial-evidence review does not let them weigh the evidence; it instead defers to the reasonable inferences from the record drawn by the Commission and the Presiding Judge.

## ARGUMENT

### I.    Standard of Review

"This Court will set aside a Commission order found to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Constellation Mystic Power, LLC v. FERC*, 45

F.4th 1028, 1042 (D.C. Cir. 2023) (quoting 5 U.S.C. § 706(2)(A)). "The scope of review under the 'arbitrary and capricious' standard is narrow;" the Court does not ask "whether a regulatory decision is the best one possible or even whether it is better than the alternatives." *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 292 (2016) (cleaned up). Instead, the Court's task is "limited to ensuring the Commission can demonstrate that its decision is supported by substantial evidence in the record and 'articulate[s] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Constellation Mystic Power*, 45 F.4th at 1042 (alteration in original) (citation omitted) (quoting *Del. Div. of Pub. Advoc. v. FERC*, 3 F.4th 461, 465 (D.C. Cir. 2021)).

Substantial evidence requires only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and this standard requires more than a scintilla, but can be satisfied by something less than a preponderance of the evidence." *Del. Riverkeeper Network v. FERC*, 45 F.4th 104, 108 (D.C. Cir. 2022) (cleaned up). Where, as here, the Commission exercises its statutory authority over electricity rates, the Court grants "great deference" to its technical

expertise. *FERC v. Elec. Power Supply Ass'n*, 577 U.S. at 292 (citation omitted). So, too, does the Court "defer to the Commission's interpretations of its own precedents." *Columbia Gas Transmission Corp. v. FERC*, 477 F.3d 739, 743 (D.C. Cir. 2007).

## II. The Commission Appropriately Applied the Cost Causation Principle.

Petitioners are correct that the central legal issue in this case is the proper "level of generality" for ratemaking. Br. 38. They are incorrect, however, as to the level required to assure "just and reasonable" rates. The Commission, agreeing with the Presiding Judge, chose Southwest Zone 10 as the appropriate level of analysis, and that choice made sense against the backdrop of Southwest's license plate rate structure. *See supra* pp. 9–11 (discussing this rate structure). Petitioners demanded, and continue to demand, an extremely taxing "proportionality" analysis specific to each customer's use of each transmission asset. That approach would be unworkable across the Southwest system and would offend Commission policies in favor of integration and fairness. Since neither judicial precedent nor prior Commission orders required this degree of granularity, the Commission reasonably rejected Petitioners' demands. *See Metro. Wash. Airports*

*Auth. Pro. Fire Fighters Ass'n Loc. 3217 v. United States*, 959 F.2d 297, 300 (D.C. Cir. 1992) ("[J]udicial deference is at its highest in reviewing an agency's choice among competing policy considerations, including the choice here of the level of generality at which it will promulgate norms implementing a legislative mandate.") (citation omitted).

**A.    The Commission reasonably applied the cost causation principle to Zone 10 as a whole.**

Analysis at the zone level satisfies the Commission's statutory mandate.  Cost causation does not oblige the Commission to "utilize a particular formula" for rates "or to allocate costs with exacting precision."  *Old Dominion Elec. Coop.*, 898 F.3d at 1260 (cleaned up). Indeed, "[i]t would no doubt be impossible, even if desirable, to formulate a rate scheme with such precision that each customer—or even customer group—is made to bear the exact cost of the service [it] received."  *Ala. Elec. Coop.*, 684 F.2d at 28.  The Commission, instead, need only ensure that costs track benefits "to some degree," *KN Energy, Inc. v. FERC*, 968 F.2d 1295, 1301 (D.C. Cir. 1992), or that "there is 'some resemblance' between costs and benefits," *Long Island Power Auth. v. FERC*, 27 F.4th 705, 715 (D.C. Cir. 2022) (quoting *Pub. Serv. Elec. & Gas Co. v. FERC*, 989 F.3d 10, 13–14 (D.C. Cir. 2022)).  Put

differently, costs must be allocated "'in a manner that is at least roughly commensurate'" with benefits. *Coal. of MISO Transmission Customers v. FERC*, 45 F.4th 1004, 1009 (D.C. Cir. 2022) (quoting *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 53 (D.C. Cir. 2014)).

Here, the Commission articulated a sufficient degree of connection between costs and benefits. Since this proceeding involved placement into a Southwest pricing zone, the Commission understandably took Southwest's "zonal rate construct" as its starting point. Rehearing Order P 17, JA450. That construct allocates transmission costs at the zone-wide or "aggregate level." *Id.*

More specifically, Southwest assigns costs to a customer through that customer's "load ratio share, which reflects its total use of the aggregate [transmission] assets in the zone." *Id.* "Load" is jargon for the demand side of the electricity market, *see, e.g.*, *W. Area Power Admin. v. FERC*, 525 F.3d 40, 45 (D.C. Cir. 2008), so a customer's load reflects the extent to which it uses transmission facilities to pull electricity off the grid. Southwest then allocates the sum costs of the zone's transmission facilities to customers in proportion to the load of each, *i.e.*, on a *pro rata* basis within the zone. *See, e.g.*, Affirming Order

P 3, JA366–67.  This method ensures that customers "receiv[e] roughly commensurate benefits from the transmission assets within the zone as compared to the zonal rates," even if this method does not perfectly track any one customer's use of any one transmission asset.  Rehearing Order P 17, JA450.

This allocation method is especially appropriate in a case like this, where the rate at issue covers "network service."  *Id.* P 17 & n.55, JA450.  As the name suggests, network service allows a customer to order electricity generated anywhere on the transmission network.  *Fla. Mun. Power Agency*, 411 F.3d at 289.  This service takes advantage of the fact that an integrated network of transmission facilities functions as a single system benefitting all connected users.  Affirming Order P 101, JA411; *see also W. Mass. Elec. Co.*, 165 F.3d at 927 ("When a system is integrated, any system enhancements are presumed to benefit the entire system.").  That is why the Commission has consistently opted to "roll" the costs of an integrated network into customer rates on a *pro rata* basis to match the network-wide benefits.  *See, e.g.*, Affirming Order P 101 & n.302, JA411–12; *see also S. Co. Servs., Inc.*, 116 FERC ¶ 61,247 P 17 (2006) ("Rolled-in pricing . . . . spreads the cost of network

facilities across the entire network[.]").  Commission practice has specifically applied load ratio share as a measure of network transmission use, even over attempts to show actual use of individual assets.  *See Nat'l R.R. Passenger Corp.*, 171 FERC ¶ 61,237 P 41 ("[T]he Commission has consistently rejected cost causation arguments made by network customers that sought to lower their load ratio share based on actual use of the transmission system.").

In sum, Southwest's zone structure supplies a proxy for transmission costs and customer usage over a defined geographic area.  Rehearing Order PP 17–18, JA450–51.  The zonal level thus provides at least "some degree" of cost-benefit matching, *KN Energy*, 968 F.2d at 1301, and it does so in a manner recognized by longstanding practice.  The Commission naturally adopted the same level of analysis—namely, all customers for Zone 10.  *See, e.g.*, Rehearing Order P 26, JA456 ("[c]onsidering the full picture of the costs and benefits of the Nixa Assets to all Zone 10 customers"); Affirming Order P 101, JA411 (noting benefits to "customers in Zone 10 and the City of Nixa").

## B.    The Commission reasonably rejected Petitioners' "proportionality" theory.

Petitioners criticize numerous aspects of the Commission's zone-

level analysis. The number of criticisms they raise, however, masks a common foundation for their claims: a recapitulation of the theory Petitioners called "rough proportionality" before the Commission. *See* Rehearing Order P 15, JA449; Affirming Order P 103, JA412. Though semantically framed to resemble cost causation precedent, four defining features of this theory suggest it is a novel, if not radical, departure from current law.

First, Petitioners' theory of "proportionality" examines costs and benefits at the most granular level, that of an individual utility. *See* Rehearing Order PP 15, 17, JA448–50. Second, it demands yet more granularity by assessing the costs and benefits to each utility from each physical transmission facility. *See id.* P 18 & n.58, JA450–51. Third, that assessment is further restricted to consideration only of each utility's direct use of a facility. *See, e.g.*, *id.* P 10, JA445. The fourth feature is implicit but perhaps most important: It operates to protect incumbent utilities. As applied here to a new zonal placement, "proportionality" would allow only those placements that improve the situation of utilities *already integrated* into Zone 10. *See* Affirming Order P 103, JA412. Yet Petitioners' framework would not apply the

same level of granularity to their assets already placed into the zone. *See* Rehearing Order PP 18 n.57, 20 & n.61, JA450–52.

Petitioners have abandoned the label "rough proportionality" before this Court, but most of their arguments claim legal error on the same premise.[6] This continuity is apparent from Petitioners' repeated demand that the City of Nixa, a member of Zone 10, should be excluded from the analysis; that exclusion is an implication of the need to look only to the costs and benefits to individual Petitioners.

For example, Petitioners contend it is "legal error" to "count benefits to Nixa;" only benefits "to others in Zone 10" (and specifically Petitioners) matter. Br. 36; *see also id.* 39 (demanding review by customer and asset). On the cost side of the ledger, "proportionality" becomes evident when Petitioners invoke their 89% cost shift theory,

---

[6] Petitioners have forfeited any other legal theories since their application for Commission rehearing depended on their theory of "rough proportionality." *See Ameren Servs. Co. v. FERC*, 893 F.3d 786, 793 (D.C. Cir. 2018) (Court lacks jurisdiction over arguments not raised with specificity in application for rehearing); *see also* Rehearing Order P 15, JA448–49 (citing Reh'g Req. 2, 8, 10, 14, 16, 19, 22) (explaining that Petitioners claimed on rehearing that rough proportionality is necessary to satisfy cost causation principles); Rehearing Order P 27, JA457 (explaining that Petitioners' rehearing objections to benefits and costs depend on rough proportionality).

which necessarily excludes costs to the City.  *See, e.g.*, *id.* at 31, 34; *see also id.* at 44 (demanding "customer-specific cost allocation").  And Petitioners repeatedly demand that the overall comparison of costs and benefits must occur on a customer- and facility-specific basis.  *See, e.g.*, *id.* at 47 (faulting lack of customer-specific findings); *see also id.* at 58–59 (claiming precedent required cost-benefit analysis for one specific zone member).  Nothing required the Commission to meet any of these demands, and its choice of a zone-level analysis was reasonable.

The Commission rejected Petitioners' hyper-granular reading of cost causation in both the Affirming Order and the Rehearing Order, dedicating most of the latter to that end.  Reading these orders together, the Commission's reasoning can be distilled into three key premises, each of which is well supported by precedent.

*First*, the very fact that the Commission adopted a reasonable framework means that it had no obligation to accept an alternative framework from Petitioners.  *See Ala. Elec. Coop.*, 684 F.2d at 27 ("[C]ourts will not be so presumptuous as to hold unlawful a rate approved by the Commission if, even if not in the court's judgment the 'ideal' design, it is nevertheless within a 'zone of reasonableness.'"); *see*

*also FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021)

(arbitrary-and-capricious standard requires only that agency action "be

reasonable and reasonably explained").

*Second*, the demands of Petitioners' "proportionality" theory

disqualify it in this context. The Commission may "balance . . .

competing policy goals" against cost causation, *Consol. Edison of N.Y.,*

*Inc. v. FERC*, 45 F.4th 265, 288 (D.C. Cir. 2022), and chief among those

are basic "feasibility concerns," *Sithe/Indep. Power Partners, L.P. v.*

*FERC*, 285 F.3d 1, 5 (D.C. Cir. 2002). Here, the Commission had clear,

justifiable concerns about the feasibility of "proportionality."

On its own terms, Petitioners' theory would require first

identifying "every customer" in a zone, then identifying "every

particular transmission asset" in the zone, then determining "how each

asset is used" by each customer, then fashioning a bespoke rate for

every customer-asset pairing "in proportion to [the customer's] usage" of

that asset. Rehearing Order PP 18–19, JA450–51. And Petitioners

would then repeat that process for any "customer group" or "set of

assets" that might seek some collective treatment. *Id.* P 18, JA451.

The result, as the Commission explained, is an unwieldy "number of

permutations," each of which would require extensive work to determine costs and benefits. *Id.* P 18 n.58, JA451.

Consider the 70,000 miles of transmission in the Southwest system. Were that divided into ten-mile segments similar to the Nixa Assets, the Commission would need at least 7,000 rates—before deciding how much each customer across Southwest's 500,000 square-mile footprint used each of those 7,000 assets. Courts have never required such work. *See Ala. Elec. Coop.*, 684 F.2d at 28 (noting the impossibility of "formulat[ing] a rate scheme with such precision that each customer—or even customer group—is made to bear the exact cost of the service [it] received.").

The Commission's concern about the implications of customer-facility-usage matching, Rehearing Order, P 18 n.58, JA451, was enough to reject Petitioners' theory of "proportionality." *See Sithe/Indep. Power Partners*, 285 F.3d at 5 ("feasibility concerns"). Compounding the problem, however, was the plain "inconsisten[cy] with the zonal rate construct in [Southwest]'s Tariff." Rehearing Order P 19, JA451. The current rates "for all of the assets already included in . . . Zone 10" are not broken out by each customer's use of each asset. *Id.*

To require such an exacting standard of matching now "'would unravel'" those rates, *id.* P 18 n.59, JA451 (quoting Sw. Br. Opposing Exceptions 52–53), because many assets—including those of the transmission-owning Petitioners—are located hundreds of miles from customers who help fund those same assets, Sw. Br. Opposing Exceptions 52–53, JA364–65. "[N]o current [Southwest] Transmission Owner has made," or plausibly could make, "a showing" that such assets are used by those customers in exact proportion to their costs. *Id.* at 53. The Commission thus had no obligation to force this sort of wrenching change on Southwest's zonal structure. *See Long Island Power Auth.*, 27 F.4th at 715 ("Nor must a regulator always consider cost-allocation rules on a project-by-project basis" where doing so "would unravel the framework of *ex ante* tariffs" under which rates were approved.).

Even if rough proportionality did not fully unravel the current rate structure for much of the country,[7] it would at least drain that structure of vitality. Adding new assets to a zone becomes "a nearly

---

[7] Customers might challenge current rates through a complaint filed with the Commission under Section 206 of the Federal Power Act. *See, e.g.*, *FirstEnergy Serv. Co. v. FERC*, 758 F.3d 346, 352–53 (D.C. Cir. 2014) (citing 16 U.S.C. § 824e(a)).

impossible task" when customers continue to pay based on their load ratio share. Affirming Order P 103, JA412. No individual asset would have demonstrable benefits proportional to the load ratio share of "all other customers" in the zone. *Id.* The current zones would be frozen in place.

*Third*, Petitioners' "proportionality" theory unfairly singles out the City of Nixa (as well as GridLiance). Rehearing Order P 20, JA452. No other transmission assets had to clear the "rough proportionality" bar when added to Zone 10 (and none could have). *Id.* P 20 & n.62, JA452. Consequently, the City, as a Zone 10 customer, has paid and continues to pay rates "based on the costs of the Zone 10 transmission system as a whole . . . irrespective of whether . . . it benefits from any particular transmission asset within that system." *Id.* P 17 n.56, JA450. In other words, the City has subsidized assets used chiefly, if not exclusively, by the municipal Petitioners. *Id.* P 20, JA450–51. But assets used by the City would face a "more stringent" test for inclusion in zonal rates. *Id.*

That type of treatment might run afoul of the Federal Power Act's anti-discrimination mandate. *See* 16 U.S.C. § 824d(b) (barring "unreasonable difference[s] in rates"); *see also* Initial Decision P 127 &

n.247, JA189 (noting Petitioners' "artificial distinction" to exclude

Nixa); *see also* Ex. SPP-0031 27–29, R.297, JA349–51 (same). At the

least, unfair treatment here "might discourage transmission owners"

like GridLiance "from deciding to participate in" Southwest, Rehearing

Order P 20 & n.61, JA451, and the same would undoubtedly be true for

new network service customers. The zone's borders would become a

moat defending incumbents (or, more precisely, its most economically

powerful incumbents). *See* Initial Decision P 127 & n.247, JA189

(noting potential discrimination concerns); *see also* Ex. SPP-0031 27–29,

JA349–51 (explaining "proportionality" theory's bias in favor of

Petitioners). And that would undermine the Commission's policy

promoting Regional Transmission Organizations for their operational

efficiency and competition benefits. *See* Order 2000, 65 Fed. Reg. at

811. This fairness problem, especially when coupled with the

Commission's wider policy concerns, warranted rejection of Petitioners'

overly demanding "proportionality" standard. *See Consol. Edison Co. of*

*N.Y.*, 45 F.4th at 286 ("Aligning project costs and benefits necessarily

includes questions of fairness and the need to balance 'competing

goals.'") (quoting *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 88 (D.C.

Cir. 2014)).

### C. No Court precedent compelled the Commission to override Southwest's zonal rate structure.

Petitioners claim several judicial precedents require their exacting, granular approach. That claim is based largely on stray quotations. *See, e.g.*, Br. 22 (quoting *Illinois I*, 576 F.3d at 476). But those snippets do not establish a maximally granular view of cost causation. *See Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 373–74 (2023) (Since "opinions dispose of discrete cases and controversies," the "'language of an opinion is not always to be parsed as though we were dealing with language of a statute.'") (quoting *Reiter v. Sonotone*, 442 U.S. 330, 341 (1979)). The reach of these cases is limited by their facts, and those facts did not raise the specific issues here.

#### 1. The Seventh Circuit *Illinois Commerce Commission* cases.

Petitioners contend that the Seventh Circuit's 2009 and 2014 *Illinois Commerce Commission* decisions "rejected" any analysis that did not consider costs and benefits to individual utilities (described as "others in Zone 10" besides the City of Nixa). Br. 36–37 (citing *Illinois II*, 756 F.3d at 564; *Illinois I*, 576 F.3d at 470, 476). As the Commission explained, however, those decisions did not require Petitioners' vision of

"proportionality."  Rehearing Order P 24, JA455; Affirming Order P 103, JA412.  Rather, the Seventh Circuit acknowledged that *pro rata* rate structures can satisfy cost causation.  *See Illinois II*, 756 F.3d at 561 ("We do not suggest that [*pro rata*] postage-stamp pricing is appropriate only for the postal service."); *accord* Rehearing Order P 24 n.77, JA455.

In fact, the Seventh Circuit refused the same sort of customer-, facility-, and usage-specific assessment that Petitioners call for here. *Compare Illinois II*, 756 F.3d at 560 (rejecting the "extreme . . . 'beneficiary pays' approach" based on flows through a transmission facility), *with* Rehearing Order P 15, JA449 (Petitioners "seek to apply an asset-level, beneficiary-pays rough proportionality requirement."). Otherwise, the cost causation principle might force the Commission to calculate benefits to the "last penny." *Illinois I*, 576 F.3d at 477. Unsurprisingly, then, the Seventh Circuit sustained cost allocation based on *pro rata* electricity consumption (like that of the load ratio share here) even where nothing "ensure[d] that *every utility* in [the organization]'s vast region will benefit from *every . . . project*, let alone

in exact proportion" to power consumption. *Illinois III*, 721 F.3d at 774 (emphasis added); *accord* Rehearing Order P 23, JA454.

The Commission further explained that the Seventh Circuit never grappled with a pre-existing zonal rate structure. *See* Rehearing Order P 24, JA455; Affirming Order P 103 & n.305, JA412. That fact alone distinguishes this case from cost allocation "across an entire RTO." Br. 37 (citing *Illinois I*, 576 F.3d at 470, 476); *see Neb. Pub. Power Dist.*, 957 F.3d at 941 (distinguishing *Illinois I* as unrelated to placement "into a specific zone").

That same fact disposes of Petitioners' claim that the Seventh Circuit mandates cost-causation analysis for "all members" of any potential "group." Br. 37 (citing *Illinois II*, 756 F.3d at 564). That court did offer a metaphor in which "suburbanites," some of whom commuted into a neighboring "city," should not bear most of the costs to repair a "major pothole" on city streets. *Illinois II*, 756 F.3d at 564. But this case is about the cost allocation among those already within the administrative structure of the "city," namely, Zone 10. *See* Rehearing Order P 17, JA450 (finding customers' benefits from "total use of the

aggregate assets in the zone" roughly commensurate to their "zonal rates").

The Seventh Circuit did *not* declare that costs must be allocated by each city driver's individual use of each city road. *See Illinois II*, 756 F.3d at 564. That would be as "nearly impossible" as disaggregating Southwest's current zonal rates and replacing them with bespoke rates for every combination of customers and facilities across Southwest. Affirming Order P 103 & n.306, JA412 (citing Southwest Br. Opposing Exceptions 52); *see also* Rehearing Order P 18 & n.58, JA451 ("[W]e cannot see how this could be accomplished short of delineating zones based on how each asset is used, which would effectively eliminate [Southwest]'s zonal rate construct."); *Long Island Power Auth.*, 27 F.4th at 715 ("Nor must a regulator always consider cost-allocation rules on a project-by-project basis, which would unravel the framework of *ex ante* tariffs . . . ."). And, of course, the non-municipal Petitioners never demanded such an exacting analysis when recouping the costs of their own transmission assets. *E.g.*, Rehearing Order P 20 & n.62, JA452. The Commission recognized that changing the rules now would discriminate against new transmission owners and new customers, a

major disincentive to joining Southwest's integrated network. Rehearing Order P 20 & n.61, JA451–52. That "competing policy" concern justifies any putative departure from "perfectly track[ing] cost causation." *Consol. Edison Co. of N.Y.*, 45 F.4th at 288.

2. This Court's *Old Dominion Electric Cooperative* case. At three separate points, Petitioners invoke this Court's decision in *Old Dominion* as a requirement for their customer- and facility-specific test. *See* Br. 40, 44, 61–64. The Commission distinguished that decision on similar grounds to *Illinois Commerce Commission*. First, *Old Dominion* did not mandate anything as exacting as Petitioners' "proportionality" standard. Rehearing Order P 25, JA455; *see also* Affirming Order P 103, JA412. That case instead *restored* partial cost allocation "on a pro rata basis, based on the level of customer demand within each zone, regardless of where the specific project at issue is located." *Old Dominion*, 898 F.3d at 1256 (explaining cost allocation prior to the amendments under review); *see id.* at 1262 ("FERC's reasoning would replace a cost-allocation formula *about which FERC had expressed no concerns* with another one that is less accurate overall"). That allocation resembles the load ratio share method used in Zone 10.

Rehearing Order P 17, JA450. Even if *Old Dominion* did mention some evidence of facility-specific benefits to one customer, *see* Br. 44, 63, its result cannot be squared with the hyper-granular approach Petitioners demand.[8] The Court was instead careful to cabin its holding to the specific facts in that case. Rehearing Order P 25 & n.80, JA455–56 (citing *Old Dominion*, 898 F.3d at 1263–64).

Second, the Commission explained that *Old Dominion* "does not necessarily apply to zonal placement decisions such as this one." Affirming Order P 103, JA412; *see also* Rehearing Order P 25, JA455. Petitioners claim there is "no reason why not." Br. 63. But that reason is obvious from the opinion itself: *Old Dominion* addressed regional or inter-zonal cost allocations, not whether costs had to be finely parsed out within a pre-existing pricing zone. *See* 898 F.3d at 1255 (noting that petitioners' "local zone now must bear the entire cost of these two

---

[8] That inconsistency arises because Petitioners effectively demand more than cost-causation analysis on a "facility" or "asset" level. Br. 63 (cleaned up). No one disputes that the Commission considered the zonal costs and benefits when adding the Nixa facilities to Zone 10— essentially a facility-specific analysis. *E.g.*, Rehearing Order P 17, JA450. But what Petitioners want is a precise tally of costs and benefits from each facility *to each customer* based on that customer's *direct use* of that facility. *See supra* pp. 31–34.

projects"); *see also id.* at 1256 ("The region is subdivided into zones that correspond to areas served by each individual utility."); *accord* Rehearing Order P 25 n.78, JA455; *LSP Transmission Holdings II, LLC v. FERC*, 45 F.4th 979, 995 (D.C. Cir. 2022) ("The crux of our holding in *Old Dominion* . . . [is] that where FERC has found that a category of projects has significant regional benefits, it must permit regional cost-sharing for that category . . . ."). The *Old Dominion* court simply had no occasion to address whether zonal administrative structures had to be upended in favor of a customer- and facility-specific analysis, and any stray language suggesting otherwise does not bind the Commission every time it applies the statutory just-and-reasonable requirement, *see Nat'l Pork Producers Council*, 598 U.S. at 373–74.

3. The Eighth Circuit *Nebraska Public Power District* case.

Petitioners point to language in *Nebraska Public Power District*, claiming that the Eighth Circuit required something more demanding for every zonal placement. *See* Br. 23, 44–45, 57–58, 60. The Commission disagreed. *See* Rehearing Order P 23, JA454 ("[T]he Eighth Circuit . . . upheld a zonal placement decision without requiring a demonstration that the facilities at issue benefitted existing

customers in the zone proportionate to their load ratio share.").  And rightly so.  Nothing in the Eighth Circuit's opinion attempted to disaggregate the costs or benefits by each individual transmission asset scattered over a large region.  *See, e.g.*, *Sw. Power Pool, Inc.*, 163 FERC ¶ 61,109 P 90 (2018) (noting "300 miles of Tri-State transmission lines" in a "service territory of approximately 22,000 square miles across sparsely populated areas").

True, the Eighth Circuit did reference benefits to the party challenging the zonal addition.  *See Neb. Pub. Power Distr.*, 957 F.3d at 939–40.  But those references, to the extent they reveal anything essential to the court's decision, are consistent with zone-level analysis. The Nebraska Public Power District was the "dominant" entity in the existing zone—a description that appears in no other cost-causation decision.  *See id.* at 936; *accord Sw. Power Pool, Inc.*, 166 FERC ¶ 61,019 P 2 (2019); *Sw. Power Pool*, 163 FERC ¶ 61,109 P 1.  In other words, the challenger (including its customer base) effectively *was* the existing zone—there was no equivalent there to the City of Nixa.

Thus, neither the Commission nor the Eighth Circuit needed to distinguish zonal and individual costs or benefits.  *See Neb. Pub. Power*

*Dist.*, 957 F.3d at 941 ("[T]he present case revolves around SPP's placement of Tri-State into a specific zone *with NPPD*.") (emphasis added). But the Commission could not elide that distinction here for one obvious reason: By Petitioners' own account, the benefits of the proposed addition are not distributed with perfect uniformity across Zone 10 members, and there is no one proxy entity for the whole zone. *See, e.g.*, Br. 28 (contending that the City of Nixa will see unique benefits). So, here, the Commission more explicitly assessed costs and benefits at the level of the zone as a whole. *See, e.g.*, Rehearing Order PP 17, 20, JA450, 451–52. This case, in sum, is a much more complicated setting, for which Petitioners' preferred test would require a bewildering number of customer-facility "permutations." *Id.* P 18 n.58, JA451.

### D. Prior agency proceedings did not compel the Commission to override Southwest's zonal rate structure.

Petitioners also point to two past Commission orders to demand customer- and facility-level analysis. The first is the 2018 Complaint Order. *See* Br. 41–44; *see also supra* pp. 11–12 (discussing that order). To Petitioners, that order promised the chance to contest zonal

placements on a case-by-case basis. *Id.* (citing Complaint Order, 162 FERC ¶ 61,213 PP 69, 74). But that is exactly what the Commission did here. *See, e.g.,* Affirming Order P 101, JA411 (evaluating costs and benefits on a case-specific basis). That the Commission relied partly on Southwest's zonal structure does not show otherwise. *See* Br. 42–43 (claiming that reliance on the Tariff amounts to a "shell game"). The Complaint Order indicated only that the Tariff did not preclude proper "case-specific" challenges. Complaint Order, 162 FERC ¶ 61,213 P 74. Petitioners could have demonstrated, for example, that costs and benefits would be grossly disproportionate at the level of the zone as a whole. *See* Rehearing Order P 17, JA450.

But the Complaint Order, like controlling case law, never endorsed Petitioners' extreme theory of customer-, facility-, and use-specific analysis. If anything, that theory runs into the Complaint Order's holding that the Tariff's zonal structure was not *per se* unjust and unreasonable. *Compare* Complaint Order, 162 FERC ¶ 61,213 P 62, *with* Affirming Order P 103, JA412 (zonal placement would be "nearly impossible" to show as just and reasonable under Petitioners' "proportionality" approach).

Nor did the Commission's 2021 Remand Order endorse Petitioners' sub-zonal theory. *See supra* pp. 15–16 (discussing that order). Petitioners point to that order's call for further development of the record. *See* Br. 43–44 (citing Remand Order PP 40–41, JA71–72). Again, though, nowhere did that order require a granular analysis of each customer by its direct use of each facility. To the contrary, the Remand Order explained that potential "benefits to the ARKMO Cities" would not establish a just and reasonable settlement; the Commission instead needed to see that "customers *as a whole within Zone 10* will benefit . . . ." Remand Order P 43, JA72 (emphasis added). That is the same level of analysis the Commission ultimately applied. *See* Rehearing Order P 17, JA450.

## E. No other reason compelled the Commission to override Southwest's zonal rate structure.

Petitioners offer a grab-bag of other reasons why the Commission had to apply a much more particularized matching of costs and benefits. None persuades. They first claim—without citation to legal authority—that Southwest's proposal to add the Nixa Assets implies the need for objections "on that same scope," meaning at the level of "single assets." Br. 39. For starters, Petitioners did not preserve this claim on agency

rehearing, so the Court has no jurisdiction to hear it.  *See, e.g.*, *Consol.*

*Edison of N.Y.*, 45 F.4th at 289 (Court lacks jurisdiction over arguments

not specifically raised on rehearing).  But the claim fails even on its own

merits.

It is not "impossible" to defeat a zonal placement under the

Commission's analysis, Br. 40; the objector can show, if the record

evidence supports it, that the costs of the placement are not roughly

commensurate with its benefits on "an aggregate level," *i.e.*, across the

zone as a whole, Rehearing Order P 17, JA450.  Again, that is how the

Commission posed the test in rejecting settlement.  *See* Remand Order

P 43, JA72 (asking whether "customers as a whole within Zone 10 will

benefit," not whether the "ARKMO Cities" alone benefit).

This test might well be met in other zones, or even when adding

different assets to Zone 10.  But, here, the assets at issue benefit Zone

10, even if they do not benefit individual Petitioners to a particular

degree.  *See infra* pp. 59–66 (discussing substantial evidence of benefits

to Zone 10).

Next, Petitioners assert that the Commission improperly ignored

the option of a new "subzone" specific to the Nixa Assets.  Br. 41.  Yet,

as the Commission explained, there was no such formal subzone proposal before it, and the Federal Power Act does not require the Commission to accept or reject proposed rates based on the possibility of other just and reasonable alternatives. Affirming Order P 115, JA417 (citing, *e.g.*, *Cities of Bethany v. FERC*, 727 F.2d 1131, 1136 (D.C. Cir. 1984)). In any event, the Commission "need not always carve out exceptions for arguably distinct subcategories of projects." *Old Dominion*, 898 F.3d at 1262. The number of "permutations" for customer-asset subzones would be too high. Rehearing Order P 18 & n.58, JA451.

Finally, Petitioners claim "zonal rates are meant to prevent, not cause costs shifts." Br. 45 (citing, *e.g.*, *PJM Interconnection, LLC*, Opinion No. 494, 119 FERC ¶ 61,063 P 42 (2007)). But the law has never held a rate *per se* unjust or unreasonable simply because some cost shifting occurs. *See Neb. Pub. Power Dist.*, 957 F.3d at 938 (noting that "FERC had already approved nine multi-[transmission owner] zones in SPP despite cost shifts"); *see also* Complaint Order, 162 FERC ¶ 61,213 PP 63–66 (citing examples of rates approved despite cost shifts, including *PJM Interconnection, LLC*, Opinion No. 494, 119 FERC

¶ 61,063 (2007)).  What's more, the current structure of Zone 10 shifts some costs of the assets *Petitioners use* onto the City of Nixa and others. *See* Rehearing Order PP 17 n.56, 18 n.58 (citing Southwest Br. Opposing Exceptions 52–53), P 20 & n.62, JA450–52.  Unsurprisingly, then, the Commission concluded that it was not compelled to undo Southwest's entire zonal system to avoid any possible cost shift here. *See* Rehearing Order P 22, JA453 (holding that, even if assets are generally grouped in zones with customers for whom they were constructed, it does not follow that zones are constructed "to ensure that each customer benefits from each asset in the zone in rough proportion to the costs it pays for that specific asset, or that new assets . . . must meet such a requirement").

## III. The Commission Appropriately Assessed the Costs of Placing the Nixa Assets in Zone 10.

The Commission assessed the costs of Southwest's proposal, to Zone 10 as a whole, at $1.8 million; that amount reflects the increase in zonal rates.  *E.g.*, Affirming Order P 29, JA379 (affirming the Presiding Judge's factfinding).  Petitioners raise two complaints about the Commission's view of costs.  Neither has merit.

Petitioners first claim that the Commission adopted a "factual

falsehood" by treating the City of Nixa as a "victim" of higher rates.  Br. 33–34.  To Petitioners, costs include only those borne by Zone 10 customers—except the City itself.[9]  *Id.* at 34.  But the exclusion of the City betrays the lack of any "factual" dispute here.  *Id.*  Petitioners' complaint here is truly about "the legal test," specifically that the Commission did not adopt their exceedingly granular "proportionality" theory.  *Id.* at 35.  This complaint fails, then, for the same reasons as that theory.  *See supra* pp. 31–40.  The Commission reasonably chose to view "the full picture of the costs" to Zone 10.  Rehearing Order P 26, JA456.  That meant including those rates paid by the City.  *See* Affirming Order P 30, JA379 (Because "the City of Nixa is already a Zone 10 customer," excluding its rates "give[s] an incomplete view of the total cost shift amount.").

That the Commission focused on rates, rather than some more amorphous view of costs, is neither a "shellgame" nor "misleading," Br. 35; that focus simply reflects the scope of the Commission's jurisdiction.

---

[9] Petitioners express their preferred cost framing in several ways, *see* Br. 26–27 ("89 percent of the annual total costs," "$1.6 million," "22 percent" rate increase), but each framing depends on the exclusion of rates paid by the City of Nixa.

The Federal Power Act requires just and reasonable "rates," specifically those charged by regulated utilities. 16 U.S.C. § 824d(a). Changes in costs are relevant only to the extent that "the resulting rates" are just and reasonable. *Sw. Power Pool*, 163 FERC ¶ 61,109 P 38; *accord* Remand Order P 38, JA70.

Next, Petitioners flip their critique. Rather than complain that the Commission focused too much on rates, they now complain that it "ignore[d] the evidence of rate impact" to Zone 10. Br. 32. But the Commission did not ignore rate impacts, expressed as a percentage change; it merely chose "not . . . to rely" on percentage changes when it could decide the matter using a "dollar figure." Affirming Order P 32, JA380; *see also* Rehearing Order P 27 n.87, JA457 (sustaining same conclusion). That choice effectively gave Petitioners much of what they want: The $1.8 figure used by the Commission equates to the *impact on rates* for Zone 10. *See, e.g.*, Affirming Order PP 29–30, JA379.

To the extent the two metrics differ, the dollar figure was the more conservative choice—in line with the Commission's earlier views. *See* Remand Order P 41, JA72 (directing the parties to focus on "known and measurable changes"). As the Presiding Judge found, and as

parties argued to the Commission, percentage projections were highly uncertain due to potential increases in the Zone 10 load (over which rates are spread).[10] *See* Initial Decision P 79 & n.133, JA169 (collecting evidence); *see also* Affirming Order P 25, JA377 (citing City Utilities Br. Opposing Exceptions 11, JA359). Even the witnesses cited by Petitioners explained that an increase in customer load might mitigate rate-impact percentages over time. *Compare* Br. 27 (citing Locke and Deters testimony), *with* Tr. 592, R.277, JA78 (The 22% figure "is likely to decline over time" "if load does continue to convert to network service"), *and* Tr. 1785, R.288, JA135 ("So as the load grows the rate impact goes down. But the amount that's shifted goes up . . . That's correct[.]"). At least due to these obvious problems, the Commission deserves "great deference" in its technical measure of rate changes. *FERC v. Elec. Power Supply Ass'n*, 577 U.S. at 292 (citation omitted).

---

[10] These changes were expected because many transmission customers in Zone 10 paid rates set by bilateral contracts, not the Tariff. Southwest anticipated much of that load converting to the Tariff's network service as these contracts expired; doing so would spread the zone's transmission costs over a larger customer base. *See* Affirming Order PP 25–26, JA377–78; *see also* Initial Decision PP 5–6, JA143; Sw. Submission of Tariff Revisions 10–13, JA10–13.

## IV. The Commission Appropriately Assessed the Benefits of Placing the Nixa Assets in Zone 10.

The Commission found extensive benefits to Zone 10 as a whole, including the City of Nixa. *See* Affirming Order PP 64–73, JA394–98. Petitioners incorrectly criticize this finding as entirely confined to benefits to the City of Nixa. They also incorrectly criticize the Commission's benefits finding as lacking substantial evidence.

### A. Petitioners mischaracterize the Commission's assessment of benefits.

Petitioners begin their critique by distorting the Commission's decision. Although they acknowledge that the Commission found benefits to Zone 10 "as a whole," they construe that to "mean[] benefits to Nixa, or at least benefits that rely heavily on the undeniably extensive benefits" to Nixa. Br. 47–48 (citing Affirming Order PP 30, 64–65, 101). That construction is not accurate.

The Commission found, in line with the Presiding Judge, three types of benefits to Zone 10: integration benefits, power-transfer benefits, and reliability benefits. Affirming Order P 64, JA394. The Commission found that these benefits, collectively, were roughly commensurate with the costs of zonal placement. *Id.* P 101, JA411.

But that was "mostly" thanks to "the extensive integration benefits . . . ." *Id.* The "reliability and power transfer benefits" tip the balance further toward a Zone 10 placement, but they are not necessary to justify that result. *See id.* In fact, the integration benefits alone were "extensive" enough to be roughly commensurate with the costs to Zone 10 customers. *Id.* P 102, JA412.

The Commission was clear that integration benefits "do not go entirely to the City of Nixa" but to "all" Zone 10 customers collectively. *Id.* P 68, JA396. That makes sense; integration benefits accrue to multiple users across the network. *See id.* P 101 & n.302, JA411–12. That much is plain from the variety and type of integration benefits present here.

Under the umbrella of "integration," the Commission identified a suite of related benefits arising from Southwest's operational control over the Nixa Assets. *See id.* PP 67–68, JA395–96. These benefits include use by network service customers, *id.* P 67, JA395, an "additional" or redundant "path for power flows that could be used by other customers in Zone 10," *id.*, linking the local and adjacent "balancing authorities" responsible for maintaining regional grid

stability, *id.*, JA395–96, connecting Southwest Zone 10 to the neighboring Zone 3, *id.*, JA396, more effective planning and more reliable operation, *id.*, and better ability to schedule maintenance outages, *id.* P 68, JA396.

In contrast, the Commission found that reliability benefits accrued "specifically to Zone 10 customers," but primarily to the City of Nixa. *Id.* P 69, JA396. The Commission therefore found a "limited," but real, "reliability benefit to the Zone as a whole . . . ." *Id.*

## B. Substantial record evidence supports the benefits of zonal placement.

Perhaps recognizing that the Commission's reasoning did not depend on Nixa-specific benefits, *see* Br. 49 (citing Affirming Order P 68, JA396), Petitioners pivot to challenge the evidentiary basis for the Commission's findings. But benefits here are supported by far more than a "scintilla" of record evidence. *Del. Riverkeeper Network*, 45 F.4th at 108.

Petitioners first challenge the whole group of integration benefits as too "generic." Br. 50 (citing Remand Order P 41, JA72). By their account, the possibility that entities outside Zone 10 might *also* benefit somehow means those in Zone 10 can't or won't. *See* Br. 50-51

(describing the Eastern Interconnection). Yet the Commission, like the Presiding Judge, found these benefits all accrued to Zone 10 specifically. *See* Affirming Order PP 36, 67–68, JA382, JA395–96; Initial Decision PP 124 & n.229, JA186 (collecting testimony). The very nature of the benefits here compelled that finding. *See* Affirming Order P 67, JA395–96 (crediting unique connections made with Zone 10's neighboring balancing authority and pricing zone).

And the evidence supports a nexus to Zone 10, too, sometimes down to individual projects. *See, e.g.*, Ex. SPP-0026 16–17, R.297, JA344–45 (describing the Notice to Construct project in Zone 10). Other evidence is tied to Zone 10 by definition. *See* Tr. 1026–27, R.280, (Tsoukalis) (balancing authority benefits to Zone 10 and neighbors), JA113–14; *see also* Ex. GHP-0234REV at 10, 14, JA262, JA266 (explaining that the Nixa Assets facilitate balancing authority cooperation when Southwestern Power Administration's hydropower output is low). These are sufficiently specific. *See* Remand Order P 41, JA72 (calling for evidence on Zone 10 benefits).

In substance, Petitioners' complaint here is an attempt to smuggle in its "proportionality" theory under the guise of an evidentiary claim.

*Compare* Br. 50 (arguing "benefits must flow to *those* customers," meaning "non-Nixa customers in Zone 10"), *with* Rehearing Order P 27, JA457 (describing same).  This complaint fails, then, for the same reasons as Petitioners' legal theory.  *See supra* pp. 31–40.

Petitioners also challenge the whole group of integration benefits based on "modeling" of power flows, which they characterize as too "small" or immaterial.  Br. 51.  But power flows alone do not capture the whole basket of integration benefits (*e.g.*, planning or maintenance).  *See* Affirming Order PP 67–68, JA395–96.  And while power flows might be germane to direct "use by [Southwest] network . . . customers," Affirming Order P 67, JA395, the Commission did not hang its overall cost-benefit balance on pure power transfers, *see id.* P 101, JA411 (relying "mostly" on other integration benefits rather than "power transfers").

That's not to say flow-related benefits are not real or meaningful. The same witness cited by Petitioners testified that even modest power flows would provide genuine benefits to Zone 10.  *See* Initial Decision P 96, JA176–77 (compiling Tsoukalis testimony of power flows); *id.* PP 126 & n.242, 158, JA188, JA202 (crediting same); *see also* Ex. GHP-

0250 19–20, R.296, JA294–95 (power flows over Nixa Assets could serve "1,000 typical households in Zone 10" beyond Nixa). At the very least, these flows are *typical* for assets already included in Zone 10. *See* Ex. GHP-0250 25–27, JA300–02 (noting higher shift factors than other Zone 10 assets, half of which would fail Petitioners' materiality threshold).

The record also substantiates the redundancy benefits of the Nixa Assets; the Commission described this benefit as an "'additional path for power flows that could be used by other customers in Zone 10.'" Br. 52 (quoting Affirming Order P 67, JA395); *see also* Initial Decision P 100, JA178. Petitioners' own expert pointed to industry standards indicating the Nixa Assets provide redundancy to Zone 10. *See* Ex. GHP-0250 20–21, JA295–96. This redundancy aids Zone 10 customers and the region's balancing authority overseeing grid stability. *See* Tr. 1026–27, R.280, JA113–14. That these benefits might not accrue primarily to the specific Petitioners, Br. 52, does not imply zero benefits to "other customers in Zone 10," Affirming Order P 67, JA395.

Petitioners next fault the Nixa Assets' role in coordinating maintenance activities. Br. 52–53. They claim only a very small chance that the Nixa Assets would prevent a "blackout" in Zone 10, based on

their interpretation of an "N-1-1 contingency" (two-asset outage) analysis.  *See id.*; *see also id.* 28–29.  That claim misconstrues the evidence and the Commission's reasoning.

An N-1-1 contingency is an industry-standard analysis, based on sequential outage of two assets, adopted by Southwest and other regional organizations.[11]  *See* Ex. GHP-0234REV 17–18, JA269–70.  An expert witness found twelve such contingencies in which the Nixa Assets reduce overload on nearby assets.  *Id.* at 19, JA271.  But maintenance scenarios are not limited to true N-1-1 contingencies; the latter merely "illustrate[]" the benefit for a wider class of outages (like those for maintenance of a single asset).  *See id.* at 21, JA273; *see also* Ex. GHP-0250 23, JA298 (planned outages).  Thus, the Commission's finding of a maintenance benefit, Affirming Order P 68, JA396, did not depend on the odds of a sequential loss of two assets, or even a "blackout."  Br. 53.

Petitioners contest planning benefits because the Nixa Assets were not built with the subjective intent to benefit Zone 10.  *Id.*  This

<hr />

[11] *See N.Y. Indep. Sys. Operator, Inc.*, 136 FERC ¶ 61,165 P 6 (2011).

Commission finding, however, depends on *prospective* planning. *See* Affirming Order PP 67–68, JA395–96. Several witnesses testified to this benefit. *See* Ex. GHP-0229 12–14, JA250–52; Tr. 822 (Hooton), R.278, JA93; Tr. 109 (Locke), R.91, JA37; Ex. SPP-0026 18, JA346. The Presiding Judge credited this testimony. *See* Initial Decision PP 123–24, JA186–87. That suffices. *Del. Riverkeeper Network*, 45 F.4th at 108.

Nonetheless, Petitioners contest planning benefits from one project, the Notice to Construct, because it upgraded only the Nixa Assets. Br. 53–54. But because the Nixa Assets were integrated, Southwest was able first to diagnose a problem caused by loss of nearby generation and then avoid less efficient measures to address that problem. Affirming Order P 58, JA391. That illustrates better planning for Zone 10. Affirming Order P 70, JA397. And there was even a second project derived from the Nixa Assets, this time upgrading the Southwestern Power Administration's facilities, that also showed regional planning benefits. *See* Initial Decision P 124 & n.230, JA186 (citing Tr. 903–04, R.280, JA97–98); *see also* Ex. GHP-0029 13–14, JA251–52 (discussing terminal equipment upgrades evincing "specific

regional planning benefits in Zone 10").

Finally, Petitioners blame the Commission's invocation of power transfer benefits, claiming the Commission did not explain its finding. Br. 54 (citing Affirming Order PP 64, 101, JA394, JA411). This criticism simply fails to note the Commission's adoption of the Presiding Judge's finding. *Compare* Affirming Order PP 35, 64 JA381, JA394, *with* Initial Decision PP 125–26, JA187–88; *see also Allegheny Power v. FERC*, 437 F.3d 1215, 1220 (D.C. Cir. 2006) (When the Commission "plainly adopted by reference . . . reasons articulated by the ALJ[,]" that "is enough."). Those benefits are substantiated by the same power-flow analysis Petitioners criticize under integration. *See supra* pp. 61–62.

Petitioners further fault that analysis as showing low percentages relative to the size of some Zone 10 cities. Br. 55. But these are small assets at issue, so comparing their utility to whole cities is misleading. The better metric *for benefits* is the magnitude of the flows, and that shows meaningful results for Zone 10.

The Presiding Judge, in a finding affirmed by the Commission, specifically credited the testimony of the GridLiance witness who translated the technical analysis of flow results into real benefits to

Zone 10 customers.  *See* Initial Decision P 96 & nn.165–66, JA176

(citing Tsoukalis testimony for significant benefits, including "11,500

MWh of power transfers," even for small flow percentages); *see also id.*

P 126 & nn.238, 240, 242, JA188 (citing Ex. GHP-0234REV 6–21, 23,

JA258–73, JA275, and Ex. GHP-0250 1–21, 25–27, JA276–96, 300–02).

For example, if the Nixa Assets support only 0.29% of flows to Zone 10

customers, as the GridLiance expert found in one scenario, that still

equates to "enough power to serve 1,300 homes for a full year."  Ex.

GHP-0234REV 12–13, JA264–65.  And those representative homes

were not confined to the City of Nixa.  *See* Ex. GHP-0250 15–19, JA290–

94 (estimating that the assets serve "as many as 1,000 typical

households" for non-Nixa customers); *see also id.* at 20 (Tsoukalis

analysis shows that even "2.1 MW of power in each hour of the year is

enough to serve as many as 1,700 homes in the ARKMO Cities"),

JA295.

The Commission affirmed the Presiding Judge on the question of

power-transfer benefits, *see* Affirming Order P 64, JA394, and the

Presiding Judge's finding rested on substantial evidence.  That is

enough.  *Del. Riverkeeper Network*, 45 F.4th at 108.

## CONCLUSION

For the reasons above, the petition for review should be denied.

Respectfully submitted,

Matthew R. Christiansen
  General Counsel

Robert H. Solomon
  Solicitor

*/s/ J. Houston Shaner*
J. Houston Shaner
  Attorney

Federal Energy Regulatory
  Commission
Washington, DC 20426
(202) 502-6883
john.shaner@ferc.gov

December 26, 2023

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g) and Circuit Rule 32(e), I certify

that this brief complies with the type-volume limitation of Fed. R. App.

P. 32(a)(7)(B) because this brief contains 12,854 words, excluding the

parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule

32(e)(1).

I further certify that this brief complies with the type-face

requirements of Fed. R. App. P. 32(a)(5) and the type-style

requirements of Fed. R. App. P. 32(a)(6) because this brief has been

prepared in Century Schoolbook 14-point font using Microsoft Office

365.


/s/ *J. Houston Shaner*
J. Houston Shaner
Attorney

Federal Energy Regulatory
  Commission
888 First Street, NE
Washington, DC 20426
(202) 502-6883
john.shaner@ferc.gov

December 26, 2023

# ADDENDUM

# Table of Contents

**Statutes**

Administrative Procedure Act

5 U.S.C. § 706…………………………………………………..………..A1

Federal Power Act

16 U.S.C. § 824d…………………………………………………………...A2

16 U.S.C. § 824e…………………………………………………………...A4

**Regulations**

18 C.F.R. § 35.2 (excerpt)…………………………………………….…A6

to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction. If no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer. Except to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law, agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392; Pub. L. 94–574, §1, Oct. 21, 1976, 90 Stat. 2721.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 1009(b). | June 11, 1946, ch. 324, §10(b), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

Editorial Notes

AMENDMENTS

1976—Pub. L. 94–574 provided that if no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer as defendant.

## § 704. Actions reviewable

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 1009(c). | June 11, 1946, ch. 324, §10(c), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

## § 705. Relief pending review

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 1009(d). | June 11, 1946, ch. 324, §10(d), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

## § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 1009(e). | June 11, 1946, ch. 324, §10(e), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

Statutory Notes and Related Subsidiaries

ABBREVIATION OF RECORD

Pub. L. 85–791, Aug. 28, 1958, 72 Stat. 941, which authorized abbreviation of record on review or enforcement of orders of administrative agencies and review on the original papers, provided, in section 35 thereof,

A1

mental orders in the premises as it may find necessary or appropriate, and may by any such supplemental order modify the provisions of any previous order as to the particular purposes, uses, and extent to which, or the conditions under which, any security so theretofore authorized or the proceeds thereof may be applied, subject always to the requirements of subsection (a) of this section.

**(c) Compliance with order of Commission**

No public utility shall, without the consent of the Commission, apply any security or any proceeds thereof to any purpose not specified in the Commission's order, or supplemental order, or to any purpose in excess of the amount allowed for such purpose in such order, or otherwise in contravention of such order.

**(d) Authorization of capitalization not to exceed amount paid**

The Commission shall not authorize the capitalization of the right to be a corporation or of any franchise, permit, or contract for consolidation, merger, or lease in excess of the amount (exclusive of any tax or annual charge) actually paid as the consideration for such right, franchise, permit, or contract.

**(e) Notes or drafts maturing less than one year after issuance**

Subsection (a) shall not apply to the issue or renewal of, or assumption of liability on, a note or draft maturing not more than one year after the date of such issue, renewal, or assumption of liability, and aggregating (together with all other then outstanding notes and drafts of a maturity of one year or less on which such public utility is primarily or secondarily liable) not more than 5 per centum of the par value of the other securities of the public utility then outstanding. In the case of securities having no par value, the par value for the purpose of this subsection shall be the fair market value as of the date of issue. Within ten days after any such issue, renewal, or assumption of liability, the public utility shall file with the Commission a certificate of notification, in such form as may be prescribed by the Commission, setting forth such matters as the Commission shall by regulation require.

**(f) Public utility securities regulated by State not affected**

The provisions of this section shall not extend to a public utility organized and operating in a State under the laws of which its security issues are regulated by a State commission.

**(g) Guarantee or obligation on part of United States**

Nothing in this section shall be construed to imply any guarantee or obligation on the part of the United States in respect of any securities to which the provisions of this section relate.

**(h) Filing duplicate reports with the Securities and Exchange Commission**

Any public utility whose security issues are approved by the Commission under this section may file with the Securities and Exchange Commission duplicate copies of reports filed with the Federal Power Commission in lieu of the reports, information, and documents required under sections 77g, 78l, and 78m of title 15.

(June 10, 1920, ch. 285, pt. II, § 204, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 850.)

### Executive Documents

#### TRANSFER OF FUNCTIONS

Executive and administrative functions of Securities and Exchange Commission, with certain exceptions, transferred to Chairman of such Commission, with authority vested in him to authorize their performance by any officer, employee, or administrative unit under his jurisdiction, by Reorg. Plan No. 10 of 1950, §§1, 2, eff. May 24, 1950, 15 F.R. 3175, 64 Stat. 1265, set out in the Appendix to Title 5, Government Organization and Employees.

## § 824d. Rates and charges; schedules; suspension of new rates; automatic adjustment clauses

**(a) Just and reasonable rates**

All rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful.

**(b) Preference or advantage unlawful**

No public utility shall, with respect to any transmission or sale subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.

**(c) Schedules**

Under such rules and regulations as the Commission may prescribe, every public utility shall file with the Commission, within such time and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services.

**(d) Notice required for rate changes**

Unless the Commission otherwise orders, no change shall be made by any public utility in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after sixty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. The Commission, for good cause shown, may allow changes to take effect without requiring the sixty days' notice herein pro-

vided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.

**(e) Suspension of new rates; hearings; five-month period**

Whenever any such new schedule is filed the Commission shall have authority, either upon complaint or upon its own initiative without complaint, at once, and, if it so orders, without answer or formal pleading by the public utility, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the public utility affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect; and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made at the expiration of such five months, the proposed change of rate, charge, classification, or service shall go into effect at the end of such period, but in case of a proposed increased rate or charge, the Commission may by order require the interested public utility or public utilities to keep accurate account in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require such public utility or public utilities to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such increased rates or charges as by its decision shall be found not justified. At any time involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the public utility, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible.

**(f) Review of automatic adjustment clauses and public utility practices; action by Commission; "automatic adjustment clause" defined**

(1) Not later than 2 years after November 9, 1978, and not less often than every 4 years thereafter, the Commission shall make a thorough review of automatic adjustment clauses in public utility rate schedules to examine—

(A) whether or not each such clause effectively provides incentives for efficient use of resources (including economical purchase and use of fuel and electric energy), and

(B) whether any such clause reflects any costs other than costs which are—

(i) subject to periodic fluctuations and

(ii) not susceptible to precise determinations in rate cases prior to the time such costs are incurred.

Such review may take place in individual rate proceedings or in generic or other separate proceedings applicable to one or more utilities.

(2) Not less frequently than every 2 years, in rate proceedings or in generic or other separate proceedings, the Commission shall review, with respect to each public utility, practices under any automatic adjustment clauses of such utility to insure efficient use of resources (including economical purchase and use of fuel and electric energy) under such clauses.

(3) The Commission may, on its own motion or upon complaint, after an opportunity for an evidentiary hearing, order a public utility to—

(A) modify the terms and provisions of any automatic adjustment clause, or

(B) cease any practice in connection with the clause,

if such clause or practice does not result in the economical purchase and use of fuel, electric energy, or other items, the cost of which is included in any rate schedule under an automatic adjustment clause.

(4) As used in this subsection, the term "automatic adjustment clause" means a provision of a rate schedule which provides for increases or decreases (or both), without prior hearing, in rates reflecting increases or decreases (or both) in costs incurred by an electric utility. Such term does not include any rate which takes effect subject to refund and subject to a later determination of the appropriate amount of such rate.

**(g) Inaction of Commissioners**

**(1) In general**

With respect to a change described in subsection (d), if the Commission permits the 60-day period established therein to expire without issuing an order accepting or denying the change because the Commissioners are divided two against two as to the lawfulness of the change, as a result of vacancy, incapacity, or recusal on the Commission, or if the Commission lacks a quorum—

(A) the failure to issue an order accepting or denying the change by the Commission shall be considered to be an order issued by the Commission accepting the change for purposes of section 825*l*(a) of this title; and

(B) each Commissioner shall add to the record of the Commission a written statement explaining the views of the Commissioner with respect to the change.

**(2) Appeal**

If, pursuant to this subsection, a person seeks a rehearing under section 825*l* of this title, and the Commission fails to act on the merits of the rehearing request by the date that is 30 days after the date of the rehearing request because the Commissioners are divided two against two, as a result of vacancy, incapacity, or recusal on the Commission, or if the Commission lacks a quorum, such person may appeal under section 825*l*(b) of this title.

(June 10, 1920, ch. 285, pt. II, § 205, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 851; amended Pub. L. 95–617, title II, §§ 207(a), 208, Nov. 9, 1978, 92 Stat. 3142; Pub. L. 115–270, title III, § 3006, Oct. 23, 2018, 132 Stat. 3868.)

Editorial Notes

AMENDMENTS

2018—Subsec. (g). Pub. L. 115–270 added subsec. (g).
1978—Subsec. (d). Pub. L. 95–617, §207(a), substituted "sixty" for "thirty" in two places.
Subsec. (f). Pub. L. 95–617, §208, added subsec. (f).

**Statutory Notes and Related Subsidiaries**

STUDY OF ELECTRIC RATE INCREASES UNDER FEDERAL POWER ACT

Section 207(b) of Pub. L. 95–617 directed chairman of Federal Energy Regulatory Commission, in consultation with Secretary, to conduct a study of legal requirements and administrative procedures involved in consideration and resolution of proposed wholesale electric rate increases under Federal Power Act, section 791a et seq. of this title, for purposes of providing for expeditious handling of hearings consistent with due process, preventing imposition of successive rate increases before they have been determined by Commission to be just and reasonable and otherwise lawful, and improving procedures designed to prohibit anticompetitive or unreasonable differences in wholesale and retail rates, or both, and that chairman report to Congress within nine months from Nov. 9, 1978, on results of study, on administrative actions taken as a result of this study, and on any recommendations for changes in existing law that will aid purposes of this section.

## § 824e. Power of Commission to fix rates and charges; determination of cost of production or transmission

**(a) Unjust or preferential rates, etc.; statement of reasons for changes; hearing; specification of issues**

Whenever the Commission, after a hearing held upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order. Any complaint or motion of the Commission to initiate a proceeding under this section shall state the change or changes to be made in the rate, charge, classification, rule, regulation, practice, or contract then in force, and the reasons for any proposed change or changes therein. If, after review of any motion or complaint and answer, the Commission shall decide to hold a hearing, it shall fix by order the time and place of such hearing and shall specify the issues to be adjudicated.

**(b) Refund effective date; preferential proceedings; statement of reasons for delay; burden of proof; scope of refund order; refund orders in cases of dilatory behavior; interest**

Whenever the Commission institutes a proceeding under this section, the Commission shall establish a refund effective date. In the case of a proceeding instituted on complaint, the refund effective date shall not be earlier than the date of the filing of such complaint nor later than 5 months after the filing of such complaint. In the case of a proceeding instituted by the Commission on its own motion, the refund effective date shall not be earlier than the date of the publication by the Commission of notice of its intention to initiate such proceeding nor later than 5 months after the publication date. Upon institution of a proceeding under this section, the Commission shall give to the decision of such proceeding the same preference as provided under section 824d of this title and otherwise act as speedily as possible. If no final decision is rendered by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision. In any proceeding under this section, the burden of proof to show that any rate, charge, classification, rule, regulation, practice, or contract is unjust, unreasonable, unduly discriminatory, or preferential shall be upon the Commission or the complainant. At the conclusion of any proceeding under this section, the Commission may order refunds of any amounts paid, for the period subsequent to the refund effective date through a date fifteen months after such refund effective date, in excess of those which would have been paid under the just and reasonable rate, charge, classification, rule, regulation, practice, or contract which the Commission orders to be thereafter observed and in force: *Provided*, That if the proceeding is not concluded within fifteen months after the refund effective date and if the Commission determines at the conclusion of the proceeding that the proceeding was not resolved within the fifteen-month period primarily because of dilatory behavior by the public utility, the Commission may order refunds of any or all amounts paid for the period subsequent to the refund effective date and prior to the conclusion of the proceeding. The refunds shall be made, with interest, to those persons who have paid those rates or charges which are the subject of the proceeding.

**(c) Refund considerations; shifting costs; reduction in revenues; "electric utility companies" and "registered holding company" defined**

Notwithstanding subsection (b), in a proceeding commenced under this section involving two or more electric utility companies of a registered holding company, refunds which might otherwise be payable under subsection (b) shall not be ordered to the extent that such refunds would result from any portion of a Commission order that (1) requires a decrease in system production or transmission costs to be paid by one or more of such electric companies; and (2) is based upon a determination that the amount of such decrease should be paid through an increase in the costs to be paid by other electric utility companies of such registered holding company: *Provided*, That refunds, in whole or in part, may be ordered by the Commission if it determines that the registered holding company would not experience any reduction in revenues which results from an inability of an electric

utility company of the holding company to recover such increase in costs for the period between the refund effective date and the effective date of the Commission's order. For purposes of this subsection, the terms ''electric utility companies'' and ''registered holding company'' shall have the same meanings as provided in the Public Utility Holding Company Act of 1935, as amended.[1]

**(d) Investigation of costs**

The Commission upon its own motion, or upon the request of any State commission whenever it can do so without prejudice to the efficient and proper conduct of its affairs, may investigate and determine the cost of the production or transmission of electric energy by means of facilities under the jurisdiction of the Commission in cases where the Commission has no authority to establish a rate governing the sale of such energy.

**(e) Short-term sales**

(1) In this subsection:

(A) The term ''short-term sale'' means an agreement for the sale of electric energy at wholesale in interstate commerce that is for a period of 31 days or less (excluding monthly contracts subject to automatic renewal).

(B) The term ''applicable Commission rule'' means a Commission rule applicable to sales at wholesale by public utilities that the Commission determines after notice and comment should also be applicable to entities subject to this subsection.

(2) If an entity described in section 824(f) of this title voluntarily makes a short-term sale of electric energy through an organized market in which the rates for the sale are established by Commission-approved tariff (rather than by contract) and the sale violates the terms of the tariff or applicable Commission rules in effect at the time of the sale, the entity shall be subject to the refund authority of the Commission under this section with respect to the violation.

(3) This section shall not apply to—

(A) any entity that sells in total (including affiliates of the entity) less than 8,000,000 megawatt hours of electricity per year; or

(B) an electric cooperative.

(4)(A) The Commission shall have refund authority under paragraph (2) with respect to a voluntary short term sale of electric energy by the Bonneville Power Administration only if the sale is at an unjust and unreasonable rate.

(B) The Commission may order a refund under subparagraph (A) only for short-term sales made by the Bonneville Power Administration at rates that are higher than the highest just and reasonable rate charged by any other entity for a short-term sale of electric energy in the same geographic market for the same, or most nearly comparable, period as the sale by the Bonneville Power Administration.

(C) In the case of any Federal power marketing agency or the Tennessee Valley Authority, the Commission shall not assert or exercise any regulatory authority or power under paragraph (2) other than the ordering of refunds to achieve a just and reasonable rate.

(June 10, 1920, ch. 285, pt. II, §206, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 852; amended Pub. L. 100–473, §2, Oct. 6, 1988, 102 Stat. 2299; Pub. L. 109–58, title XII, §§1285, 1286, 1295(b), Aug. 8, 2005, 119 Stat. 980, 981, 985.)

EDITORIAL NOTES

REFERENCES IN TEXT

The Public Utility Holding Company Act of 1935, referred to in subsec. (c), is title I of act Aug. 26, 1935, ch. 687, 49 Stat. 803, as amended, which was classified generally to chapter 2C (§79 et seq.) of Title 15, Commerce and Trade, prior to repeal by Pub. L. 109–58, title XII, §1263, Aug. 8, 2005, 119 Stat. 974. For complete classification of this Act to the Code, see Tables.

AMENDMENTS

2005—Subsec. (a). Pub. L. 109–58, §1295(b)(1), substituted ''hearing held'' for ''hearing had'' in first sentence.

Subsec. (b). Pub. L. 109–58, §1295(b)(2), struck out ''the public utility to make'' before ''refunds of any amounts paid'' in seventh sentence.

Pub. L. 109–58, §1285, in second sentence, substituted ''the date of the filing of such complaint nor later than 5 months after the filing of such complaint'' for ''the date 60 days after the filing of such complaint nor later than 5 months after the expiration of such 60-day period'', in third sentence, substituted ''the date of the publication'' for ''the date 60 days after the publication'' and ''5 months after the publication date'' for ''5 months after the expiration of such 60-day period'', and in fifth sentence, substituted ''If no final decision is rendered by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision'' for ''If no final decision is rendered by the refund effective date or by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, whichever is earlier, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision''.

Subsec. (e). Pub. L. 109–58, §1286, added subsec. (e).

1988—Subsec. (a). Pub. L. 100–473, §2(1), inserted provisions for a statement of reasons for listed changes, hearings, and specification of issues.

Subsecs. (b) to (d). Pub. L. 100–473, §2(2), added subsecs. (b) and (c) and redesignated former subsec. (b) as (d).

STATUTORY NOTES AND RELATED SUBSIDIARIES

EFFECTIVE DATE OF 1988 AMENDMENT

Pub. L. 100–473, §4, Oct. 6, 1988, 102 Stat. 2300, provided that: ''The amendments made by this Act [amending this section] are not applicable to complaints filed or motions initiated before the date of enactment of this Act [Oct. 6, 1988] pursuant to section 206 of the Federal Power Act [this section]: *Provided, however,* That such complaints may be withdrawn and refiled without prejudice.''

LIMITATION ON AUTHORITY PROVIDED

Pub. L. 100–473, §3, Oct. 6, 1988, 102 Stat. 2300, provided that: ''Nothing in subsection (c) of section 206 of the Federal Power Act, as amended (16 U.S.C. 824c(c)) shall be interpreted to confer upon the Federal Energy Regulatory Commission any authority not granted to it elsewhere in such Act [16 U.S.C. 791a et seq.] to issue an order that (1) requires a decrease in system production or transmission costs to be paid by one or more electric utility companies of a registered holding company; and (2) is based upon a determination that the amount of such decrease should be paid through an increase in the

---

[1] See References in Text note below.

schedule to unilaterally make application to the Federal Energy Regulatory Commission for a change in rates under section 205 of the Federal Power Act and pursuant to the Commission's Rules and Regulations promulgated thereunder.

(3) Rate schedules, tariffs or service agreements covered by the terms of paragraph (d)(1) of this section shall contain the following provision when it is the intent of the contracting parties to withhold from the party furnishing service the right to file any unilateral rate changes under section 205 of the Federal Power Act:

The rates for service specified herein shall remain in effect for the term of _____ or until _____, and shall not be subject to change through application to the Federal Energy Regulatory Commission pursuant to the provisions of Section 205 of the Federal Power Act absent the agreement of all parties thereto.

(4) Rate schedules covered by the terms of paragraph (d)(1) of this section, but which are not covered by paragraphs (d)(2) or (d)(3) of this section, are not required to contain either of the boilerplate provisions set forth in paragraph (d)(2) or (d)(3) of this section.

(e) No public utility shall, directly or indirectly, demand, charge, collect or receive any rate, charge or compensation for or in connection with electric service subject to the jurisdiction of the Commission, or impose any classification, practice, rule, regulation or contract with respect thereto, which is different from that provided in a rate schedule required to be on file with this Commission unless otherwise specifically provided by order of the Commission for good cause shown.

(f) A rate schedule applicable to the sale of electric power by a public utility to the Bonneville Power Administration under section 5(c) of the Pacific Northwest Electric Power Planning and Conservation Act (Pub. L. No. 96–501 (1980)) shall be filed in accordance with subpart D of this part.

(g) For the purposes of paragraph (a) of this section, any service agreement that conforms to the form of service agreement that is part of the public utility's approved tariff pursuant to §35.10a of this chapter and any market-based rate service agreement pursuant to a tariff shall not be filed with the Commission. All agreements must, however, be retained and be made available for public inspection and copying at the public utility's business office during regular business hours and provided to the Commission or members of the public upon request. Any individually executed service agreement for transmission, cost-based power sales, or other generally applicable services that deviates in any material respect from the applicable form of service agreement contained in the public utility's tariff and all unexecuted agreements under which service will commence at the request of the customer, are subject to the filing requirements of this part.

[Order 271, 28 FR 10573, Oct. 2, 1963, as amended by Order 541, 40 FR 56425, Dec. 3, 1975; Order 541–A, 41 FR 27831, July 7, 1976; 46 FR 50520, Oct. 14, 1981; Order 337, 48 FR 46976, Oct. 17, 1983; Order 541, 57 FR 21734, May 22, 1992; Order 2001, 67 FR 31069, May 8, 2002; Order 714, 73 FR 57530, 57533, Oct. 3, 2008; 74 FR 55770, Oct. 29, 2009]

§ 35.2  Definitions.

(a) *Electric service.* The term *electric service* as used herein shall mean the transmission of electric energy in interstate commerce or the sale of electric energy at wholesale for resale in interstate commerce, and may be comprised of various classes of capacity and energy sales and/or transmission services. *Electric service* shall include the utilization of facilities owned or operated by any public utility to effect any of the foregoing sales or services whether by leasing or other arrangements. As defined herein, *electric service* is without regard to the form of payment or compensation for the sales or services rendered whether by purchase and sale, interchange, exchange, wheeling charge, facilities charge, rental or otherwise.

(b) *Rate schedule.* The term *rate schedule* as used herein shall mean a statement of (1) electric service as defined in paragraph (a) of this section, (2) rates and charges for or in connection with that service, and (3) all classifications, practices, rules, or regulations which in any manner affect or relate to the aforementioned service, rates, and charges. This statement shall be in

288

writing and may take the physical form of a contract, purchase or sale or other agreement, lease of facilities, or other writing. Any oral agreement or understanding forming a part of such statement shall be reduced to writing and made a part thereof. A rate schedule is designated with a Rate Schedule number.

(c)(1) *Tariff.* The term *tariff* as used herein shall mean a statement of (1) electric service as defined in paragraph (a) of this section offered on a generally applicable basis, (2) rates and charges for or in connection with that service, and (3) all classifications, practices, rules, or regulations which in any manner affect or relate to the aforementioned service, rates, and charges. This statement shall be in writing. Any oral agreement or understanding forming a part of such statement shall be reduced to writing and made a part thereof. A tariff is designated with a Tariff Volume number.

(2) *Service agreement.* The term *service agreement* as used herein shall mean an agreement that authorizes a customer to take electric service under the terms of a tariff. A service agreement shall be in writing. Any oral agreement or understanding forming a part of such statement shall be reduced to writing and made a part thereof. A service agreement is designated with a Service Agreement number.

(d) *Filing date.* The term *filing date* as used herein shall mean the date on which a rate schedule, tariff or service agreement filing is completed by the receipt in the office of the Secretary of all supporting cost and other data required to be filed in compliance with the requirements of this part, unless such rate schedule is rejected as provided in §35.5. If the material submitted is found to be incomplete, the Director of the Office of Energy Market Regulation will so notify the filing utility within 60 days of the receipt of the submittal.

(e) *Posting* (1) The term posting as used in this part shall mean:

(i) Keeping a copy of every rate schedule, service agreement, or tariff of a public utility as currently on file, or as tendered for filing, with the Commission open and available during regular business hours for public inspec-

tion in a convenient form and place at the public utility's principal and district or division offices in the territory served, and/or accessible in electronic format, and

(ii) Serving each purchaser under a rate schedule, service agreement, or tariff either electronically or by mail in accordance with the service regulations in Part 385 of this chapter with a copy of the rate schedule, service agreement, or tariff. Posting shall include, in the event of the filing of increased rates or charges, serving either electronically or by mail in accordance with the service regulations in Part 385 of this chapter each purchaser under a rate schedule, service agreement or tariff proposed to be changed and to each State Commission within whose jurisdiction such purchaser or purchasers distribute and sell electric energy at retail, a copy of the rate schedule, service agreement or tariff showing such increased rates or charges, comparative billing data as required under this part, and, if requested by a purchaser or State Commission, a copy of the supporting data required to be submitted to this Commission under this part. Upon direction of the Secretary, the public utility shall serve copies of rate schedules, service agreements, or tariffs, and supplementary data, upon designated parties other than those specified herein.

(2) Unless it seeks a waiver of electronic service, each customer, State Commission, or other party entitled to service under this paragraph (e) must notify the public utility of the e-mail address to which service should be directed. A customer, State Commission, or other party may seek a waiver of electronic service by filing a waiver request under Part 390 of this chapter providing good cause for its inability to accept electronic service.

(f) *Effective date.* As used herein the *effective date* of a rate schedule, tariff or service agreement shall mean the date on which a rate schedule filed and posted pursuant to the requirements of this part is permitted by the Commission to become effective as a filed rate schedule. The effective date shall be 60 days after the filing date, or such other date as may be specified by the Commission.

**CERTIFICATE OF SERVICE**

I hereby certify that, on December 26, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ *J. Houston Shaner*
J. Houston Shaner
Attorney

Federal Energy Regulatory
  Commission
888 First Street, NE
Washington, DC 20426
(202) 502-6883
john.shaner@ferc.gov

December 26, 2023